UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
LAWRENCE HARDY, RAMONE CROSS, and           :
SHAWN SMITH, individually and on behalf of all others
similarly situated,                                          :
                                    Plaintiffs,
                                                             :
            -against-                                        :        08 Civ. 2460 (SHS)

BRIAN FISCHER, in his capacity as Commissioner of the  :
New York State Department of Correctional Services
(DOCS), and in his individual capacity; ANTHONY J.    :        **DECLARATION**
ANNUCCI, in his capacity as Deputy Commissioner and
Counsel for DOCS, and in his individual capacity;     :
LUCIEN J. LECLAIRE, JR., former Acting Commissioner
of DOCS in his individual capacity; GLENN S. GOORD,   :
FORMER Commissioner of DOCS, in his individual
capacity; and JOHN/JANE DOES 1-50  (DOCS             :
Supervisory, Training, and Policy Personnel),
                                                             :
                                    Defendants.
------------------------------------------------------------------------X

        MICHAEL J. KEANE, pursuant to 28 U.S.C. § 1746, declares under penalty of

perjury as follows:

        1. I am an Assistant Attorney General in the office of ANDREW M. CUOMO,

Attorney General of the State of New York, attorney for defendants herein.  I submit this

declaration in support of state defendants' application that the Court abstain in above-referenced

action and dismiss the amended complaint.

        2. Attached hereto as Exhibit A is a copy of New York State Senate Bill S8714

(Assembly Bill A 11764), the Governor's Program Bill #73R, with attached Revised

Memorandum from the Executive Chamber, as well as both the New York State Senate

Introducer's Memorandum In Support and the New York State Assembly Memorandum In

Support of Legislation.  The Bill became effective on June 30, 2008.

3.  Attached hereto as Exhibit B is a copy of a Memorandum distributed within the Legal Aid Society in August 1998 regarding Jenna's Law and Post-release Supervision.

4.  Attached hereto as Exhibit C is a copy of the Affirmation of Anthony J. Annucci, dated June 4, 2008, and filed in the Supreme Court of the State of New York, County of Albany, in an action captioned The State of New York, The New York State Department of Correctional Services and The New York State Division of Parole v. Michael Myers, Roger Smalls, Jesus Negron and Malcolm Carter, individually and on behalf of all others similarly situated (Index No. 4834-08).

5.  Attached hereto as Exhibit D are transcripts of the proceedings hearing applications for a Temporary Restraining Order on June 6, 2008 and for a Preliminary Injunction on June 20, 2008 before the Hon. John C. Egan, Jr., Supreme Court Justice, Supreme Court of the State of New York, County of Albany, in an action captioned The State of New York, The New York State Department of Correctional Services and The New York State Division of Parole v. Michael Myers, Roger Smalls, Jesus Negron and Malcolm Carter, individually and on behalf of all others similarly situated (Index No. 4834-08).  Specifically referenced in the accompanying Memorandum of Law is the June 20, 2008 testimony of Denise O'Donnell, Commissioner of the New York State Division of Criminal Justice Services (June 20, 2008 transcript, pp. 41-69).

6.  Attached hereto as Exhibit E is a copy of the complaint filed in the United States District Court for the Southern District of New York, in an action captioned Messiah S., et al., v. Alexander (Docket No. 07-CV-1327 (MGC)(FM)).

7.  Attached hereto as Exhibit F is a copy of the Affirmation of Terrence X. Tracy, dated June 4, 2008, and filed in the Supreme Court of the State of New York, County of Albany, in an action captioned <u>The State of New York, The New York State Department of Correctional Services and The New York State Division of Parole v. Michael Myers, Roger Smalls, Jesus Negron and Malcolm Carter, individually and on behalf of all others similarly situated</u> (Index No. 4834-08).

8.  Attached hereto as Exhibit G is a copy of an E-mail from Matthew D. Brinckerhoff, dated June 4, 2008, to the Office of the Attorney General of the State of New York, regarding an action captioned <u>The State of New York, The New York State Department of Correctional Services and The New York State Division of Parole v. Michael Myers, Roger Smalls, Jesus Negron and Malcolm Carter, individually and on behalf of all others similarly situated</u> (Index No. 4834-08).

Dated: New York, New York
       July 7, 2008

                                        _____/s_____

_____        Michael J. Keane
                                        Assistant Attorney General
                                        Office of the Attorney General
                                        of the State of New York
                                        120 Broadway
                                        New York, New York 10271
                                        (212) 416-8550

GOVERNOR'S PROGRAM BILL

**PROGRAM BILL #73R**
**REVISED**

2008

### MEMORANDUM

AN ACT      to amend the criminal procedure law, the penal law, the correction law and the county law, in relation to post-release supervision

#### Purpose:

This bill provides a framework for a prompt, fair, and careful response to recent decisions in which the Court of Appeals struck down longstanding practices for determining the supervision terms of violent felons.

#### Summary of Provisions:

Sections 1 and 1-a of the bill amend Criminal Procedure Law §380.70 to specify that it is the court that is responsible for delivery of sentencing minutes to the Department of Correctional Services ("DOCS").

Section 2 of the bill adds a new §70.85 to the Penal Law to apply to certain cases in which determinate sentences were imposed between 1998 and 2008, and in which the sentencing court failed to explicitly state that a term of post-release supervision ("PRS") was being imposed. The bill allows a re-sentencing court, on consent of the district attorney, to impose the originally imposed determinate sentence without any period of PRS.

Section 3 of the bill amends Penal Law §70.45(1) to modify procedural provisions for determinate sentences to be imposed in the future. It replaces a provision that such sentences automatically include supervision terms with one that requires courts to state such terms explicitly in the course of pronouncing sentence.

Section 4 of the bill amends Correction Law §601-a to expand the duty of DOCS to facilitate re-sentencing of inmates whose original sentence was unlawful.

Section 5 of the bill adds a new Correction Law §601-d that applies to cases possibly in need of resentencing because the term of PRS may not have been pronounced by the court. It provides an orderly procedure for bringing such cases to the attention of the court, ensuring their prompt resolution, and directing DOCS and the Division of Parole ("Parole") to take appropriate steps in light of court proceedings. In particular, the new Correction Law §601-d includes the following subdivisions:

- Subdivision 1 defines "designated person" to mean an inmate sentenced to a determinate sentence that was required to include a term of PRS, but for whom the sentencing papers suggest that the required term may not have been pronounced at sentencing.

- Subdivision 2 requires DOCS and Parole to give notice of such designated persons to the criminal courts that originally sentenced them. Rather than set strict timelines within which the agencies must complete the process of review and notification, it allows them to conduct a prompt but orderly review, prioritized for different groups according to the relative needs, and urgency of review, as to each group.

- Subdivision 3 provides that when a sentencing court that has received such notice learns that a term of PRS was actually pronounced at the sentence, the court shall send the relevant information, including a superseding commitment order, to the parties.

- Subdivision 4 requires the sentencing court to appoint counsel for the defendant, obtain necessary information, and schedule proceedings to consider re-sentencing. Courts are required to issue written orders within 40 days of receiving the notice, unless additional time is allowed on the consent of the defendant, or, when there are extraordinary circumstances, in 10-day extensions on the motion of the district attorney.

- Subdivision 5 provides for the parties to be notified of the court's decision.

- Subdivision 6 provides that when the court does not re-sentence the defendant within the statutorily allowed time, the records of DOCS and Parole shall reflect that a term of PRS has not been imposed.

- Subdivisions 7 and 8 relate to whether remedies in the bill are exclusive, and preserve the ability of defendants to seek relief in other kinds of actions.

Section 6 of the bill amends Correction Law §722 to provide for assigned counsel to assist defendants in re-sentencing proceedings.

Section 7 of the bill authorizes the Office of Court Administration to promulgate regulations for the fair and expeditious consideration of re-sentencing cases.

Section 8 of the bill sets out the severability clause.

Section 9 of the bill sets forth an immediate effective date.

**Existing Law:**

      Criminal Procedure Law §380.20 provides that the court must pronounce sentence in every case where a conviction is entered.

      Penal Law §70/45(1) provides that each determinate sentence "also includes, as a part thereof, an additional period of post-release supervision."

**Statement in Support:**

      In 1998, the New York State Legislature enacted Jenna's Law, which was named for Jenna Grieshaber, a twenty-two-year-old nursing student who was murdered by a violent felon released from prison after serving only two-thirds of his sentence. Jenna's Law amended the Penal Law to end "indeterminate sentences" – i.e., sentences running between certain minimum and maximum periods set by the court at the time of sentencing – for criminal defendants convicted of violent felonies. Instead, Jenna's Law required "determinate" sentences, and also created a schedule of mandatory terms of PRS to be included as a part of the determinate sentences of violent felony offenders.

      In many cases, judges informed defendants, at the time of sentencing, that they would be subject to a period of PRS following completion of their determinate sentence; in other cases, they did not, and DOCS simply included the PRS pursuant to the terms of the Penal Law. Over time, offenders challenged DOCS's calculation of PRS as part of their determinate sentence, and courts throughout the State were split on this legal issue – with some finding that PRS automatically was a part of the sentence by operation of law, and others finding PRS had to be expressly imposed by the sentencing court.

      On April 29, 2008, the New York State Court of Appeals issued two decisions (Matter of Garner v. DOCS and People v. Sparber) that finally resolved some of the legal issues associated with the imposition of PRS. Most notably, the Court ruled that only the sentencing judge has the authority to impose the PRS component of an offender's determinate sentence, and that the period of PRS must be stated by the judge at the time of sentencing in the offender's presence. The Court in Garner also ruled, however, that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

      Since then, DOCS and Parole have undertaken major initiatives to bring the relevant cases to the attention of the sentencing courts, so that those courts can make decisions about re-sentencings. The initiatives have already had some success in arriving at resolution of individual cases, but it has become clear that it would be hard to reach resolutions of all the relevant cases through such initiatives alone.

This bill provides a statutory framework that facilitates and mandates a comprehensive review. The framework will allow DOCS and Parole to obtain definitive judicial guidance as to which defendants are to remain subject to PRS and which are not. It provides for a process that can be deliberate and orderly, yet fair and expeditious.

The massive burden of identifying which inmates and releasees shall be referred to the courts is not made subject to strict time limits. Within the universe of inmates and releasees, there are many different circumstances, and many difficulties obtaining the necessary information. Therefore, it would be hard to specify across-the-board deadlines in a way that provides sufficiently for both promptness and feasibility. The bill thus allows DOCS and Parole to identify classes among inmates and releasees that may require different levels of urgency in review and judicial resolution, and to structure the review process accordingly. The diligence with which these agencies have undertaken their PRS initiatives to date provides reassurance that they will identify and refer to courts most promptly those inmates and releasees for whom judicial resolution is most urgent. For example, some inmates may be serving unlawful determinate sentences for which the conditional release date is necessarily many months or even years from now. This bill allows the DOCS review process to be prioritized so that the cases of such inmates can be timely and fairly resolved, but DOCS can first devote its resources to more pressing cases, such as those in which inmates are scheduled for release in the near future, or are being held on violations of PRS terms that were administratively added by DOCS.

The need for prompt but orderly resolution is also served by the provision in the bill that authorizes the Office of Court Administration to promulgate regulations for judicial consideration of these cases. It would be difficult for the courts to provide fair and expeditious adjudication if thousands of cases were simultaneously added to the system without coordination, prioritization or planning.

Judicial guidance to DOCS and Parole is crucially important because, for example, the absence of sentencing minutes may make it impossible in many cases for the agencies to know whether PRS was properly imposed at the time of sentence. Such matters are appropriate for judicial resolution. There would be unacceptable consequences for public safety if custody or supervision ended when it should be continued, and an infringement on individual liberty if custody or supervision continued when it should end.

The bill also addresses an issue arising from the Court of Appeals decision in People v. Catu. When a defendant who pleads guilty has not been informed that the sentence would include a term of PRS, the defendant may later seek for the plea to be vacated. This bill allows the District Attorney to consent to re-sentencing to the previously imposed determinate term without any term of PRS. By allowing defendants in this situation the benefit of their plea bargains, there should be no need for the pleas to be vacated.

4

The bill not only provides effective relief as to unlawful sentences imposed in the past, but also makes related improvements going forward. Current statutory language seems to reflect an intent that PRS arise automatically as a part of every determinate sentence. The bill replaces that approach with a requirement that sentencing courts explicitly state terms of PRS when imposing determinate sentences. This is a more open and transparent way of ensuring that defendants are sufficiently informed about their sentences. Other benefits include an enhanced ability for DOCS to facilitate correction of other kinds of unlawful sentences.

**Budget Implications:**

This bill has no appreciable fiscal impacts beyond those that otherwise would have resulted from the two recent Court of Appeals decisions. Those decisions also contemplated re-sentencing for the same population of individuals, resulting in the same impact with respect to DOCS transportation costs, costs associated with the provision of defense counsel, operational costs borne by the courts and the supervision responsibilities of the Division of Parole.

**Effective Date:**

This act shall take effect immediately.

**SPONSORS MEMO:**

### 1. NEW YORK STATE SENATE
### INTRODUCER'S MEMORANDUM IN SUPPORT
### submitted in accordance with Senate Rule VI. Sec 1

**BILL NUMBER:** S8714                    REVISED

**SPONSOR:** NOZZOLIO

**TITLE OF BILL**:  An act to amend the criminal procedure law, the penal law, the correction law and the county law, in relation to post-release supervision

**PURPOSE**:  This bill provides a framework for a prompt, fair, and care-ful response to recent decisions in which the Court of Appeals struck down longstanding practices for determining the supervision terms of violent felons.

**SUMMARY OF PROVISIONS**:  Sections 1 and 1-a of the bill amend Criminal Procedure Law §380.70 to specify that it is the court that is responsi-ble for delivery of sentencing minutes to the Department of Correctional Services ("DOCS").

Section 2 of the bill adds a new §70.85 to the Penal Law to apply to certain cases in which determinate sentences were imposed between 1998 and 2008, and in which the sentencing court failed to explicitly state that a term of post-release supervision ("PRS") was being imposed. The bill allows a re-sentencing court, on consent of the district attorney, to impose the originally imposed determinate sentence without any period of PRS.

Section 3 of the bill amends Penal Law §70.45(1) to modify procedural provisions for determinate sentences to be imposed in the future. It replaces a provision that such sentences automatically include super-vision terms with one that requires courts to state such terms explicit-ly in the course of pronouncing sentence.

Section 4 of the bill amends Correction Law §601-a to expand the duty of

DOCS to facilitate re-sentencing of inmates whose original sentence was unlawful.

Section 5 of the bill adds a new Correction Law §601-d that applies to cases possibly in need of re-sentencing because the term of PRS may not have been pronounced by the court. It provides an orderly procedure for bringing such cases to the attention of the court, ensuring their prompt resolution, and directing DOCS and the Division of Parole ("Parole") to take appropriate steps in light of court proceedings. In particular, the new Correction Law §601-d includes the following subdivisions:

*Subdivision 1 defines "designated person" to mean an inmate sentenced to a determinate sentence that was required to include a term of PRS, but for whom the sentencing papers suggest that the required term may not have been pronounced at sentencing

*Subdivision 2 requires DOCS and Parole to give notice of such designated persons to the criminal courts that originally sentenced them. Rather than set strict timelines within which the agencies must complete the process of review and notification, it allows them to conduct a prompt but orderly review, prioritized for different groups according to the relative needs, and urgency of review, as to each group.

*Subdivision 3 provides that when a sentencing court that has received such notice learns that a term of PRS was actually pronounced at the sentence, the court shall send the relevant information, including a superseding commitment order, to the parties.
*Subdivision 4 requires the sentencing court to appoint counsel for the defendant, obtain necessary information, and schedule proceedings to consider re-sentencing. Courts are required to issue written orders within 40 days of receiving the notice, unless additional time is allowed on the consent of the defendant, or, when there are extraordinary circumstances, in 10-day extensions on the motion of the district attorney.

*Subdivision 5 provides for the parties to be notified of the court's decision.

*Subdivision 6 provides that when the court does not re-sentence the defendant within the statutorily allowed time, the records of DOCS and Parole shall reflect that a term of PRS has not been imposed.

*Subdivisions 7 and 8 relate to whether remedies in the bill are exclu-
sive, and preserve the ability of defendants to seek relief in other
kinds of actions.

Section 6 of the bill amends Correction Law §722 to provide for assigned
counsel to assist defendants in re-sentencing proceedings.

Section 7 of the bill authorizes the Office of Court Administration to
promulgate regulations for the fair and expeditious consideration of
re-sentencing cases.

Section 8 of the bill sets out the severability clause. Section 9 of the
bill sets forth an immediate effective date.

**EXISTING LAW**:  Criminal Procedure Law §380.20 provides that the court
must pronounce sentence in every case where a conviction is entered.
Penal Law §70/45(1) provides that each determinate sentence "also
includes, as a part thereof, an additional period of post-release super-
vision."

**STATEMENT IN SUPPORT**:  In 1998, the New York State Legislature enacted
Jenna's Law, which was named for Jenna Grieshaber, a twenty-two-year-old
nursing student who was murdered by a violent felon released from prison
after serving only two-thirds of his sentence. Jenna's Law amended the
Penal Law to end "indeterminate sentences" - i.e., sentences running
between certain minimum and maximum periods set by the court at the time
of sentencing - for criminal defendants convicted of violent felonies.
Instead, Jenna's Law required "determinate" sentences, and also created
a schedule of mandatory terms of PRS to be included as a part of the
determinate sentences of violent felony offenders.
In many cases, judges informed defendants, at the time of sentencing,
that they would be subject to a period of PRS following completion of
their determinate sentence; in other cases, they did not, and DOCS
simply included the PRS pursuant to the terms of the Penal Law. Over
time, offenders challenged DOCS's calculation of PRS as part of their
determinate sentence, and courts throughout the State were split on this
legal issue -with some finding that PRS automatically was a part of the
sentence by operation of law, and others finding PRS had to be expressly
imposed by the sentencing court.
On April 29, 2008, the New York State Court of Appeals issued two deci-

sions (Matter of Garner v. DOCS and People v. Sparber) that finally
resolved some of the legal issues associated with the imposition of PRS.
Most notably, the Court ruled that only the sentencing judge has the
authority to impose the PRS component of an offender's determinate
sentence, and that the period of PRS must be stated by the judge at the
time of sentencing in the offender's presence. The Court in Garner also
ruled, however, that its holding was "without prejudice to any ability
that either the People or DOCS may have to seek the appropriate re-sen-
tencing of a defendant in the proper forum."

Since then, DOCS and Parole have undertaken major initiatives to bring
the relevant cases to the attention of the sentencing courts, so that
those courts can make decisions about re-sentencings. The initiatives
have already had some success in arriving at resolution of individual
cases, but it has become clear that it would be hard to reach resol-
utions of all the relevant cases through such initiatives alone.

This bill provides a statutory framework that facilitates and mandates a
comprehensive review. The framework will allow DOCS and Parole to obtain
definitive judicial guidance as to which defendants are to remain
subject to PRS and which are not. It provides for a process that can be
deliberate and orderly, yet fair and expeditious.  The massive burden of
identifying which inmates and releasees shall be referred to the courts
is not made subject to strict time limits.  Within the universe of
inmates and releasees, there are many different circumstances, and many
difficulties obtaining the necessary information,. Therefore, it would
be hard to specify across-the-board deadlines in a way that provides
sufficiently for both promptness and feasibility. The bill thus allows
DOCS and Parole to identify classes among inmates and releasees that may
require different levels of urgency in review and judicial resolution,
and to structure the review process accordingly. The diligence with
which these agencies have undertaken their PRS initiatives to date
provides reassurance that they will identify and refer to courts most
promptly those inmates and releasees for whom judicial resolution
is most urgent. For example, some inmates may be serving unlawful determi-
nate sentences for which the conditional release date is necessarily
many months or even years from now. This bill allows the DOCS review
process to be prioritized so that the cases of such inmates can be time-
ly and fairly resolved, but DOCS can first devote its resources to more
pressing cases, such as those in which inmates are scheduled for release
in the near future, or are being held on violations of PRS terms that
were administratively added by DOCS.

The need for prompt but orderly resolution is also served by the

provision in the bill that authorizes the Office of Court Administration to promulgate regulations for judicial consideration of these cases It would be difficult for the courts to provide fair and expeditious adjudication if thousands of cases were simultaneously added to the system without coordination, prioritization or planning.

Judicial guidance to DOCS and Parole is crucially important because, for example, the absence of sentencing minutes may make it impossible in many cases for the agencies to know whether PRS was properly imposed at the time of sentence. Such matters are appropriate for judicial resolution. There would be unacceptable consequences for public safety if custody or supervision ended when it should be continued, and an infringement on individual liberty if custody or supervision continued when it should end.

The bill also addresses an issue arising from the Court of Appeals decision in People v. Catu. When a defendant who pleads guilty has not been informed that the sentence would include a term of PRS, the defendant may later seek for the plea to be vacated. This bill allows the District Attorney to consent to re-sentencing to the previously imposed determinate term without any term of PRS. By allowing defendants in this situation the benefit of their plea bargains, there should be no need for the pleas to be vacated.

The bill not only provides effective relief as to unlawful sentences imposed in the past, but also makes related improvements going forward. Current statutory language seems to reflect an intent that PRS arise automatically as a part of every determinate sentence,. The bill replaces that approach with a requirement that sentencing courts explicitly state terms of PRS when imposing determinate sentences.  This is a more open and transparent way of ensuring that defendants are sufficiently informed about their sentences. Other benefits include an enhanced ability for DOCS to facilitate correction of other kinds of unlawful sentences..

**BUDGET IMPLICATIONS**:  This bill has no appreciable fiscal impacts beyond those that otherwise would have resulted from the two recent Court of Appeals decisions. Those decisions also contemplated re-sentencing for the same population of individuals, resulting in the same impact with respect to DOCS transportation costs, costs associated with the provision of defense counsel, operational costs borne by the courts and the supervision responsibilities of the Division of Parole.

**EFFECTIVE DATE**; This act shall take effect immediately.

**SPONSORS MEMO:**

1. **NEW YORK STATE ASSEMBLY
MEMORANDUM IN SUPPORT OF LEGISLATION
submitted in accordance with Assembly Rule III, Sec 1(e)**

**BILL NUMBER:** A11764

**SPONSOR:** Rules (Aubry)

**TITLE OF BILL**:  An act to amend the criminal procedure law, the penal law, the correction law and the county law, in relation to post-release supervision

Purpose:

This bill provides a framework for a prompt, fair, and careful response to recent decisions in which the Court of Appeals struck down longstanding practices for determining the supervision terms of violent felons.

Summary of Provisions:

Sections 1 and 1-a of the bill amend Criminal Procedure Law §380.70 to specify that it is the court that is responsible for delivery of sentencing minutes to the Department of Correctional Services ("DOCS").

Section 2 of the bill adds a new §70.85 to the Penal Law to apply to certain cases in which determinate sentences were imposed between 1998 and 2008, and in which the sentencing court failed to explicitly state that a term of post-release supervision ("PRS") was being imposed. The bill allows a re-sentencing court, on consent of the district attorney, to impose the originally imposed determinate sentence without any period of PRS.

Section 3 of the bill amends Penal Law §70.45(1) to modify procedural provisions for determinate sentences to be imposed in the future. It replaces a provision that such sentences automatically include supervision terms with one that requires courts to state such terms explicitly in the course of pronouncing sentence.

Section 4 of the bill amends Correction Law §601-a to expand the duty of

DOCS to facilitate re-sentencing of inmates whose original sentence was unlawful.

Section 5 of the bill adds a new Correction Law §601-d that applies to cases possibly in need of resentencing because the term of PRS may not have 'been pronounced by the court. It provides an orderly procedure for bringing such cases to the attention of the court, ensuring their prompt resolution, and directing DOCS and the Division of Parole ("Parole") to take appropriate steps in light of court proceedings. In particular, the new Correction Law §601-d includes the following subdivisions:

* Subdivision 1 defines "designated person" to mean an inmate sentenced to a determinate sentence that was required to include a term of PRS, but for whom the sentencing papers suggest that the required term may not have been pronounced at sentencing.

* Subdivision 2 requires DOCS and Parole to give notice of such desig-nated persons to the criminal courts that originally sentenced them.

* Subdivision 3 provides that when a sentencing court that has received such notice learns that a term of PRS was actually pronounced at the sentence, the court shall send the relevant information, including a superseding commitment order, to the parties.

* Subdivision 4 requires the sentencing court to appoint counsel for the defendant, obtain necessary information, and schedule proceedings to consider re-sentencing. Courts are required to issue written orders within 40 days of receiving the notice, unless additional time is allowed on the consent of the defendant, or, when there are extraor-dinary circumstances, in 10-day extensions on the motion of the district attorney.

* Subdivision 5 provides for the parties to be notified of the court's decision.

* Subdivision 6 provides that when the court does not re-sentence the defendant within the statutorily allowed time, the records of DOCS and Parole shall reflect that a term of PRS has not been imposed.

* Subdivisions 7 and 8 relate to whether remedies in the bill are exclu-

sive, and preserve the ability of defendants to seek relief in other
kinds of actions.

Section 6 of the bill amends Correction Law §722 to provide for assigned
counsel to assist defendants in re-sentencing proceedings.

Section 7 of the bill authorizes the Office of Court Administration to
promulgate regulations for the fair and expeditious consideration of
re-sentencing cases.

Section 8 of the bill sets out the severability clause. Section 9 of the
bill sets forth an immediate effective date.

Existing Law:

Criminal Procedure Law §380.20 provides that the court must pronounce
sentence in every case where a conviction is entered.

Penal Law §70/45(1) provides that each determinate sentence "also
includes, as a part thereof, an additional period of post-release super-
vision."

Statement in Support:

In 1998, the New York State Legislature enacted Jenna's Law, which was
named for Jenna Grieshaber, a twenty-two-year-old nursing student who
was murdered by a violent felon released from prison after serving only
two-thirds of his sentence. Jenna's Law amended the Penal Law to end
"indeterminate sentences" - i.e., sentences running between certain
minimum and maximum periods set by the court at the time of sentencing -
for criminal defendants convicted of violent felonies.  Instead, Jenna's
Law required "determinate" sentences, and also created a schedule of
mandatory terms of PRS to be included as a part of the determinate
sentences of violent felony offenders.

In many cases, judges informed defendants, at the time of sentencing,
that they would be subject to a period of PRS following completion of
their determinate sentence; in other cases, they did not, and DOCS
simply included the PRS pursuant to the terms of the Penal Law. Over
time, offenders challenged DOCS's calculation of PRS as part of their
determinate sentence, and courts throughout the State were split on this
legal issue -with some finding that PRS automatically was a part of the
sentence by operation of law, and others finding PRS had to be expressly
imposed by the sentencing court.

On April 29, 2008, the New York State Court of Appeals issued two deci-
sions (Matter of Gamer v. DOCS and People v. Sparber) that finally
resolved some of the legal issues associated with the imposition of PRS.

Most notably, the Court ruled that only the sentencing judge has the authority to impose the PRS component of an offender's determinate sentence, and that the period of PRS must be stated by the judge at the time of sentencing in the offender's presence. The Court in Garner also ruled, however, that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

Since then, DOCS and Parole have undertaken major initiatives to bring the relevant cases to the attention of the sentencing courts, so that those courts can make decisions about re-sentencings. The initiatives have already had some success in arriving at resolution of individual cases, but it has become clear that it would be hard to reach resolutions of all the relevant cases through such initiatives alone.  This bill provides a statutory framework that facilitates and mandates a comprehensive review. This will allow DOCS and Parole to obtain definitive judicial guidance as to which defendants are to remain subject to PRS and which are not.

Such guidance is crucially important. There would be unacceptable consequences for public safety if these agencies ended custody or supervision when there is legal basis for it, and unacceptable consequences for individual liberty it they continued custody or supervision when there is not such legal basis. The problem is immensely magnified by factors, such as the absence of sentencing minutes, that may make it impossible in many cases for the agencies to know whether PRS was properly imposed at the time of sentence.  Such matters are appropriate for judicial resolution.

The bill also addresses an issue arising from the Court of Appeals decision in People v. Catu. When a defendant who pleads guilty has not been informed that the sentence would include a term of PRS, the defendant may later seek for the plea to be vacated. This bill allows the District Attorney to consent to re-sentencing to the previously imposed determinate term without any term of PRS. By allowing defendants in this situation the benefit of their plea bargains, there should be no need for the pleas to be vacated.

While the bill provides effective relief as to unlawful sentences imposed in the past, it also makes related improvements going forward. Current statutory language seems to reflect an intent that PRS arise automatically as a part of every determinate sentence. The bill replaces that approach with a requirement that sentencing courts explicitly state terms of PRS when imposing determinate sentences.  This is a more open and transparent way of ensuring that defendants are sufficiently

informed about their sentences. Other benefits include an enhanced abil-
ity for DOCS to facilitate correction of other kinds of unlawful
sentences.

Budget Implications:

This bill has no appreciable fiscal impacts beyond those that otherwise
would have resulted from the two recent Court of Appeals decisions.

Those decisions also contemplated re-sentencing for the same population
of individuals, resulting in the same impact with respect to DOCS trans-
portation costs, costs associated with the provision of defense counsel,
operational costs borne by the courts and the supervision responsibil-
ities of the Division of Parole.

Effective Date:

This act shall take effect immediately.

**STATUS:**

**A11764** Rules (Aubry)    Same as S 8714  NOZZOLIO

Criminal Procedure Law

TITLE....Enacts provisions relating to post-release supervision

06/23/08  referred to codes

06/23/08  reported referred to rules

06/24/08  reported

06/24/08  rules report cal.780

06/24/08  substituted by s8714

**S08714 NOZZOLIO**

06/23/08  REFERRED TO RULES

06/24/08  ORDERED TO THIRD READING CAL.2184

06/24/08  MESSAGE OF NECESSITY - 3 DAY MESSAGE

06/24/08  PASSED SENATE

06/24/08  DELIVERED TO ASSEMBLY

06/24/08  referred to codes

06/24/08  substituted for a11764

06/24/08  ordered to third reading rules cal.780

06/24/08  message of necessity - 3 day message

06/24/08  passed assembly

06/24/08  returned to senate

06/25/08  DELIVERED TO GOVERNOR

**BILL TEXT:**

## STATE OF NEW YORK

11764

## IN ASSEMBLY

June 23, 2008

Introduced by COMMITTEE ON RULES -- (at request of M. of A. Aubry, Lentol, Silver) -- (at request of the Governor) -- read once and referred to the Committee on Codes

AN ACT to amend the criminal procedure law, the penal law, the correction law and the county law, in relation to post-release super- vision

The People of the State of New York, represented in Senate and Assem- bly, do enact as follows:

```
1    Section 1. Section 380.70 of the criminal procedure law, as amended by
2  section 3 of part D of chapter 56 of the laws of 2008, is  amended  to
3  read as follows:
4  § 380.70 Minutes of sentence.
5    In  any  case  where a person receives an indeterminate or determinate
6  sentence of imprisonment, a certified copy of the  stenographic  minutes
7  of the sentencing proceeding, a certificate of conviction specifying the
8  section  and,  to  the extent applicable, the subdivision, paragraph and
9  subparagraph of the penal law or other statute under which the defendant
10  was convicted and a copy of any order of protection or  temporary  order
```

```
11  of protection issued against the defendant at the time of sentencing
12  must be delivered by the court to the person in charge of the institu-
13  tion to which the defendant has been delivered within thirty days from
14  the date such sentence was imposed; provided, however, that a sentence
15  or commitment is not defective by reason of a failure to comply with the
16  provisions of this section.
17    § 1-a. Section 380.70 of the criminal procedure law, as amended by
18  section 4 of part D of chapter 56 of the laws of 2008, is amended to
19  read as follows:
20  § 380.70 Minutes of sentence.
21    In any case where a person receives an indeterminate sentence of
22  imprisonment or a reformatory or alternative local reformatory sentence
23  of imprisonment, a certified copy of the stenographic minutes of the
24  sentencing proceeding and a copy of any order of protection or temporary
25  order of protection issued against the defendant at the time of sentenc-
26  ing must be delivered by the court to the person in charge of the insti-
```

        EXPLANATION--Matter in **italics** (underscored) is new; matter in brackets
                     [-] is old law to be omitted.

                                                        LBD12093-02-8

A. 11764                                    2

1  tution to which the defendant has been delivered within thirty days from
2  the date such sentence was imposed; provided, however, that a sentence
3  or commitment is not defective by reason of a failure to comply with the
4  provisions of this section.
5     § 2. The penal law is amended by adding a new section 70.85 to read as
6  follows:
7  § 70.85 Transitional exception to determinate sentencing laws.
8     This section shall apply only to cases in which a determinate sentence
9  was imposed between September first, nineteen hundred ninety-eight, and
10 the effective date of this section, and was required by law to include a
11 term of post-release supervision, but the court did not explicitly state
12 such a term when pronouncing sentence. When such a case is again before
13 the court pursuant to section six hundred one-d of the correction law or
14 otherwise, for consideration of whether to resentence, the court may,
15 notwithstanding any other provision of law but only on consent of the
16 district attorney, re-impose the originally imposed determinate sentence
17 of imprisonment without any term of post-release supervision, which then
18 shall be deemed a lawful sentence.
19    § 3.  Subdivision 1 of section 70.45 of the penal law, as amended by
20 section 4 of part E of chapter 56 of the laws of 2007, is amended to
21 read as follows:
22    1.  In general.  [Each] When a court imposes a determinate sentence
23 [also includes, as a part thereof,] it shall in each case state not only
24 the term of imprisonment, but also an additional period of post-release
25 supervision as determined pursuant to this article Such period shall
26 commence as provided in subdivision five of this section and a violation
27 of any condition of supervision occurring at any time during such period
28 of post-release supervision shall subject the defendant to a further
29 period of imprisonment up to the balance of the remaining period of
30 post-release supervision, not to exceed five years; provided, however,
31 that a defendant serving a term of post-release supervision for a
32 conviction of a felony sex offense, as defined in section 70.80 of this
33 article, may be subject to a further period of imprisonment up to the
34 balance of the remaining period of post-release supervision. Such maxi-
35 mum limits shall not preclude a longer period of further imprisonment
36 for a violation where the defendant is subject to indeterminate and
37 determinate sentences.
38    § 4. Section 601-a of the correction law, as amended by chapter 508 of
39 the laws of 1991, is amended to read as follows:
40    § 601-a.  Return of persons erroneously sentenced for the purpose of
41 resentence.  Whenever it shall appear to the satisfaction of the [warden
42 of any state prison] department based on facts submitted on behalf of a
43 person sentenced and confined in a state prison, that any such person
44 has been erroneously sentenced [as a second, third or fourth offender],
45 it shall [become his] be the duty of the department to communicate with
46 the district attorney of the county in which such person was convicted.
47 If upon investigation, such district attorney believes that the person
48 has been so erroneously sentenced, he [or she] shall notify the [warden of
49 the state prison wherein such person is confined] department.  The
50 [warden] department thereupon shall notify the sheriff of the county, or
51 in counties within the city of New York or the county of Westchester,
52 the commissioner of correction of such city or county from which such
53 person was committed, who shall remove such person from such prison and
54 cause him or her to be taken before the court in which he or she was
55 sentenced for the purpose of resentence. The cost and expense of the

A. 11764                                    3

1  return of such person necessarily incurred shall be a charge against the
2  county from which he or she was committed.
3     § 5.  The  correction law is amended by adding a new section 601-d to
4  read as follows:
5     § 601-d. Post-release supervision; certain cases.  This section  shall
6  apply  only to inmates in the custody of the commissioner, and releasees
7  under the supervision of the division of parole, upon whom a determinate
8  sentence was imposed between September first, nineteen hundred ninety-
9  eight, and the effective date of this section, which was required by law
10 to include a term of post-release supervision:
11    1.  For  purposes  of  this  section,  such a person shall be deemed a
12 "designated person" if the commitment order that accompanied such person
13 does not indicate imposition of any term  of  post-release  supervision;
14 provided,  however,  that  if such agency with custody of or supervision
15 over such person has the sentencing minutes that show  that  a  term  of
16 post-release  supervision  was  actually  pronounced  at  sentence, such
17 person shall not be deemed a designated person.
18    2. Whenever it shall appear to the satisfaction of the department that
19 an inmate in its custody, or to the  satisfaction  of  the  division  of
20 parole  that  a  releasee under its supervision, is a designated person,
21 such agency shall make notification of  that  fact  to  the  court  that
22 sentenced such person, and to the inmate or releasee.
23    3.  If a sentencing court that has received such notice, after review-
24 ing the sentencing minutes, if available, is or  becomes  aware  that  a
25 term  of  post-release  supervision  was in fact pronounced at the prior
26 sentencing of such person, it shall issue a superseding commitment order
27 reflecting that fact, accompanied by a written explanation of the  basis
28 for  that  conclusion, and send such order and explanation to the agency
29 that provided the notice, to the defendant,  and  to  the  attorney  who
30 appeared  for  the  defendant in connection with the judgment or sentence
31 or, if the defendant is currently  represented  concerning  his  or  her
32 conviction  or  sentence  or  with  respect to an appeal from his or her
33 sentence, such present counsel.
34    4. (a) If the sentencing court shall not  have  issued  a  superseding
35 commitment  order, reflecting imposition of a term of post-release super-
36 vision,  within  ten days after receiving notice pursuant to subdivision
37 two of this section, then the sentencing  court  shall  appoint  counsel
38 pursuant  to section seven hundred twenty-two of the county law, provide
39 a copy of the notice pursuant to subdivision two of this section to such
40 counsel, and calendar such person for a  court  appearance  which  shall
41 occur  no  later  than twenty days after receipt of said notice. At such
42 court appearance, the court shall furnish a copy of such notice and  the
43 proceeding  date  pursuant  to  paragraph  (c) of this subdivision to the
44 district attorney, the  designated  person,  assigned  counsel  and  the
45 department or the division of parole.
46    (b)  The  court shall promptly seek to obtain sentencing minutes, plea
47 minutes and any other records and shall provide copies  to  the  parties
48 and  conduct  any  reconstruction  proceedings  that may be necessary to
49 determine whether to resentence such person.
50    (c) The court shall commence a proceeding to  consider  resentence  no
51 later  than  thirty  days after receiving notice pursuant to subdivision
52 two of this section.
53    (d) The court shall, no later than forty days after  receipt  of  such
54 notice,  issue  and  enter  a written determination and order, copies of
55 which shall be immediately provided to the district attorney, the desig-
56 nated person, his or her counsel and the department or the  division  of

A. 11764                                    4

1  parole along with any sentencing minutes pursuant to section 380.70 of
2  the criminal procedure law.
3      (e)  The  designated  person  may,  with counsel, knowingly consent to
4  extend the time periods specified in paragraphs  (c)  and  (d)  of  this
5  subdivision.   The people may apply to the court for an extension of ten
6  days on the basis of extraordinary  circumstances  that  preclude  final
7  resolution  within  such period of the question of whether the defendant
8  will be resentenced. The department or the division of parole  shall  be
9  notified by the court of any such extension.
10     5.  The  court shall promptly notify the agency that referred a desig-
11 nated person whenever it (a) resentences the  defendant  to  a  sentence
12 that includes a term of post-release supervision; or (b) determines that
13 it  will  not  resentence the defendant under this section or otherwise.
14 Upon the conclusion of the  proceeding,  the  court  shall  furnish  the
15 parties and the agency that referred the designated person with an accu-
16 rate copy of the current order of commitment for the person.
17     6.  In any case in which the department or division of parole notifies
18 the court of a designated person, and has not  been  informed  that  the
19 court  has  made  a  determination  in  accordance with paragraph (d) of
20 subdivision four of this section (unless extended pursuant to  paragraph
21 (e)  of such subdivision), then such agency may notify the court that it
22 has not received a determination and, in any  event,  shall  adjust  its
23 records  with  respect to post-release supervision noting that the court
24 has not, in accordance with subdivision four of this section, imposed  a
25 sentence of post-release supervision.
26     7.  When  the  department  complies  with this section as to a person
27 confined in state prison, it need not separately follow  the  procedures
28 set forth in section six hundred one-a of this article.
29     8.  Nothing  in  this  section  shall affect the power of any court to
30 hear, consider and decide any petition, motion or proceeding pursuant to
31 article four hundred forty of the criminal procedure law, article seven-
32 ty or seventy-eight of the civil practice law and rules, or any  author-
33 ized proceeding.
34     § 6.  Subdivision  4  of section 722 of the county law, as amended by
35 section 1 of part J of chapter 62 of the laws of  2003,  is  amended  to
36 read as follows:
37     4.  Representation according to a plan containing a combination of any
38 of the foregoing. Any judge, justice or magistrate in assigning  counsel
39 pursuant  to  sections 170.10, 180.10, 210.15 and 720.30 of the criminal
40 procedure law, or in assigning counsel to a defendant when a hearing has
41 been ordered in a proceeding upon a motion,  pursuant  to  article  four
42 hundred  forty of the criminal procedure law, to vacate a judgment or to
43 set aside a sentence or on a motion for a writ of error coram nobis,  or
44 in  assigning  counsel pursuant to the provisions of section two hundred
45 sixty-two of the family court act or section four hundred seven  of  the
46 surrogate's  court procedure act, or in assigning counsel to a defendant
47 when a case has been calendared for consideration of resentencing pursu-
48 ant to subdivision four of section six hundred one-d of  the  correction
49 law or when a court is otherwise called upon to consider whether a prop-
50 er term of post-release supervision was imposed as part of a determinate
51 sentence,  shall  assign  counsel furnished in accordance with a plan
52 conforming to the requirements of this section; provided, however,  that
53 when  the  county  or the city in which a county is wholly contained has
54 not placed in operation a plan conforming to  that  prescribed  in  this
55 subdivision  or subdivision three of this section and the judge, justice
56 or magistrate is satisfied that a  conflict  of  interest  prevents  the

A. 11764                                    5

1  assignment of counsel pursuant to the plan in operation, or when the
2  county or the city in which a county is wholly contained has not placed
3  in operation any plan conforming to that prescribed in this section, the
4  judge, justice or magistrate may assign any attorney in such county or
5  city and, in such event, such attorney shall receive compensation and
6  reimbursement from such county or city which shall be at the same rate
7  as is prescribed in section seven hundred twenty-two-b of this article.
8  **When a case has been calendared for consideration of resentencing pursu-**
9  **ant to subdivision four of section six hundred one-d of the correction**
10 **law or when a court is otherwise called upon to consider whether a prop-**
11 **er term of post-release supervision was imposed as part of a determinate**
12 **sentence, the attorney appointed should be the attorney who appeared for**
13 **the defendant in connection with the judgment or sentence or, if the**
14 **defendant is currently represented concerning his or her conviction or**
15 **sentence or with respect to an appeal from his or her conviction or**
16 **sentence, such present counsel.**
17     § 7.  The office of court administration shall promulgate such rules
18 and regulations as may be necessary to ensure the fair and expeditious
19 consideration of cases brought pursuant to section 601-d of the
20 correction law, as added by section five of this act.
21     § 8. If any provision of this act or the application thereof to any
22 person or circumstances is held invalid, such invalidity shall not
23 affect other provisions or applications of the article which can be
24 given effect without the invalid provision or application, and to this
25 end the provisions of this act are declared to be severable.
26     § 9. This act shall take effect immediately; provided, however, that
27 section three of this act shall not apply to sentences imposed prior to
28 the effective date of this act; and provided further that the amendments
29 to section 380.70 of the criminal procedure law made by section one of
30 this act shall be subject to the expiration and reversion of such
31 section pursuant to subdivision d of section 74 of chapter 3 of the laws
32 of 1995, as amended, when upon such date the provisions of section one-a
33 of this act shall take effect.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

-------------------------------------------------------------------------X

THE STATE OF NEW YORK, THE NEW YORK                                Case No.:

STATE DEPARTMENT OF CORRECTIONAL
SERVICES, and THE NEW YORK STATE DIVISION :
OF PAROLE,
                                                  :
                      Plaintiffs,                      **AFFIRMATION OF**
                                                       **ANTHONY J. ANNUCCI**
         -against-                                :

MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON:
and MALCOLM CARTER, individually and on behalf of all
others similarly situated,
                                                  :
                      Defendants.

-------------------------------------------------------------------------X

ANTHONY J. ANNUCCI, an attorney duly admitted to practice in the courts of the

State of New York, affirms that the following statements are true under the penalties of

perjury:

1.      I currently serve as Executive Deputy Commissioner of the New York State

Department of Correctional Services ("DOCS" or the "Department").

2.      Between September 1, 1989 and October 1, 2007, I served as the

Department's Deputy Commissioner and Counsel. I joined the Department in October of

1984 as Deputy Counsel. From 1980 to 1984, I served as the law secretary to two Acting

Supreme Court Justices in Kings County, Criminal Term.

3.      Among my duties, I am responsible for the provision of all the legal services

for the day-to-day operation of the New York State prison system, which consists of 69

correctional facilities, an inmate population numbering approximately 62,500, and a

1

workforce of about 31,600 employees. The Department's combined annual operations and capital budget amounts to approximately $3 billion. The Department's principal office is located at Building 2, 1220 Washington Avenue, Albany, New York 12226.

4.    I make this affirmation in the paramount interests of the safety and security of the citizens of the State of New York, and in support of an application, through an Order to Show Cause, for a temporary restraining order and preliminary injunction, authorizing the Department and the New York State Division of Parole ("Parole" or the "Division") to maintain on a temporary and limited basis, continued custody or supervision of certain classes of individuals, whose status is based solely on the terms and conditions of post-release supervision ("PRS") that was administratively added by the Department, in order to allow an orderly and systematic process whereby each of these cases can be referred to the appropriate sentencing court and district attorney in this state for possible resentencing, consistent with two recent decisions by the New York State Court of Appeals, or for whatever other action is deemed appropriate by the sentencing court.

## THE DEPARTMENT'S PRACTICE OF CALCULATING PRS SENTENCES

5.    On August 6, 1998, the New York State Legislature enacted "Jenna's Law," which ended indeterminate sentences for criminal defendants convicted of violent felonies. See L. 1998, ch. 1. Jenna's Law also created a schedule of mandatory periods of PRS to be included as a part of the determinate terms of violent felony offenders. See Penal Law §70.45. The Legislature subsequently extended determinate sentencing and PRS to all drug offenders with the Drug Law Reform Act of 2004 (L. 2004, ch. 738), and to those sex

2

offenders who had been subject to indeterminate sentencing, with the Sex Offender Management and Treatment Act of 2007 (L. 2007, ch. 7).

6.   Jenna's Law was named for Jenna Grieshaber, a twenty-two-year-old nursing student who was murdered by a violent felon released from prison after serving two-thirds of his sentence.

7.   Until recently, all New York State prison sentences were "indeterminate" - they ran between a certain minimum and maximum amount of time set by the court at the time of sentencing. Beginning with the Sentencing Reform Act of 1995 (L. 1995, ch. 3), and thereafter as part of other major legislative enactments, the Legislature has established determinate terms for repeat offenders convicted of violent felonies, first-time violent felony offenders, drug offenders, and sex offenders. Determinate terms have no minimum periods. Rather, the inmate is ineligible for release by the parole board and must serve at least six-sevenths of the determinate term before he or she is eligible for release; an inmate serving a determinate term for a drug felony is eligible to earn a merit time reduction and may be released upon serving five-sevenths of said term.1

8.   Penal Law §70.45 requires PRS for every determinate term imposed for an offense committed on or after September 1, 1998. For the past ten years, if the commitment for a determinate term was silent regarding PRS, DOCS assessed such period mandated by §70.45 upon the inmate's transfer to this Department's custody.

---

$^1$ If the inmate loses sufficient "good time" while incarcerated, he or she may serve the entire determinate term. However, if there is a portion (2/7th or less) of the determinate term that is undischarged at the time of release, and the inmate is not subject to PRS, then the inmate is subject to supervision by Parole for that undischarged portion of the term. Such parole supervision is legally distinct from PRS but it similar in the nature of the supervision imposed.

3

9.     DOCS undertook this course of conduct in the good-faith belief that its actions were fulfilling Penal Law mandates for determinate terms to include periods of PRS.

10.    It appears that such practice was understood and accepted by the courts, district attorneys and the defense bar for over eight years until it was challenged in the last few years, with the first successful challenge occurring in 2006.

11.    Accordingly, when an inmate sentenced to a determinate term for a violent felony (Penal Law §§70.02, 70.04, 70.06(6)), a drug felony (§§70.70, 70.71), or a sex offense (§70.80), was received by DOCS, DOCS would apply the mandates of §70.45 to the information on the inmate's sentence and commitment order.

12.    The documents required to accompany an inmate's transfer to DOCS are listed in Correction Law §601(a); a transcript of the sentencing proceeding is not included therein. Although Criminal Procedure Law §380.70 requires DOCS to be furnished with the sentencing minutes within 30 days of the sentencing date, compliance with this statute has been irregular. As a practical matter, sentencing minutes are not ever received by DOCS for a substantial number of its inmates. Moreover, even when sentencing minutes are received by DOCS, they tend to arrive long after the reception process. DOCS does not, therefore, have for many inmates (at the time of reception or thereafter) a record sufficient to determine whether PRS was actually pronounced if the sentence and commitment order is silent regarding PRS. Indeed, in some cases in which DOCS does have the sentencing minutes, PRS has been correctly pronounced by the sentencing courts even though the commitment sheet is silent. As of May 30, 2008, DOCS identified a total of 45 technical

4

PRS violators in its custody with silent commitments for whom sentencing minutes were available that did confirm the imposition of PRS by the court.

13.     Courts around the state regularly sentenced violent felons and committed them to the custody of DOCS with the apparent understanding that PRS arose automatically by operation of law. Courts and defense attorneys did not raise any serious challenge to this practice until some time in 2005.

14.     DOCS calculated the release dates of inmates' sentences and assessed the periods of PRS to be served under the jurisdiction of Parole upon their release from DOCS.

15.     Inmates serving determinate terms for violent felonies who were credited with the full amount of good time authorized by Correction Law § 803 were granted conditional release after serving six-sevenths of their terms. Those inmates who failed to earn any good time were released to PRS upon completion of the entire determinate term.

16.     Upon release from DOCS, such persons were under the jurisdiction of and supervised by Parole while serving their periods of PRS. See Executive Law § 259-a(4).

17.     During the course of their PRS or Parole supervision, certain individuals were found to have violated the terms of their supervision. Upon such violations, Parole issued warrants for the detention of the offending supervisees and conducted release revocation hearings pursuant to Executive Law §259-i(3).

18.     Upon the completion of the violation hearing process, where any charges were sustained, supervisees were either restored to PRS, placed in a parole transition facility for up to 180 days or returned to DOCS for a duration of time determined by Parole. See Executive Law §259-i(3)(f)(x).

19.    Defendants as a class belong to subclasses of incarcerated inmates and releasees, some of whom have completed their underlying determinate terms, and some of whom have not completed said terms.

## THE HISTORY OF DETERMINATE SENTENCING AND PAROLE

20.    New York's sentencing provisions are complex and address a range of issues, including the effects that incarceration and parole have on offenders, the collateral consequences of criminal convictions, the alternatives to incarceration, the re-entry of incarcerated inmates into society upon release and the impact of sentencing on crime victims. New York's sentencing provisions reflect policies grounded in criminal justice data, and were formulated in consultation with judges, prosecutors, defense attorneys, crime victims and the general public at large.

21.    New York State, like other states, has since the 1950s moved away from policies and legislation promoting sentencing discretion as then advocated by the American Law Institute's Model Penal Code, to policies and legislation limiting sentencing discretion through administrative guidelines and determinate terms imposed both for purposes of incarceration and supervision thereafter.

22.    With the passage of the Rockefeller Drug Laws in 1973, judges were limited in their discretion to impose lesser terms of imprisonment upon defendants convicted of certain drug offenses. See L. 1973, ch. 276. In 1973, the Legislature also passed second felony offender laws imposing mandatory sentences. See L. 1973, ch. 277, § 9. In 1978,

additional mandatory sentencing laws were passed for juvenile offenders and violent felony offenders. See L. 1978, ch. 481.

23.    At the same time that judicial discretion was being limited by New York's Legislature, the Parole Reform Act of 1977 was enacted in an effort to limit administrative discretion by the Division. Said Act required written guidelines to govern determinations of release on parole.

24.    Another effort to curtail judicial determinations regarding the length of time inmates would be incarcerated resulted in the establishment of the DOCS Shock Incarceration Program, which allowed certain inmates to be released before the completion of their judicially imposed minimum periods of imprisonment. See L. 1987, ch. 261.

25.    In the 1990s, the New York Legislature enacted several pieces of legislation requiring determinate terms for violent felony offenses. The Sentencing Reform Act of 1995 required determinate terms for predicate felons convicted of violent felony offenses, but still left prosecutors and judges wide discretion in plea bargaining. Determinate sentencing was extended to first-time violent felony offenders in 1998 by Jenna's Law.

26.    Jenna's Law also introduced the requirement for determinate terms to include periods of PRS.

27.    Determinate terms, and thus PRS, were extended to drug offenders in 2004 and in 2007, to defendants convicted of non-violent felony sex offenses.

28.    In New York State, 274,000 offenders are presently subject to some kind of state, county or community supervision. DOCS incarcerates approximately 62,500 inmates and Parole supervises over 42,000 releasees from DOCS. In addition, 30,000 offenders

are in local jails, another 125,000 are subject to probation, and 14,000 are in some other sort of community supervision.

29.     The Department's records indicate that approximately 26,000 inmates are released from DOCS into the community each year. Of these, 10,000, i.e., 39%, return to prison within three years of their release.

30.     Nevertheless, research on recidivists shows that the failure to comply with the rules governing parole is highest in the first year following release, and the failure rate decreases with time spent on supervision. The data also shows that within the first year of release, the risk of re-arrest is highest in the first six months following release, and then declines by the twelfth month and continues to decline through the third year following release.

31.     The criminal justice statistics available to the Department indicate that post-release supervision has been an effective tool in facilitating the adjustment of incarcerated inmates back into the community. Studies show that where supervision is not maintained, the released inmate presents a danger to the community and has less of a likelihood of succeeding by gaining employment and avoiding criminal activity.

32.     It was with these laudable goals that the post-release supervision legislation was adopted in New York, and it has always been the policy of DOCS to carry out the intention of the Legislature.

33.     DOCS calculated PRS into the sentences of defendants convicted of the applicable offenses, and the courts upheld such practice for years. However, when DOCS became aware of the challenges to this practice, it expended considerable efforts to be

8

prepared, for the possibility that such challenges would ultimately be sustained, as recently happened when, the Court of Appeals issued its' decisions in the Garner and Sparber cases.

## POST-RELEASE SUPERVISION AND THE COURT OF APPEALS

34.    I have reviewed the recent New York State Court of Appeals' decision in Matter of Garner v. New York State Dept. Of Correctional Services, 10 NY3d 358 (2008), which held that the Department was prohibited from administratively assessing PRS for determinate terms; even though PRS is mandated by statute, it may only be pronounced by the sentencing judge. The Court of Appeals in issuing its decision, however, noted that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." Id. at 363, n. 4.

35.    I have also reviewed the decision the Court of Appeals issued the same day as Garner in a group of cases combined under the lead of People v. Sparber, 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053 (April 29, 2008), which addressed issues involved in trying to remedy sentences for which periods of PRS were not actually pronounced by the sentencing judges, but there were some other indicia on the record that PRS was at least contemplated by the court. The Court of Appeals held that although "the procedure through which PRS was imposed upon these defendants was flawed as it did not comply with the statutory mandate[,] . . .[and] [t]o remedy this error, rather than striking PRS from the sentences... as urged by defendants, these matters must be remitted to Supreme Court for resentencing and the proper judicial pronouncement of the relevant PRS terms." Id. at **2.

9

36.     After the decisions by the Court of Appeals were issued, DOCS prepared to implement a plan immediately to identify all inmates in its custody whose determinate terms were required to include PRS, and then to identify those whose commitments do not satisfy the Garner and Sparber requirements. While this initiative is a major undertaking, months of preparation by DOCS dating back to early 2007, placed the Department in a position to launch the "Post-Release Supervision Resentencing Initiative" expeditiously (see "Post-Release Supervision Resentencing Initiative," attached as Exhibit A). Within days of the Court of Appeals' decisions, the Department secured the cooperation of the New York State Office of Court Administration ("OCA") and in consultation with other state agencies, was able to begin to address the PRS problem by giving notice to the courts and the district attorneys that resentencings of thousands of inmates may be required (see Memorandum to New York State Administrative Judges from Lawrence K. Marks, regarding Post-Release Supervision, dated May 14, 2008, attached as Exhibit B).   The Post-release Resentencing Initiative includes reviewing the Department's records for thousands of inmates, as well as concerted efforts to enlist the cooperation and guidance of other state agencies, including Parole, the Office of the Governor of the State of New York, OCA, and the Division of Criminal Justice Services ("DCJS") in order to identify the scope of the PRS issues and to implement a path toward resolution of the issues as expeditiously as practicable.

37.     The Department has reviewed information that accompanied inmates so as to identify those with potential PRS problems who may be affected by Garner and the Sparber cases.  I have concluded that said decisions may affect as many as 30,000

10

inmates and parolees and could have a significant adverse impact on public safety if the Department, Parole, sentencing courts, district attorneys and other state, county and municipal entities are not afforded an appropriate opportunity to respond deliberately and carefully in resolving sentencing errors. The recent decisions of the Court of Appeals could have the effect of substantially advancing the release dates from DOCS or supervision by Parole of thousands of inmates and releasees, even though the Legislature mandated longer periods of supervision and imprisonment pursuant to statutorily-required PRS. The Court of Appeals' decisions affect the release dates of hundreds of currently-incarcerated felons and thousands more who have since been released to supervision of Parole. In light of the nature of the crimes committed by these individuals, and in the interest of public safety it is necessary that this Court direct that the status quo be maintained until DOCS and Parole have had the opportunity to review the individual circumstances of every sentence, and the sentencing courts and the district attorneys have had the opportunity to evaluate resentencing in the proper forum. Because the overwhelming majority of affected inmates and releasees are violent felony offenders, and many of them repeat violent felony offenders, the impact on public safety could be irreparably severe.

38.    Accordingly, after having consulted with other state agencies, and in response to the Court of Appeals' decisions, the Department launched the Post-release Resentencing Initiative on April 30, 2008 in order to identify all inmates or releasees whose sentences contain PRS errors in light of the Court of Appeals' decisions, and in order to remedy those errors through resentencing or for whatever other determination is made by

the sentencing courts. All of the affected inmates or releasees belong to a class of defendants whose sentences may contain PRS errors and may require resentencing.

39.     DOCS and Parole have been able to identify the defendant class and its subclasses after months of diligent work. In early 2007, the Department organized a work group and outlined a plan to undertake a comprehensive manual review of thousands of inmate files. Initially, the DOCS mainframe computer created a master list of cases where determinate terms had been imposed during the period from September 1, 1998, the day that Penal Law § 70.45 took effect, to March 8, 2007. The purpose of the manual review was to ascertain in each case whether the sentence and commitment order itself, as required by Criminal Procedure Law § 380.60 and Correction Law § 601(a), affirmatively noted that the required PRS period was a part of the sentence.

40.     The manual review required an examination of approximately 40,000 sentence and commitment orders, each of which contained one or more determinate terms of imprisonment. The analysis of these historic records began on March 12, 2007, and concluded on April 20, 2007. A total of 39,883 computer notations were entered into the Department's mainframe computer on a newly-created data field called "PRS." As a result of this project, the PRS data field is now routinely filled in at all of the DOCS reception centers for each new sentence and commitment order that contains a determinate term of imprisonment, and for which the law requires a period of PRS. For each applicable sentence and commitment order, the following entries are made:

Y = PRS is silent, meaning the commitment was silent regarding PRS;

N = PRS is NOT silent, meaning the commitment indicated PRS;

12

> H = historic, meaning the inmate had already been released from custody and the file was not available. If the inmate is returned to DOCS thereafter, the field would be updated at that time; and
>
> M = the sentencing minutes indicated that PRS was pronounced at sentence even though the commitment was silent.

41. As of January 2008, DOCS staff had made approximately 49,300 entries into the PRS data field. This number includes new commitments that were received between the manual cutoff review date and January 4, 2008.

42. An analysis of this data reveals that there are approximately 41,000 entries where the sentence and commitment orders were NOT SILENT regarding PRS.

43. Hence, the concern arises with the approximately 8,100 entries where the sentence and commitment order WAS SILENT regarding PRS, which means that DOCS staff assessed the PRS component of the sentence when the inmate was received at a DOCS reception center. Of this number, approximately 6,300 inmates remained in DOCS custody at the time the analysis was run, while 1,800 have been released.

44. In the wake of the Garner and the Sparber decisions, the Department has worked diligently to identify all inmates who may belong to the defendant class, and is attempting to document the identities of inmates and releasees belonging to several subclasses of the defendant class, including inmates currently incarcerated solely on the basis of PRS violations, inmates who are currently incarcerated pursuant to their underlying determinate terms but will in the future be subject to PRS, and released inmates who are now on PRS and being supervised by Parole. As noted above, as many as 30,000 inmates and releasees may be affected in some way by the decisions, even though each

13

class member has issues based on unique circumstances that would require individual resolution before a resentencing court.

45.     As a result of the PRS Initiative, the Department has been prioritizing groups of inmates belonging to the pool affected by the Garner and Sparber decisions according to their status. In order to proceed in an equitable fashion, DOCS determined that the first priority for PRS resentencing must be accorded to those individuals who have been returned to DOCS as PRS violators and their sentence and commitment orders are silent regarding PRS.

46.     A determination on the merits in each case, including the potential outcome of an immediate release, cannot be made, however, unless and until (1) the sentencing minutes are also reviewed, and (2) it is determined whether at the time of the violation, the inmate was subject to an undischarged period of the determinate sentence. For example, in those cases in which the sentence and commitment orders are silent regarding PRS but the sentencing minutes do reflect that PRS was imposed by the sentencing courts, it would appear that no resentencing procedure is warranted or necessary. Instead, the defect can be cured by the court issuing a new commitment that correctly reflects the period of PRS that was imposed.

47.     Of the entire pool of inmates with potential PRS sentencing errors, DOCS has determined that approximately 546 inmates are currently being incarcerated by DOCS solely on the basis of PRS violations. DOCS does not have available all of the necessary documentation for each of these individuals to determine whether release is now appropriate. In these cases, it is likely that only the sentencing court can make a

14

determination as to whether PRS was properly pronounced. Moreover, even if PRS was not properly pronounced, it will be necessary to determine whether the inmate was also subject to an undischarged portion of the determinate sentence at the time of the violation.

48.    At the outset, within days of the Court of Appeals' decisions, and with concern that this first priority subclass of inmates required immediate focus, an outreach effort was made to all district attorneys' offices throughout New York State and a contact was identified for each office to facilitate resentencing where appropriate.

49.    DOCS organized the 546 inmates with silent sentence and commitment orders into separate lists of individual inmates categorized by county of commitment (the "County Lists"). On May 6, 2008, DOCS e-mailed each County List of inmates to the district attorneys of each concerned county, together with the identification data that was pertinent in each case, including an indictment or SCI number and a New York State Identification number (NYSID).

50.    Furthermore, working with the OCA, a procedure was developed whereby the administrative judge of each judicial district would be the contact person to receive formal notifications of the cases that DOCS identified as potentially being appropriate for resentencing. As previously discussed, attached hereto as Exhibit B is the May 14, 2008 OCA e-mail instruction that was sent, with attachments, to each administrative judge by Lawrence Marks.

51.    As the e-mail explains, in each case DOCS is preparing a standardized letter to each sentencing judge of an inmate who appears to have a PRS sentencing error. One type of standard letter is addressed to the sentencing judges when the sentencing minutes

15

are in the file, and a second standardized letter is used when the sentencing minutes are not in the file.

52.   Of the 546 inmate files reviewed for sentence and commitment orders that are silent regarding PRS, a total of 167 had sentencing minutes in the file with no PRS, while in the remaining 379 inmate files reviewed for silent commitments, the sentencing minutes were not in the file.

53.   In the letters to the sentencing judges, a copy of the sentence and commitment order is included as well as a copy of the sentencing minutes, when available.

54.   A copy of every letter sent to a sentencing judge is sent to the district attorney of the county of commitment and to the inmate with the apparent PRS error.

55.   In addition, as the OCA instruction to the administrative judges also indicated, each letter from DOCS included a proposed order whereby the sentencing court could set the matter down for a hearing and require the production of the inmate for a resentencing nunc pro tunc, or instead direct that DOCS recalculate the inmate's sentence without a period of PRS.  The OCA e-mail further delineated that the sentencing court could take whatever other action was deemed appropriate.

56.   The entire thrust of the resentencing initiative is to place each matter in which there appears to be an error in sentencing before the sentencing court and have the court, not an executive agency like DOCS, make a determination as to whether mandatory PRS should apply. This is critical for several reasons. First, as the Court of Appeals aptly noted, sentencing is within the sole province of the sentencing court. Second, in order to make a determination as to what the appropriate course of action should be, whether an actual

16

resentencing or some other disposition, a court might also need to examine other critical records in addition to the sentencing minutes. These other records would include such documents as the plea minutes, and as noted in the Sparber decision, the court worksheet or the file jacket, none of which can be accessed in the normal course by the Department.

57.    For the approximately 167 inmates identified as those whose sentencing minutes do not contain a reference to PRS, and for the remaining 379 whose sentence and commitment are silent (for the total of 546) but for whom the sentencing minutes are not in the file, DOCS has been mailing letters to sentencing courts, district attorneys and inmates seeking the intervention of the sentencing courts.

58.    As of the close of business on May 27, 2008, DOCS mailed out a total of 433 letters to sentencing courts. Of these apparently erroneous commitments, 138 were in New York County, 110 in Kings County, 55 in Erie County, 55 in Queens County, 21 in Suffolk County, 28 in Bronx County, 12 in Monroe County, 4 in Westchester County, 8 in Rockland County and 2 in Albany County..

59.    The Department believes that Garner and the Sparber cases do not signal a call for immediate and precipitous release of inmates in custody; rather, the Court of Appeals remanded for resentencing in the Sparber cases, and noted in Garner that resentencing may be available. Rather than immediately release inmates and supervisees from custody, plaintiffs believe referral of these cases to the sentencing courts within a reasonable time is appropriate to permit the courts, with input from the district attorneys and defendants, the opportunity to correct errors in sentences or otherwise pronounce what such defendants' sentences must encompass under applicable law.

17

60.    The Department has worked historically with the courts and county and municipal authorities to correct errors in sentencing. The PRS Initiative has required the Department and Parole to undertake the burdensome and time-consuming process of notifying the relevant district attorney of any inmate or releasee whose criminal sentence may not have had PRS properly pronounced at sentencing, in violation of the law.

61.    Time is required to coordinate this resentencing effort with district attorneys across the state as well as with the resentencing courts and the attorneys for the criminal defendants requiring resentencing.

62.    This affirmation is made specifically in support of plaintiffs' application for an emergency order authorizing the Department to retain in its custody each member of the defendant subclasses described until such time as a subclass member has been calendared for resentencing, or the courts have otherwise taken appropriate steps toward resolving the issues presented; and authorizing the Department to release from its custody any member of the defendant subclass who is incarcerated solely on the basis of a PRS violation and for whom it appears that no resentencing will timely resolve such issues.

63.    Immediate release of such inmates would subject the citizens of New York to imminent and irreparable harm. The threat is real and not imagined. Indeed, a habeas corpus petitioner challenging custody pursuant to a PRS violation, after prevailing in Bronx County Supreme Court in April 2008, was released rather than reincarcerated, only to have been charged in the May 15, 2008 murder of a 63-year-old grandmother at her dry cleaning business in Brooklyn.

18

64. The Department submits that it should defer to the sentencing courts before releasing hundreds of inmates immediately and thousands more in the next year, and many more thousands in the years to come. As Garner instructs, the Department may not presume to determine what an inmate's sentence should be. The Department respects the fundamental premise that sentencing is the sole premise of the judiciary and recognizes that it must calculate terms of imprisonment as ordered by the sentencing court. It is the practice of the Department to notify the sentencing court of any apparent errors in sentencing, so that the court may have the opportunity to take any appropriate action.

65. Given the circumstances, the Department requests that this Court grant an order maintaining the status quo until the parties have had an opportunity to obtain necessary documents and assess the circumstances of individual cases, and the sentencing courts have had an opportunity to calendar the cases for possible resentencing.

66. Time is of the essence, and there would be foreseeable irreparable harm to the people of the State of New York if DOCS must immediately release hundreds, and then thousands of violent felons. Equally compelling is the need for swift resolution of the matters so that individuals who are entitled to be released are released as soon as practicable. Any such individuals obviously should not be exposed to unnecessary incarceration; conversely, the citizens of the State of New York should not be exposed to the public safety risks that are consequences of PRS errors made or uncorrected by the sentencing courts, the district attorneys, the defense bar as well as DOCS, Parole and other state agencies.

## CLASS ACTION RELIEF IS REQUIRED

19

67.    In Garner, the Court of Appeals ruled that DOCS can be prohibited from administratively assessing a period of PRS on a determinate term of imprisonment, even though PRS is mandated by statute. Nevertheless, the Court noted that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." Id., 10 NY3d at 363, n. 4. Indeed, the Court of Appeals' decision in the Sparber group of cases signals that the remedy for the error of unpronounced terms of PRS is not to strike PRS from the sentences, but rather to remit to the sentencing courts "for resentencing and the proper judicial pronouncement of the relevant PRS terms." Id., 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053, at **2.

68.    Because of the Court of Appeals' decisions in Garner and Sparber, plaintiffs are faced with a vast number of individuals who are currently subject to periods of PRS that were not lawfully imposed and may appropriately be subject to correction through the resentencing process.

69.    The class includes thousands of inmates and supervisees who are subject to periods of PRS that, under Garner and Sparber, were not lawfully imposed. The specific circumstances of each case may differ, and, as the Sparber and Garner cases demonstrate, there are a variety of flaws that can lead to a period of PRS being declared unlawful. However, the only method that has consistently been identified as correcting a period of unlawful PRS is a resentencing proceeding before the original sentencing court. See, e.g., Garner; Sparber; and Earley v. Murray, 451 F.3d 71, at 76 (2nd Cir. 2006), rearg. denied 462 F.3d 147, ("when DOCS discovered the oversight made by Earley's sentencing

judge, the proper course would have been to inform the state of the problem . . . [t]he state then could have moved to correct the sentence through a judicial proceeding, in the defendant's presence, before a court of competent jurisdiction").

70.    Therefore, if DOCS is to avoid (a) releasing thousands of violent felons to the street without any further supervision and (b) allowing thousands of illegal sentences to stand uncorrected, it must endeavor to return each member of the class to his or her sentencing court. The sentencing courts are the forums that are best suited to making the individualized determinations that must be made if the legal deficiencies in the sentences of all the class members are to be corrected.

71.    The first step in implementing the necessary resentencings is for plaintiffs to identify every individual who may be subject to an improperly imposed term of PRS (the members of the class).

72.    DOCS and Parole have already commenced this massive task, which is complicated by the fact that the sentence and commitment order and the sentencing minutes of each class member must be inspected, and each case must also be examined to determine any undischarged portion of the determinate sentence.

73.    Plaintiffs  must enlist the sentencing court of each class member, as well as the relevant district attorney's office, and believe that the interests of justice are best served when defendants have been given the opportunity to retain counsel.

74.    As set forth above, plaintiffs are currently seeking that cooperation by sending individual letters and proposed orders to the sentencing courts and district attorneys for each class member. To the date of this Complaint, more than 433 letters

have been sent to sentencing courts across the state impacted by the decisions in Garner
and Sparber.

75. Therefore, it is essential that a temporary restraining order brought on by an
order to show cause be granted, and that the status quo be maintained for the specified
timeframe from the entry of this Order or pending the hearing on the preliminary injunction.

76. No prior application for similar relief has been made to this Court.

WHEREFORE, it is respectfully requested that the relief requested be granted.

Dated:Albany, New York
    June _4/ᵣₕ_, 2008

Anthony J. Annucci

# EXHIBIT A

## POST-RELEASE SUPERVISION
## RESENTENCING INITIATIVE

### PURPOSE

The purpose of this document is to detail the cooperative effort that is being undertaken jointly by the Department of Correctional Services (DOCS) and the Office of Court Administration (OCA), in conjunction with the Governor's Office of Counsel, to arrange for the resentencing of numerous individuals presently incarcerated with DOCS. Specifically, this applies to individuals with determinate sentences of imprisonment that require the imposition of post-release supervision (PRS) pursuant to Penal Law Section 70.45, and for whom the sentencing court did not pronounce such period of PRS at the time of sentence.

### HISTORICAL BACKGROUND

Penal Law Section 70.45 was enacted as a part of Chapter 1 of the Laws of 1998 and in pertinent part provides that "[e]ach determinate sentence also includes as a part thereof, an additional period of post-release supervision." It applies to all violent felony offenders who committed their crimes on or after September 1, 1998, and who were subject to a determinate sentence of imprisonment. It has since been expanded to also cover drug offenders and those sex offenders who were previously subject to indeterminate sentencing.

When an individual is committed to state prison and delivered to a DOCS reception center, in accordance with Correction Law Section 601(a), the documents that accompany the individual include "a certified copy of the sentence and a certificate of conviction pursuant to Section 380.70 of the Criminal Procedure Law", a copy of the pre5sentence report, and a copy of the criminal history record.

The sentencing minutes are not delivered with the inmate to a reception center. Instead, in accordance with Section 380.70 of the Criminal Procedure Law (CPL), the sentencing minutes are required to be transcribed and then mailed to DOCS within thirty days of the date of sentence. Though this provision of law is mandatory, DOCS does not always receive a copy of the sentencing minutes. Moreover, at the time of reception, DOCS must perform all reception related responsibilities, which include the calculation of an inmate's sentence whereby all of the potential release dates are determined, e.g., the parole eligibility date where applicable, the conditional release date, and the maximum expiration date, etc.

Each month DOCS receives approximately 1,400 new commitments into its custody, each of whom will require a sentence calculation. This is a separate and distinct category from the hundreds of parole violators, conditional release violators, and post-release supervision violators who are also routinely returned to the custody of DOCS.

Once all of the various reception responsibilities are completed, which generally requires a period of about one week, the inmate is transferred to a general confinement

facility to continue serving the underlying sentence of imprisonment. It is crucial for DOCS not to cause any delays in the reception process since all such beds are needed to enable DOCS to accept all state-ready inmates in a timely manner from the localities. (see CPL section 430.20(1)). Hence, the sentence calculation responsibility must be performed at the time of the reception.

In a recent Court of Appeals case captioned Matter of Garner v. DOCS,__NY3d__, (April 29, 2008), the Court ruled that DOCS was without authority to administratively add PRS to the sentence and that only the sentencing judge is authorized to pronounce the PRS component of a defendant's sentence. The Court also noted that their holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

Prior to the Garner decision, and based upon DOCS' earlier understanding of the requirements of Penal Law Section 70.45, DOCS would calculate the mandatory period of PRS as part of the inmate's sentence at reception, even if the commitment document was silent on the issue of PRS.

## PLANNED COURSE OF ACTION

Now that the Garner decision has finally resolved the issue, DOCS, in accordance with the general principles set forth in Correction Law Section 601-a, is working in tandem with OCA to identify every potential case that would appear to qualify for resentencing, and to provide official notification to the sentencing courts and the district attorneys. It would appear that such resentencing should be pronounced nunc pro tunc to the date the original sentence was imposed.

In order to proceed in an orderly fashion, it has been determined that the first priority must be accorded to those individuals who are in the custody of DOCS based upon a technical violation of PRS, and for whom the commitment document was silent. Several months ago DOCS undertook a huge research project to identify every case that involved both a silent commitment and a period of PRS. In order to do this, DOCS had to manually examine each commitment document for every inmate who was subject to a determinate sentence of imprisonment that required PRS, in order to determine whether it was silent as to PRS.

In the wake of the Garner decision, however, another step is required in order to determine whether or not the court actually failed to pronounce a period of PRS at the time of sentencing. The experience of DOCS has been that in a number of cases where the commitment was silent, a separate review of the sentencing minutes did indicate that the period of PRS was pronounced by the court at sentencing. In all such cases it would appear that a clerical error had been made in the preparation of the commitment document and that the issuance of a new commitment document that would conform to what transpired during sentencing, would correct the defect without the necessity of an actual resentencing procedure. Hence, a review of the sentencing minutes is a prerequisite in every case in order to accurately determine whether resentencing is warranted.

Since DOCS is not always provided with a copy of the sentencing minutes, it is not possible to definitively identify every case where resentencing is warranted. Instead, in those cases where the sentencing minutes are available and the commitment is silent, DOCS can identify definitively each case that would be subject to resentencing. As of May 7, 2008, DOCS identified a total of 166 cases in this category.

In those cases where the commitment is silent but there are no sentencing minutes, DOCS can only bring these cases to the attention of the sentencing courts and the district attorneys as cases that potentially may warrant resentencing. The sentencing courts and district attorneys in turn will have to retrieve and review the sentencing minutes in order to make definitive determinations. As of May 7, 2008, a total of 380 cases have been identified within this category.

In an overall effort to move expeditiously, DOCS has generated lists of both categories of cases by county of commitment, and is providing such lists by e-mail to the concerned district attorney offices, so that the appropriate investigations can be immediately initiated. Formal notifications will separately be mailed both to the sentencing courts and the district attorney offices, which will also include copies of the commitment documents, and where available, the sentencing minutes as well.

# EXHIBIT B

**NEW YORK STATE**
Unified Court System

OFFICE OF COURT ADMINISTRATION

ANN PFAU
CHIEF ADMINISTRATIVE JUDGE

LAWRENCE K. MARKS, ESQ.
ADMINISTRATIVE DIRECTOR

## MEMORANDUM

May 14, 2008

TO:         Administrative Judges

FROM:     Lawrence K. Marks $\smile$ M

SUBJECT:  Post-Release Supervision

As you may know, the Court of Appeals in two recent decisions (People v. Sparber and People v. Garner, both decided on April 29, 2008) addressed the issue of a trial court's failure to pronounce at sentencing the period of post-release supervision (PRS) that the Penal Law requires be imposed for sentences in certain cases (see Penal Law § 70.45).

These decisions may well require, ultimately, that thousands of currently incarcerated defendants be resentenced . The immediate focus of concern, however, is a group of several hundred defendants who have served their prison terms but have been returned to State prison for committing a technical violation of a condition of their PRS. In the next few days, the State Department of Correctional Services (DOCS) will be sending directly to each of you letters and a proposed order that DOCS has individually addressed to the judges in your court or district who sentenced these defendants (drafts of these materials are attached). These are cases in which DOCS has a copy of the sentencing minutes and the minutes reveal that the PRS period was never pronounced at sentencing or cases in which DOCS does not have a copy of the sentencing minutes and thus is unable to determine if the PRS period was pronounced at sentencing. The numbers of these cases range from as many as 142 in New York County and 107 in Kings County to just a few or even none in the smaller counties.

As you can see in the attached drafts, among other things DOCS will be asking the sentencing judge (1) if DOCS has a copy of the sentencing minutes, to calendar the case and impose the PRS period nunc pro tunc, or, if the judge is not prepared to do that, to order DOCS to calculate the term of imprisonment without PSR and (assuming there are no holds) release the inmate without any further supervision; or (2) if DOCS does not have a copy of the sentencing minutes, to acquire the sentencing minutes, and if the minutes reveal that the PRS period was not pronounced at the sentencing then calendar the case and impose the PRS

TRO Argument.txt

1

STATE OF NEW YORK
SUPREME COURT                         COUNTY OF ALBANY
-----------------------------------------------------------
THE STATE OF NEW YORK, THE NEW YORK STATE
DEPARTMENT OF CORRECTIONAL SERVICES and THE NEW
YORK STATE DIVISION OF PAROLE,

                              Plaintiffs,

        -against-                              INDEX NO.
                                               4834-08

MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON and
MALCOLM CARTER, Individually and on behalf of
all others similarly situated,

                         Defendants.

-----------------------------------------------------------
                      ORAL ARGUMENT

B E F O R E:        HON. JOHN C. EGAN, JR.,
                    Supreme Court Justice

A P P E A R A N C E S:

For the Plaintiffs: HON. ANDREW M. CUOMO,
                    NYS Attorney General
                    BY:  MICHAEL J. KEANE, ESQ.,
                    and ANDREW H. MEIER, ESQ.,
                    and KAREN MARCOUX MANKES, ESQ.,
                    Assistant Attorneys General.

For the Defendants: THE LEGAL AID SOCIETY
                    BY:  WILLIAM D. GIBNEY, ESQ.

                    JOSHUA L. DRATEL, P.C.
                    BY:  AARON MYSLIWIEC, ESQ.

        TRANSCRIPT OF PROCEEDINGS in the above-entitled matter

held at the Albany County Judicial Center, Albany, New York

on Friday, June 6th, 2008 commencing at 2:20 p.m.

TRO Argument.txt

```
1  (State of NY, et al. v. Michael Myers, et al.)                 2
2                 THE COURT:  This is The Matter of the State
3            of New York, The New York State Department of
4            Correctional Services and the New York State
5            Division of Parole, as plaintiffs, against Michael
6            Myers, Roger Smalls, Jesus Negron and Malcolm
7            Carter, individually and on behalf of all others
8            similarly situated, as defendants.
9                 We are here this afternoon in open court on
10           an application by the plaintiffs for an order to
11           show cause and temporary restraining order.  Are
12           there any appearances by any party to this action?
13                MR. KEANE:  On behalf of plaintiffs, from
14           The Office of the Attorney General, Michael Keane.
15                MR. MEIER:  On behalf of plaintiffs, Andrew
16           Meier, Attorney General's Office.
17                MS. MANKES:  On behalf of plaintiffs,
18           Attorney General Karen Mankes.
19                MR. GIBNEY:  William Gibney, The Legal Aid
20           Society.
21                Your Honor, for the record I would like to
22           make it clear that I do not represent any of the
23           named defendants in this action.  We do represent
24           people who are among the purported class, and thus
25           their rights maybe affected.
```

TRO Argument.txt

```
 1  (State of NY, et al. v. Michael Myers, et al.)              3
 2                   THE COURT: Any other appearances?
 3                   For the State, please.
 4                   MR. KEANE:  Your Honor, on behalf of The
 5              State of New York, The New York State Department of
 6              Correctional Services and The New York State
 7              Division of Parole.
 8                   Plaintiffs, through our office, are seeking
 9              interim emergency relief, an order from this Court
10              to maintain the status quo in that DOCS and parole
11              should be directed by this Court, for reasons of
12              public safety, to maintain custody of incarcerated
13              inmates and maintain supervision over parolees
14              released to parole supervision who are serving
15              terms of the legislatively mandated post-release
16              supervision, which appears to be beyond their
17              maximum expiration dates of a determinate sentence
18              to which they were sentenced some years ago.  The
19              immediate release of these individuals to the
20              community presents a public safety hazard, as can
21              be substantiated by an incident occurring just
22              weeks ago in which a parolee, who was relieved of
23              his parole supervision by habeas corpus, was
24              released, and consequently weeks later was arrested
25              and charged with the murder of a woman in Brooklyn,
```

TRO Argument.txt

```
 1  (State of NY, et al. v. Michael Myers, et al.)          4
 2              who was running a dry cleaning store.
 3                    Indeed, parole supervision is a fundamental
 4              part of the public safety apparatus that is
 5              designed to protect the public from people who are
 6              reintegrated into society after serving terms in
 7              prison, and by the some token a program that helps
 8              these same individuals help themselves by helping
 9              people transition into society.  The post-release
10              supervision is part of that overall plan.  The
11              Legislature never intended that post-release
12              supervision should somehow be commuted through
13              habeas corpus or Article 78 proceedings.  It is
14              important that every individual, as the Court of
15              Appeals dictated in Garner, be returned to a
16              sentencing court to correct the sentencing errors
17              in the sentence, and have the sentencing court make
18              the determination of whether or not the criminal
19              defendant should serve post-release supervision or
20              not.  Had post-release supervision been carried out
21              as contemplated, the class of defendants that DOCS
22              and parole and the State of New York are seeking to
23              maintain custody over would be serving mandatory
24              terms of post-release supervision.  The fortuity of
25              sentencing errors, and these are not glaring
```

TRO Argument.txt
1  (State of NY, et al. v. Michael Myers, et al.)          5

2              errors.  These are errors that ten years of

3              practice by court administrators, by judges, by

4              indeed defense bar lawyers, by district attorneys,

5              the entire judicial system and everyone who

6              participates in the judicial system believed that

7              post-release supervision worked largely

8              automatically by operation of law, and indeed the

9              Court of Appeals decisions made that same

10             determination, as well as the Appellate Division,

11             for at least eight years beyond the passage of

12             Jenna's Law.

13                    Indeed, the Court can take judicial notice

14             of the fact that lawyers from The Legal Aid

15             Society, who represented criminal defendants,

16             received a memo from Legal Aid in 1998 instructing

17             Legal Aid lawyers and defense lawyers of

18             post-release supervision and of its provisions.  No

19             one can claim in good faith that there has been ten

20             years of ignorance of the law.  The People of New

21             York, the State of New York, its citizens deserve

22             to have, to avoid a situation where the precipitous

23             release of hundreds and then thousands of

24             individuals should be forestalled not by some type

25             of unlimited custody, but by very cautious and

1  (State of NY, et al. v. Michael Myers, et al.)          6

2              deliberate process.  DOCS and parole were

Page 5

TRO Argument.txt

3      prohibited by the Garner decision calculating

4      post-release supervision into sentences,

5      determinate sentences pursuant to the statute

6      because that determination exceeds their

7      jurisdiction as executive agencies.  Only courts

8      should be determining whether post-release is part

9      of a sentence or not.

10      DOCS is facing a Hobson's choice.  Either to

11      make a judicial determination that it is or isn't

12      there, based on imperfect records.  For many

13      defendants we do not have sentencing minutes.  We

14      don't have other indicia of what the sentence of

15      the Court was.  If DOCS releases inmates, parole

16      releases parolees based on imperfect information,

17      the State exposes itself to liability for Any

18      consequences that arise out of that precipitous

19      release.  Then, by the same token, counsel in the

20      courtroom will tell us, and indeed counsel for the

21      federal class action told us by e-mail just a

22      couple of days ago, if we don't immediately release

23      all of these people we are exposing ourselves to an

24      ever increasing money damage lawsuit.  We get sued

25      one way or the other, and that is why the

1  (State of NY, et al. v. Michael Myers, et al.)     7

2      declaration seeks a definition of our rights, and

3      all we are asking for is time.

4      It is important, it is of paramount

TRO Argument.txt

5       importance to the safety and security of the people
6       of New York State that for a short time, whether it
7       be for a week or for two weeks, before a
8       preliminary injunction motion can be heard that
9       DOCS be authorized to maintain custody.  It is
10      without prejudice, this application, to any
11      individual to on its own, the 500 whose names have
12      already been identified to sentencing courts around
13      the state whose names are identified to DA's.
14      whose resentencing hearings, for dozens of them,
15      have already been scheduled or heard, where that
16      defendant has appeared in court with a lawyer.  It
17      is without prejudice to their release.  All DOCS
18      and parole is asking this Court to do is to follow
19      the Court of Appeals and permit the sentencing
20      courts to do their job.  It is again without
21      prejudice to anyone from seeking any kind of
22      independent relief.

23          DOCS is not the bad guy; parole is not the
24      bad guy.  We just don't know.  We may even have 50
25      percent of the cases at the end of the day where we

☐

1  (State of NY, et al. v. Michael Myers, et al.)            8
2       don't have sufficient information to know what the
3       sentences were to be.  There will be a hearing, a
4       conference in front of Judge Stein in the Southern
5       District on Monday in the federal class action.
6       DOCS has spoken up in conferences before Judge

TRO Argument.txt

7     Stein, who has not formally scheduled a hearing on

8     a preliminary injunction, but has not signed a

9     temporary restraining order. Judge Stein will be

10    asked, undoubtedly, on Monday for federal

11    supervision of the post-release sentencing program

12    in the state system. We have argued, as did

13    District Judge Koreman in Brooklyn, on the early

14    case on remand that these are problems that can and

15    should be solved by the State. The State of New

16    York is perfectly capable of solving the

17    post-release supervision release sentencing

18    problems. We do not think the Federal Court needs

19    to entertain the issues, and we seek this Court's

20    assistance in propelling us forward so that we can

21    get justice for all, justice for the public, and

22    justice for the criminal defendants who may or may

23    not be entitled to their liberty. There is no

24    margin of error. We simply seek the Court's

25    assistance in moving this post-release sentencing

1  (State of NY, et al. v. Michael Myers, et al.)     9

2     issue forward.

3         THE COURT: What relief are you seeking

4     today?

5         MR. KEANE: We are seeking an order from

6     this Court authorizing DOCS and parole to maintain

7     custody over incarcerated inmates, who appear to be

8     in custody solely on the strength of post-release

TRO Argument.txt

 9        supervision, although we can't be sure based on our

10        records.  At the same time, maintain custody over

11        parolees who are being supervised solely on the

12        basis of post-release supervision whose records,

13        again, we can't be sure suggest that post-release

14        supervision was not correctly pronounced in the

15        sentence report.  That is all we ask.  For a period

16        of time.  At the same time, and this is where

17        defendants are not prejudiced terribly because any

18        defendant of our potentially 30 thousand

19        post-release supervision inmates or supervisees

20        could at anytime step up, file papers in court, as

21        hundreds of them have already done.  It is a win

22        win for everyone concerned.

23              THE COURT: Let me ask you this.  Who are

24        they?

25              MR. KEANE:  We have a concrete grasp on 546.

 1  (State of NY, et al. v. Michael Myers, et al.)          10

 2        We know who the 546 DOCS inmates are.

 3              THE COURT:  Is that in your papers?

 4              MR. KEANE:  Yes.  It is also in our papers

 5        that we have communicated with the sentencing

 6        courts in all of those cases, but for perhaps a

 7        dozen by the end of this week, and perhaps that

 8        process will be completed early into next week.

 9        There are thousands more under parole supervision,

10        and the division of parole is sending out letters

Page 9

TRO Argument.txt

11          to sentencing courts in those cases as we speak,

12          and we do note that as far as the 546 in the DOCS

13          custody go, we have received at least 60 orders to

14          produce into sentencing courts from that 546, and

15          we are simply awaiting word from sentencing courts

16          whether DOCS should release or maintain custody.

17          Perhaps as many as a dozen of these inmates have

18          been released already, within the past month, on

19          the strength of communications with the sentencing

20          courts.  We are simply asking for time to allow

21          ourselves to move the process along without the

22          precipitous release.

23               THE COURT: What I am trying to determine is:

24          Who is it that you are asking me to issue a

25          temporary restraining order against?  In terms of

1   (State of NY, et al. v. Michael Myers, et al.)          11

2          identity.

3               MR. KEANE:  We are asking you to issue an

4          order  --

5               THE COURT: I'm sorry.  There are four named

6          defendants, but it seems to be there is a larger

7          group that you are alluding to.

8               MR. KEANE:  We would ask the order to be

9          directed against the subclass of defendants who fit

10          the subclass, a category, as defined in footnote

11          one on page two of the order to show cause.  It

12          would be the whole group, but  --

Page 10

```
                        TRO Argument.txt
13              THE COURT: What are their names?
14              MR. KEANE: We do not have the identities of
15         the roughly 1,000 parolees, but we do have names
16         that we could provide the Court as to the 546 in
17         DOCS.
18              THE COURT: Are those names in the papers?
19              MR. KEANE: Those names are not in the
20         papers.
21              THE COURT: Were any of those people notified
22         of this application?
23              MR. KEANE: One of those names may have
24         been. One of the named defendants.
25              THE COURT: Which would that be?
```

⬜

```
1  (State of NY, et al. v. Michael Myers, et al.)        12
2              MR. KEANE: Michael Myers.
3              THE COURT: He has been served?
4              MR. KEANE: He has been served and, indeed,
5         he also has received, at some point in the last
6         four weeks, a letter from DOCS in which DOCS
7         informed the sentencing court there may have been
8         an error in his sentence.
9              THE COURT: Anyone else?
10             MR. KEANE: Everyone else in the subclass
11        that we are talking about who is incarcerated has
12        received or will have received -- I think an
13        affidavit attached to our papers states that over
14        500 letters have been sent as sentencing reports.
```

Page 11

TRO Argument.txt

15    So 500 members of this subclass are fully aware of
16    the fact that DOCS has referred their sentences to
17    the sentence reports.
18         THE COURT: Are they aware of this
19    proceeding?
20         MR. KEANE:  They are not aware of this
21    proceeding.
22         THE COURT: Have they been served with these
23    papers?
24         MR. KEANE:  They have not been served with
25    these papers.



1  (State of NY, et al. v. Michael Myers, et al.)        13
2         THE COURT: Let me ask you this.  Doesn't
3    post-release supervision contemplate that each of
4    these defendants would be released from custody?
5         MR. KEANE:  The way it works, and actually
6    perhaps I could defer to Mr. Meier.  He knows
7    this.
8         MR. MEIER:  Absolutely.  It is all about
9    release.  Basically post-release supervision.
10   There was a time when all sentences in New York
11   State were indeterminate.  You got five to ten or
12   15 to 20.  Then there was a move into the '90s to
13   make sentences for violent felony offenders
14   determinate, so there was no more people getting
15   out before they should.  So instead of eight to
16   ten, you got eight.  But then, because you couldn't

TRO Argument.txt

17          be released straight from prison back to the

18          community, the Legislature determined you have some

19          sort of post-release supervision.  So instead of

20          having five to 15 or whatever you had eight and

21          then five years of post-release supervision at the

22          end.

23              THE COURT: That is commonly referred to as

24          parole.

25              MR. MEIER:  Pretty much you call it parole.

1  (State of NY, et al. v. Michael Myers, et al.)          14

2          Conditional release.  Supervised release.

3          Post-release supervision.  Conditional release.

4          Parole release.  Discretionary release.  It all is

5          basically parole.  The only group that would be

6          affected in this action would be those who have

7          post-release supervision after a determinate

8          sentence.

9              The one complicating factor.  In order to

10         maintain prison discipline you need to have an

11         award for good behavior.  So built into sentences

12         is conditional release.

13             THE COURT: Isn't the problem that the Court

14         of Appeals pointed out is that the Department of

15         Correctional Services was imposing post-release

16         supervision, not the sentencing court?

17             MR. MEIER:  The problem is they were doing

18         it, but the sentencing court had not.  In other

Page 13

TRO Argument.txt

19        words, when you are received into custody DOCS

20        takes your information from the courts and does the

21        math on your sentence.  They do that for every,

22        single person they get.  Calculate and impose a

23        sentence on everybody into custody.

24              THE COURT: So what does the State want to do

25        here?  Send each of these people back to the local

 1  (State of NY, et al. v. Michael Myers, et al.)          15

 2        sentencing court and rectify the error?

 3              MR. MEIER:  Absolutely.

 4              THE COURT: Have the local sentencing courts

 5        imposed post-release supervision?

 6              MR. MEIER:  There is a number of options.

 7        They could either resentence.  They could ask --

 8              THE COURT: To what?

 9              MR. MEIER:  Whatever they worked out.  The

10        original determinate sentence, plus post-release

11        supervision.  They could discount some time off the

12        determinate sentence.  Give them a whole new

13        sentence.  The defendant could move to vacate his

14        plea on the basis that his plea was unknowing and

15        he was never informed of post-release supervision.

16        That is something that is another complicating

17        factor that a lot of defense attorneys argue.

18        These guys, you have to give them their plea back,

19        but what they want to do is strike the post-release

20        supervision without giving these guys an

Page 14

TRO Argument.txt

```
21          opportunity to seek to get the plea back.  So, in
22          other words, if we excised post-release
23          supervision.  The actual defendants themselves
24          would not only be deprived of the benefit of
25          post-release supervision, they would also be
```

 

```
 1   (State of NY, et al. v. Michael Myers, et al.)       16
 2          deprived of the benefit to get to litigate whether
 3          or not their plea was voluntary by returning to the
 4          sentencing court.
 5               THE COURT: So from the perspective of the
 6          State, is it fair to say you just want to make sure
 7          that these defendants are legally placed on
 8          post-release supervision?
 9               MR. MEIER:  That is precisely it, to the
10          extent that the sentencing courts decide --
11               THE COURT: You are okay leaving that up to
12          the sentencing court?
13               MR. MEIER:  We would not be a party to
14          resentencing.  That would be the Judge, the DA and
15          the defendant himself.  We would have no role.  We
16          would be bound by the determination of the
17          sentencing court.
18               THE COURT: Okay.  Thank you.
19               MR. MEIER:  Thank you.
20               THE COURT: Mr. Gibney.
21               MR. GIBNEY:  Thank you, Your Honor.
22               On behalf of the purported portion of the
```

TRO Argument.txt
23          purported defendant's class, we have submitted
24          papers to the Court summarizing our argument
25          regarding opposition to the temporary restraining

1    (State of NY, et al. v. Michael Myers, et al.)          17
2          order.  This saga about post-release supervision
3          began two years ago this month, or next month.  Two
4          years ago when Early v. Murray came down from the
5          federal circuit, which said that the New York State
6          Department of Correctional Services has no
7          authority to administratively impose post-release
8          supervision.  At that time, when the decision came
9          down, DOCS applied for reargument.  It was denied.
10         The Court reiterated its position that DOCS had no
11         authority.  Instead of complying with the Federal
12         Court mandate, which said that the Constitution of
13         the United States prohibits DOCS from maintaining
14         its procedure, DOCS decided to totally ignore the
15         Federal Court order, and that decision two years
16         ago precipitated what they now call an emergency.
17              For the last two years they have forced
18         petitioners on post-release supervision to file
19         action after action after action against the State,
20         and over the course of the last two years Appellate
21         Division after Appellate Division has agreed with
22         the Federal Court, which said DOCS had no authority
23         to hold people on administratively imposed
24         post-release supervision.  They continued to do

Page 16

TRO Argument.txt
25          that through that entire period, when all four

1   (State of NY, et al. v. Michael Myers, et al.)        18
2          Appellate Divisions agreed with the Federal Court.
3          Last month they went and the Court of Appeals
4          upheld the ruling of Earley v. Murray and said that
5          under State law you have no authority to impose and
6          hold people under administratively imposed
7          post-release supervision.  This action is an
8          attempt by the State to get this Court to authorize
9          illegal incarceration for periods that have already
10         been declared by every court now that has seen the
11         issue from the Second Circuit to the Court of
12         Appeals of this State, that it is improper for DOCS
13         to hold people and administratively impose
14         post-release supervision.
15              The plaintiffs come into this action with
16         unclean hands, and it is unlikely that they will
17         ever succeed on the merits regarding this ability
18         to hold what they call the defendant Class A for
19         continued periods exclusively on the post-release
20         supervision.  They want the Court then to provide
21         cover for their continued illegal incarceration.
22              Any extension of incarceration by this Court
23         would be improper.  If you think about it, Your
24         Honor, what is going to happen in a resentencing?
25         We are talking primarily about defendant Class A.

TRO Argument.txt

```
 1   (State of NY, et al. v. Michael Myers, et al.)          19
 2              The people being held on post-release supervision
 3              for  -- while they are serving a period of
 4              illegally imposed post-release supervision.  What
 5              is going to happen at resentencing?  The Court is
 6              going to impose post-release supervision.  What
 7              DOCS does not tell you is that part of their plan
 8              is to hold these people beyond the resentencing on
 9              the theory that somehow a nunc pro tunc
10              resentencing will retroactively justify all of the
11              post-release supervision proceedings that have
12              occurred in the interim.  Supreme Court Justice
13              Cirigliano has already declared part of this plan
14              illegal.  It is one illegal plan after another to
15              continue incarceration.  We pointed out the
16              plaintiffs do not meet their standards for a
17              temporary restraining order, and they have failed
18              to state a cause of action in this proceeding.  Any
19              order that is issued by the Court, Your Honor,
20              should be carefully worded, and we would be willing
21              to come back for a meeting with the Court, if you
22              want assistance drafting this order on Monday.  Our
23              concerns are that the broad and sweeping language
24              that has been proposed by the plaintiffs may
25              suspend habeas corpus orders that are pending.
```

TRO Argument.txt

```
 1  (State of NY, et al. v. Michael Myers, et al.)          20
 2              That it may allow the plaintiffs to ignore Article
 3              78 proceeding decisions that might come down in the
 4              interim that would order post-release supervision
 5              to be removed.  Any order from the Court should
 6              explicitly state that it does not affect the prior
 7              rights of parties that existed before we came into
 8              court today, and that certainly doesn't interfere
 9              with habeas corpus orders or Article 78 proceedings
10              from other courts of concurrent jurisdiction.
11              We think it is improper to issue any class
12              relief today, because there are no represented
13              class defendants here.  In many of the cases that
14              are asking you to continue incarceration for a
15              resentence at all is illegal because the entire  --
16              the original sentence imposed by the Court has
17              expired, and there is a long line of double
18              jeopardy cases that say that when your original
19              sentence expires you can't come back and be
20              resentenced to some longer sentence later on.  Your
21              expectation of finality for double jeopardy
22              purposes is over.
23              Counsel for the federal action has pointed
24              out to me a transcript from the federal proceeding
25              in which it appears that the position of the
```

TRO Argument.txt

2          plaintiffs in this action appears to have changed
3          regarding their ability to maintain custody of the
4          defendants in this class.  They were asked by Judge
5          Stein on May 9th on page 22 of the transcript of
6          the proceeding.  "Is the position of DOCS going to
7          be that nothing is going to happen unless and until
8          people insert individual habeas petitions in State
9          Court?"  Mr. Keane stated:  "No, Your Honor.  That
10         is not the position.  The position of DOCS is that
11         we understand we are prohibited from maintaining
12         custody of individuals, unless we have a court
13         order permitting us to do so from some court.  We
14         are prohibited from maintaining custody. The
15         question is:  How did we develop a subsequent
16         response and handle the volume of people who maybe
17         affected." They are asking this Court to not
18         maintain the status quo, but to change the status
19         quo and give the plaintiffs cover for what we
20         believe would be a period of illegal incarceration.
21              Mr. Keane said in his presentation to the
22         Court that at the end of the day perhaps DOCS will
23         have 50 percent of the people, the paperwork
24         available so that they can tell exactly what the
25         sentencing court did.  If part of their application

1  (State of NY, et al. v. Michael Myers, et al.)         22
2          was to say the court orders that anybody that State
3          DOCS has the sentencing minutes for and commitment
                              Page 20

TRO Argument.txt

```
 4          papers, and it is clear that the sentencing court
 5          never imposed post-release supervision and that we
 6          will, when we have those papers in hand.  If that
 7          is, in fact, the situation that the papers reveal
 8          we will release those people.  That is not the
 9          position of the plaintiffs here.  They are
10          requesting relief from the Court which is greatly
11          overbroad, because they want authority from the
12          Court to maintain the people who they are
13          scrambling, we believe they are, in fact,
14          scrambling to get as many papers as they can, but
15          they are requesting authority to maintain custody
16          of the people who they know the sentencing court
17          did not impose post-release supervision.  So the
18          request is greatly overbroad.
19                  If Your Honor could press the plaintiffs, we
20          are very interested in trying to identify the 546
21          people, so if we could have some day when those
22          names would be turned over to us.  We fear that if
23          we don't get a day to turn them over we will be
24          given them a half hour before the next appearance
25          before this Court.
```

☐

```
 1  (State of NY, et al. v. Michael Myers, et al.)          23
 2                  MR. MYSLIWIEC: May I note my appearance?  In
 3          the same manner as Mr. Gibney, my name is Aaron
 4          Mysliwiec. I'm from the law office of Joshua
 5          Dratel.  I'm also one of the co-counsel on the
```

TRO Argument.txt

6   federal class action case that Mr. Keane referred
7   to.  I will be brief.

8     This whole action started with Mr. Keane
9   saying here today on the record that there is a
10   crisis in the judicial system.  That there is an
11   emergency matter that must be dealt with.  He
12   referred to this federal class action as something
13   that could end up with a broad order releasing
14   hundreds, perhaps thousands of people.  That is
15   just simply not the case.  There is no crisis right
16   now.  It has been dealt with on a case-by-case
17   basis in the State system, and in our own briefs we
18   conceded that the argument to get people to be
19   released all at once had problems here.  There is a
20   problem based on a case that the People cited in
21   their response.  Judge Stein has acknowledged that
22   issue as well.  Nothing about that litigation has
23   been an emergency.

24     We did seek injunctive relief.  Judge Stein
25   refused to give that in the beginning.  That

1 (State of NY, et al. v. Michael Myers, et al.)   24
2   litigation commenced on March 11th.  He said, "Try
3   to work some things out, see where the parties
4   stand."  We came back to court almost two months
5   later on May 9th.  He said the same thing.  He
6   said, "I want the parties to talk to each other."
7   He asked the Assistant Attorney General to include

TRO Argument.txt

8          plaintiff's counsel in those discussions about what

9          would the policy be.  What is going to happen?

10         There was supposed to be another court date on May

11         30th.  Again, in an effort to try to work this out,

12         we agreed to postpone that court date until Monday.

13              There is no chance that there is going to be

14         an order from Judge Stein on Monday ordering the

15         State to release 546 people.  It is not going to

16         happen.  There is no emergency.  It is a red

17         herring, yet it is the basis for this entire action

18         in the State Court.

19              THE COURT: All right.  Thank you.  We will

20         take a brief recess.

21              (Recess.)

22              THE COURT: We will go back on the record.

23         We are here in open court in the presence of the

24         attorneys who had appeared earlier, and I am

25         informed that Roger Smalls is present?

1  (State of NY, et al. v. Michael Myers, et al.)          25

2              MR. SMALLS: Yes, sir.

3              THE COURT:  Mr. Smalls, come on up.  State

4          your name.

5              MR. SMALLS:  Roger Smalls.  How you doing,

6          Your Honor?

7              THE COURT: I'm good.

8              MR. SMALLS: I'm not so good.

9              THE COURT:  You have an attorney, sir?

TRO Argument.txt

```
10              MR. SMALLS: No.  I don't have an attorney.
11              THE COURT: Did you receive some legal papers
12          from the Attorney General's Office recently?
13              MR. SMALLS: Yes, I did.
14              THE COURT: You need to speak with an
15          attorney about that.
16              Were you previously represented by counsel
17          in some criminal matters here in this County or
18          some other County?
19              MR. SMALLS: Yes.  Previously represented in
20          this County by -- I guess at the time it was Devane
21          maybe.
22              THE COURT: I'm sorry?
23              MR. SMALLS: Eugene Devane.  We are going
24          back some time ago.
25              THE COURT: Eugene Devine was the former
```

☐

```
 1  (State of NY, et al. v. Michael Myers, et al.)         26
 2              Albany County Public Defender.  So did you have The
 3          Public Defender representing you?
 4              MR. SMALLS: Yes.
 5              THE COURT: What Court was that?
 6              MR. SMALLS: It was in Judge Rosen's
 7          courtroom.
 8              THE COURT: Probably what you want to do is
 9          pay a visit to the Albany County Public Defender's
10          Office, and bring with you any legal papers that
11          you received in this matter.
```

TRO Argument.txt

12              MR. SMALLS: I have done that already.

13              THE COURT: Is there an attorney coming down

14      here this afternoon?

15              MR. SMALLS: No.   There was an Ed Schupp that

16      I spoke to with regard to this matter.

17              THE COURT: Okay.   He is an Assistant Public

18      Defender.

19              MR. SMALLS: Right.   He said that he was

20      doing some Article 78 work on my behalf on the

21      side.

22              THE COURT: Let's not get into too much what

23      he said to you.   You have done the right thing.   We

24      are just doing some preliminary work on this case

25      this afternoon.   We are going to adjourn this case,

☐

1  (State of NY, et al. v. Michael Myers, et al.)          27

2              and we will give you the adjourned date.   It will

3              be two weeks from today, June 20th at 9:30 in the

4              morning.   So we will get you an appointment card

5              with that written on it.   You should show that card

6              to Mr. Schupp so he knows when your next court date

7              is.

8              MR. SMALLS: He is not my attorney.   I need

9              some proper representation.   He told me he was

10             doing this for me on the side.   I need you to help

11             me, appoint counsel to me.

12             THE COURT: We will deal with that issue on

13             the 20th.   It may very well be that The Public
                         Page 25

TRO Argument.txt

14          Defender will be representing you.  Us judges will
15          figure that out.  All right?  I think what you want
16          to do is let him know of your court date and tell
17          him -- you know my name?
18                  MR. SMALLS: Judge Egan.
19                  THE COURT: Yes.  I think we have met.
20                  MR. SMALLS: Probably not.
21                  THE COURT: Let him know that I asked him to
22          come here on the 20th.
23                  MR. SMALLS: Okay.
24                  THE COURT: I suspect he will be willing to
25          do that.



1  (State of NY, et al. v. Michael Myers, et al.)          28
2                  MR. SMALLS: I'm sure he will.
3                  THE COURT: You gave him the papers?
4                  MR. SMALLS: He has all of the papers that I
5          have.  Yes.
6                  THE COURT: That is what he needs to do.  Ask
7          him to be here on the 20th.  We will figure this
8          out.  Here is your appointment.  We are almost done
9          here, if you want to remain.
10                 MR. SMALLS: I'm not going nowhere.
11                 THE COURT: Have a seat.  You will hear what
12         I have to say.
13                 I will grant the application of The State of
14         New York for an order to show cause.  The record
15         should reflect, before we came out here in court,
                           Page 26

TRO Argument.txt

16          we had an off-the-record discussion among the
17          attorneys regarding scheduling, and I will make the
18          return date on the order to show cause to be June
19          20th, 2008 at 9:30 in the morning here in Albany.
20              Per our discussion, I believe that date is
21          convenient for all of the attorneys who are
22          presently here.  That appearance may or may not be
23          in this courtroom.  You will want to check the day
24          before.  We rotate around between different
25          courtrooms.  It will depend on the Judge as well.

1  (State of NY, et al. v. Michael Myers, et al.)        29
2              I will deny the application of the State for
3          a temporary restraining order against the four
4          named defendants and the unnamed class of persons,
5          against whom the State has sought a temporary
6          restraining order.
7              First of all, with the exception of one of
8          the defendants who the Attorney General advised was
9          notified of this application here this afternoon,
10          none of the others were notified of this
11          application in order to be present here this
12          afternoon to be heard on application.  Secondly,
13          there is no apparent emergency to me, and I assure
14          the plaintiffs that there is no crisis in the
15          courts.  The Court of Appeals has spoken on the
16          issue which brings us here today, and the trial
17          courts are dealing with that on a County-by-County
                            Page 27

TRO Argument.txt

18          basis.  Mr. Keane pointed out a case of a former

19          inmate who apparently once released went on to

20          commit another crime, but the interesting fact here

21          is that the State is not asking ultimately to

22          extend the sentence of anyone.  They are seeking to

23          have certain person's post-release supervision

24          imposed in a legal fashion to rectify a procedural

25          error that the Court of Appeals pointed out.  We in

 1  (State of NY, et al. v. Michael Myers, et al.)          30

 2          the courts will deal with that situation on a

 3          case-by-case basis with the defendant, the

 4          defendant's attorney, and a prosecutor present.

 5              Now I have personally sentenced thousands of

 6          individuals to incarceration, but never without a

 7          defendant present, and to grant this TRO would

 8          effectively incarcerate an unnamed class of persons

 9          without any sense of due process.

10              I will sign the order to show cause with

11          modifications made by myself, and get copies of

12          that order for anyone who wishes a copy in a

13          moment.

14              I will see you on June 20th.  The Attorney

15          General should file the original papers in this

16          case with the Clerk of the Court, and within a few

17          days the Clerk of the Court will inform the parties

18          of the assigned Judge.  Thank you.

19                    (Proceedings concluded.)
                          Page 28

TRO Argument.txt

20
21
22
23
24
25

□

1  (State of NY, et al. v. Michael Myers, et al.)          31
2
3                  C E R T I F I C A T I O N
4
5
6
7
8            I, Deborah Mehm, a Senior Court Reporter in
9       the Unified Court System, Third Judicial District,
10      do hereby certify that the foregoing is a true and
11      accurate transcript of the proceedings reported
12      stenographically by me held before HON. JOHN C.
13      EGAN, JR., at Albany, New York on the 6th day of
14      June, 2008.
15
16                  _____
17                       Deborah Mehm, C.S.R.
18
19
20
21
                         Page 29

TRO Argument.txt

22

23

24

25

Parole6-20-001

1

STATE OF NEW YORK
SUPREME COURT                        COUNTY OF ALBANY
----------------------------------------------------------
THE STATE OF NEW YORK, THE NEW YORK STATE
DEPARTMENT OF CORRECTIONAL SERVICES and THE
NEW YORK STATE DIVISION OF PAROLE,

                              Plaintiffs,

       -against-                              INDEX NO.
                                              4834-08
MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON
and MALCOLM CARTER, Individually and on
behalf of all others similarly situated,

                              Defendants.
----------------------------------------------------------
                    ORAL ARGUMENT

B E F O R E:        HON. JOHN C. EGAN, JR.,
                    Supreme Court Justice
A P P E A R A N C E S:

For the Plaintiffs: HON. ANDREW M. CUOMO,
                    NYS Attorney General
                    BY:   MICHAEL J. KEANE, ESQ.,
                    and   GERALD J. ROCK, ESQ.,
                    Assistant Attorneys General.

For Defendant       THE LEGAL AID SOCIETY
Carter:             BY:   WILLIAM D. GIBNEY, ESQ.,
                    and   ROBERT NEWMAN, ESQ.,

For Defendant       PRISONERS LEGAL SERVICES
Myers & Negron:     JAMES BOGIN, ESQ.

For Defendant       HON. PETER TORNCELLO, ESQ.,
Smalls:             Albany County Public Defender
                    BY:   JOSEPH MCCOY, ESQ.,
                    and   MICHAEL JURINA, ESQ.,
                    Assistant Public Defenders.

       TRANSCRIPT OF PROCEEDINGS in the above-entitled matter

held at the Albany County Judicial Center, Albany, New York

on Friday, June 20th, 2008.

                          Page 1

Parole6-20-001

```
 1  (State of New York, et a. v. Michael Myers, et al.)       2
 2              THE COURT:  Good morning.  This is the State
 3         of New York, the New York State Department of
 4         Correctional Services and the New York State
 5         Division of Parole, Plaintiffs, against Michael
 6         Myers, Roger Smalls, Jesus Negron and Malcolm
 7         Carter, individually and on behalf of all others
 8         similarly situated.  We are here this morning in
 9         open court pursuant to an order to show cause
10         signed by me on June the 6th.
11              Why don't we see who is here.  We will take
12         appearances by any parties.  First by the
13         plaintiffs.
14              MR. KEANE:  Your Honor, defendant's counsel
15         is still in the hallway.  Mr. Rock will run out to
16         gather them.
17              THE COURT: I'm not sure who anyone here
18         is.
19              MR. KEANE:  My name is Michael Keane.
20              THE COURT: If you think there are people out
21         in the hallway, we will wait to get everybody in
22         here.
23              (Pause.)
24              THE COURT: We will recall State of New York
25         against Myers, Smalls, Negron and Carter.  Let's
```

Parole6-20-001

```
 1  (State of New York, et a. v. Michael Myers, et al.)      3
 2           see who is here.  We will take the appearances of
 3           the various attorneys, starting with the
 4           plaintiffs.
 5                MR. KEANE:  For the plaintiffs, State of New
 6           York, The New York State Department of Correctional
 7           Services and New York State Division of Parole,
 8           from The Office of the Attorney General, Michael
 9           Keane.
10                MR. ROCK:  Assistant Attorney General Gerald
11           Rock.
12                THE COURT: Any appearances by the defendant
13           Michael Myers?
14                MR. BOGIN: James Bogin from Prisoner's Legal
15           Services of New York, here on behalf of defendant
16           Michael Myers and defendant Jesus Negron.
17                THE COURT: So Mr. Bogin is appearing for
18           Michael Myers and Jesus Negron.  Any appearance for
19           Roger Smalls?
20                MR. GIBNEY:  I believe he is outside.
21                THE COURT:  Is that Mr. Smalls?
22                MR. SMALLS: Yes.
23                THE COURT: Do you want to come forward.  Do
24           you have an attorney, sir?
25                MR. SMALLS: No.  I don't have no attorney.
```

Parole6-20-001

```
 1  (State of New York, et a. v. Michael Myers, et al.)      4
 2           But I know one thing.  Something is very wrong with
 3           this situation.  What might be causing the
 4           problem.
 5               THE COURT: Okay.  Stand by.  We are not
 6           doing any sentencing today.  Let's stand by and see
 7           what develops here.  Was your case here two weeks
 8           ago?  Was your case out of Albany County?
 9               MR. SMALLS: Yes.
10               THE COURT: Who was your attorney on the
11           Albany County underlying criminal case?
12               MR. SMALLS: I think it was --
13               THE COURT: Was it a private attorney or
14           public defender?
15               MR. SMALLS: Public defender.
16               THE COURT: Have a seat.  We can probably get
17           an Albany County public defender here this morning.
18           Just stand by.  We will get to work on that.
19               Any appearance by the defendant Malcolm
20           Carter?
21               MR. GIBNEY:  William Gibney.  The Legal Aid
22           Society.
23               THE COURT: Spell that for me.
24               MR. GIBNEY:  G-I-B-N-E-Y.
25               THE COURT: Are there any other appearances
```

Parole6-20-001
1  (State of New York, et a. v. Michael Myers, et al.)        5
2          on behalf of anyone else or the so-called unnamed
3          class?
4                  Let me take a brief recess and see if we can
5          get an Albany County public defender up here, to
6          speak with Mr. Smalls.
7                  (Recess.)
8                  THE COURT: Back on the record.  I will ask
9          Roger Smalls to come forward.
10                 Mr. Smalls, I want you to meet Joseph McCoy.
11         He is an Albany County Assistant Public Defender.
12         Now that you two have met and the Court Clerk has
13         just provided Mr. McCoy with a copy of the order to
14         show cause that I signed two weeks ago, we will
15         take another short recess to allow you and
16         Mr. McCoy to talk in private, and he can get
17         acquainted with your situation.
18                 MR. MCCOY: Thank you, Judge.
19                 THE COURT: Mr. McCoy will let me know when
20         he is ready. Why don't we have the other attorneys
21         introduce themselves to Mr. McCoy off the record,
22         so he knows who is here and everyone knows who is
23         who.  We will take another break.
24                 (Recess.)
25                 THE COURT:  We are back on the record.  I

1  (State of New York, et a. v. Michael Myers, et al.)        6
2                  see Mr. McCoy has returned.  Have you had a chance

Parole6-20-001
3      to preliminarily speak with Mr. Smalls?

4          MR. MCCOY:  I have, Your Honor.  I have read

5      the documents and we are ready to proceed.

6          THE COURT: Mr. Keane, Mr. McCoy is ready to

7      proceed.  I will recognize Mr. Keane and Mr. Rock,

8      for argument on the order to show cause.

9          MR. KEANE:  Thank you, Your Honor.  Your

10     Honor, the State of New York, the Department of

11     Correctional Services, the Division of Parole are

12     plaintiffs in this action, and are seeking in this

13     complaint a declaration of their rights, as well as

14     a declaration of the rights of defendants who are

15     defendants incarcerated or under parole supervision

16     pursuant to Jenna's Law which impose a period of

17     post-release supervision by legislative mandate on

18     certain violent felons.

19         As the Court heard a couple of weeks ago,

20     Jenna's Law was followed by several other

21     determinate sentencing laws that also impose a

22     determinate period of post-release supervision

23     indeterminate sentences that were imposed by the

24     sentencing courts.  For eight years, 1998 to 2006,

25     the courts, administrators and the defense bar,

▯

1  (State of New York, et a. v. Michael Myers, et al.)          7
2          prosecuting attorneys, DOCS, parole.  Everyone
3          seemed to concur with the practice that
4          post-release supervision was largely automatic and

Page 6

Parole6-20-001

5        by operation of law was imposed on defendants.

6            About six weeks ago the Court of Appeals of

7        New York handed down two decisions.  Sparber, a set

8        of five cases, and Garner, one case in which the

9        Court of Appeals stated for the first time that

10       only a sentencing court can pronounce the sentence

11       that a defendant is to serve, and directed that in

12       the Sparber line of cases the criminal defendant's

13       remedy for an unpronounced period of post-release

14       supervision is to return to the sentencing courts

15       to be resentenced.  In Garner the Court said for

16       the first time that DOCS is prohibited from

17       enforcing a period of post-release supervision.

18       DOCS is prohibited from calculating a period of

19       post-release supervision into a sentence, if it was

20       not pronounced by the sentencing court.

21           DOCS is now faced with responding to the

22       Court of Appeals and has, in good faith, launched

23       the post-release resentencing initiative.  Parole

24       has a similar initiative in which all of the

25       inmates in custody and all of the parolees under

口

1   (State of New York, et a. v. Michael Myers, et al.)        8

2        the supervision of Division of Parole are being

3        examined, analyzed to see if post-release

4        supervision was properly pronounced in their

5        sentences, and DOCS and Parole and the State of New

6        York believe that they should be returned to their

Page 7

Parole6-20-001
7        sentencing courts to correct the errors.

8            We want to mend post-release supervision,
9        not end it. We think that is the policy, the
10       directive of the Court of Appeals, and we think
11       that is the sound policy of the State of New York.
12       In order to effect that policy in an orderly and
13       deliberate way, DOCS and parole and the State of
14       New York are seeking some additional time. We are
15       faced with potentially 30 thousand inmates or
16       parolees who are currently, because of this state
17       of the law prior to April 29th, 2008, subject to
18       terms of post-release supervision that may or may
19       not have been correctly pronounced by the courts.

20           DOCS has prepared and parole is prepared to
21       immediately investigate the situation. Our
22       defendant class action has divided the class of
23       defendants as defined in the complaint to subjects
24       who may not have had post-release supervision
25       correctly pronounced in sentencing courts. We have

1  (State of New York, et a. v. Michael Myers, et al.)      9
2            divided those defendants into prioritized classes.
3            People who are currently solely in custody or under
4            supervision, because of post-release supervision.
5            That is to say the maximum expiration date of their
6            determinate term has expired. The expectation of
7            the law, the expectation of courts, administrators,
8            defense bar at the time the sentences were imposed

Parole6-20-001
```
 9          was that the determinate sentence would be followed
10          by a period of post-release supervision.
11               There were two portions to a sentence.  The
12          determinate term and the post-release supervision
13          portion of the term.  The sentence, as it would
14          stand without post-release supervision, would be an
15          illegal sentence.  The sentence, as it stands with
16          post-release supervision, if post-release
17          supervision were not correctly pronounced, is also
18          arguably illegal.
19               Your Honor, we need time.  The State of New
20          York, DOCS, Parole needs time to look at the
21          records of, first and immediately, the people who
22          belong to what we have defined as Subclass A to
23          determine whether their commitment sheets, their
24          sentencing minutes contain the correct
25          pronouncement of post-release supervision.  We need
```

```
 1  (State of New York, et a. v. Michael Myers, et al.)      10
 2               to undergo that analysis for members of Subclass A,
 3               and then for members of Subclass B and Subclass C.
 4                    We are prepared to call witnesses to address
 5               the policy concerns that the State of New York and
 6               DOCS and Parole have with respect to their rights,
 7               the rights of the defendants, the rights of
 8               citizens of the State of New York.  The witnesses
 9               will be able to testify as to the universe of
10               people who may not have sentences that were
```
Page 9

Parole6-20-001

11    correctly pronounced by a criminal court. The

12    witnesses would also testify as to what the

13    response of DOCS and Parole has been, and why DOCS

14    and Parole need additional time to refer the class

15    of defendants individually, one by one, to the

16    sentencing courts for correction. They will also

17    be able to testify that the records in the

18    possession of DOCS and Parole do not indicate

19    whether post-release supervision has been correctly

20    pronounced or not. DOCS was prohibited in the

21    Garner decision from exceeding its jurisdiction and

22    acting like the Court and imposing post-release

23    supervision. DOCS cannot add post-release

24    supervision to this two part sentence, determinate

25    and post-release supervision, nor does DOCS believe

1    (State of New York, et a. v. Michael Myers, et al.)    11

2    it is within its jurisdiction to subtract

3    post-release supervision from the sentence. That

4    is the province of the sentencing court. DOCS and

5    Parole has already referred most of Subclass A to

6    sentencing courts, and we are waiting for the

7    sentencing courts to respond. The witnesses will

8    be able to testify as to the status of that

9    process. Some members of Subclass A have already

10    been released, but we have other members of

11    Subclass A who are in custody whose records do not

12    clearly indicate whether they should be released

13      from DOCS's custody, or whether they should remain
14      in DOCS's custody, and for that reason, because the
15      rights of the citizens of New York would be
16      violated if people who should be in custody were
17      released from DOCS and Parole custody and
18      supervision incorrectly. The people have a right
19      against that sudden and precipitous release. By
20      the same token, DOCS and parole have a right to
21      rely on the sentencing court.
22              If Your Honor would permit, we would like to
23      call witnesses. Commissioner Denise O'Donnell,
24      Counsel for the Department of Correctional
25      Services, Anthony Annucci, Counsel for the Division

1   (State of New York, et a. v. Michael Myers, et al.)      12
2       of Parole, Terrence Tracey, who can briefly testify
3       as to some of the policies and some of the concerns
4       that the State of New York, DOCS and Parole have
5       with respect to the release of the defendant class,
6       or the custody of the defendant class in the
7       interests of public safety and the efficient
8       administration of justice.
9               THE COURT: Let me ask a few questions. What
10      is the release status of the four named defendants?
11      Actually we know the release status of Mr. Smalls,
12      because he is present in the courtroom.
13              MR. KEANE: Mr. Smalls is currently being
14      supervised by parole.

Parole6-20-001

| | |
|---|---|
| 15 | THE COURT: How about Mr. Myers? |
| 16 | MR. KEANE: Mr. Myers and Mr. Negron are |
| 17 | currently in custody in DOCS. |
| 18 | THE COURT: How about Mr. Carter? |
| 19 | MR. KEANE: He is paroled and under parole |
| 20 | supervision in Brooklyn, New York. |
| 21 | THE COURT: You used the word mending the |
| 22 | sentences. Isn't the question of mending the |
| 23 | sentences or correcting the defect that the Court |
| 24 | of Appeals pointed out up to the individual |
| 25 | sentencing courts across the state? |

□

| | |
|---|---|
| 1 | (State of New York, et a. v. Michael Myers, et al.)    13 |
| 2 | MR. KEANE: Absolutely. |
| 3 | THE COURT: So what is my role in your mind? |
| 4 | MR. KEANE: Our application is a modest |
| 5 | application. We are seeking this Court to grant an |
| 6 | injunction that would maintain the status quo of |
| 7 | custody of supervisees and inmates until such time |
| 8 | as a court of competent jurisdiction, in our view |
| 9 | preferably the sentencing court, determines whether |
| 10 | custody should be maintained. In other words, we |
| 11 | need to have the State of New York's rights |
| 12 | defined, to protect the People of the State of New |
| 13 | York and to facilitate the smooth administration of |
| 14 | justice, until such time as the sentencing courts |
| 15 | can be heard from. Already the 55 sentencing |
| 16 | courts have responded to DOCS and/or Parole, but |

Page 12

Parole6-20-001

17          the State is faced with the quandary of whether an

18          imminent or precipitous release is what it must do

19          to protect the rights of defendants.  This is what

20          the defendant's counsel is asking us to do.

21          Indeed, in multiple habeas corpus petitioners filed

22          in several counties in the State of New York, of

23          which this Court can take judicial notice, The

24          Legal Aid Society has filed petitions to release

25          inmates with nothing more as support for that

1  (State of New York, et a. v. Michael Myers, et al.)      14

2          petition than correspondence from the Department of

3          Correctional Services, to the effect that there

4          maybe a problem with the sentencing courts

5          pronouncement of the sentence.

6                 THE COURT: Is not the process of going back

7          and addressing the issue pointed out by the Court

8          of Appeals already underway by OCA?

9                 MR. KEANE:  Anthony Annucci can testify as

10          to the process that has been engaged in by OCA, and

11          by several other State agencies.  Indeed, OCA is

12          coordinating with DOCS, with Parole, with the Chief

13          Administrative Judges.  That process is underway.

14          We are not seeking to do anything with that

15          process, except to facilitate it and to ensure its

16          smooth administration.  Our concern is that that

17          process is ongoing at the same time that the State

18          is facing from the very counsel, Legal Aid Society,

Page 13

Parole6-20-001

19          representing the defendant Malcolm Carter.   They

20          are filing petitions seeking the immediate release

21          before the sentencing court has a chance to define

22          its own sentence.   Our concern is that the State,

23          DOCS and Parole need to maintain the status quo.

24          You will hear the witnesses testify that if

25          defendants are released from prison without

1   (State of New York, et a. v. Michael Myers, et al.)       15

2           resorting to the sentencing court, the State of New

3           York could very well lose some of these people who

4           may arguably be resentenced correctly along the

5           way.

6               THE COURT: If I were to grant the relief

7           asked by the plaintiffs, would it not be, that at

8           least in the case of some of this class of

9           defendants, that their incarceration would be

10          extended beyond their current release date?

11              MR. KEANE:   Your Honor, that is probably not

12          an accurate characterization of what the plaintiffs

13          are seeking.   What we are seeking is to maintain

14.         custody of individuals until a sentencing court or

15          other court of competent jurisdiction resentences,

16          orders their continued custody or orders the

17          defendant's release.   We have asked for time, and

18          there are individual members of Subclass A whose

19          determinate terms as pronounced by the Court, the

20          determinate portion of their criminal sentence will

Page 14

Parole6-20-001

21          have expired.  We are asking the Court to permit

22          the State to maintain custody of those individuals

23          for some period of time after that determinate

24          term's expiration date, so that the sentencing

25          court can determine whether those individuals

1  (State of New York, et a. v. Michael Myers, et al.)        16

2          should be resentenced or should be released.

3              THE COURT:  Well then could you address the

4          issue of, from a due process or constitutional

5          perspective, of my jurisdiction to hold over in

6          incarceration a class of persons?

7              MR. KEANE:  Your Honor has jurisdiction over

8          this defendant class.  If the question is: Does an

9          order of this Court effect the due process rights

10          of those defendants, or the State procedural rights

11          of those defendants, the answer is yes.  But given

12          the public safety, given the circumstances involved

13          in the administration of justice, the resentencing

14          directive from the Court of Appeals, and given the

15          fact that whether the defendants have a right or an

16          expectation of finality in an illegal sentence.

17          Whether the defendants have a right to an illegally

18          lenient sentence is a right that may not implicate

19          due process.  There is no constitutional right to

20          an illegal sentence.  Indeed, The Legal Aid Society

21          itself expected that Jenna's Law would involve a

22          period of post-release supervision.  We have

Page 15

Parole6-20-001
23          referred to their memorandum to their staff dated
24          August 20 of 1998.
25                  MR. GIBNEY:  I will object.

⬚

1  (State of New York, et a. v. Michael Myers, et al.)      17
2                  THE COURT: I'm sorry?
3                  MR. GIBNEY:  I object.  Mr. Keane is citing
4          an internal memorandum that was submitted in 1998
5          as a training memorandum to advise people of the
6          new law.  I don't see its relevance in this
7          discussion.
8                  THE COURT: Overruled.
9                  MR. KEANE:  Your Honor, the Court may take
10         judicial notice of the memorandum.  We have shared
11         it with counsel, and we will submit it to the
12         Court.  The memorandum was an exhibit in the early
13         litigation on the federal habeas corpus in the
14         Eastern District of New York, which became the
15         Second Circuit case, the controversy on
16         post-release supervision.  But, indeed, in 1998 we
17         know that all defendants represented by The Legal
18         Aid Society had lawyers who had been informed of
19         the period of post-release supervision that was
20         mandated by the Legislature.  Those defendants
21         cannot have expected that they would have served an
22         abbreviated portion of the sentence mandated by the
23         Legislature.  They should not be heard to say that
24         their expectations have been defeated by what was

Page 16

25          the process of sentencing and sentence calculated

☐

1   (State of New York, et a. v. Michael Myers, et al.)      18
2          that went on for eight years and, indeed, the New
3          York State courts did not finally declare that
4          house release supervision was not automatic by
5          operation of law until Garner and Sparber came
6          down.  Indeed, in 2007.  November of 2007 the Court
7          of Appeals in dicta suggests that their view was
8          that it was by operation of law.  A case called
9          People v. Hill.
10         To return to your concern about the due
11         process rights of the defendants.  The People of
12         the State of New York have rights as well.  The
13         citizens.  We have to weigh the rights of the
14         people to make sure that sentences are uniform.
15         That they comply with the law.  That they meet the
16         expectations of the Legislature and the public, and
17         balance that against whatever legitimate rights the
18         defendant may have.  This application does not
19         defeat the due process rights of any defendant in
20         this class, because any defendant in this class is
21         free to walk into Court and file a habeas petition
22         or Article 78 petition and seek more immediate
23         relief.  Mr. McCoy's client could do that today.
24         Malcolm Carter could do that.  All we are seeking
25         is that until they exercise or pursue their remedy

☐

Parole6-20-001

```
 1    (State of New York, et a. v. Michael Myers, et al.)      19
 2              that DOCS and Parole, The State of New York be
 3              permitted to maintain custody and supervision.  So
 4              it does not undermine the due process rights in one
 5              way or the other.  In fact, what it does is it only
 6              affords the State the right to maintain custody
 7              until such time as the sentencing courts can carry
 8              out the directive of the Court of Appeals.  The
 9              directive that the resentencing is the remedy.
10                  THE COURT: You argued a few minutes ago
11              that, on a certain point, that the defendants
12              should not be heard to raise a certain point, but I
13              guess one of my concerns is, with the exception of
14              the four named defendants who all have counsel,
15              this class of unnamed defendants, they are not
16              here.  Shouldn't that be a concern of mine?
17                  MR. KEANE: Again, Your Honor, we are simply
18              asking that this Court order that DOCS and Parole
19              maintain custody of this class.  This class has
20              received notice and we will hear the testimony of
21              DOCS counsel, parole counsel and Commissioner
22              O'Donnell that indicates that notice has been
23              distributed across the state in every state
24              correctional facility.  In every local or city
25              jail.  And in every parole office, local parole
```

Parole6-20-001

```
 1   (State of New York, et a. v. Michael Myers, et al.)      20
 2              office throughout the State notifying any member of
 3              this class, any defendant who might be a member of
 4              this class of the fact of this litigation and of
 5              the fact that they have rights that are implicated
 6              in this litigation.  We do not know who all of
 7              these class members are, because we simply do not
 8              know who has sentencing minutes and other
 9              commitment papers that have correctly pronounced a
10              sentence.  We won't know that until they go to
11              their sentence reports.  We are trying to get them
12              back to the sentencing courts quickly, facilitate
13              that process as expeditiously as practical.
14              Indeed, the due process rights of Subclass A are
15              not profoundly implicated as to notice for this
16              reason.  Every single member of Subclass A has
17              already been notified of the fact that DOCS and/or
18              Parole believes there is a potential infirmity in
19              his or her sentence.  Those letters have gone to
20              the sentencing judges, and they have been copied to
21              each of the inmates or parolees affected.  So there
22              is no problem with notice.  In fact, we are halfway
23              to the remedy.  Once that inmate or parolee has
24              received that letter, they know that plaintiffs are
25              seeking to correct the situation.
```

Parole6-20-001

```
2              Plaintiffs are asking this Court simply to
3       allow us to maintain the status quo, until we can
4       hear back from the sentencing court.  We will hear
5       testimony, for example, that there are people that
6       we thought did not have post-release supervision in
7       their sentencing minutes, or in their commitment
8       sheets, and we heard back from the Court already in
9       a few of these cases that, indeed, we were wrong.
10      There was post-release supervision correctly
11      imposed at sentencing.  We need the Court to
12      instruct us that it is not  -- it is beyond our
13      jurisdiction to play judge, and that it is within
14      our right to maintain custody, and that the
15      defendants do not have a right to be released until
16      such time as the sentencing court is able to make
17      its decision as to whether post-release supervision
18      was or was not properly pronounced at sentence and
19      as to what the remedy should be.
20              THE COURT: All right.  Why don't I recognize
21      Mr. Bogin for argument on the motion.  Or
22      Mr. Gibney.  In whatever order you want to go.
23              MR. GIBNEY:  William Gibney, Your Honor.
24      Two years ago this month the Court of Appeals for
25      the Second Circuit ruled in Earley versus Murray.
```

⬚

```
1 (State of New York, et a. v. Michael Myers, et al.)      22
2            There is a line in that decision that is
3            appropriate and necessary for the plaintiffs to
                              Page 20
```

Parole6-20-001

```
4        hear today, as it was when that Court issued the
5        decision.  The Court stated that only a judgment of
6        a court as expressed by the sentence imposed by a
7        judge has the power to constrain a person's
8        liberty.  What the plaintiffs are seeking is to
9        avoid the judgment of Earley made two years ago,
10       denied again on rehearing in August two years ago.
11       Since that judgment they have fought this
12       fundamental concept that only the sentencing judge
13       can impose a sentence and constrain a person's
14       liberty.  That is exactly what they are asking you
15       to do today, by holding many of the members of the
16       class in prison beyond their maximum expiration
17       dates.  They have fought this concept tooth and
18       nail since the decision was imposed.  They forced
19       many of the members of the defendant class to go to
20       court to challenge in State Court the ability, both
21       the fact of the post-release supervision and their
22       incarceration.  One by one the Appellate Divisions
23       agreed with the Second Circuit.  As early as
24       February of 2007 the Second Department said yes
25       Earley is the law.  Did the plaintiffs implement
```

☐

```
1  (State of New York, et a. v. Michael Myers, et al.)      23
2            the Second Department decision, at least in the
3            Second Department where it was controlling law?
4            No.  They refused to do that.  One by one every one
5            of the other Appellate Divisions fell into line
                            Page 21
```

Parole6-20-001

6       over the course of the next ten months, until at

7       the end of last year -- I'm sorry.  The Fourth

8       Department came in in February of 2008.

9              Before the Court of Appeals decision all

10      four Appellate Divisions had agreed.  Did the

11      plaintiffs implement the law of all four Appellate

12      Divisions?  No.  They still refused to do that.

13      They then argued the case in the Court of Appeals,

14      which held that DOCS has no authority to add this

15      period of post-release supervision.  The Court held

16      no DOCS, you do not have this authority to add the

17      post-release supervision.  For those people who are

18      still serving their sentence, the Court said the

19      appropriate remedy is to get a resentence.  For

20      those sentences, who are over a thousand, the Court

21      was much more equivocal.  The Court said you may

22      remand subject to whatever authority there may

23      exist to resentence.  The Court itself recognized

24      that, but there is some question as to the ability

25      of some of the members of the class to be

☐

1  (State of New York, et a. v. Michael Myers, et al.)     24

2              resentenced.

3              Since the Garner decision all four of the

4       Appellate Divisions have again ruled that either an

5       Article 78 proceeding mandamus of prohibition, or a

6       habeas corpus is appropriate relief for the people

7       who are being held past their maximum dates on
                              Page 22

Parole6-20-001

```
 8          post-release supervision, and yet the Plaintiffs
 9          come to this Court to ask you to grant them the
10          authority that they have lost in court after court
11          after court after court to hold people past their
12          maximum expiration dates on a period of
13          administratively imposed post-release supervision.
14          That is what the heart of this matter is today.
15          The Plaintiffs met none of the standards for a
16          preliminary injunction.  They have no likelihood of
17          success on the merits.  They have already lost the
18          authority that they are seeking from this Court,
19          both from the Second Circuit and from the Court of
20          Appeals.  Yet they come to you to say give us the
21          authority to continue holding people that was
22          denied to us by those other courts.
23              They claim irreparable injury.  They mention
24          the irreparable injury of habeas corpus actions
25          being filed all over the State.  I have never heard
```

☐

```
 1  (State of New York, et a. v. Michael Myers, et al.)     25
 2          a description of injury as being the ability and
 3          the practice of people to go to court to seek their
 4          legitimate redress in a court of law as being
 5          defined as irreparable injury.  They claim that
 6          there is an imminent danger to the public because
 7          some of the members of this entire class of people
 8          may go out and commit new crimes.  The closest case
 9          in their brief is the sex offender case in Harkavy
                              Page 23
```

Parole6-20-001

| | |
|---|---|
| 10 | where they say didn't the court authorize continued |
| 11 | jurisdiction, continued custody past the maximum |
| 12 | expiration date.  An individual who will be subject |
| 13 | to the commitment process who then declares them to |
| 14 | be individually dangerous, and on that due process |
| 15 | protections have been held to be met, but for this |
| 16 | where an entire class of people would be held in |
| 17 | prison past the expiration of their sentences, it |
| 18 | just amazes me that the State of New York can stand |
| 19 | up and say that doesn't constitute any violation of |
| 20 | their rights.  I think the founding fathers would |
| 21 | be rolling over in their graves if they heard that |
| 22 | definition of liberty.  We can hold you in prison |
| 23 | after your sentence is over. |
| 24 | To balance the equities there is going to be |
| 25 | some work to do by DOCS and Parole.  Some work to |

 

| | |
|---|---|
| 1 | (State of New York, et a. v. Michael Myers, et al.)        26 |
| 2 | do on the part of the courts, but against this |
| 3 | fundamental denial of liberty the balance of |
| 4 | equities surely tips in favor of defendants.  The |
| 5 | defendants are doing nothing wrong here.  They are |
| 6 | sitting in their cell.  Mr. Bogin's clients are |
| 7 | sitting in their cells.  The other named defendants |
| 8 | are reporting on parole.  The department doesn't |
| 9 | have a claim, a cause of action against the |
| 10 | defendants here.  They have done nothing to them. |
| 11 | There is no right to be adjudicated here.  If |

Parole6-20-001

12          anyone has a claim against the other party it is

13          the defendants who have a claim against the

14          plaintiffs.  This is not a judiciable controversy.

15              The mandate of Garner is clear.  That the

16          plaintiffs are requesting an advisory opinion from

17          this Court just to put its stamp on a plan they

18          have already implemented.

19              Two weeks ago the plaintiffs came to this

20          Court and said irreparable harm will occur if you

21          do not grant us a TRO.  The Court denied the TRO

22          two weeks ago.  The day before the TRO was denied

23          the defendants were implementing their plan.  The

24          day after the TRO was denied the plaintiffs were

25          still implementing their plan, and if the

1  (State of New York, et a. v. Michael Myers, et al.)      27

2          preliminary injunction is denied today they are

3          going to still continue to implement their plan.

4          So the need for equitable intervention at this

5          point certainly does not exist.

6              I was very concerned about the discussion

7          about habeas corpus, because we were assured by

8          counsel that it was not their intent to suspend the

9          writ of habeas corpus in the State of New York.

10          From hearing their discussions the real intent is

11          the problem about habeas corpus actions being filed

12          all over the State.  We had the opposition to that

13          point in our TRO papers.  I dropped it after

14          counsel assured me they don't intend to suspend
15          habeas corpus, but now I'm not so sure that they do
16          not.  The problem is habeas corpus being filed all
17          over the State.  No one has the authority to
18          suspend habeas corpus under these situations.

19               No class has been certified.  It would seem
20          premature, before this Court has the ability to see
21          whether or not a class action is even appropriate,
22          to grant the plaintiffs the entire relief that they
23          seek.  There has been no review about the
24          appropriateness of relief, and certainly the relief
25          they seek in terms of resentencing is questionable

☐

 1  (State of New York, et a. v. Michael Myers, et al.)      28
 2          for some members of the class.  We submitted to the
 3          Court the double jeopardy argument, which raises
 4          some questions about the ability to resentence once
 5          the original sentence imposed by the Court is fully
 6          served.  That the sentencing courts are dealing
 7          with that issue now as we speak.  The situation on
 8          the ground right now is that many cases have been
 9          referred to the sentencing courts.  Many cases will
10          continue to be referred to the sentencing courts.
11          If I am reading their papers correctly, they are
12          not going to release anyone, whether or not the
13          Court grants a preliminary injunction, so no crisis
14          of thousands of prisoners being released will
15          result.  That kind of hysteria is just

Parole6-20-001

16          inappropriate here, and wrong.

17              DOCS says it doesn't have jurisdiction to

18          subtract the post-release supervision that we now

19          know it illegally added.  They got commitment

20          papers from courts that said, for example, the

21          sentence is seven years.  They illegally added

22          after the commitment paper an additional, for

23          instance, five years.  They now say, having never

24          had the authority to add that in the first place,

25          they now say that they can't subtract it.  I don't



1   (State of New York, et a. v. Michael Myers, et al.)      29

2           understand that.  They are bound by the contents of

3           the commitment paper that they received.  They

4           should be calculating the sentences based on the

5           court order that they received.  Thank you, Your

6           Honor.

7               THE COURT: Mr. Bogin.

8               MR. BOGIN:  I would just like to add a few

9           brief things.  Mr. Keane has spoken about the need

10          for resentencing.  The issue here is not whether

11          resentencing would be a good idea.  The issue is as

12          to those defendants, who are either past the

13          expiration of their sentence or other lawful

14          release date, such as conditional release or for

15          those who will soon reach their lawful release

16          dates, whether there is any authority for the

17          plaintiffs to continue to hold them in custody or

                          Page 27

Parole6-20-001

```
18          to continue to hold them in parole supervision in
19          the absence of lawful authority.  The answer is
20          buried in the question.  In the absence of lawful
21          authority they obviously do not have authority to
22          hold them.  That is, in fact, the reason for this
23          proceeding.  If they had authority they would not
24          be asking this Court to grant authority which is,
25          in effect, a request for this Court to grant
```

☐

```
 1  (State of New York, et a. v. Michael Myers, et al.)      30
 2          authority that doesn't exist.
 3              I would just like now to briefly address
 4          what we are here on today, which is their request
 5          for preliminary injunction.
 6              There are basically three criteria they have
 7          to meet for preliminary injunction.  Likelihood of
 8          success on the merits, irreparable harm and that
 9          the balance of equities is in their favor.  They do
10          not meet any of these prongs.
11              As to likelihood of success on the merits,
12          the merits of their request to hold people pending
13          resentencing, but after the expiration of the
14          sentence that has been imposed, there is no lawful
15          authority.  The lawful authority for holding people
16          is the sentence of the Court that imposed the
17          sentence.  When that is over the resentencing, as
18          the Court of Appeals said, maybe appropriate.  In
19          some cases it is unclear whether it would be
                          Page 28
```

Parole6-20-001

| 20 | appropriate, but there isn't any authority for |
| 21 | custody for incarceration pending resentencing. |
| 22 | Since there is no authority, there is no likelihood |
| 23 | of success on the merits.  In addition, they have |
| 24 | not cited, suggested or asserted any cause of |
| 25 | action against the defendants.  For these reasons |

1   (State of New York, et a. v. Michael Myers, et al.)      31
2           they have no likelihood of success.
3                   As to imminent irreparable harm.  The harm
4           that they allege is that because of the
5           invalidation of periods of post-release supervision
6           that were added illegally, that violent felons will
7           be released prematurely and will commit new crimes.
8           First, this is speculative.  We don't know what
9           will happen.  It is not an imminent irreparable
10          harm.  It is a guess as to what the future holds.
11          As to the general proposition that some people
12          released from prison will commit more crimes.
13          Well, we have a word for that.  It is called
14          recidivism.  It is a fact of life.  It is not a
15          good thing.  It is a bad thing, but it does happen.
16          The fact that we know there is such a thing as
17          recidivism does not warrant incarceration of people
18          because of possible future crimes, if they have
19          already completed the sentence that was previously
20          imposed.  If there is not still a sentence against
21          which they owe time then the possibility that they
                            Page 29

Parole6-20-001

22          commit a future crime does not justify
23          incarceration.  The possibility of future crimes,
24          therefore, is not an appropriate irreparable harm.
25                  Also the relief they have requested, which

☐

1  (State of New York, et a. v. Michael Myers, et al.)      32
2                  is what they call maintaining the status quo or
3                  maintaining people in prison or parole until the
4                  sentencing, regardless of whether they have passed
5                  their lawful release dates, that relief is the same
6                  as what is occurring now.  It is the same as what
7                  occurred before the TRO was denied.  It is the same
8                  as what has occurred since the TRO and presumably
9                  life will continue the same, with or without the
10                 preliminary injunction, which is that they will
11                 continue to implement their plan and release people
12                 only when a court of competent jurisdiction issues
13                 an order.  Since there would be no difference in
14                 the way these matters are handled with or without a
15                 preliminary injunction, there is no irreparable
16                 harm.

17                         As to the balance of the equities.  The
18                 defendants are being asked, not in all but in some
19                 cases certainly, as to the Class A defendants who
20                 are already past their maximums, and others who
21                 will soon get to their maximums, or to their lawful
22                 conditional release dates, the defendants are being
23                 asked to give up their personal liberties and
                                    Page 30

Parole6-20-001

24          remain either in prison or on parole supervision,
25          despite the fact that they have completed the



1  (State of New York, et a. v. Michael Myers, et al.)     33
2          sentence imposed by a judge.  This greatly
3          outweighs the plaintiff's interests in
4          incarcerating defendants for the possibility of
5          preventing future possible crimes.  For these
6          reasons, we request that the request for
7          preliminary injunction be denied.
8              THE COURT: Could you address the issue of my
9          jurisdiction over the unnamed class as opposed to
10         the four named defendants?
11             MR. BOGIN:  I don't believe there is any,
12         Your Honor.  The plaintiffs indicate that they have
13         made some notice.  They have done so completely
14         unilaterally, without any input from counsel or the
15         Court.  I don't believe there is any jurisdiction
16         over a class.
17             THE COURT: All right.  Mr. McCoy.
18             MR. MCCOY:  Your Honor, on the point that
19         you just gave.  I join with counsel.  I have been a
20         public defender for 27 years, probably as long as
21         most of the people here, but when our inmates, when
22         our defendants get these notices from the courts
23         they basically can't even read them, let alone
24         understand that the State of New York is trying to
25         hold them over.  For them to just simply get a
                          Page 31

Parole6-20-001

1   (State of New York, et a. v. Michael Myers, et al.)      34
2           notice that there is a procedure in place means
3           next to nothing to most of those defendants.
4                 As my co-counsel just said, until they have
5           a right to talk to an attorney and explain to them
6           what that notice means, and what their rights are,
7           they are being infringed upon, in my opinion.
8                 I join especially in the balancing act.  As
9           they indicated, the threat to the community and the
10          danger to the community is purely speculative.
11          Even if these defendants were placed on supervised
12          release, they are no longer incarcerated.  They can
13          commit the same crimes that they are scared about
14          already, but keeping them in jail over their
15          maximum expiration date, or keeping them on parole
16          after their maximum expiration date is a definite.
17          That is what they are asking this Court to do, as
18          opposed to the speculation which they are putting
19          on their scales to have the Court grant this
20          injunction.  Thank you.
21                THE COURT: Do I understand, Mr. Keane you
22          wanted to call some fact witnesses?
23                MR. KEANE:  Your Honor, could I make one
24          clarifying point?
25                THE COURT: Briefly, because I have to take a

Page 32

Parole6-20-001

1   (State of New York, et a. v. Michael Myers, et al.)      35
2              break.
3              MR. KEANE:  The State of New York is not
4         attempting to suspend habeas corpus.  In fact, we
5         have invited habeas corpus and Article 78 by saying
6         in our order to show cause that it is without
7         prejudice.  Our issue with the habeas corpus
8         proceedings, and it helps to clarify on both sides
9         what the issue is.  The courts have dismissed the
10        habeas corpus petitions brought by multiple
11        Petitioners, in part because there isn't sufficient
12        support for release for determining that
13        post-release supervision wasn't pronounced in those
14        sentences.  Counsel is assuming that we have
15        complete records that indicate that we are holding
16        people beyond their appropriate maximum expiration
17        dates.  We don't have those records.  We don't know
18        that.  That is why we are here.  In fact, DOCS and
19        Parole could have sat back and just waited for
20        people to help themselves.  Instead, they are
21        proactively doing the work themselves and not
22        waiting for inmates and parolees to file those.
23             The likelihood of success, Your Honor.  We
24        are sure to win the declaration that says that DOCS
25        has a right to maintain custody of someone who was

```
 1  (State of New York, et a. v. Michael Myers, et al.)      36
 2            correctly pronounced through a determinate term of
 3            post-release supervision that included post-release
 4            supervision.  We just don't know what the
 5            underlying --
 6                 THE COURT: Hang on.  Gentlemen, Mr. Smalls,
 7            why don't you just stick with us here, because
 8            Mr. McCoy wants to hear this.
 9                 MR. MCCOY:  I'm sorry, Your Honor.
10                 MR. KEANE:  As the witnesses will be able to
11            corroborate, DOCS and Parole simply do not have
12            sufficient information to determine whether release
13            is appropriate or whether the maintenance and
14            custody and supervision is appropriate.  It was the
15            same problem that Legal Aid faced in their
16            petitions.  We all agree that the sentencing court
17            is an appropriate forum to make this determination.
18                 THE COURT: You are arguing that within this
19            class of persons your client doesn't know right now
20            which ones should be released and which ones should
21            not?
22                 MR. KEANE:  That is correct, Your Honor.  I
23            would defer to the testimony of Counsel Annucci and
24            Counsel Tracy, because they will explain what their
25            predicament is.
```

 1  (State of New York, et a. v. Michael Myers, et al.)      37

Parole6-20-001

2    THE COURT: I think the difficulty I'm having

3    here is that in light of that your client candidly

4    is stating within this group of persons we are

5    predicting that the ultimate outcome is that some

6    should be held and some should not, and pending

7    that determination I direct that all be held.

8        MR. KEANE:  That all should be held until

9    such time as the sentencing court can make that

10   determination.  If we knew absolutely that anyone

11   in Subclass A definitively should be released, that

12   person would be released.  We have not been able to

13   make that determination with accuracy that the

14   sentencing court or some other court of competent

15   jurisdiction, like this court, could make.

16       THE COURT: Okay.  Thank you.

17       MR. GIBNEY:  Your Honor, may I very briefly

18   respond?  The last time he was here Mr. Keane said

19   the Department of Correctional Services had the

20   sentencing minutes for, they estimated, about 50

21   percent of that 540 something group.  They have the

22   commitment paper which says what the clerk filled

23   out.   They have the sentencing minutes which says

24   what sentence the Court imposed.  I will concede in

25   some cases the Court actually imposed a sentence

☐

1  (State of New York, et a. v. Michael Myers, et al.)     38

2        where the commitment didn't, and there is no doubt

3        that time to prove those points is necessary, but

Page 35

Parole6-20-001

```
 4        what they are saying is for those cases where we
 5        have all of the paperwork we are still going to
 6        hold those people.  Where we know that a problem
 7        existed, and they are still going to hold those
 8        people.  What Mr. Keane just said is not in their
 9        plan.  We will release people as soon as we know.
10        We have sentencing minutes and commitment papers.
11        If they were saying give us time to get the papers
12        so we can figure this thing out, I think there
13        would be a much different posture to the case.
14        They are not saying that.  They are saying we want
15        to incarcerate.
16            THE COURT: Mr. Keane, you want to call some
17        witnesses?
18            MR. KEANE:  Yes.  I will begin with
19        Commissioner Denise O'Donnell.
20            THE COURT: Let's do this first.  First of
21        all, we will give our people here a break.
22        Mr. McCoy?
23            MR. MCCOY:  I can't stay, Your Honor.
24            THE COURT: Here is what we will do, because
25        we invited Mr. McCoy here not really with a whole
```

☐

```
 1  (State of New York, et a. v. Michael Myers, et al.)     39
 2        lot of notice, and he has two sentencing matters
 3        with Judge Lamont.  So let's take a 15 minute break
 4        and let him go attend to that.
 5            MR. MCCOY:  And maybe I can get somebody to
```

Page 36

Parole6-20-001
```
 6      cover, or talk to Mr. Smalls.

 7              THE COURT: We will take a 15 minute break

 8          and then take some testimony.

 9              (Recess.)

10              THE COURT: Back on the record.  The record

11          should reflect that Assistant Albany County Public

12          Defender Michael Jurena will be replacing Assistant

13          Public Defender Joseph McCoy as counsel for Mr.

14          Smalls.

15              MR. NEWMAN:  I wanted to introduce myself.

16          Robert Newman.  I will be joining in our

17          presentation with Mr. Gibney, my colleague.

18              MR. KEANE:  Plaintiffs would like to call

19          Commissioner Denise O'Donnell.

20                      DENISE O'DONNELL,

21          having been duly sworn, was examined and testified

22          as follows:

23              THE COURT:  Mr. Gibney.

24              MR. GIBNEY:  Your Honor, I wonder to

25          expeditiously move this hearing if we could deal
```

☐

```
 1  (State of New York, et a. v. Michael Myers, et al.)      40

 2          with it by an offer of proof.  We don't have

 3          anything yet in the record from Ms. O'Donnell, but

 4          I know a number of other witnesses have submitted

 5          extensive affidavits to the Court, and I don't see

 6          the issues that are really in contention as being

 7          factual issues.  There are far more legal arguments
```
Page 37

Parole6-20-001
8          being made about the plan, so I wonder if there is
9          a way to expeditiously move this along in a way
10         that allows sufficient facts to come in, but the
11         affidavits are there and present the basic case for
12         the plaintiffs.
13              THE COURT: Mr. Keane?
14              MR. KEANE:  Your Honor, might I suggest that
15         with respect to Commissioner O'Donnell I think the
16         most expeditious way to handle Commissioner
17         O'Donnell is to proceed with the testimony, because
18         she will not be long.  We can discuss this after
19         she is done.  I know she has a busy schedule.
20         After she has completed her testimony, we could
21         talk about the issue.
22              THE COURT: Let's go forward with the
23         testimony.  The Commissioner is here.  I will
24         recognize Mr. Keane.
25    DIRECT EXAMINATION OF MS.



1  (Commissioner O'Donnell - Direct by Mr. Keane)          41
2  O'DONNELL BY MR. KEANE:
3          Q    Good morning.  What is your current
4  position?
5          A    I am currently the Commissioner of New York
6  State Division of Criminal Justice Services.
7          Q    And for how long have you been the
8  Commissioner of Criminal Justice Services?
9          A    Since January of 2007.

Page 38

Parole6-20-001

10       Q   Could you briefly describe for the Court what

11  your duties are as Commissioner of Criminal Justice

12  Services?

13       A   Well, DCJS is a full service criminal justice

14  agency, as I believe Judge Egan is aware.  We perform many

15  functions in the criminal justice system, including

16  maintaining criminal justice statistics, research arm for

17  criminal justice research.  We routinely provide criminal

18  justice policy advice to the executive and to other

19  criminal justice agencies.

20       Q   In your work in DCJS have you addressed issues

21  involving criminal sentencing?

22       A   Yes.  In addition to serving as the

23  Commissioner at DCJS I also serve as the chair of the

24  Commission on Sentencing Reform that was formed as a result

25  of an executive order issued by former Governor Spitzer in



1  (Commissioner O'Donnell - Direct by Mr. Keane)           42

2  March of 2007.

3       Q   In your work with the sentencing commission

4  did you address specifically the issue of determinate

5  sentencing?

6       A   We did.  We really found by looking at New

7  York sentencing laws, first of all, that there had been no

8  systematic review of our sentencing laws or revision of our

9  sentencing laws in 40 years, but there had been a number of

10  changes that occurred in sentencing laws over those 40

11  years that made it extremely byzantine, complex in many

Page 39

Parole6-20-001
12  cases, unfair and in the commission we actually heard from
13  national experts all across the country about sentencing.
14  We looked, in terms of New York, at what really occurred
15  beginning in 1995 when New York moved from a purely
16  indeterminate sentencing structure to a partially
17  determinate sentencing structure.

18          In 1995 the Legislature passed a law that made
19  second violent felony offenders sentenced or required them
20  to be sentenced to determinate sentencing for the first
21  time.  As a result of that statute, there really was no
22  longer parole as we knew it for those second violent felony
23  offenders.  The Legislature, after that I think, recognized
24  with the passage of Jenna's Law in 1998 that if it was
25  going to go to determinate sentencing of particularly

☐

1  (Commissioner O'Donnell - Direct by Mr. Keane)            43
2  violent offenders, that it was imperative that they also
3  impose a period of post-release supervision so that those
4  violent offenders would not leave prison often after
5  serving lengthy sentences and have no supervision in the
6  community afterwards.  So the Legislature passed Jenna's
7  Law in 1998 that did require determinate sentencing for
8  violent, in that case first time violent felony offenders,
9  but also required a period of post-release supervision for
10  those offenders so they would be supervised in the
11  community after their release.  Thereafter, several years
12  ago in 1994, the Legislature made determinate sentencing a
13  requirement for drug sentences.  So what we found in the

Page 40

Parole6-20-001
14  sentencing commission was now, in New York State, we have

15  determinate sentencing for violent felony offenders, for

16  sex offenders, for drug offenders and the only category is

17  non-drug, non-violent, non-sex offenders who have

18  indeterminate sentencing schemes.  We found that it was an

19  extremely complex process to have both an indeterminate and

20  determinate sentencing scheme, and very difficult for

21  judges, very difficult for the Department of Corrections

22  that actually determines the sentencing calculations that

23  govern an individual sentence, and so we have made a

24  recommendation that New York move toward determinate

25  sentencing for the non-violent, non-sex, non-drug offenses



1  (Commissioner O'Donnell - Direct by Mr. Keane)            44

2  as part of our preliminary report from the sentencing

3  commission.

4            Q    When you talk about determinate sentences that

5  are the trend in New York law, does determinate sentencing

6  contemplate a period of parole supervision along with the

7  determinate sentence?

8            A    Well with Jenna's Law that is clearly what the

9  Legislature required.  It is now no longer discretionary.

10  It is required as part of the sentence that the sentence

11  include a period of post-release supervision.

12            Q    Post-release supervision.  Could you define

13  what is meant by post-release supervision?

14            A    Sure.  In practice it is not really any

15  different than the parole supervision that the Division of

Parole6-20-001

16  Parole exercises.  In the case of individuals who achieve

17  discretionary release by the parole board.  So it means

18  that parole will supervise individuals in their community.

19  I think that is pivotal to the reason why we are here and

20  bringing the lawsuit.  That post-release supervision is not

21  only an integral part of sentencing in New York, it is an

22  important part of ensuring that individuals return to the

23  community, particularly violent individuals who we are

24  really talking about in this lawsuit, so individuals that

25  have been convicted of rape and sex offenses, other sex

☐

1  (Commissioner O'Donnell - Direct by Mr. Keane)        45

2  offenses involving children, homicides -- or excuse me.

3  Not homicides, but violent gun crimes, arsons.  To make

4  sure that those individuals have supervision by parole

5  after they are released to the community.

6          Q    You mentioned the court decisions Garner and

7  Sparber.  Are you aware of those court decisions

8  recently?

9          A    I am.

10          Q    What is the State's policy with respect to

11  post-release supervision at this time?

12          A    We believe that it is imperative that the

13  Legislature required it.  That the law required it as part

14  of sentences in these cases that post-release supervision

15  be imposed on individuals who have been sentenced under

16  Jenna's Law.  We don't believe that people should be

17  required to serve periods of incarceration beyond their

Page 42

Parole6-20-001

18  maximum expiration dates, or their conditional release

19  dates, but we do believe it is imperative that we continue

20  the status quo so that individuals can be resentenced to

21  what the law requires, namely a period of post-release

22  supervision.

23            MR. KEANE:  Your Honor, may I approach the

24       witness?

25            THE COURT: You may.

 

1  (Commissioner O'Donnell - Direct by Mr. Keane)          46

2       Q   I would like to show you what we will mark as

3  Plaintiff's Exhibit 1.  If I may show you this document.

4  Your Honor may I hand one up to the Court?

5            (Plaintiff's Exhibit 1 was marked for

6  identification.)

7       Q   I have handed counsel a copy of this as well.

8  Commissioner O'Donnell, have you seen this document before?

9       A   I have.

10       Q   What is it?

11       A   This is a summary of criminal justice system

12  indicators or statistics, a number of which are maintained

13  in the statistical records of Division of Criminal Justice

14  Services.  Others obtained from the records of parole or

15  the Department of Corrections, both indicating current

16  numbers of individuals who are in the system either in

17  incarceration, under parole supervision, as well as our

18  best estimates of the numbers of cases that are affected by

19  the Court of Appeal's decisions.

Page 43

Parole6-20-001
20      MR. KEANE:  Your Honor, if there is no

21      objection may I move this into evidence?

22          THE COURT: You may always offer it into

23      evidence.

24          MR. NEWMAN:  I have the many page document,

25      which I believe is the exhibit.  I would ask if I



1  (Commissioner O'Donnell - Direct by Mr. Keane)        47

2          could compare what they are seeking to introduce

3          with what I have been given?

4              THE COURT: Mr. Keane, show Plaintiff's

5          Exhibit 1 to counsel, please.  Mr. Newman, who are

6          you representing?

7              MR. NEWMAN:  I am Mr. Gibney's associate. I

8          will be cross-examining this witness.

9              Your Honor, we have no objection to the

10         admission of Plaintiff's 1, with the exception of

11         pages five and eight of that document.  These

12         appear to be pages which should properly be

13         introduced, if at all, as a separate exhibit.  They

14         are not part of the statistical tabulations, as I

15         see it.

16             THE COURT: Show the exhibit to Mr. Bogin.

17             MR. BOGIN: I would concur with that, but

18         also note that number five is not just a page.  It

19         is a two page document.

20             THE COURT: Show Mr. Jurena the exhibit.  Any

21         comment?

Page 44

Parole6-20-001
22          MR. JURENA: No, Judge.

23          THE COURT: May I see the exhibit?

24          Plaintiff's Exhibit 1 is received.

25          MR. NEWMAN:  All of it, Your Honor?

□

1  (Commissioner O'Donnell - Direct by Mr. Keane)          48
2               THE COURT: All of it.  Let our stenographer
3          so mark it.
4               (Plaintiff's Exhibit 1 received in
5          evidence.)
6               MR. KEANE:  Your Honor, may I offer you one
7          for the Court's review to follow along?
8               THE COURT: Not necessary.  I will read
9          Plaintiff's 1 before I render any decision.
10          Q    Commissioner O'Donnell, on the first page of
11  Plaintiff's Exhibit 1 statistical summary you said there is
12  a number on the top of the page under the caption
13  "Statewide felony processing" and there is a number that
14  appears to be for the 2007 felony arrests.  What is that
15  number?
16          A    That is 172,673 felony arrests in 2007.
17          Q    Made in New York State?
18          A    Made in New York State.
19          Q    Can you tell from this statistical analysis
20  how many of those arrests end up in convictions?
21          A    Felony convictions in 2007 were 44,300.
22          Q    Can you determine how many prison sentences
23  result from those convictions in 2007?

Page 45

Parole6-20-001
24          A   Yes.  17,731.

25          Q   By prison sentences, would that be a prison

☐

1   (Commissioner O'Donnell - Direct by Mr. Keane)          49
2   sentence in a state correctional facility?
3          A   That's correct.
4          Q   How many people, how many inmates are in
5   custody in the Department of Correctional Services at this
6   time?
7          A   well, as of several days ago, June 18th,
8   because this changes daily there is 62,139 individuals
9   under custody at the Department of Correctional Services.
10          Q   Can you tell from the statistical summary how
11   many of those 62 thousand inmates were released in 2007?
12          A   Yes.  That number was 27,564 individuals were
13   released from DOCS custody in 2007.
14          Q   Can you tell from this summary how many of
15   those released in 2007 were released to some kind of parole
16   supervision, or does the document not indicate that?
17          A   The number of releasees, I can tell you the
18   active parole population under supervision.  I can't equate
19   the number with the number that we released last year.
20          Q   Based on this analysis how many parolees are
21   under supervision at this time?
22          A   As of May 31st, 2008 43,101 individuals are
23   under active parole supervision.
24          Q   Based on this analysis can you determine, as
25   an estimate, how many inmates or parolees may have

Page 46

Parole6-20-001

⬜

```
 1  (Commissioner O'Donnell - Direct by Mr. Keane)          50
 2  post-release supervision issues?
 3          A    The best estimate from parole and from the
 4  Department of Corrections is that the universe is as high
 5  as 30 thousand individuals.
 6          Q    Have you received information from the
 7  Department of Correctional Services regarding how many
 8  people who were on post-release supervision are currently
 9  in custody for post-release supervision violations in a
10  DOCS facility?
11          A    Yes.  I think an important focus for this
12  particular lawsuit is the fact that we have individuals who
13  are on post-release supervision who have been violated, and
14  are either in local jails because they haven't gone through
15  the parole violation process, or have been adjudicated as
16  violators of supervised release and are now in DOCS
17  custody, and the number that are currently in the custody
18  of the Department of Correctional Services is 546
19  individuals for violations of post-release supervision.
20  The number of individuals under parole custody in the
21  violation process for violations of supervised release is
22  500.  So in total there is 1,046 individuals right now who
23  are in the  -- who have been either charged with a
24  violation of supervised release, or in DOCS custody for a
25  violation of supervised release.
```

⬜

Page 47

Parole6-20-001

1  (Commissioner O'Donnell - Direct by Mr. Keane)        51

2        Q   With respect to the individuals in that
3  category that you just testified to who are in local jails,
4  have those people in custody been given any notice
5  regarding this lawsuit?

6        A   Yes.  Through the Division of Criminal Justice
7  Services we sent notice to all of the sheriffs in the State
8  asking them to post notice of lawsuits in conspicuous
9  locations at the local jails, as well as to Riker's Island,
10  and asking them to post notices in conspicuous areas of the
11  jail notifying individuals of a lawsuit.

12        Q   Commissioner O'Donnell, why does the State of
13  New York require time to address post-release supervision
14  problems that have come to its attention?

15            MR. NEWMAN:  Objection, Your Honor.

16            THE COURT:  Overruled.

17        A   Well, there are several reasons.  First of
18  all, the decisions by the Court of Appeals were not
19  self-executing.  The Court of Appeals did not direct that
20  DOCS release individuals.  Did not direct that parole
21  release individuals under parole supervision.  So that we
22  now have a situation where we believe the Court of Appeals
23  has directed us to ensure that individuals are resentenced
24  to post-release supervision, and we need time in order to
25  do that.

Parole6-20-001

1  (Commissioner O'Donnell - Direct by Mr. Keane)          52

2          With respect to the 546 individuals, DOCS has been
3  sending notice to all of the courts saying these
4  individuals need to be resentenced under the Court of
5  Appeals decisions, but in many cases DOCS either doesn't
6  have sentencing minutes to know whether the Court did
7  impose post-release supervision or did not.  Parole is
8  sending out notifications to judges as they are going
9  through their files and identifying their cases.  They
10  don't know, in many cases, whether the Court imposed
11  post-release supervision or not because they don't have
12  sentencing minutes.  In many cases, we are finding out that
13  courts may not have sentencing minutes and may have to go
14  through procedures in order to determine whether, in fact,
15  they did impose post-release supervision.  If courts know
16  that they did not, then the courts have to make decisions
17  about whether they want to resentence individuals.  That is
18  going to take time in courts that we know are already
19  overburdened with their current caseloads.  That is just
20  the individuals that we are dealing with who have been
21  either accused or found to be in violation of post-release
22  supervision right now.  A very small universe.  We then
23  have thousands of cases involving individuals who are under
24  parole supervision right now who we do not know whether
25  they were sentenced to post-release supervision or not by

☐

1  (Commissioner O'Donnell - Direct by Mr. Keane)          53

2  the courts, who we have to follow that procedure with as
Page 49

Parole6-20-001

3  well with the courts.  We have the same situation with the

4  Department of Corrections.  So while at first glance this

5  may seem like something that can wind its way through the

6  courts, we really have a potential of a very large number,

7  thousands of individuals who have to be resentenced under

8  the Court of Appeal's decision.  We have a public safety

9  concern about ensuring that individuals are properly

10  sentenced to post-release supervision.  The way to proceed,

11  the way we think it is important to proceed is to do this

12  in an orderly way by preserving the status quo.  Allowing

13  us to continue, for parole to supervise individuals who are

14  currently under supervision.  Allowing the Department of

15  Corrections to continue to proceed in an orderly way to

16  have individuals resentenced.  Allow the courts to have

17  time to resentence individuals, as well as the prosecutors

18  and defense counsel.  So it really is a case of preserving

19  the status quo and allowing the individuals to remain under

20  either DOCS custody or parole supervision while the

21  proceedings are taking place.

22         Q    Is it important to the State of New York that

23  sentences be uniform?

24         A    It is extremely important.  It is also

25  important that we follow the law in our sentences, and that

0

1  (Commissioner O'Donnell - Direct by Mr. Keane)          54

2  sentences that are imposed are the proper sentences.  In

3  this case post-release supervision being part of the

4  sentences.

Page 50

Parole6-20-001

5            Q    Is it the policy of the State of New York to
6    maintain custody of individuals who the State has no lawful
7    right to maintain custody over?

8            A    It is not.  I do think we need to clarify, at
9    least from some of the positions that we articulated, that
10   the process is not now to keep in DOCS custody individuals
11   beyond their maximum expiration date or conditional release
12   date.  The policy is to preserve the status quo.  If those
13   individuals are to be released under their current
14   sentencing calculations they will be released under parole
15   supervision and continue the parole supervision process
16   while individuals are being resentenced, so we are trying
17   to maintain the status quo while a very large volume of
18   cases can be resentenced through the courts.

19                MR. KEANE:  Thank you, Commissioner.  I have
20           no further questions of this witness.

21                THE COURT:  Mr. Newman will question on
22           behalf of Mr. Carter.

23                MR. NEWMAN:  Thank you, Your Honor.

24   CROSS-EXAMINATION OF MS.

25   O'DONNELL BY MR. NEWMAN:

☐

1    (Commissioner O'Donnell - Cross by Mr. Newman)         55

2            Q    Good morning, Commissioner.

3            A    Good morning.

4            Q    Regarding this notice that you talked about
5    that was sent to sheriffs, and I believe you said was sent
6    to jails and prisons.  When was that notice sent?
                        Page 51

Parole6-20-001

 7          A   I believe it was sent last week.  I can't tell
 8  you the exact date.
 9          Q   Would you agree that it was sent just within
10  the past week?
11          A   I would agree to that.  Yes.
12          Q   Did the notice specifically instruct inmates
13  what to do if they wished to participate in the action and
14  make their voices heard?
15          A   It gave them general notice about the nature
16  of the lawsuit.
17          Q   Did the notice provide the telephone numbers
18  of class counsel?
19          A   Not that I recall.
20          Q   Did the division or any other agency, so far
21  as you know, initiate a process by which inmate counselors
22  within the prison were directed to call in inmates, either
23  individually or collectively, and orally tell them about
24  the lawsuit?
25          A   I think you are going to have to ask Mr.


 1  (Commissioner O'Donnell - Cross by Mr. Newman)        56
 2  Annucci what was done at DOCS, but I don't believe that
 3  that was part of the notice requirements or the notice that
 4  was given at the local jails.
 5          Q   Thank you.  When you took office as
 6  Commissioner, were you aware that the Second Circuit in
 7  Earley v. Murray had ruled that post-release supervision
 8  could only be imposed by a judge and that the
                        Page 52

Parole6-20-001

9   administrative addition of post-release supervision to a
10  sentence was illegal?
11          A   I probably was not aware at that time.  I
12  became aware later.  I can't really say when that was.
13  When I first followed the lawsuit.
14          Q   Can you approximate when you became aware of
15  that?
16          A   I can't.  I would estimate that that was
17  sometime before the decision was decided.  Several months
18  perhaps.
19          Q   Before the Court of Appeals Murray decision?
20          A   No.  No.
21              THE COURT: One at a time.
22          A   No.  Before the Garner lawsuit was decided.
23          Q   Would you agree that the Second Department
24  based in Brooklyn handles more cases, particularly more
25  criminal cases than any of the other Appellate Divisions?

1   (Commissioner O'Donnell - Cross by Mr. Newman)        57
2           A   I wouldn't know.
3           Q   Would you agree that that Court handles
4   thousands of criminal cases a year?
5           A   I would agree with that.
6           Q   At some point did you become aware that
7   beginning in February, I believe February 2007, in People
8   against Noble, People against Smith and other cases that
9   the Second Department joined the Second Circuit Court of
10  Appeals in ruling that DOCS could not administratively add
                        Page 53

Parole6-20-001

11 post-release supervision to a sentence?

12        A    Well, I was aware that for approximately eight
13 years the New York courts followed precedent that DOCS
14 could administratively add post-release supervision, and
15 that at some point in time the courts in some cases
16 reversed themselves and took different positions.

17        Q    Approximately when did you become aware that
18 the Second Department had joined the federal courts in
19 ruling that the practice which had prevailed before 2006
20 was illegal?

21        A    I couldn't tell you when that was.  I wouldn't
22 agree with your characterization of the cases.

23        Q    Are you also aware that there is a statute CPL
24 380.70, I believe, which provides that sentencing courts
25 when a defendant is sentenced to prison are required to

□

1 (Commissioner O'Donnell - Cross by Mr. Newman)          58
2 produce the sentencing minutes and within 30 days get them
3 to the Department of Correctional Services?

4        A    I am aware of that requirement.

5        Q    Have you in your capacity as Commissioner
6 taken any action to ensure that sentencing courts comply
7 with that requirement?

8        A    We actually have had an effort underway with
9 OCA to get better compliance with that requirement.

10        Q    When did you begin that process?

11        A    I believe that process was already begun at
12 the time I became Commissioner.  That efforts were underway
                          Page 54

Parole6-20-001

13 and have been underway to work with OCA in that regard, but
14 we recognize that that has been a real problem in the
15 criminal justice system to ensure that those sentencing
16 minutes are available to the Department of Corrections.

17        Q    Would you agree that the Sparber and Garner
18 decisions were issued by the Court of Appeals this spring?
19 Two or three months ago?

20        A    I believe it was approximately two months
21 ago.

22        Q    And were you aware at that time that by the
23 time the Court of Appeals issued those decisions all four
24 Appellate Divisions, as well as the Second Circuit Court of
25 Appeals, had ruled that DOCS could not administratively add

1 (Commissioner O'Donnell - Cross by Mr. Newman)          59
2 post-release supervision?

3        A    I was aware that at least three of the Court
4 of Appeals or of the Appellate Divisions had either
5 reversed prior rulings of the courts that appeared to be
6 moving in the direction that DOCS could not calculate the
7 period of post-release supervision. I think the next part
8 of it is: Did I predict that the Court of Appeals would
9 adopt that opinion? I would say no. I was surprised, but
10 I also believe that the Court of Appeal's rulings make it
11 clear that individuals are to be resentenced and that the
12 remedy is not to strike post-release supervision or to
13 allow individuals to proceed with illegal sentences, but
14 that the remedy is that they be resentenced before the
Page 55

Parole6-20-001

15  sentencing court.

16          Q    I don't wish to argue law with you,
17  Commissioner.  I know you are a very experienced attorney.
18  Will you agree that in the Garner decision the Garner Court
19  addressed the question of resentencing only in a footnote
20  by saying that its granting of Article 78 relief was
21  without prejudice to any possible remedy that the State
22  might have with regard to resentencing?

23          A    I would agree that it was addressed in a
24  footnote.  In Garner.  Not in the Sparber decision.

25          Q    Would you agree that all of the cases decided

⬛

1  (Commissioner O'Donnell - Cross by Mr. Newman)              60
2  in the Sparber matter were cases brought to the Court of
3  Appeals in the direct appeal process?

4          A    I would agree with that.

5          Q    Did you or your agency take any action prior
6  to the Sparber and Garner decisions in anticipation that we
7  would be in the situation that has led the plaintiffs to
8  bring this action?

9          A    I would defer to Mr. Annucci about the steps
10  that were taken by the Department of Corrections to
11  identify cases that might be affected, but that is the
12  principle action that was taken.  My view was that the
13  Court of Appeals would continue, as it had previously, to
14  recognize that the law requires a sentence of post-release
15  supervision and that this was or is, as a matter of law,
16  part of the sentence.
                        Page 56

Parole6-20-001

17          Q    So, therefore, until the Court of Appeals
18 ruled would you agree that your agency based its policy on
19 the hope and assumption that the Court of Appeals would
20 disagree with the Second Circuit and at least three
21 Appellate Divisions?

22          A    I wouldn't say it was a hope and assumption.
23 There was a long history of legal decisions and precedents
24 really upholding the right of the Department of Corrections
25 to administratively add post-release supervision to

 

1 (Commissioner O'Donnell - Cross by Mr. Newman)          61
2 sentences, because it was mandatory under the law.

3          Q    Prior to the Garner and Sparber decisions, did
4 you or your agency specifically take any action to ensure
5 that at least as to the most urgent cases, those people who
6 were already in custody for violating post-release
7 supervision, that the State would obtain and review the
8 sentencing minutes in order to determine who was lawfully
9 in custody and who was not?

10          A    I'll answer your question this way.   The
11 Department of Corrections has been very aggressive about
12 identifying those cases and getting notice out to the
13 court.   Part of what we hope to achieve by bringing this
14 lawsuit is actually to prioritize the cases that need to be
15 resentenced by creating classes of defendants who have the
16 most need to be resentenced quickly, and so the efforts on
17 the part of the Department of Corrections, which had to go
18 through thousands and thousands and thousands of records
Page 57

Parole6-20-001

19  was, in my view, extraordinary to identify cases that are
20  affected by the post-release supervision decisions, if they
21  were, or did not affirm what we had hoped would be affirmed
22  and to permit those cases to be identified to the courts
23  for resentencing.  So I think quite a bit was done in order
24  to identify cases that could be affected.
25          Q    Let me rephrase this.  Would you agree that

 

1  (Commissioner O'Donnell - Cross by Mr. Newman)          62
2  the sentencing minutes are a very important element in
3  determining whether someone is lawfully on post-release
4  supervision or not?
5          A    I would.
6          Q    And so to your knowledge was any effort made
7  by the State, prior to the Garner and Sparber decisions
8  being handed down, to ensure that sentencing minutes would
9  be obtained in cases where the sentencing commitments did
10  not show post-release supervision?
11          A    It was not related specifically to the
12  decisions, but there were ongoing efforts to work with OCA
13  to make sentencing minutes available.  I think it is a very
14  complex issue that we are dealing with, which is one of the
15  reasons we are bringing this lawsuit.  In some cases courts
16  have the minutes.  In other cases they don't.  In a number
17  of cases the minutes are not with the Department of
18  Corrections, as they should be.
19          Q    Are you familiar with the relief that
20  plaintiffs are seeking in this action?
                        Page 58

Parole6-20-001

21        A    I am.

22        Q    Will you also agree that as to persons who are
23    presently serving their determinate sentences as imposed by
24    the courts, that even if post-release supervision is not
25    part of the sentence, that person will also be supervised

⬜

 1    (Commissioner O'Donnell - Cross by Mr. Newman)            63
 2    under conditional release generally for the final 1/7th of
 3    the determinate sentence?

 4        A    Correct.  So after they are released -- your
 5    question.  Just to clarify.  After they are released they
 6    will be supervised for conditional release or for the
 7    remaining part of their sentence as a type of post-release
 8    supervision.  Was that your question?

 9        Q    Yes.

10        A    Okay.

11        Q    So that at least these individuals, if they
12    are in custody now, in general, they will not be directly
13    released from prison to the street without supervision, but
14    will be released to conditional release for the remainder
15    of their determinate sentence?

16        A    That would be 1/7th of their sentence.  It is
17    interesting, because that is also one of the reasons we
18    think it is important to bring the lawsuit, because also
19    those individuals, some of whom courts may find should no
20    longer be on supervised release, may in fact be subject to
21    supervised release because they were let out of prison
22    before.  while they still had 1/7th remaining on their
                        Page 59

Parole6-20-001

23  sentence because of good time that was earned in prison.

24  So we are finding in some cases courts are releasing

25  individuals from supervision when, in fact, they may still



☐



1  (Commissioner O'Donnell - Cross by Mr. Newman)          64

2  be subject to supervision.  That is why we think it is so

3  important that cases go back before the sentencing court.

4  That the sentencing court obtain the minutes, search their

5  records to see whether, in fact, post-release supervision

6  was properly imposed.  That the courts have the opportunity

7  to hear from the DA's and hear from defense counsel before

8  deciding how to deal with a particular case.

9          Q    If a court had released someone from

10  supervision, let's say, that would normally be on an

11  Article 78 proceeding.  Wouldn't it?

12          A    It could be, unless a Court released someone

13  on a writ of habeas corpus without knowing that the person

14  was still under a period of post-release supervision.

15          Q    It would be one or the other.  Writ or Article

16  78.  Normally would you agree that a judge would not do

17  that unless the sentencing commitment failed to reflect

18  post-release supervision?

19          A    I'm assuming that.  I don't know what a

20  particular court would do.  That is a valid assumption.

21          Q    Would you agree that most courts, certainly

22  the courts that follow the law, as we assume they will,

23  would not discharge someone from supervision or custody if

24  the sentencing minutes showed that supervision had been

Page 60

Parole6-20-001

25  pronounced by the judge?

☐

1  (Commissioner O'Donnell - Cross by Mr. Newman)            65

2            A    That's correct.  I'm assuming in some cases
3  judges will resentence individuals to post-release
4  supervision if they hadn't articulated that sentence at the
5  time of sentencing.

6            Q    Would you agree that if the State had begun
7  promptly the action after Earley versus Murray was decided
8  in order to obtain the sentencing minutes that the law says
9  it is supposed to have, then we would have eliminated the
10  danger that courts would mistakenly release people who
11  should not have been released?

12            A    The law was very fluid, and there were
13  certainly laws supporting the position that was taken by
14  the State for the past ten years.  So I would not assume
15  that.  I also think it is important to recognize the
16  magnitude of the issue when we are talking about 30
17  thousand cases.  We are talking about cases for which we
18  have heard, in some instances, sentencing minutes were not
19  even transcribed.  So it is a significant issue, and I do
20  not agree with you that we could have avoided it by, in the
21  last year, taking some other action.  I also would like to
22  respond to your question about the remaining one seventh of
23  a sentence that someone may, in fact, owe by way of
24  post-release supervision.  That is exactly what the
25  Legislature, I think, intended to avoid when they passed

Parole6-20-001

1  (Commissioner O'Donnell - Cross by Mr. Newman)          66
2  Jenna's Law.  Very first time they passed determinate
3  sentencing that, in fact, was the case.  That individuals
4  would be under a very short period of supervision after
5  their release, because of the one seventh of their sentence
6  that was not served, since they got out because of good
7  time.  That was found to be grossly insufficient.  I think
8  the importance of post-release supervision is that you
9  ensure that someone is under supervision.  Has the parole
10  board set conditions.  If they need mental health
11  treatment, they are in mental health treatment.  If they
12  need drug treatment, they are in drug treatment.  That they
13  have a curfew.  So doing that for a very short time, to me,
14  is not sufficient for individuals who are violent felony
15  offenders.  So I don't think that that 1/7th of a sentence
16  is a proper remedy for the type of post-release supervision
17  that the Legislature is requiring under Jenna's Law.
18          Q    Couple more questions.  With regard to the
19  individual that we represent.  Malcolm Carter.  Have you
20  reviewed any records relating to this case?
21          A    I have not.
22          Q    Are you familiar with the Department of
23  Correctional Services inmate information website and the
24  information it contains?
25          A    I am.

Page 62

Parole6-20-001

```
 1  (Commissioner O'Donnell - Cross by Mr. Newman)        67
 2          Q    I would ask if you could look at this for a
 3  moment and ask you a question based on it.
 4                  (Defendant's Exhibit A was marked for
 5              identification.)
 6          Q    I would ask you if you could refer to the
 7  portion of the information that refers to a maximum
 8  expiration date, then give it back to me.
 9          A    I'm sorry.  Could you point it out to me?  Is
10  it on the second page?
11          Q    I believe so.
12          A    So you are pointing to maximum expiration date
13  of 9/18/2009?
14          Q    Yes.
15          A    Okay.
16          Q    Would you agree then that Mr. Carter, who is
17  currently under supervision, has a maximum expiration date
18  of September 18th of 2009?
19          A    Based on what you showed me.  Yes.
20          Q    He would, therefore, be under supervision
21  until then, no matter what happens in this action?
22          A    I don't know enough about the circumstances of
23  his case to know if he has been resentenced.  Needs to be
24  resentenced.
25          Q    Without regard to any resentencing and
```

Parole6-20-001
1 (Commissioner O'Donnell - Cross by Mr. Newman)        68
2 assuming that parole keeps him under supervision as long as
3 they can, he would remain under supervision until September
4 18th of next year.  Right?

5        A    I would hope so.

6        Q    That is more than a year from now.  Isn't
7 it?

8        A    Yes, it is.

9        Q    Yet the plaintiffs in their request for relief
10 for Subclass C, which includes Mr, carter are asking for
11 permission to keep him under supervision beyond that date,
12 which is more than a year from now, if minutes haven't been
13 obtained by that time and a resentencing judge wishes to
14 have more time to get the minutes?

15        A    well, we put him in the third category because
16 we recognize that there is some time to get him before the
17 sentencing judge.  Then what we are asking for, as part of
18 our plan, is to get him before the sentencing judge before
19 the expiration of his period under supervision.  That is
20 what we are trying to do here.  Expediting the cases to
21 ensure that individuals are resentenced within the time of
22 their current sentences.  whether it is in the custody of
23 the Department of Corrections or on parole.

24        Q    So even for persons whose maximum expiration
25 date does not expire for more than a year, you are still

1 (Commissioner O'Donnell - Cross by Mr. Bogin)        69
2 seeking the possibility of them being held under

Page 64

Parole6-20-001
3   supervision beyond that date awaiting resentencing?

4           A    I believe what we are seeking is to have him

5   sentenced before his supervision date expires.

6                   MR. NEWMAN:  No further questions.

7                   THE COURT: Mr. Bogin?

8   CROSS-EXAMINATION OF MS.

9   O'DONNELL BY MR. BOGIN:

10          Q    With respect to your last response, that you

11  are requesting that an individual be resentenced before the

12  end of his sentence, where it might be in 2009.  That would

13  not require any intervention from this Court.  Would it?

14          A    Well, we think it is important that the Court

15  clarify that individuals can remain on post-release

16  supervision, as they are right now, until they can be

17  resentenced, and that we have a plan so that we can move

18  toward resentencing in those cases in an orderly way,

19  beginning with the people who are in custody for violation

20  of supervised release.  Then with the people whose period

21  of custody in custody is expiring or supervision is

22  expiring in the next year or so, and then with the people

23  with longer periods of expiration.

24          Q    If your goal is to refer these matters for

25  resentencing, you don't need court approval to do that.  Do

☐

1  (Commissioner O'Donnell - Cross by Mr. Bogin)          70

2  you?

3          A    Well, many issues have been raised, I believe,

4  by each of defense counsel claiming that perhaps we don't

Page 65

Parole6-20-001

5  have authority to maintain individuals in custody.  I think

6  that is to be determined at a later date, but until those

7  issues can be decided we believe that we should be able to

8  maintain the status quo to get people resentenced.

9          Q    The status quo continues as of today.  Does it

10  not?

11          A    We are continuing to proceed with the

12  resentence of individuals, but we believe it is important

13  that these individuals remain in custody or under

14  supervision during their sentences until this process can

15  take place.

16          Q    The statistical sheet that you discussed, it

17  has a number of PRS releasees who have returned to State

18  custody, and of those 167 for which the State has the

19  minutes.  Is that on here?

20          A    Yes.  That is correct.

21          Q    Do those refer to minutes that are within the

22  files of Department of Correctional Services?

23          A    Yes.  I believe it does.

24          Q    Are you aware of whether or not the Department

25  of Corrections has reviewed those 167 minutes that they

☐

1  (Commissioner O'Donnell - Cross by Mr. Bogin)          71

2  have?

3          A    I believe they have.

4          Q    Are those 167 minutes ones in which

5  post-release supervision is not imposed?

6          A    I believe.  I don't know the answer to that.

Page 66

Parole6-20-001
7  I believe Mr. Annucci does.

8          Q    Would you agree that if upon review by the
9  Department of Corrections that those minutes show no
10 post-release supervision and those individuals are held
11 solely as post-release violators they are entitled to
12 release?

13          A    No.  I would agree they are entitled to
14 resentencing.  Notice has been given to the Court, and I
15 believe that they should proceed to be resentenced, and the
16 sentencing court should decide what relief they are
17 entitled to in their particular cases.

18          Q    Didn't the Court of Appeals in Garner indicate
19 that post-release supervision was a nullity if not imposed
20 by a judge?

21          A    I believe the Court in Garner prohibited the
22 Department of Corrections from adding post-release
23 supervision to any sentences.  The Court did not order the
24 Department of Corrections to release any individuals within
25 its custody.  I believe the Court in Sparber specifically

☐

1  (Commissioner O'Donnell - Cross by Mr. Bogin)          72
2  said that it should not be a windfall to any particular
3  individuals that the Court did not articulate post-release
4  supervision at the time of sentencing.  In fact, those
5  individuals should be resentenced.

6          Q    In Garner, as Mr. Newman had suggested, isn't
7  it correct that in Garner the Court of Appeals simply noted
8  that its decision was without prejudice to any possible

Page 67

Parole6-20-001

9   resentencing?

10          A    I believe the Court specifically refused to

11   strike post-release supervision from the sentences in the

12   case in Sparber and in Garner the Court did not direct the

13   Department of Corrections to do anything, other than not

14   add post-release supervision in the future.

15          Q    The Court in Garner did not order

16   resentencing.  Did it?

17          A    It didn't.

18          Q    Thank you.

19               THE COURT: Mr. Jurena?

20               MR. JURENA: I have no questions, Judge.

21               THE COURT: Any redirect?

22               MR. KEANE:  Just one question.

23   REDIRECT EXAMINATION OF MS.

24   O'DONNELL BY MR. KEANE:

25          Q    Commissioner, are you familiar with the



1   (Commissioner O'Donnell - Redirect by Mr. Keane)        73

2   recidivism rates for releasees from prison?

3          A    Yes.  A study done by the Department of

4   Corrections, and a study which we looked very carefully at

5   in the sentencing commission, indicated that approximately

6   or exactly 39 percent of individuals are released from the

7   Department of Corrections recidivate, based on 2002 data,

8   within three years.

9          Q    And are you familiar with the recidivism rates

10   for releasees who are supervised for as many as five

Page 68

Parole6-20-001

11 years?

12        A    Yes.  It does decline fairly substantially

13 after the third year to the fifth year.  We believe that

14 supervision during the first three years is essential and

15 an important component of any sentence.

16                    MR. KEANE:  Thank you very much.

17                    THE COURT: Mr. Newman, any recross?

18                    MR. NEWMAN:  No, Your Honor.

19                    THE COURT:  Mr. Bogin?

20                    MR. BOGIN: No, Your Honor.

21                    THE COURT: Mr. Jurena?

22                    MR. JURENA: No.  Thank you, Judge.

23                    THE COURT:  Mr. Keane, call your next

24        witness.

25                    MR. ROCK:  Your Honor, if I may we would

1 (Mr. Annucci - Direct by Mr. Rock)                    74

2        call Anthony Annucci.

3                    THE COURT:  You may.

4                            ANTHONY ANNUCCI,

5        having been duly sworn, was examined and testified

6        as follows:

7                    MR. GIBNEY:  I just renew my offer of proof.

8        Mr. Annucci has an affidavit before the Court,

9        which we do not have factual arguments with, so if

10        we could limit his testimony to matters not covered

11        in his affidavit I think that would make this

12        hearing much more expeditious.

Page 69

Parole6-20-001
13          THE COURT: Mr. Rock?

14          MR. ROCK: My intention is not to go through

15          Mr. Annucci's affidavit and to repeat everything.

16          There are certain matters that I believe are

17          background for some more procedural issues and

18          recent developments that I think are necessary for

19          testimony.

20          MR. GIBNEY: No objection to things not

21          covered in the affidavit.

22          THE COURT: Okay. Go ahead.

23   DIRECT EXAMINATION OF MR.

24   ANNUCCI BY MR. ROCK:

25          Q   Mr. Annucci, currently where are you

 

1  (Mr. Annucci - Direct by Mr. Rock)                    75

2  employed?

3          A   Presently the Executive Deputy Commissioner

4  for the New York State Department of Correctional Services,

5  and I continue to serve as its general counsel.

6          Q   And could you describe for us generally what

7  your position involves?

8          A   Very briefly. I'm the number two person in

9  the agency. I report directly to the Commissioner. I

10 represent him at a number of functions. I also oversee

11 inter-governmental matters, and in my capacity as the head

12 of counsel's office I am responsible for all of the legal

13 services necessary for the day-to-day operation of the

14 State Prison system, consisting of 69 different

Page 70

Parole6-20-001
15  correctional institutions, a work force of 31,600 employees
16  and inmate under custody population of approximately 62,200
17  individuals.

18          Q    Prior to assuming your current
19  responsibilities, what other positions have you held with
20  the Department of Correctional Services?

21          A    Initially employed by the Department starting
22  in 1984 as deputy counsel.  I became Deputy Commissioner
23  and counsel on September 1st of 1989.  I continued in that
24  capacity until October of 2007, when I also became
25  Executive Deputy Commissioner, and prior to that before

□

1  (Mr. Annucci - Direct by Mr. Rock)                    76
2  coming to DOCS I served as a law assistant to two different
3  Supreme Court Judges in Kings County.

4          Q    In your work as a law assistant did you have
5  occasion to become familiar with the documentation involved
6  in commitment orders and sentencing proceedings?

7          A    I became familiar with that, and also became
8  familiar with how the process works in terms of the
9  activities that take place day-to-day in a criminal trial
10  part leading up to convictions and sentences.

11          Q    You just testified that the DOCS population is
12  roughly 62 thousand inmates.  Is that a constant number or
13  is that a fluid number?

14          A    No.  It is a very fluid number.  Whenever I
15  lecture judges and defense attorneys and district attorneys
16  I always explain that there is a constant intake.  A

Page 71

Parole6-20-001
17  constant flow through the system.  Every month

18  approximately 22 hundred individuals are committed to our

19  custody.  A number of them as new commitments, maybe 14 or

20  1500 each month, and the rest of them as technical

21  violators.  Either parole release, conditional release

22  violators or post-release supervision violators.  So over

23  the course of a one year period we may actually incarcerate

24  close to 90 thousand different individuals.

25          Q   With respect to those inmates who come into

□

 1  (Mr. Annucci - Direct by Mr. Rock)                    77

 2  DOCS custody directly from a sentencing court, could you

 3  explain for the Court, please, what the process is when

 4  these inmates come into DOCS custody?

 5          A   Yes, I can.  We are responsible for confining

 6  everyone who receives either a determinate or indeterminate

 7  sentence of imprisonment.  Anyone who is given a definite

 8  sentence of imprisonment is incarcered locally.  When a

 9  judge sentences someone to state imprisonment, they are

10  retained locally until all of the requisite documentation

11  is assembled that must accompany that individual to a

12  department reception center.  Those documents consist of

13  the presentence report and the commitment document, and any

14  summaries of medical records.  That sort of thing.  Usually

15  that takes a period of approximately ten to 20 days within

16  the date someone is actually sentenced.  When a locality

17  has that documentation assembled, he is declared state

18  ready, and then we have to accept them within our custody

Page 72

Parole6-20-001
19 within a prescribed period of time, at which point they are

20 delivered to a department reception center. We then

21 conduct the reception process for each individual inmate.

22 The process generally takes about a one week period.

23 During this time we take the initial photograph, after

24 giving them a hair cut. We test them. We do medical

25 examinations. We determine what their reading levels might

1 (Mr. Annucci - Direct by Mr. Rock)                    78

2 be. We determine what their psychiatric needs might be.

3 The most fundamental responsibility we do is to calculate

4 the inmate's sentence. That is to determine how long they

5 will have to be in our custody to determine their parole

6 eligibility date. If they are subject to parole release,

7 to determine their conditional release date and determine

8 their maximum expiration date, and then from there we have

9 to assign them to their initial general confinement

10 facility. If, for example, they have a period of at least

11 six or more years to their earliest release date, they will

12 in all likelihood start off in a maximum security prison,

13 and as they get closer to a release date, perhaps to a

14 medium release, and ultimately perhaps to a minimum or

15 local release facility.

16          Q    What information is it that the Department of

17 Correctional Services uses to make the sentence

18 calculations that you have just described?

19          A    It is the information that is contained on the

20 commitment documents itself, and any jail time records that

Page 73

Parole6-20-001
21  accompany the inmate which, in effect, is a representation

22  of how much credit the individual earns while in local

23  custody before coming to our system.

24      Q    Now Mr. Annucci, in addition to the commitment

25  order that you have testified about, is there any other



1  (Mr. Annucci - Direct by Mr. Rock)                        79

2  statutory requirement for records that the Department of

3  Correctional Services is supposed to receive regarding a

4  newly received inmate?

5       A    Well, first, together with the commitment

6  document the other crucial document is the presentence

7  report that accompanies the inmate.  If that is not there

8  on the bus with the inmate, we will refuse to accept

9  custody, but that is the critical document that tells us

10  the background of the inmate and what needs he may have,

11  and also factor into this security level.  The sentencing

12  minutes, which are required by statute to be transcribed

13  and separately mailed to us, do not arrive with the inmate

14  at a reception center.  That is a separate process.  It is

15  incumbent upon the court stenographer, who I recently

16  learned works for the Chief Clerk of the Court, to

17  follow-up and transcribe those minutes, and then mail them

18  to the department within 30 days after sentence.  Our

19  records in terms of knowing the compliance with that is, in

20  my estimation, well below 50 percent compliance.  Probably

21  closer to 30 percent.  In the specific sample we talked

22  about, the 548 number, of that number only 167 where

Page 74

Parole6-20-001
23  sentencing minutes actually are in our institutional files.

24  So that is well below 50 percent.

25          Q    Just for purposes of clarity, the requirement

□

1  (Mr. Annucci - Direct by Mr. Rock)                          80

2  that the sentencing minutes be sent to the Department of

3  Correctional Services, could you tell us where that

4  requirement is?

5          A    I believe it is in Criminal Procedure Law

6  Section 380.50, and since I arrived at the department it is

7  one of the things I have constantly worked with the Office

8  of Court Administration to try and achieve better

9  compliance on their part.  For example, when I first

10  arrived in state corrections I learned that we had a number

11  of sentencing minutes waiting at reception centers that we

12  couldn't then file in the appropriate inmate file.  When I

13  asked why, I was told that the identifiers on the cover of

14  the minutes, simply the indictment number from the County

15  of commitment.  For example, People versus John Smith with

16  an indictment number from Bronx County, would not tell us

17  which of the 50 or more John Smiths in our custody those

18  minutes belong to.  So I immediately undertook an

19  initiative with OCA to have their court stenographers

20  routinely place the NYSID number on the cover of the

21  sentencing minutes, so that when they are subsequently

22  delivered to us, well after the inmate has already gone

23  through our reception centers, we will be able to, with

24  that NYSID number, to identify the appropriate inmate file

Page 75

Parole6-20-001
25  that those minutes must be placed within and, therefore, be

1  (Mr. Annucci - Direct by Mr. Rock)                        81

2  a permanent part of that inmate's file.

3          Q    In your discussions with the Office of Court

4  Administration regarding compliance with this requirement,

5  is that something that has been ongoing during your time

6  with the Department of Correctional Services?

7          A    Yes.  It has been ongoing.  I also remind all

8  judges, all defense lawyers, and all DA's, whenever I give

9  a CLE lecture, to remind their court stenographers that

10 with the transcribed minutes they must place the NYSID

11 number on the cover, so that we can match it with the

12 appropriate inmate's file.

13         Q    Mr. Annucci, have you in the course of your

14 employment, have you had occasion to read and review the

15 Garner and Sparber decisions from the Court of Appeals this

16 year?

17         A    Yes.

18         Q    And in the Sparber decision in particular,

19 there was reference to other court documents where the

20 imposition of post-release supervision might be mentioned.

21 Are you aware of that reference?

22         A    Yes.  I am aware of that reference.  I believe

23 the reference was to a court work sheet and a file jacket.

24 In that line of cases, the Court also did not on the record

25 impose a period of post-release supervision, but the Court

Parole6-20-001

1   (Mr. Annucci - Direct by Mr. Rock)                          82
2   of Appeals did look at those other records and conclude
3   that the proper remedy was for these individuals to have
4   the sentence pronounced in their presence in court.  None
5   of those records are part of the records that are delivered
6   to us.  Neither are the plea minutes ever delivered to us.
7   Neither is even the original indictment delivered to us.
8   The only document that comes to the Department of
9   Correctional Services with an inmate that is supposed to
10  reflect the actual sentence that was imposed is that single
11  sheet of paper.  On that single sheet of paper not only is
12  it supposed to record the actual sentence for the various
13  counts, it is also supposed to record correctly any other
14  part of the sentence which could consist of a mandatory
15  surcharge.  A designated surcharge.  A DNA data bank filing
16  fee.  Many other aspects to the sentence.  So over the
17  years this has increased enormously in complexity and
18  number of times.  It is possible that errors could be
19  reflected on that sheet.
20          Q   Apart from the practical reality that you do
21  not receive these other documents that were mentioned in
22  the Sparber decision, are you aware of any statutory
23  requirement that the sentencing court forward those
24  documents to the Department of Correctional Services?
25          A   No.  There is no legal obligation on the part

Page 77

Parole6-20-001

1  (Mr. Annucci - Direct by Mr. Rock)                    83
2  of the sentencing court, that I am aware of, that would
3  require any of the documents along those lines to be
4  forwarded to the Department of Correctional Services.
5         Q    When an inmate is admitted to the Department
6  of Correctional Services, what is the department's role
7  with respect to the administration of a period of
8  post-release supervision?
9         A    The department's role is to correctly
10 calculate that as part of the inmate's sentence, so that at
11 the time he is released that that period would then
12 commence.  To give you a practical example.  If an
13 individual were to receive a three and a half year
14 determinate sentence for a particular violent felony
15 offense, there would be two critical dates that are part of
16 that sentence.  The conditional release date and maximum
17 expiration date.  If the inmate did not lose any good time,
18 he would be conditionally released after three years.  If
19 he lost all of his good time, he would be released at the
20 end of three and a half years.  At both release points he
21 would then commence serving the period of post-release
22 supervision sentence that was part of his sentence, which
23 typically would be a five year period of supervision.  When
24 the State switched from indeterminate to determinate
25 sentencing, the thrust was to incorporate a system of

1  (Mr. Annucci - Direct by Mr. Rock)                    84

2  sentencing whereby people would know basically what the
3  actual amount of time an inmate could be expected to serve
4  while incarcerated.  This is called truth in sentencing,
5  and the target was to have individuals actually serve 85
6  percent or more of the sentence that was imposed.
7  Initially the State went in that direction in 1995 with
8  repeat violent felony offenders.  The last seventh being
9  the time that individuals could, if released, be supervised
10  in the community by the division of parole.  The State
11  learned that in many cases that period was very short, and
12  if the inmate received all good time he was released from
13  his underlying sentence of imprisonment without any
14  supervision.  So the decision was made that going forward
15  in 1998 we should have two separate tracks.  One to
16  determine what the actual determinate sentence should be,
17  and a second track that would be the period of post-release
18  supervision.  When the statute was written, and I was one
19  of the people that helped work on the initial drafts, it
20  was written with the mind set that in all likelihood judges
21  might forget to pronounce periods of post-release
22  supervision, since they are not used to having to fulfill
23  that responsibility.  So if you look in the statute, Penal
24  Law Section 70.45, nowhere do you see the term sentencing
25  court.  Nowhere do you see the term impose.  Nowhere do you

⬜

1  (Mr. Annucci - Direct by Mr. Rock)                    85
2  see the term pronounce.  The initial sentence says each
3  determinate sentence has as a portion thereof a period of

Parole6-20-001

4   post-release supervision.  The rest of the sections talk
5   about what the lengths of those periods must be with the
6   various types of crimes that an individual would be
7   convicted of.

8        Q   Was it the department's understanding that the
9   period of post-release supervision was imposed by operation
10  of law?

11       A   It was the department's understanding, and
12  apparently it was the understanding of many sentencing
13  judges, many defense lawyers and many DAs for an
14  approximate eight year period of time, until we first had
15  that Second Circuit decision in Earley v. Murray.

16       Q   In those instances where a commitment order
17  came to DOCS without an indication of post-release
18  supervision but it was clear from the statute that it was a
19  sentence that required that, what did DOCS do?

20       A   DOCS calculated the period of post-release
21  supervision that was required by the statute into the
22  inmate's sentence.

23       Q   That is the practice that the Garner court
24  found to be inappropriate?

25       A   That is correct.



1   (Mr. Annucci - Direct by Mr. Rock)                    86
2        Q   Is the Department of Correctional Services in
3   this litigation seeking the ability to administratively
4   impose a period of post-release supervision?
5        A   No, it is not.
                    Page 80

Parole6-20-001

6        Q    Apart from the commitment order, what other
7   documents can be used to verify or determine whether or not
8   a period of post-release supervision was imposed by the
9   Court?

10        A    I think the critical document is the
11  sentencing minutes, but the sentencing minutes could also
12  be equivocal.  They are not always unequivocal.  For
13  example, we have seen a sentencing judge say a period of
14  post-release supervision will be determined by the
15  Department of Correctional Services.  So in a situation
16  like that, the judge did reference post-release supervision
17  on the record.  He didn't spell out what the term would be,
18  but he did say that it would be calculated by the
19  Department of Correctional Services.  So in a scenario like
20  that, we prefer the sentencing court to make the decision
21  as to whether or not resentencing is appropriate, or some
22  other form of relief is required.  Not an executive agency
23  like the department to make that determination.

24        Q    As the law has shifted, as the case law has
25  shifted from permitting DOCS to administratively impose the

 

1   (Mr. Annucci - Direct by Mr. Rock)                    87
2   post-release supervision period, what has the Department of
3   Correctional Services done to address this situation?

4        A    The Department of Correctional Services early
5   in 2007 thought that it would be a prudent move to try and
6   essentially identify all of the potential hundreds and
7   thousands of cases that could be affected by a ruling that
                           Page 81

Parole6-20-001

8  ultimately did agree with the initial Earley v. Murray
9  ruling.  There at the time was no way to know which cases
10 would fall into that category of, in effect, silent
11 commitments, as we speak about them.  We did not have a way
12 to retroactively know which commitments came to our custody
13 without an indication of post-release supervision where
14 they would have been required by law.  In order to try to
15 get a handle on this, we assembled a special team of people
16 and brought them to a central office and we first created a
17 master list of 40 some odd thousand cases, I believe, where
18 the individual had at least a determinate sentence of
19 imprisonment that we believe was imposed for a crime
20 committed after September 1st of 1998.  We then had these
21 individuals manually pull all of the inmate files that are
22 maintained at central office.  They then examined the
23 commitment and they then made computer entries.  We
24 developed a new field in our official inmate computer
25 records called PRS.  We then entered indicators for each

□

1 (Mr. Annucci - Direct by Mr. Rock)                    88
2 commitment that was examined.  If there was no indication
3 of PRS, we entered the letter Y to mean yes the commitment
4 is silent, and N for those commitments where the PRS was,
5 in fact, indicated on the commitment document.  And then we
6 entered an H for those records that we could not access,
7 because if the case was so old or we did not have the
8 inmate's institutional file you still wanted to make a data
9 entry that historically the file was not within our grasp

Parole6-20-001

10  at this time, but we would update the field if that
11  individual did come back into our custody and we did
12  resurrect his file.  Lastly, we had another entry for M,
13  which meant there was no indication on the commitment, but
14  we did have the minutes and the minutes did confirm that
15  post-release supervision was, in fact, imposed by the
16  sentencing judge.

17       Q    This work that was undertaken by the
18  Department of Correctional Services, what has the
19  department done with the results of this project in light
20  of Garner and Sparber?

21       A    That project took about a six week period of
22  time to make all of the entries and, on an ongoing basis,
23  people would make entries as individuals are returned to
24  our custody or newly received.  That total effort enabled
25  us to take the following steps.  In the wake of the Garner

☐

1  (Mr. Annucci - Direct by Mr. Rock)                    89
2  and Sparber decisions we made a decision ourselves that the
3  first priority had to be for any post-release supervision
4  violator in our custody that we knew about for whom the
5  commitment was silent.  We then prepared master lists of
6  these cases.  We then secured contacts in each of the
7  District Attorney offices throughout the State, 62
8  different District Attorney's Offices, each of whom was
9  individually e-mailed a list that contained not just the
10  name of the inmate and DIN number, but we had to enter the
11  indictment number, because that is the identifier that they
                        Page 83

12  use. We identify the crime and identified the sentencing
13  judge, so that they could immediately start the process of
14  searching their records to try to assemble whatever
15  documentation they would need to deal with the case.  Next
16  we reached out to the Office of Court Administration.  We
17  explained to them that we intended to do a massive
18  undertaking of bringing everyone of these cases as quickly
19  as possible to the attention of the appropriate sentencing
20  judge.  We determined that we would have two different
21  types of form letters that would explain exactly what the
22  circumstances were for each individual inmate.  One form
23  letter was used for those inmates for whom we had
24  sentencing minutes.  The other form letter was used for
25  those inmates that we did not have sentencing minutes.  We

⬜

1  (Mr. Annucci - Direct by Mr. Rock)                        90
2  used a standard proposed order attached to each letter
3  whereby when a sentencing judge received this he could make
4  a number of determinations.  He could determine to calendar
5  the matter.  He could determine to inquire as to produce
6  the matter at a future proceeding, and he could even issue
7  an order directing us to remove the post-release
8  supervision from that inmate's sentence, and if there were
9  no other holds on that inmate, to immediately release him.
10  When we reached out to the Office of Court Administration
11  they agreed to work with us closely.  They then took our
12  proposed letters and orders and they first determined that
13  the administrative judges in each of the counties should be
                        Page 84

Parole6-20-001

14  the contact persons.  They explained to the judges that
15  DOCS was undertaking this massive initiative whereby they
16  would bring all of these cases to their attention to be
17  then delivered to the individual sentencing judges for the
18  appropriate determination.  An e-mail was prepared by
19  Lawrence Marks of the office of court Administration to
20  each of these administrative judges.  They attached samples
21  of each of the two types of letters that would be sent, as
22  well as the proposed order and the instruction from Larry
23  Marks to make this process work as expeditiously as
24  possible.  For each county DOCS would prepare the necessary
25  letters, address each letter to the individual sentencing

⬜

1  (Mr. Annucci - Direct by Mr. Rock)                          91
2  judge, but mail them in bulk to the administrative judge.
3  so this way the administrative judge, upon receiving the
4  letters, could then not only assign the ones assigned to
5  the sentencing judges still on the bench, but assign the
6  ones to a new judge, in case the original judge was no
7  longer sitting on the bench.  so we put a lot of time and
8  effort to try and expedite the delivery of each of these
9  cases to the original sentencing court, and give them, with
10  those letters, the documentation that was in our
11  possession.  Namely, the commitment and the indication that
12  it was silent.  obviously there is no indication of PRS and
13  a copy of sentencing minutes if we had it.  we also copied
14  the District Attorney with that letter, and the letter was
15  also sent to the inmate from the institution.
Page 85

Parole6-20-001

16              MR. ROCK: Your Honor, for purposes of the
17         record, sample copies of letters that were sent by
18         the department are annexed to Mr. Annucci's
19         affirmation that was offered previously to the
20         Court.
21         Q    When these letters were prepared, did the
22 Department take it upon itself to offer a proposed
23 resolution for each of the individual cases, or was that
24 totally left to the sentencing courts?
25         A    It would be left to the sentencing court, but

⬜

1 (Mr. Annucci - Direct by Mr. Rock)                        92
2 to try and ease the method for them to make that
3 determination, we did include a proposed order that would
4 give them several different options. So, for example, if
5 they wanted right there and then to not even calendar the
6 matter. To just send us back the orders and direct us to
7 not include post-release supervision in the inmate's
8 sentence, we would abide by that. If they directed us to
9 produce the inmate at a future proceeding, we would do
10 that. In each case we made it clear that we needed to be
11 provided with that determination in the central office,
12 because we were going to be tracking each and every one of
13 these cases and following up on them. To date a grand
14 total of 585 letters have been sent out. As I said, the
15 numbers in our system are always changing. When we did our
16 first computer run on May 8th we came up with the 546
17 cases. Since that time some additional technical
                        Page 86

18 post-release supervision violators who were admitted to our
19 custody from the local jails and my colleague, Terry
20 Tracey, had not yet written letters to the courts on those
21 individuals. So now I am writing those letters and
22 tracking those cases. To date of the 585 letters that have
23 been sent out, we have received the following responses. I
24 believe 56 where the judges directed us to remove
25 post-release supervision from those individuals' sentences,

1 (Mr. Annucci - Direct by Mr. Rock)                    93
2 and all 56 have either been released or are about to be
3 released. Another 26 where they imposed post-release
4 supervision nunc pro tunc to the original date of sentence.
5 I believe we have another 39 cases where the judges have
6 issued orders to produce. Every day we get back more and
7 more responses from the courts directing us what they want
8 us to do.

9        Q    I believe you already testified to this, but
10 just so it is clear for purposes of the record. In
11 determining which inmates would have letters sent out, how
12 did the Department prioritize whose letters should go out
13 first?

14        A    Let me back up a little bit and explain the
15 global results of that study we did back in early 2007,
16 where we wanted to identify every individual in our custody
17 who required PRS, but for whom the commitment was silent.
18 At that time I think we came up with 8,100 individuals in
19 our custody for whom the commitment was silent. I think
                Page 87

20 about 21 hundred or so had already been released.  So the
21 concern remained with the 63 hundred number that were still
22 in our custody.  Of that number, when we most recently
23 looked at who is in our custody as post-release violators,
24 we came up with the number of 546.  The balance are
25 individuals in our custody who have not yet reached their



1 (Mr. Annucci - Direct by Mr. Rock)                        94
2 release dates, but they will start to be released.  Like
3 everyone else we are not in any way stopping the normal
4 flow of inmates in and out of our system.  They are being
5 released this month and next month and months after that.
6 We understood from a legal perspective that those
7 individuals who would have the most immediate concerns and
8 would require the immediate attention of the courts were
9 those technical post-release supervision violators in our
10 custody, and that is why we concentrated on them.
11        We next planned to start sending out the hundreds
12 and perhaps thousands of letters on those other individuals
13 still in our custody who have not yet reached either their
14 conditional release date or maximum expiration date
15        Q    Is it the Department's intent for those
16 inmates who in the coming days and months will reach their
17 conditional release date or maximum expiration date, is it
18 the Department's intention to continue to hold them in
19 custody?
20        A    No.  Those individuals will be released in the
21 normal course.  What the Department is trying to preserve
                         Page 88

Parole6-20-001

22  for a limited period of time is that period of post-release
23  supervision that has been administratively added by us that
24  the Court of Appeals has said cannot be done.  We are
25  trying to give that back to the sentencing court, because

□

1  (Mr. Annucci - Direct by Mr. Rock)                        95

2  we feel only the sentencing court can make that decision.
3  Only the sentencing court would know whether or not on the
4  plea minutes, for example, it expressly told the individual
5  that he would receive post-release supervision.  Only the
6  sentencing court would have access to and know what is on
7  the other documentation that the Court of Appeals referred
8  to.  Namely, the court work sheet and the jacket file.
9  Only the sentencing judge, considering all of the issues,
10 including potentially K-two issues, which involve whether
11 or not a plea actually involved advising the individual
12 that post-release supervision was part of his sentence,
13 could be taken into consideration.  So, therefore, the
14 thrust of this entire initiative is to place each one of
15 these cases as quickly as possible back before the
16 sentencing court, so that they could make the appropriate
17 determination and advise us as soon as possible, and we
18 will then comply with whatever direction we receive.

19          Q    As a part of this initiative did the team of
20 people you had working to review the various records for
21 those inmates whose file did contain sentencing minutes,
22 were those reviewed by the people in your agencies?

23          A    They were reviewed, but these were not lawyers
                          Page 89

Parole6-20-001

24  that were reviewing these records.  These were clerical
25  type of personnel, and they did not always get it

 

 1  (Mr. Annucci - Direct by Mr. Rock)                    96
 2  correctly.  For example, there are some instances where we
 3  sent out our letter to the sentencing judge.  We included
 4  the sentencing minutes, and we placed the standard letter
 5  advising him both the commitment was silent and the
 6  sentencing minutes were silent.  And the judge wrote back
 7  issuing a commitment saying the minutes were not silent.  I
 8  did pronounce PRS.  Here is an amended commitment to
 9  reflect that PRS was actually imposed.
10          Q    Has that happened on more than one occasion?
11          A    Yes.
12          Q    So based on the review by the people that you
13  had examining these records, the Department's review
14  reflected that the commitment was silent and that the
15  sentencing minutes were silent?
16          A    That is correct.
17          Q    The sentencing court, after having reviewed
18  those documents, disagreed with the determination of the
19  department?
20          A    That is correct.  Just to understand, these
21  are people that are trying to do a massive review of a
22  number of documents.  They are not trained lawyers and they
23  have to make categorizations into our computer records.
24  They will make mistakes, as many of us do.  We know that
25  court clerks make mistakes when they don't correctly record
                           Page 90

1  (Mr. Annucci - Direct by Mr. Rock)                    97
2  PRS on commitments when, in fact, judges did pronounce it.
3  I found at least 45 cases where the commitments were
4  silent. We did have the minutes, and the minutes did
5  indicate the judge pronounced post-release supervision on
6  the records.

7          Q    Can the Department of Correctional Services
8  actually say that based on a silent commitment and silent
9  sentencing minutes, as determined by the review of your
10 staff, that a particular inmate is entitled to release?

11         A    I'm not comfortable making that determination
12 because, as I said, there maybe other records that are
13 appropriate for review that are specifically within the
14 purview of the original sentencing court, and as the Court
15 of Appeals teaches, sentencing is solely within the
16 province of the judiciary. Therefore, DOCS, as an
17 executive agency, is trying as quickly as possible to
18 render each one of these cases back before the original
19 sentencing judge for the appropriate determination,
20 whatever that is.

21         Q    Mr. Annucci, in your experience with the
22 Department of Correctional Services, has there before been
23 an occasion where the Department or an officer or employee
24 of the Department has been sued for releasing an inmate
25 from custody of the Department who should not have been

1  (Mr. Annucci - Direct by Mr. Rock)                         98
2  released?

3          A    I believe there have been a number of cases
4  along those lines. One case does come to mind where an
5  individual had his sentence changed by the Appellate
6  Division, and the Appellate Division remanded it back for
7  resentencing. When the commitment came back to the
8  Department, the Clerk of the Court incorrectly recorded the
9  sentences as running concurrently. This individual then, I
10 believe, raped and murdered a couple of individuals.  In
11 the Court of Claims decision holding the Department
12 partially responsible for that outcome, the Court ruled
13 that when we became aware of what the original Appellate
14 Division decision was. Namely, that the particular
15 sentence on a particular count was the wrong range.  For
16 example, it was five to 15 and it could have been at best
17 two and a third to seven, and was remanded back for that
18 sole purpose. We should have known that when we got the
19 new commitment that it was erroneous and, therefore, we
20 should have taken corrective action. So I am aware of that
21 kind of determination being made.

22          Q    Is it a fair characterization of the
23 Department's position in this litigation that they are
24 looking, that it is looking to have the sentencing courts
25 provide direction to it as to whether or not a period of

Parole6-20-001

1  (Mr. Annucci - Direct by Mr. Rock)                           99
2  post-release supervision has been imposed for particular
3  individuals?
4            A    That is correct, and if it has not been, for
5  the Court to decide whether it wishes to impose
6  post-release supervision or wishes for the post-release
7  supervision to be excised from the sentence, even though
8  the Court of Appeals did not seem to continence that
9  result.  The Court of Appeals seemed to say that that would
10 be an illegal sentence.  Nevertheless, we feel as the
11 executive agency we would be bound by whatever
12 determination is made by the sentencing court.
13           Q    The Department's role in the overall scheme of
14 things is as the custodian?
15           A    That is correct.
16           Q    We heard Commissioner O'Donnell testify
17 regarding a notice being provided to inmates about this
18 litigation.  Has the Department of Correctional Services
19 taken any actions to provide notice to inmates in its
20 custody?
21           A    Yes, we have.  What I did is to take that
22 notice and send it by e-mail, e-message to every
23 superintendent of our 69 different correctional facilities,
24 with the direction that they shall immediately post that
25 notice in the law library.  In the general library.  I

☐

1  (Mr. Annucci - Direct by Mr. Rock)                          100
                        Page 93

Parole6-20-001
2  believe in all inmate housing areas, and in any other areas
3  they deem appropriate where inmates are likely to view a
4  posting.  I also directed them to give a copy of that
5  notice to the inmate liaison committee and the inmate
6  grievance resolution committee, which are bodies that deal
7  with issues of common interest among the population.
8           MR. ROCK: Your Honor, if I may have a
9      moment?
10           THE COURT: Sure.
11           (Pause.)
12           MR. ROCK: One additional point.
13       Q    Mr. Annucci, with respect to the 585 I believe
14  letters you said you already sent out, could you provide
15  the Court with a general break down of where those  -- what
16  counties those letters were sent to?  What counties had the
17  greatest percentage of the letters?
18       A    If I remember correctly, the County with the
19  largest number of silent commitments was Manhattan County.
20  I think the number was somewhere around 145 or 150.  I
21  think the second largest County was Kings County, with
22  something like 104.  Other counties that had fairly high
23  numbers were, I believe, Erie.  The counties which have
24  large numbers of commitments, such as Queens and the Bronx.
25  Smaller numbers for counties like Westchester.  I have an

□

1  (Mr. Annucci - Direct by Mr. Rock)              101
2  actual count for every County.  I just can't remember every
3  one.  I think it is important to understand why we are

Page 94

Parole6-20-001

4  seeking the relief that we are seeking here.  When we sent
5  these letters out I know in Brooklyn and in Manhattan that
6  a lawyer, I believe with the firm that is present here
7  today, asked for a list from the clerk of those courts of
8  every individual that was sent.  The clerk of that court
9  prepared a separate list, after getting the names off of
10  each individual letter that we sent to that court.
11  Supposedly, or the representation may have been made, that
12  that would assist in the resentencing initiative, but what
13  that individual did was look up where these inmates are
14  presently incarcerated and then file habeas petitions for
15  the ones housed in correctional facilities within a
16  particular County, such as Seneca County or Oneida County.
17  In various other counties around the State.  So it seemed
18  like there was a lack of candor in the acquisition, or at
19  least the representation that was made to the Clerk of the
20  Court.  I know in reviewing the papers there was definitely
21  a misrepresentation as to how they got the list of those
22  inmates, because I believe there was a sentence that said
23  it was the Department that provided that list to them.
24  That's not correct.
25              MR. ROCK: Thank you.

1  (Mr. Annucci - Cross by Mr. Bogin)                    102
2              THE COURT: Which lawyer will cross-examine
3        for Mr. Carter?
4              MR. BOGIN: I am.
5              THE COURT: I thought you had Mr. Negron and
Page 95

```
                    Parole6-20-001
 6          Mr. Myers.
 7                MR. NEWMAN: Your Honor, would it be all
 8          right if we defer to Mr. Bogin and then Mr. Gibney
 9          will do a much briefer cross after his?
10                THE COURT: Okay.  Mr. Bogin will go first.
11                MR. BOGIN: The two individuals I represent
12          are both in the custody of Mr. Annucci's
13          department.  So it makes senses.
14                THE COURT: Doesn't matter to me.  I wanted
15          to know who to recognize first.
16    CROSS-EXAMINATION OF MR.
17    ANNUCCI BY MR. BOGIN:
18          Q    You told us about the Department's
19    resentencing initiative, as well as the preliminary work
20    that was done in 2007.  Correct?
21          A    That's correct.
22          Q    I believe you indicated that the 2007
23    component was a review of commitments in which there were
24    determinate sentences after 1998.  The effective date of
25    the post-release supervision provision?
```

⬜

```
 1  (Mr. Annucci - Cross by Mr. Bogin)                   103
 2          A    Correct.
 3          Q    That project in 2007, did that also include
 4  evaluating what sentencing minutes the Department had in
 5  those cases?
 6          A    Evaluating what?
 7          Q    Determining whether the Department had the
                        Page 96
```

Parole6-20-001
8   relevant sentencing minutes?

9          A    I believe so.

10         Q    And in the case where the Department did have

11  the minutes, were they reviewed to determine whether

12  post-release supervision was addressed?

13         A    No.  I believe that was only done recently as

14  part of this resentencing initiative.  I have to double

15  check, but to the best of my knowledge we only respectfully

16  started doing that with this initiative.

17         Q    You were aware of the Second Circuit's

18  decision in Earley v. Murray at the time it came out in

19  2006.  Correct?

20         A    Correct.

21         Q    I would assume you did not agree with that

22  decision?

23         A    I think that is a safe assumption.

24         Q    But you were aware of it?

25         A    Yes.

☐

1  (Mr. Annucci - Cross by Mr. Bogin)                    104

2          Q    And you were aware that the Second Circuit

3  indicated that DOCS did not have the authority to add a

4  period of post-release supervision, if it was not included

5  by the sentencing judge?

6          A    That is correct.

7          Q    At the very least that raised a question of

8  the legality of administratively imposed post-release

9  supervision.  Correct?

Page 97

Parole6-20-001
10          A    That's correct.

11          Q    However, at that time in 2006 the Department
12  did not begin a resentencing initiative?

13          A    No, but sometime thereafter I began an
14  initiative with the Office of Court Administration asking
15  them going forward to put out an instruction to all judges
16  in the State that the good practice would be whenever a
17  determinate sentence of imprisonment was imposed, they
18  should announce the period of post-release supervision on
19  the record.  That instruction by OCA did ultimately go out,
20  but it was not until, I think, September of 2007, which
21  indicated the state of confusion because there was so many
22  different decisions out there, and the original instruction
23  that was prepared by OCA was summarizing the various court
24  decisions, and it got to be a lengthy instruction.
25  Eventually, I believe, the determination was made the

[]

1  (Mr. Annucci - Cross by Mr. Bogin)                    105
2  instruction needed to be a lot simpler, so it did not go
3  out until September of 2007.

4          Q    At the time that Earley v. Murray was decided,
5  the Department could have conducted the review that was
6  actually done in the spring of 2007 to determine the number
7  of affected inmates.  Correct?

8          A    Correct.

9          Q    And that review was not done in 2006.
10  Correct?

11          A    That's correct.

Page 98

Parole6-20-001
12          Q    The Department could have in 2006 commenced
13  the resentencing initiative that you discussed that, in
14  fact, occurred after the Garner decision.  Correct?
15          A    I think it would have been much more difficult
16  because there are many judges that had determined and
17  considered that very issue after Earley v. Murray, and said
18  that decision is not binding on the state courts.
19          Q    I understand in 2006 it was an open question
20  of law, but it was the question, wouldn't you agree, that
21  the decision of the Second Circuit presented this as a
22  question that could become problematic?
23          A    At that time it was a question.
24          Q    Would you agree that if the Department had
25  taken in 2006 the steps that were, in fact, taken in 2007

☐

 1  (Mr. Annucci - Cross by Mr. Bogin)                    106
 2  and 2008 to both identify the affected inmates and contact
 3  courts regarding resentencing, that that process would be
 4  one to two years ahead of where it is currently?
 5          A    No.  I don't agree with that.  I think the
 6  only way we could take the current initiative that we have
 7  taken is to have finally had resolution by the Court of
 8  Appeals.  Until our Court of Appeals decided this issue
 9  there was ambiguity, despite the fact that four Appellate
10  Divisions had ruled and changed their decisions on this.
11  The most recent decision by the Court of Appeals in late
12  2007 seemed to indicate that they very well might rule
13  contrary to the Appellate Divisions and legitimize the

Page 99

Parole6-20-001
14  administrative addition of post-release supervision by the

15  Department.

16          Q    Had the Department requested resentencing at

17  an earlier date that would not have created any additional

18  problem.  Would it?

19          A    Except it is not likely to have been taken

20  with the seriousness and urgency that has presently been

21  taken by all of the courts, because we have now had a final

22  ruling by the Court of Appeals.

23          Q    You described the initial phase of the

24  resentencing, not so much the resentencing project but the

25  identification of the inmates and the review of the

☐

1  (Mr. Annucci - Cross by Mr. Bogin)                    107

2  commitments, which was done in the spring of 2007.  Was it

3  at that time that you determined that the Department had

4  167 of the relevant sentencing minutes?

5          A    No.

6          Q    When did that happen?

7          A    This was part of the most recent initiative.

8  We did this computer run, I believe, on May 8th.  We ran

9  our computer and said which technical post-release

10  supervision violators are presently in our custody, and for

11  whom we know the commitments are silent.  Then we looked

12  into the records and determined which ones we also had

13  minutes for.  Then we examined those minutes and were able

14  to determine whether or not they were silent or not.  So of

15  this group it is actually over six hundred, because I'm

Page 100

Parole6-20-001

16  including the 45 that the commitment was silent, but the
17  sentencing minutes indicated post-release supervision was
18  imposed.  They are not part of the resentencing initiative,
19  but I will be writing letters to the courts asking for
20  corrective commitments.

21          Q    In your affirmation, your affidavit that was
22  previously submitted here you stated that it was essential
23  that a temporary restraining order be granted pending a
24  preliminary injunction.  Correct?

25          A    Correct.



1  (Mr. Annucci - Cross by Mr. Bogin)                    108

2          Q    The Court did not grant the temporary
3  restraining order.  Correct?

4          A    Correct.

5          Q    That did not produce a crisis.  Did it?

6          A    We are trying to avoid the exact same scenario
7  that happened some months ago where somebody was apparently
8  able to get released on a habeas, and this is prior to the
9  Court of Appeal's decision, and apparently they are now the
10 number one suspect in the murder of a 62 year old woman
11 that received a lot of attention in New York City.

12          Q    The individual you are referring to is Jamal
13 Winter?

14          A    I believe so.

15          Q    You are referring to an instance where an
16 individual was an individual who was in DOCS custody?

17          A    I believe at the time he was a technical

Page 101

Parole6-20-001

18  post-release supervision violator, being held in local

19  custody, and he was able to secure release through a habeas

20  petition.  I do not know all of the records involved in

21  this case.  I do not know whether there were minutes or

22  whether they were silent or not.

23         Q    Do you know whether he was in DOCS?  Was it

24  from DOCS that his release was ordered or in local

25  custody?

☐

1  (Mr. Annucci - Cross by Mr. Bogin)                    109

2         A    I believe he was in local custody in Riker's

3  Island.

4         Q    To the best of your knowledge he went into

5  court on a habeas corpus?

6         A    To the best of my knowledge.

7         Q    And the issue that he raised was that he was

8  being held on post-release supervision, which was illegal

9  because it had never been imposed by a court?

10         A    I believe that was the case.

11         Q    The court hearing, the habeas corpus

12  determined that he was right.  That he had stated a lawful

13  claim.  Correct?

14         A    That sounds logical.

15         Q    And so the habeas corpus was granted.  You are

16  familiar, I assume, with the relief requested by the

17  plaintiffs in this case?

18         A    Yes.

19         Q    Is it correct that the relief requested is to

Page 102

Parole6-20-001
20  maintain the status quo, unless a court of competent

21  jurisdiction orders an inmate's release?

22          A    For a limited period to maintain the status

23  quo.

24          Q    The status quo is for a limited period, but

25  the exception is unless a court of competent jurisdiction

☐

1  (Mr. Annucci - Cross by Mr. Bogin)                    110

2  orders the inmate's relief?

3          A    That is correct.

4          Q    That exception would apply to Mr. Winters.

5  Correct?

6          A    Unless we would obtain a ruling here on a

7  preliminary injunction that at least we might be able to

8  submit to a habeas judge, who may then determine that that

9  immediate relief was not warranted.  Right now we are

10  trying to coordinate all of these different cases all over

11  the State.  We have sent cases to the sentencing judges,

12  and then find out that habeas petitions have been issued.

13  We are trying to connect everybody to what is going on.

14  There is a lot of confusion.

15          Q    In your view is the purpose of this case to

16  block inmates from proceeding with habeas corpus?

17          A    The purpose of this case is to have the

18  opportunity for the appropriate entity, the sentencing

19  judge, to make a decision on the merits as quickly as

20  possible.

21          Q    Mr. Winter was released by a court's decision

Page 103

Parole6-20-001
22  on a habeas corpus.  As you see this case is there anything
23  if the relief requested were granted, wouldn't he still be
24  entitled to the same relief?
25          A    I don't know if the same judge would grant the

1   (Mr. Annucci - Cross by Mr. Bogin)                    111
2   same relief, presented with those facts.
3           Q    He could still assert the same legal
4   entitlement to relief.  Could he not?
5           A    He could.
6           Q    And that would be true for other inmates who
7   have completed their maximum expiration of their
8   sentence?
9           A    That would be true.
10          Q    Would you agree that the Department of
11  Correction's responsibility is to carry out the sentences
12  imposed by courts?
13          A    Yes.
14          Q    DOCS doesn't impose sentences?
15          A    That is correct.
16          Q    I believe you have indicated on your direct
17  testimony that the Department recognizes, based on Garner
18  and Sparber than it cannot add periods of post-release
19  supervision?
20          A    That's correct.
21          Q    Can the Department incarcerate people where
22  the only basis for incarceration is a period of
23  post-release supervision that was not imposed?

Page 104

Parole6-20-001
24          A    I think the Department has to follow the

25   reasoning of Sparber and Garner.  In those cases, the Court

1   (Mr. Annucci - Cross by Mr. Bogin)                        112

2   of Appeals expressly rejected the immediate release of

3   individuals that it knew fell into these various

4   situations.  It said an immediate release would be grossly

5   disproportionate to the actual wrong suffered by this

6   individual.  If you recall in Sparber where the judge did

7   not pronounce sentence, and the Clerk of the Court

8   administratively added it to the commitment document, the

9   people asked that nothing further be done.  That individual

10  is entitled to relief, and the Court of Appeals said he is

11  entitled because it is the judge's pronouncement of

12  sentence that is critical here.  We do not know in every

13  one of these cases exactly what happened.

14          Q    Is the commitment legally considered to be

15  conclusively binding on the Department?

16          A    In many respects it is, but obviously based

17  upon that quote I was alluding to in the Sparber decision,

18  not necessarily.  The Court of Appeals was instructing the

19  people that it was not going to stop at the commitment

20  where post-release supervision was indicated, but wasn't

21  pronounced at sentence.  Said more is involved than simply

22  that document under those circumstances.

23          Q    What is the legal document you rely on in

24  calculating the inmate's sentence?

25          A    The commitment.

Page 105

Parole6-20-001

1  (Mr. Annucci - Cross by Mr. Bogin)                    113
2        Q    Are you familiar with the statistics that
3  Commissioner O'Donnell presented earlier?
4        A    I believe I have seen the sheet briefly.
5        Q    You indicated today that there have been some
6  slight adjustments based upon some additional return of
7  post-release violators.  So here this indicates 546
8  violators and you indicate it is now 585?
9        A    Correct.
10        Q    The statistics here indicate that the
11  Department has the minutes for 167.  Is that 167 a correct
12  figure now?
13        A    I didn't make that current.  I assume the
14  number goes up slightly, because of the additional letters
15  we sent out.
16        Q    Is the Department getting additional minutes
17  on an ongoing basis?
18        A    What the courts are doing, or some district
19  attorneys, when they have the minutes in their file that we
20  didn't have, they have been providing them to us.
21        Q    Has the Department reviewed the 167 minutes or
22  the actual number, have they reviewed the minutes in their
23  possession?
24        A    As I said earlier, clerical people were
25  assigned the responsibility to review the minutes and

Parole6-20-001

1  (Mr. Annucci - Cross by Mr. Bogin)                     114
2  classify them as being silent or not being silent.  That
3  was done at their level and appropriately when we sent them
4  all to the sentencing judges there are, at least, some
5  number where the judge came back and said they were not
6  silent.  PRS was pronounced by me.  Here is an amended
7  commitment to reflect the period of PRS that I did
8  impose.
9           Q    I believe you indicated that that clerical
10  review was part of the 2007 project?
11          A    The 2007 project?  I'm not certain.  May have
12  simply been to make the computer entry as to whether or not
13  minutes are present or not.  This last review was to
14  determine whether or not the minutes, when they are in the
15  file and there is a silent commitment, whether or not the
16  minutes are also silent or not.
17          Q    So the Department has 167 minutes that have
18  been reviewed by Department staff.  Correct?
19          A    Correct.
20          Q    Is the Department prepared to release those
21  people for whom neither the commitment nor the minutes
22  include post-release supervision, and who are held solely
23  on post-release supervision?
24          A    The Department is prepared to immediately do
25  whatever the sentencing judges require us to do.  All of

⬚

Parole6-20-001

1  (Mr. Annucci - Cross by Mr. Bogin)                    115

2  those letters have been mailed to the sentencing courts.

3         Q    In your direct testimony you refer to some

4  other documents that maybe related to sentencing.  You

5  mentioned the court work sheet and file jacket, and I

6  believe there was a reference also to the plea minutes.  Do

7  you recall that?

8         A    Yes.

9         Q    I believe that was a reference to some of the

10 discussion in the Court of Appeal's decision in the Sparber

11 case?

12        A    Correct.

13        Q    If memory serves me right though, isn't it

14 correct that that the Court's decision was that reference

15 to post-release ·supervision in the work sheet or the file

16 jacket is not sufficient to impose post-release

17 supervision.  Is that correct?

18        A    That's correct.

19        Q    So not having that would not impair your

20 ability to assess whether post-release supervision was

21 imposed.  Correct?

22        A    No.  I think what that pointed out is only the

23 sentencing court can make the appropriate determination as

24 to what is involved here, not the Department.

25        Q    Let's take one.  The court work sheet.  Just



1  (Mr. Annucci - Cross by Mr. Bogin)                    116

2  the court work sheet.  Didn't the Court of Appeals
                          Page 108

Parole6-20-001

3  specifically say that post-release supervision cannot be
4  imposed by way of the court work sheet?
5          A    As I understand it, what the Court of Appeals
6  was attacking was the ability of the Court Clerk to
7  indicate on the commitment that post-release supervision
8  was imposed, when the judge did not impose it at the time
9  of sentencing.  But based upon the other indicia in the
10 record, namely that the judge had signed the court work
11 sheet with a PRS notation, or the court file, the Court of
12 Appeals said your sole remedy now is to go back and have
13 sentence pronounced in your presence by the judge.
14         Q    The Court did not state that reference to
15 post-release supervision in the court work sheet could
16 constitute the imposition of post-release supervision.  Did
17 it?
18         A    That's my understanding.
19         Q    It did not?
20         A    It did not.
21         Q    Nor did they hold that a reference in the file
22 jacket was sufficient.  Did they?
23         A    That's correct.
24         Q    So you don't need those documents to determine
25 whether post-release supervision was imposed.  Correct?

☐

1  (Mr. Annucci - Cross by Mr. Bogin)                    117
2          A    Again, I think only the sentencing court can
3  make that determination as to whether or not post-release
4  was imposed, and if not what the appropriate remedy is.
                            Page 109

Parole6-20-001

5          Q    What the Court of Appeals told us in those two
6    decisions, Garner and Sparber, is that the courts have to
7    impose the sentences.  Correct?

8          A    Correct.

9          Q    They did not also tell us that the courts are
10   responsible for calculating the sentences that they have
11   imposed.  Correct?

12         A    Correct.

13         Q    Isn't it a normal part of the Department's
14   operation, I believe you testified it is a normal part of
15   the Department's operation to calculate sentences based on
16   the commitment.  Correct?

17         A    Correct.

18         Q    Several times in your testimony you used a
19   phrase technical violators.  I just want to clarify that
20   when you refer to technical violators, is it not correct
21   that what you are referring to is people who have returned
22   to the Department's custody for violations of the technical
23   rules of parole or post-release, but in the absence of any
24   new criminal conviction.  Is that correct?

25         A    That's correct.



1    (Mr. Annucci - Cross by Mr. Newman)                    118
2                    MR. BOGIN: That is all.
3                    THE COURT: We will take a ten minute break.
4                    (Recess.)
5                    THE COURT: We are back on the record.  I
6             will recognize Mr. Newman on behalf of Mr. Carter.
                          Page 110

Parole6-20-001

7                    MR. NEWMAN: Thank you.

8   CROSS-EXAMINATION OF MR.

9   ANNUCCI BY MR. NEWMAN:

10        Q    Good afternoon, Commissioner.

11        A    Good afternoon.

12        Q    Commissioner, you have been looking for a

13   couple of months now to implement this post-release

14   supervision resentencing initiative.  Haven't you?

15        A    Correct.

16        Q    And that plan is working in the sense that a

17   number of judges have responded to your inquires and taken

18   action.  Right?

19        A    That is correct.

20        Q    And, in fact, it is working as planned.

21   Right?

22        A    As best as can be expected.  Yes.

23        Q    And you will continue to implement this plan,

24   this initiative whether this Court today issues a

25   preliminary injunction or not.  Won't you?

▯

1  (Mr. Annucci - Cross by Mr. Newman)                    119

2         A    If he enjoins me from going forward with my

3  plan, I will not disobey this order.

4         Q    Your plan is to refer certain identified cases

5  to resentencing courts for possible action.  Isn't that

6  true?

7         A    That's correct.

8         Q    And is anyone trying, any of the defendants or

Page 111

Parole6-20-001

9   their counsel trying to stop you from doing that?

10         A   Directly?  No.

11         Q   So the only portion of your plan that is in

12   dispute is whether and under what conditions people maybe

13   held in custody pending actions by their resentencing

14   courts.  Correct?

15         A   Correct.

16         Q   As this issue has progressed from the courts

17   from Earley v. Murray up until now there are a number of

18   judges who have directed that people be released on

19   individual writs of habeas corpus.  Correct?

20         A   Correct.

21         Q   And upon receiving copies of those orders in

22   proper form the Department obeys them.  Correct?

23         A   Correct.

24         Q   There are a number of other judges who in

25   Article 78 proceedings have ordered the Department to

□

1   (Mr. Annucci - Cross by Mr. Newman)                    120

2   excise or remove PRS from the sentence.  Correct?

3         A   Correct.

4         Q   And you have also obeyed those orders.

5   Correct?

6         A   Correct.

7         Q   Now are you seeking by this action to deprive

8   courts considering individual writs of habeas corpus and

9   Article 78 proceedings from entertaining them and ruling on

10   them as they have done?

Page 112

Parole6-20-001

11          A    We are not trying to prevent them from
12  entertaining those things, but we are hoping to influence
13  what the final ruling might be.

14          Q    So in essence when you say that you are
15  seeking an advisory opinion from this Court telling judges
16  considering individual cases under Article 70 and Article
17  78 as to what they should do?

18          A    I would say we are seeking declaratory
19  judgment, not an advisory opinion.

20          Q    So you are seeking a declaratory judgment that
21  a person who is being held under post-release supervision
22  that indisputably was not pronounced by the sentencing
23  court may nevertheless be continued in custody pending
24  action by the sentencing or resentencing judge.  Right?

25          A    I would agree with that, except for your

1  (Mr. Annucci - Cross by Mr. Newman)                    121
2  characterization of indisputably.  The records in our
3  possession do not give me the confidence to say
4  indisputably it was never pronounced, even if the minutes
5  are silent.

6          Q    By indisputably I refer to a case where the
7  minutes are in hand and a judge agrees that the sentencing
8  judge did not pronounce post-release supervision.  Do you
9  understand what I mean by indisputably?

10          A    I understand what you mean by indisputably.

11          Q    Is it true that you are seeking a declaratory
12  judgment that when it is indisputable, in that sense the
                              Page 113

Parole6-20-001

13  PRS was not pronounced by the sentencing judge and an
14  individual is being held in custody only because of that
15  PRS, that he may still be held in custody for a period of
16  time pending action by the resentencing judge?

17          A    For a limited period of time.  That is what we
18  are seeking.

19          Q    Are you aware that in numerous actions,
20  individual actions, writs and Article 78s your Department,
21  acting through the Attorney General, took the same position
22  that you are taking now.  That everything should be left to
23  the resentencing judge to decide?

24          A    I'm not aware of every specific position that
25  was taken by the Department of Law in every case.  I'm

◻

1  (Mr. Annucci - Cross by Mr. Newman)                          122
2  generally aware of them, as you have characterized them.

3          Q    Are you aware that numerous judges have,
4  acting within their legal authority, determined either to
5  release people on writs or discharge them from supervision
6  without leaving it to future proceedings to determine
7  whether the person could be and should be resentenced?

8          A    I really don't have that kind of familiarity
9  with the outcomes in every case.

10          Q    Are you aware that the Court of Appeals in
11  Garner specifically granted an Article 78 petition and
12  ordered the PRS be deleted, removed, leaving it to future
13  proceedings in a footnote to determine whether Mr. Garner
14  could be and should be resentenced?
                    Page 114

Parole6-20-001

15      A    I thought the footnote was not specific to
16  Mr. Garner alone.  I thought the footnote was generally a
17  message that their decision was without prejudice, either
18  for the People or the Department to seek the appropriate
19  resentencing in these cases.

20      Q    That is true.  They refer to resentencing of a
21  defendant in the proper form, but with respect to Garner
22  himself, who is the only litigant in that case, will you
23  agree that the Court of Appeals granted the petition and
24  prohibited you, the Department, from imposing a period of
25  post-release supervision?

☐

1  (Mr. Annucci - Redirect by Mr. Rock)                    123
2       A    Yes.  I would agree with that.
3       Q    And the Court of Appeals did not defer
4  implementation of that decision pending referral of the
5  case to the resentencing judge.  Did they?
6       A    I believe you are correct.
7       Q    So you are now asking this Court essentially
8  to do what the Court of Appeals declined to do.  Correct?
9       A    No.  I wouldn't characterize it that way.
10                  MR. NEWMAN: Nothing further, Judge.
11                  THE COURT: Mr. Jurena?
12                  MR. JURENA: No, Judge.
13  REDIRECT EXAMINATION OF MR.
14  ANNUCCI BY MR. ROCK:
15       Q    You were asked by Mr. Bogin whether or not the
16  Department was prepared to release all inmates for whom the
                              Page 115

Parole6-20-001

17  commitment was silent as to post-release supervision, and
18  as to whom you had the minutes and there was no indication
19  of PRS in those minutes.  Do you recall being asked that
20  question?

21          A    I recall the question.  Yes.

22          Q    As a part of your post-release supervision
23  resentencing initiative, isn't it true that on more than
24  one occasion minutes that the Department of Correctional
25  Services had deemed silent as to PRS, in fact, the

☐

 1  (Mr. Annucci - Redirect by Mr. Rock)                    124
 2  sentencing court has said you were mistaken?

 3          A    Correct.

 4          Q    And the sentencing courts in those cases said
 5  that those minutes did, in fact, reflect the imposition of
 6  a post-release period?

 7          A    Yes.

 8          Q    And also there may have been some confusion
 9  with a question from Mr. Newman.  Just so it is clear.  Is
10  the Department currently holding in custody any inmate that
11  it knows for a fact should be released?

12          A    If we have an order for a release we will
13  comply with that right away.

14          Q    But based on the information that you have,
15  are you currently aware of any inmate who is in custody, in
16  the custody of the Department of Correctional Services
17  illegally?

18          A    I am aware of no such inmate.
                        Page 116

Parole6-20-001

19          MR. ROCK: Thank you, Your Honor.

20          THE COURT: Mr. Bogin, any recross?

21  RECROSS-EXAMINATION OF MR.

22  ANNUCCI BY MR. BOGIN:

23      Q   At this time the Department is moving forward

24  with its resentencing initiative.  Correct?

25      A   Correct.

J

1  (Mr. Tracy - Direct by Mr. Keane)                    125

2       Q   It will continue to do so if the Court grants

3  the preliminary injunction.  Correct?

4       A   Correct.

5       Q   And if the Court does not grant the

6  preliminary injunction, the Department will also continue

7  to go forward with the resentencing initiative.  Correct?

8       A   That's correct.

9              MR. BOGIN: Thank you.

10             THE COURT: Mr. Newman?

11             MR. NEWMAN:  Nothing further, Your Honor.

12             THE COURT: Mr. Jurena?

13             MR. JURENA: No.  Thank you, Judge.

14             THE COURT: Mr. Commissioner, you may step

15         down.  Mr. Keane or Mr. Rock, any further

16         witnesses?

17             MR. KEANE: The plaintiffs will call Terrence

18         X. Tracy.

19                    TERRENCE TRACY,

20         having been duly sworn, was examined and testified
                          Page 117

Parole6-20-001

21          as follows:

22   DIRECT EXAMINATION OF MR.

23   TRACY BY MR. KEANE:

24          Q    Good afternoon.

25          A    Good afternoon.

[]

1   (Mr. Tracy - Direct by Mr. Keane)                    126

2          Q    What is your current position?

3          A    Currently counsel to the New York State

4   Division of Parole.

5          Q    Could you describe generally what your duties

6   are as counsel to parole?

7          A    As counsel for the Division of Parole I

8   oversee all of the legal matters that affect the Division.

9   Counsel's office also serves as the Division's appeals

10   unit, which is involved with the review of all of the

11   administrative appeals that are taken from the parole board

12   decisions to parole supervision, as well as those

13   individuals who are in the community under some form of

14   supervision who have had their release status revoked after

15   an administrative parole revocation hearing.  Also oversee

16   the process by which we respond to the subpoenas served on

17   the division as well as FOIL Appeals.  Drafting the

18   legislation.  Regulations and employment discrimination

19   suits.  So generally all of the legal things involved with

20   the Division of Parole I oversee that.  We have a staff of

21   six attorneys.

22          Q    Mr. Tracy, approximately how many parolees
                        Page 118

Parole6-20-001

23  does the Division of Parole supervise?

24          A   Currently there are approximately 43 thousand

25  men and women out in the community under supervision by the



1  (Mr. Tracy - Direct by Mr. Keane)                        127

2  Division of Parole.

3          Q   And you have heard the testimony here today

4  with respect to post-release supervision?

5          A   Yes.

6          Q   Approximately what number of parolees of that

7  40 some odd thousand you refer to are subject to

8  post-release supervision?

9          A   I believe there are approximately 19 thousand

10  individuals under some form of post-release supervision.

11          Q   And of that 19 thousand have you had an

12  opportunity to determine who among that 19 thousand may

13  have problems with their post-release and that sentencing

14  court did not properly pronounce post-release supervision

15  in sentencing?

16          A   Yes.  Today the Division is wrapping up our

17  part of our initiative for this issue, which is to identify

18  all of the individuals out of the community and ascertain

19  how many may have a problem that would warrant the case

20  going back to the sentencing court, and I believe we are

21  going to find that just above 5,000 individuals are going

22  to have cases that present themselves in such a way that

23  they should be brought to the attention of the sentencing

24  court, so that the sentencing court could take a look at

Parole6-20-001

25  those cases and determine what is the appropriate step to

☐

1  (Mr. Tracy - Direct by Mr. Keane)                         128
2  take.  Whether it be resentencing them to a period of
3  post-release supervision nunc pro tunc, or directing that
4  their sentences be recalculated without any period of
5  post-release supervision attached to it.
6          Q    Are there people in the custody of a local
7  jail at this time who are in custody because of a parole
8  warrant who have post-release supervision problems with
9  their sentencing?
10         A    Yes.  We, like the Department of Correctional
11 Services, in the wake of the Garner and Sparber decisions
12 prioritized our populations, and the first population that
13 we prioritized was that group of individuals who were in
14 local jails facing alleged violations of their periods of
15 post-release supervision.  Mr. Annucci mentioned the
16 indicators that the Department of Correctional Services
17 carries in its data base for individuals that were once
18 under its jurisdiction, and now transferred to us.  What we
19 did is with that information, because he indicated to you
20 that there was a Y, an H and an N, meaning no it is not
21 selected meaning that is there.  Y meaning yes it is, and H
22 is historical.  What we do is looked at the cases that were
23 identified of the pool of individuals in local custody who
24 had Ys or Hs, assuming that the Ns were properly sentenced
25 to a term of post-release supervision, and actually pulled

Page 120

1  (Mr. Tracy - Direct by Mr. Keane)                    129
2  all of their files. We pulled approximately 500 files.
3  Had to physically look through them, and realized that for
4  many of them there was a period of post-release supervision
5  stated on the sentencing commitment order. So for those we
6  did not have to worry, but we did find a number of
7  individuals who did not have post-release supervision
8  stated on their sentencing and commitment order and did not
9  find sentencing minutes in our files. We rarely get
10 sentencing minutes. So for those cases we wrote to the
11 courts. We have issued 117 letters to the sentencing
12 courts. Advising them of a possible infirmity in light of
13 Garner and Sparber and starting to hear back from the
14 courts in response to the letters written. Those letters
15 are built upon the model that was established by the
16 Department of Correctional Services in concert with the
17 Office of Court Administration, and we, like the Department
18 of Correctional Services, sent them to the sentencing judge
19 of record, and also to the Administrative Judge for the
20 judicial district in the event that that sentencing judge
21 is no longer on the bench, and we copy in the District
22 Attorney as well as the alleged parole violator.
23           Q    Now you mentioned that you don't have
24 sentencing minutes for many of these parolees on file.
25 What does that mean? Where do you have the parolee

Parole6-20-001

1 (Mr. Tracy - Direct by Mr. Keane)                        130
2 files?

3          A    We create two files for every individual that
4 comes to our jurisdiction.  One file is called the
5 facility/field folder.  It is a field that is created by
6 the facility parole staff that work in the State
7 Correctional Facilities.  We have a parole presence in
8 every State correctional facility, and also have a central
9 file, which is the file that is maintained here in Albany,
10 New York at our central office located at 97 Central
11 Avenue.  The central file mirrors to some extent the field
12 file, but it is by no means as comprehensive as the field
13 folder.

14          Q    And to go back to your 117 letters that went
15 out with respect to the roughly 500 people in custody.  Are
16 there additional letters you are sending out now with
17 respect to that?

18          A    Yes.  We have developed a Lotus Notes data
19 base that I'm amazed at what it can do.  It can interface
20 with our data base that has information about offenders, so
21 that we will be able to create letters for all of the
22 population, whether they be in a County jail or out under
23 supervision, where areas of information that need to be in
24 these letters such as indictment number, the name of the
25 judge, the NYSID number and DIN, these all pre-populate so

Parole6-20-001
1  (Mr. Tracy - Direct by Mr. Keane)                    131
2  we can get these letters out as expeditiously as possible.
3  So we will start that process.  So there will be additional
4  letters definitely.

5              Q    Have you received responses to your letters?
6              A    Yes.  We have received everything from amended
7  sentencing commitment orders to orders that have set
8  matters down for a conference with the District Attorney,
9  defense attorney and the Court to ascertain what they are
10 going to do.  I have in one instance received a letter from
11 an individual who said Mr. Tracy, you don't have to go back
12 to the court because I was there in court and I heard the
13 judge pronounce a period of post-release supervision.  So
14 I'm getting back everything.  I got a phone call from a
15 father the other day down in South Carolina whose son had
16 sent off that letter to him, and the father was calling and
17 saying:  Just what does this mean?  I explained to him that
18 your son's case will go back to the sentencing judge and,
19 depending upon what happens, your son maybe a free
20 individual and maybe able to come back to South Carolina,
21 which was the father's house, or if resentenced serve the
22 balance of his term in the State of New York.
23             Q    Are you familiar with a matter referred to
24 earlier today involving Jamal Luis?
25             A    Jamal Luis?

⬜

1  (Mr. Tracy - Direct by Mr. Keane)                    132
2              Q    Jamal Winter?
                    Page 123

Parole6-20-001

3      A    Mr. Winter.  Yes.

4           MR. NEWMAN: Your Honor, I object to this

5           unless we are going to learn something we don't

6           already know.

7           THE COURT: Overruled.  You can answer.

8      Q    With respect to Mr. Winter, do you recall  --

9  Mr. Winter was in parole custody at the time he brought his

10  habeas corpus proceeding?

11      A    Mr. Winter was on post-release supervision and

12  I believe in mid to late 2007 was confined on a parole

13  violation warrant for an alleged violation of his

14  post-release supervision.  Yes.

15      Q    And do you recall whether Mr. Winter's habeas

16  corpus petition was decided before or after the Garner

17  decision?

18      A    The decision of Justice Bruce was before

19  Garner.

20      Q    And would the Division of Parole have taken a

21  different position in its answer to the habeas corpus

22  petition after Garner then it did before?

23      A    Yes.  The position that the Division would

24  have taken post-Garner is the position we take now, which

25  is asking the habeas court to please remand the matter back



1  (Mr. Tracy - Direct by Mr. Keane)                    133

2  to the sentencing court, and especially when there is a

3  letter.  Now that we have letters we ask that the letters

4  be provided to the habeas court, so they know we are taking

Page 124

Parole6-20-001

5  action on this matter to clarify the confusion as to

6  whether or not this individual was properly on post-release

7  supervision or not.  And I have seen one case, it involved

8  an individual.  His last name is Shimmerhorn where, I

9  believe, Justice Crow in Oneida County agreed with that

10  request made on our behalf through the office of the

11  Attorney General, and directed that the individual be

12  remanded back to Queens County for resentencing

13  proceedings.  When the gentleman got back to Queens County

14  the judge decided that the sentence should be recomputed

15  without post-release supervision, but now we know, and the

16  judge did not get wrapped up, the habeas court did not have

17  to get wrapped up in granting relief or not.  That

18  confusion about how to get the individual back before the

19  sentencing court.  That case worked out in a very orderly

20  way.

21          MR. KEANE: One moment.

22      Q   Mr. Tracy, to your knowledge is the Division

23  of Parole holding anyone in custody or maintaining

24  supervision over any parolee that the division knows should

25  not be supervised or should not be in custody?

1  (Mr. Tracy - Cross by Mr. Newman)                134

2          A   NO.  Because the division does not know

3  exactly what occurred in the sentencing court.

4              MR. KEANE: Thank you.  No further

5          questions.

6              THE COURT: Mr. Gibney or Mr. Newman?

Page 125

Parole6-20-001
7          MR. NEWMAN: May the two of us consult for a
8          moment please?
9                THE COURT: Sure.
10   CROSS-EXAMINATION OF MR.
11   TRACY BY  MR. NEWMAN:
12          Q   Mr. Tracy, you will continue to implement your
13   plan by sending letters to sentencing courts, whether this
14   court issues a preliminary injunction or not.  Won't you?
15          A   That's correct.
16          Q   Now you require an order of a court of
17   competent jurisdiction before taking any action to change
18   an individual's status.  Don't you?
19          A   That's correct.
20          Q   And if an individual writ of habeas corpus is
21   brought and you become aware of it and you obtain the
22   sentencing minutes, you can and would ask the sentencing or
23   rather the habeas court to defer to the resentencing court.
24   Right?
25          A   I have not had the ability when a writ comes

☐

1  (Mr. Tracy - Cross by Mr. Newman)                    135
2  on, given the quick return date, I don't have the ability
3  to get the sentencing minutes, so all I'm left with is the
4  sentencing commitment order I provide to the Court and
5  advise the Court we do not have the sentencing minutes, but
6  I still nevertheless ask the Office of The Attorney General
7  on behalf of the Division to ask the habeas court to remand
8  the matter to the sentencing court. If it is a silent

Page 126

Parole6-20-001
 9  sentencing commitment order.

10      Q    If you did have the minutes, because the
11  Petitioner included the minutes with his petition, you
12  would have all you needed in order to answer the petition
13  and consent to it or oppose it as you saw fit.  Right?
14      A    I would still ask, now in the post-Garner
15  matter, I would still ask the matter be remanded to the
16  sentencing court for the matters previously discussed by
17  Mr. Annucci, because there could be other indicia in the
18  court's file of the court's intent with respect to
19  post-release supervision as being part of the sentence.
20      Q    Apart from the sentencing minutes?
21      A    I don't understand your question.
22      Q    So you are saying that even if the sentencing
23  minutes established to the satisfaction of the habeas court
24  that post-release supervision had not been pronounced, you
25  are saying that there are other documents that might alter

□

 1  (Mr. Tracy - Cross by Mr. Newman)                    136
 2  that conclusion?
 3      A    Certainly.  The plea minutes could contain
 4  some information about post-release supervision.  That
 5  would be very useful for the court, the sentencing court
 6  when it gets the matter back, and the habeas court from my
 7  experience rarely has the full court record from the
 8  sentencing court.
 9      Q    Would you agree that upon the presentation of
10  these arguments to a habeas court or an Article 78 court,

Page 127

Parole6-20-001
11  as the case may be, that court would be quite capable of

12  entertaining your arguments and deciding within its

13  authority how to proceed?

14          A    Oh, I think courts are quite capable of

15  entertaining arguments and deciding how to proceed.

16          Q    And would you also agree that the Department's

17  ability to retain someone under supervision or in custody,

18  if there is a violation after the original determinate

19  sentence has expired, is a question of law which really has

20  yet to be decided?

21          A    I think it is a question of law and fact,

22  because I think that, as we discussed earlier, there could

23  be things within the sentencing court's records that could

24  provide to the sentencing court some indicia of what was

25  intended by the court at the time it was handling the case.

□

1  (Mr. Tracy - Cross by Mr. Bogin)                    137

2  Understanding all the while it may not have made its way to

3  the sentencing minutes, or to the commitment order.  The

4  court may well have intended that it be a part of sentence,

5  but it didn't make its way on to either of those two

6  documents.  So I think it is both a factual issue as well

7  as a legal issue.

8          MR. NEWMAN: Nothing further.  Thank you.

9  CROSS-EXAMINATION OF MR.

10  TRACY BY MR. BOGIN:

11          Q    You have referred to other documents.  I

12  believe you used the phrase that may have indicia of what

Page 128

Parole6-20-001
13  the court intends at the time of sentencing.  Correct?

14        A    Correct.

15        Q    Would you agree that the Court of Appeals in

16  the Garner and Sparber decisions was clear that the

17  sentence has to be imposed in open court and would be

18  reflected in the sentencing minutes?

19        A    I believe that Garner and Sparber said this is

20  something that needs to be pronounced in open court, so as

21  to be properly imposed.  Yes.

22        Q    Other documents that maybe involved in the

23  criminal or the sentencing process would not necessarily

24  tell what was imposed as the sentence.  Correct?

25        A    They don't become  -- they are not technically

☐

1  (Mr. Tracy - Cross by Mr. Bogin)                     138

2  a part of the sentence, I think we all agree, but I think

3  when the matter is remanded back to the court and the court

4  is asked to look at the case it  -- that material, apart

5  from the sentencing minutes and sentencing commitment order

6  will aid the court in deciding what it should do by way of

7  possible resentencing.

8        Q    The habeas court would be asked to decide

9  whether a person's custody is lawful.  Correct?

10        A    Correct.

11        Q    And in the context of the post-release

12  supervision issues that we have been discussing, that would

13  essentially be whether the post-release supervision was

14  properly imposed.  Correct?

Page 129

1  (Mr. Tracy - Cross by Mr. Bogin)                        139

2          A    I can't agree, because I have -- even the

3  Jamal Winter decision that we discussed.  When the judge

4  granted habeas relief, he expressly said at no time in the

5  plea minutes or at no point in the plea minutes PRS wasn't

6  stated at sentencing, after having reviewed the minutes,

7  and wasn't in the sentencing commitment order.  I received

8  an amended sentencing commitment order where the plea

9  minutes are referred to, so I can't tell you what the legal

10  import is of sentencing minutes in the overall scheme, but

11  it is clear they have some import to the judges when they

12  decide the lawfulness or the existence of post-release

13  supervision, or the intent that post-release supervision be

14  a part of the individual's determinate sentence.

15          Q    Would you agree that the plea minutes would be

16  relevant to a CATU issue as to whether the defendant knew

17  that a plea would include post-release supervision?

18          A    I can't agree to that because I have seen that

19  they have had import beyond the CATU issue.  The granting

20  of habeas relief to Jamal Winter as well as the

21  resentencing.

22          Q    Are you saying the plea minutes would not be

23  relevant?

24          A    No.  They would be, but their relevance is not

25  limited to a CATU issue is what I'm saying.

```
 1   (State of New York, et al. v. Michael Myers, et al.)    140

 2               MR. BOGIN: Nothing further.

 3               THE COURT: Mr. Jurena?

 4               MR. JURENA: No questions, Judge.

 5               THE COURT: Mr. Keane, any redirect?

 6               MR. KEANE: No redirect Your Honor.

 7               THE COURT: Sir, you may step down.

 8               THE WITNESS: Thank you, Your Honor.

 9               THE COURT: Mr. Keane?

10               MR. KEANE: Your Honor, I think we are

11          prepared to conclude the testimony portion of our

12          application for the preliminary injunction.  We had

13          intended to call someone from the Office of

14          Sentencing Review to testify about how sentence

15          calculations are done, and it maybe relevant to the

16          Court's determination.  If the Court would permit

17          we could submit a brief affidavit that could

18          summarize that specific process.  Why it is

19          relevant has to do with before any inmate or

20          parolee is released there has to be a direction

21          from the Court as to what the sentence actually is.

22          We would have called Richard DeSamone, who is out

23          this week on a family emergency.  He could not be

24          here to testify.  Anyone who is in custody of

25          Parole or DOCS must have final calculations to his
```

```
 1   (State of New York, et al. v. Michael Myers, et al.)   141
 2              sentence.  It is critical that DOCS or Parole in
 3              calculating that sentence get direction from the
 4              Court as to how and when that sentence should
 5              terminate.  So what we propose --
 6                   THE COURT: It is up to you.
 7                   MR. KEANE: We would propose submitting that
 8              affirmation in a very short time.  Early next week.

 9              Permit the Court to review it and consider that, if
10              Your Honor is prepared to defer that decision until
11              another day.
12                   THE COURT: Until the end of the day?
13                   MR. KEANE: Until another day.
14                   THE COURT: How do the other attorneys feel
15              about that?
16                   MR. GIBNEY: Your Honor, I don't understand
17              the relevance.  The question that a calculation has
18              to be done before someone is released, we will
19              stipulate to that.  We agree with that.  We
20              understand the sentence has to be calculated.  We
21              don't understand the relevance of that entire line
22              of testimony to their need for a preliminary
23              injunction today.  If the Court wants to allow it
24              to be submitted anyway, we would request time to
25              review it and make an objection.
```

```
 1  (State of New York, et al. v. Michael Myers, et al.)    142
 2              THE COURT: That's all I'm asking.  Input on
 3          the suggestion of various testimony.
 4              MR. GIBNEY: I don't see a difference, if we
 5          have a chance to respond to the Court, whether I
 6          make any objection to the affidavit.
 7              THE COURT: You wouldn't have the opportunity
 8          to cross-examine.  I guess that is what I'm getting
 9          at.  We will conclude the hearing today in terms of
10          testimony.
11              Do the People want time to submit additional
12          evidence?  If you are all in accord with that I'm
13          okay with that, but you have to understand that it
14          would be in the form of documents.  You wouldn't
15          have a chance to cross-examine.
16              MR. GIBNEY: If we have a chance to respond
17          to the affidavit once it is submitted, we have no
18          objection to that process, Your Honor.
19              THE COURT: Is that what Mr. Keane wants to
20          do?
21              MR. KEANE: Your Honor, I think that would be
22          prudent.  We can do it quickly.
23              THE COURT: How long do you need to do that?
24          Consult and let me know.
25              (Counsel conferred.)
```

1    (State of New York, et al. v. Michael Myers, et al.)    143

2              MR. KEANE: Your Honor, it is the consensus

3         that the affidavit is probably duplicative and

4         unnecessary, and I think at this point plaintiffs

5         will withdraw their proffer of an affidavit and

6         conclude the testimony portion.

7              THE COURT: Mr. Gibney, Mr. Newman, any

8         witnesses you want to present?

9              MR. GIBNEY: No, Your Honor.

10             THE COURT: Mr. Bogin?

11             MR. BOGIN: No, Your Honor.

12             THE COURT: Mr. Jurena?

13             MR. JURENA: No.  Thank you, Your Honor.

14             THE COURT:  That will conclude the hearing.

15        Thank you.  I will render a decision in writing

16        shortly.

17             (Discussion off the record.)

18             THE COURT:  Back on the record at the

19        request of Mr. Keane.  All parties are present in

20        the courtroom.  Mr. Keane?

21             MR. KEANE: Does Your Honor request any

22        additional briefing on any issue?  For example,

23        Your Honor was concerned about the issue of

24        jurisdiction earlier today.  We would be happy to

25        furnish the Court with some case law addressing

```
 1   (State of New York, et al. v. Michael Myers, et al.)   144
 2              those concerns.
 3                  THE COURT: I don't require it and it is not
 4              necessary.  If you wish to you all may, but I'm not
 5              requesting it.
 6                  MR. KEANE: Thank you, Your Honor.
 7                  THE COURT: Does that answer your question?
 8                  MR. KEANE: If we find case law that we think
 9              would be helpful to the Court, we will furnish that
10              and submit a short explanation.
11                  THE COURT: I don't want to leave it that
12              way.  Either you want an opportunity to submit some
13              sort of memorandum of law.  In that case everyone
14              has the same opportunity.  I would establish a
15              deadline for it.  If you are not asking for that I
16              know I can go ahead and work on a decision, so I
17              want to leave it one way or the other.  There is
18              always that danger that I send a decision out and
19              it crosses in the mail with the memorandum of law
20              that you had a desire for me to consider.
21                  MR. KEANE: Your Honor, they submitted
22              opposition yesterday to our application for
23              preliminary injunction.  We were thinking in terms
24              of a reply to that.  We haven't had an opportunity
25              to fully review their brief, so we would request a
```

```
 1   (State of New York, et al. v. Michael Myers, et al.)    145
 2            couple of days to make a reply to that.
 3                 THE COURT: Fair enough.  How long do you
 4            feel you need?  In other words, I want to establish
 5            a date.  I'm looking to you for some guidance or I
 6            can give you what you need.  It is just I want to
 7            establish a deadline date after which I know that I
 8            wouldn't be expecting any further papers, and I
 9            know it is safe, if I'm otherwise in a position to
10            render a decision, to do so.
11                 MR. KEANE: Obviously plaintiffs would like
12            to get this matter resolved as soon as possible.
13            We would proceed no later than Wednesday to submit
14            a reply brief.
15                 THE COURT: The way we will leave it is it is
16            going to be equal opportunity.  You have heard
17            testimony here today, but obviously no one had
18            heard it until it happened, so if we are going to
19            establish a date it will be a deadline date by
20            which any party who wishes to may submit a
21            memorandum of law.  So do the parties feel they may
22            want to do it based on what you heard today?
23                 MR. GIBNEY: From what we have heard so far
24            we can rely on the memorandum of law we have
25            submitted.  Unless we hear some very different
```

```
 1   (State of New York, et al. v. Michael Myers, et al.)    146
 2              arguments coming from the State.
 3                   THE COURT: Mr. Bogin?
 4                   MR. BOGIN: I agree with that.
 5                   THE COURT: Mr. Jurena?
 6                   MR. JURENA: I agree, Judge.
 7                   THE COURT: Why don't we do this.  I'll give
 8              everybody one week until next Friday the 27th to
 9              have in my hand any memorandums of law that you, in
10              your judgment, feel you wish to give to me and
11              obviously serve your three adversaries with
12              whatever you send to me.  All right?  So basically
13              the way I will leave it is as of 5:00 on the 27th
14              of June I will consider the case fully submitted
15              and ready for a decision.
16                   Fair enough?  Thank you everyone.
17                   (Proceedings concluded.)
18
19
20
21
22
23
24
25
```

```
 1   (State of New York, et al. v. Michael Myers, et al.)     147
 2
 3
 4                    C E R T I F I C A T I O N
 5
 6
 7
 8
 9            I, Deborah Mehm, a Senior Court Reporter in
10        the Unified Court System, Third Judicial District,
11        do hereby certify that the foregoing is a true and
12        accurate transcript of the proceedings reported
13        stenographically by me held before HON. JOHN C.
14        EGAN, in Albany, New York on the 20th day of June,
15        2008.
16
17                          _____
18                          Deborah Mehm, C.S.R.
19
20
21
22
23
24
25
```

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

MESSIAH S., QUINTIN V., JESSIE E.,
GREG W., ALBERTO B., SHELDON D. and
VIKEN M., on behalf of themselves and all others
similarly situated,

Filed February 22, 2007

Plaintiffs,

-against-

No. 07 CV 1327 (MGC)(FM)

GEORGE B. ALEXANDER, as Acting Chairman
and Chief Executive Officer of the New York
State Division of Parole; NEW YORK STATE
DIVISION OF PAROLE; NEW YORK STATE
OFFICE OF MENTAL HEALTH; MICHAEL F.
HOGAN, as Acting Commissioner of the New
York State Office of Mental Health; NEW YORK
STATE DEPARTMENT OF HEALTH;
RICHARD F. DAINES, as Commissioner of the
New York State Department of Health; NEW
YORK STATE OFFICE OF TEMPORARY AND
DISABILITY ASSISTANCE; DAVID A.
HANSELL, as Acting Commissioner of the New
York State Office of Temporary and Disability
Assistance; NEW YORK CITY DEPARTMENT
OF HEALTH AND MENTAL HYGIENE;
THOMAS R. FRIEDEN, as Commissioner of the
New York City Department of Health and Mental
Hygiene; NEW YORK CITY HUMAN
RESOURCES ADMINISTRATION; and
ROBERT L. DOAR, as Commissioner of the New
York City Human Resources Administration,

Defendants.

**COMPLAINT**

**CLASS ACTION**

**TABLE OF CONTENTS**

Page

NATURE OF THE ACTION ................................................................................................. !

JURISDICTION AND VENUE ............................................................................................. 5

PARTIES ................................................................................................................................ 5

    A.    PLAINTIFFS ............................................................................................... 5

    B.    CLASS REPRESENTATIVES ................................................................. 6

    C.    DEFENDANTS ......................................................................................... 18

CLASS ACTION ALLEGATIONS .................................................................................... 22

FACTS .................................................................................................................................. 25

    A.    OVERVIEW OF DEMANDS PLACED ON PLAINTIFF CLASS UNDER
          THE PAROLE PROGRAM ................................................................... 26

    B.    CLASS MEMBERS ENTER THE PAROLE PROGRAM WITHOUT
          ADEQUATE PRE-RELEASE PLANNING AND TRANSITIONAL
          SERVICES AND, AS A RESULT, ARE DENIED AN EQUAL
          OPPORTUNITY TO PARTICIPATE IN THE PROGRAM. ............... 27

    C.    DEFENDANTS FAIL TO AFFORD CLASS MEMBERS REASONABLE
          MODIFICATIONS FOR THEIR DISABILITIES AND AN EQUAL
          OPPORTUNITY TO PARTICIPATE IN THE PAROLE PROGRAM ............... 30

          1.    Defendants Fail to Arrange for Timely and Appropriate Mental
               Health Services as Required to Afford Class Members Reasonable
               Modifications for Their Disabilities and an Equal Opportunity to
               Participate in the Parole Program ................................................... 30

               a.    Defendants Fail to Arrange for Timely and Appropriate
                      Mental Health Treatment ................................................... 31

               b.    Defendants Fail to Arrange for Case Management and Related
                      Services ............................................................................. 35

          2.    Defendants Fail to Arrange for Timely and Appropriate Public
               Benefits as Required to Afford Class Members Reasonable
               Modifications for Their Disabilities and an Equal Opportunity to
               Participate in the Parole Program ................................................... 36

Page

    a.    Defendants Fail to Submit Timely Applications for Federal Disability Benefits..........................................................................37

    b.    Defendants Fail to Submit Timely Applications for Medicaid .....39

    c.    Defendants Do Not Allow Timely Applications for Food Stamps and Public Assistance. .......................................................39

3.    Defendants Fail to Submit Timely Applications for Appropriate Housing and Mitigate the Deleterious Effects of Shelter Conditions .......43

    a.    Defendants Fail to Submit Timely Applications for Appropriate Housing ......................................................................44

    b.    Defendants Fail to Arrange for Supportive Services for Class Members Released to Homeless Shelters........................................44

4.    Defendants Have Failed to Provide Their Employees and Agents with the Appropriate Information, Training, Procedures, and Supervision Necessary to Comply with the Requirements of Federal and State Law, including the ADA and the Rehabilitation Act ..................................46

CLAIMS FOR RELIEF ..................................................................................................49

    FEDERAL CAUSES OF ACTION ...............................................................................49

    STATE LAW CAUSES OF ACTION ...........................................................................59

PRAYER FOR RELIEF ..................................................................................................65

## NATURE OF THE ACTION

1.      This is a class action for prospective declaratory and injunctive relief

brought by indigent New York City residents with psychiatric disabilities who are under the

supervision of the New York State Division of Parole ("DOP"), or who are soon to be released to

New York City from a New York State prison under DOP supervision. Plaintiffs and members

of the proposed plaintiff class (hereinafter "Class Members") have psychiatric disabilities whose

symptoms interfere with major life activities such as thinking, concentrating, interacting with

others, caring for oneself, working, and remembering and processing information. They are

qualified to participate in the parole, conditional release or post-release supervision programs

(hereinafter collectively referred to as "the Parole Program"), but require disability

accommodations in the form of pre-release planning and appropriate transitional services in

order to be successful in the Parole Program and have access to the services it offers. Due to

their lack of financial resources, Class Members are also qualified for one or more public

benefits programs, but require accommodations for their disability in the form of assistance with

pre-release applications and post-release services to obtain and maintain access to programs for

which they are eligible and which they require.

2.      The Parole Program is intended to support prisoners' successful

reintegration into their home community while at the same time protecting community safety.

State defendants have long acknowledged the necessity of pre-release planning and transitional

services for prisoners with psychiatric disabilities, and have accepted primary responsibility for

meeting this need. In practice, however, prisoners with psychiatric disabilities are thrust from a

highly structured prison environment onto the streets of New York City with little to no

preparation, and with the implicit assumption that they will be largely self-sufficient immediately upon release.

3. For prisoners with psychiatric disabilities, an abrupt and unprepared entry into parole supervision represents an enormous barrier to successful participation in the Parole Program. When prisoners with psychiatric disabilities are thrown into the Parole Program without required accommodations, they are often unable to meet the requirements of the Parole Program and to use the referrals, counseling, and services offered by their parole officer; they experience predictable and preventable exacerbations of their symptoms; they also face arrest for even non-criminal behavior that constitutes a technical violation of the conditions of their release. Defendants' actions therefore result in a "revolving door" phenomenon in which prisoners with psychiatric disabilities are released without adequate support and accommodations, and are then reincarcerated for manifestations of their psychiatric disabilities.

4. In order for prisoners with psychiatric disabilities to be able to successfully participate in the Parole Program, they should be provided with adequate pre-release planning. In the report of the Criminal Justice/Mental Health Consensus Project, issued in 2002, the Council of State Governments, advised by representatives of leading criminal justice and mental health organizations, wrote:

> For inmates with mental illness, whose community adjustment issues are even more complex than inmates in the general population, the need for systemic discharge planning is particularly crucial. For example, individuals with mental illness leaving prison without sufficient supplies of medication, connections to mental health and other support services, and housing are almost certain to decompensate, which in turn will likely result in behavior that constitutes a technical violation of release conditions or a new crime.

2

5.      Adequate pre-release planning for prisoners with psychiatric disabilities includes assisting them in completing, submitting, and monitoring the processing of applications for public benefits such as Medicaid, Social Security disability benefits, Family Assistance and Safety Net Assistance (hereinafter collectively referred to as "Temporary Assistance"), and Food Stamps, such that those benefits are available to the prisoners promptly upon their release from prison into the Parole Program. Adequate pre-release planning also includes helping prisoners secure community mental health services, supportive housing, and enrollment in vocational, educational and/or substance abuse programs. Parolees with psychiatric disabilities also need continued assistance throughout their time in the Parole Program with securing benefits, programs and services not secured prior to release, with implementing a coordinated plan of mental health care, and with addressing additional needs or problems that arise while on parole.

6.      Defendants have not provided, and are not providing, Class Members with needed accommodations, both before and after release, so that they can be successful in the Parole Program and have access to the services it offers. For example, defendants could make important improvements in pre-release planning by taking a series of easy steps at little or no additional cost, yet they have failed to do so. The failure of State and City defendants to make reasonable accommodations violates the rights of Class Members under federal law, including their rights under the Americans with Disabilities Act ("ADA") and Section 504 of the Rehabilitation Act.

7.      Because they are indigent, Class Members are eligible for one or more public benefits programs upon their release from prison. These programs include Temporary Assistance, Supplemental Security Income ("SSI"), Food Stamps, and Medicaid. The State and City defendants have failed to provide the reasonable modifications that Class Members need to

3

participate successfully in these public benefits programs, in violation of their rights under the ADA and Section 504 of the Rehabilitation Act.

8.    Under the federal Food Stamp and Medicaid Acts, Class Members are entitled to submit pre-release applications for assistance that would enable eligible Class Members to obtain Food Stamps and Medicaid immediately upon their release from prison. Similarly, under a contract between the federal Social Security Administration ("SSA") and defendant DOP, DOP—with assistance from the New York State Office of Mental Health ("OMH")—is required to submit applications for SSI up to 120 days prior to a Class Member's release date. The State and City Defendants do not enable Class Members to submit pre-release applications in sufficient time, if at all, to obtain Food Stamps, Medicaid, and/or SSI immediately upon release, in violation of the federal Food Stamp Act, Medicaid Act and the contract between SSA and DOP.

9.    Under State and local laws, Class Members are entitled to submit pre-release applications for Temporary Assistance, Food Stamps, and Medicaid that would enable eligible Class Members to obtain these public benefits immediately upon their release from prison. The City defendants do not enable Class Members to submit pre-release applications in sufficient time, if at all, to obtain public benefits immediately upon release, in violation of State and local laws.

10.    This action seeks to redress defendants' failure to provide needed modifications and defendants' related failure to train and supervise their employees. This action also seeks to redress the disparate impact of the Parole Program on individuals with psychiatric disabilities, insofar as this disparate impact results from defendants' failure to help plan for prisoners' release and facilitate their reintegration into the community.

4

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and

1343(a)(3) and (4). The controversy arises under the Americans with Disabilities Act, 42 U.S.C.

§ 12101 *et seq.*; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; 42 U.S.C. § 1983; and,

regarding the contract between SSA and DOP, federal common law. The Court also has

supplemental jurisdiction under 28 U.S.C. § 1367(a) over additional claims arising under State

and local law against City defendants.

12.     Venue properly lies in this District under 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

### A.     **Plaintiffs**

13.     Named plaintiffs and the class they represent are indigent New York City

residents who are under the supervision of DOP, or who are soon to be released to New York

City from a State prison under DOP supervision, and who are qualified individuals with a

disability as defined by the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*, and the

Rehabilitation Act, 29 U.S.C. § 794.

14.     Named plaintiffs and the class they represent suffer from a disability under

the terms of the ADA and the Rehabilitation Act. Specifically, named plaintiffs and the class

they represent suffer from psychiatric disabilities which substantially limit one or more major

life activities under 42 U.S.C. § 12102(2)(A) and 29 U.S.C. § 705(9)(B) and (20)(B).

15.     Named plaintiffs and the class they represent are qualified under 42 U.S.C.

§ 12131(2) for the programs, activities and services offered by DOP. They have met or will

meet the essential eligibility requirements of the Parole Program by virtue of their having been

granted parole by the State of New York.

5

16.     Named plaintiffs and the class they represent are qualified under 42 U.S.C.

§ 12131(2) for one or more of the public benefits programs, activities and services offered by the

State and City defendants, such as Temporary Assistance, Medicaid, and/or Food Stamps. They

have met or will meet the essential eligibility requirements of one or more of these public

benefits programs by virtue of their lack of income and financial resources.

**B.      Class Representatives**

**Messiah S.**

17.     Messiah S. is 32 years old, and is currently incarcerated at Elmira

Correctional Facility in Elmira, New York. Upon information and belief, Messiah S. will be

released on or around March 26, 2007, on conditional release. Messiah S. has been diagnosed

with bi-polar disorder and bipolar disorder with psychotic features. He has received treatment,

including medication, for his psychiatric disability for the past ten years. He currently sees a

psychiatrist and is taking Zyprexa, a psychotropic medication.

18.     Since his incarceration in 1999, Messiah S. has experienced periods of

severe psychosis with symptoms of auditory hallucinations, delusions of grandeur and extreme

paranoia. He has been hospitalized at Central New York Psychiatric Center (CNYPC) three

times since 2001. Messiah S. regularly experiences manic periods, where he becomes agitated

and paranoid, and bouts of severe depression that result in days of isolation. He generally feels

uncomfortable in crowded places (such as the subway) or other stressful situations. He also goes

through periods where he experiences auditory hallucinations.

19.     Messiah S.'s psychiatric disability has made it very difficult for him to

comply with the conditions of parole. Messiah S. has violated parole five times since his first

release in 2002. Upon most of his prior releases onto parole, Messiah S. received little or no pre-

release planning and was released to a homeless shelter with little or no money or food.

6

20.    Messiah S. began asking for help in planning for his upcoming release about six months ago and was told that he would not receive help until one month before his release date. He was not visited by an OMH social worker regarding pre-release planning until on or around February 12, 2007. Although he was handed a packet of benefits applications, including an HRA 2000 (an application form for supportive housing and case management), an SSI application and a Medicaid application, he was given no assistance in filling them out. He attempted to fill them out on his own and returned them to the social worker. Messiah S. does not know whether those applications were ever filed. As of February 20, 2007, applications on Messiah S.'s behalf for Food Stamps, Medicaid and Public Assistance had not been processed. Upon information and belief, as of February 21, 2007, applications on Messiah S.'s behalf for SSI and supportive housing (HRA 2000) had also not been submitted.

21.    Messiah will likely again be released to a homeless shelter (Bellevue in Manhattan) with no benefits or mental health treatment arranged. Without mental health treatment, benefits or housing it will be extremely difficult for Messiah S. to manage his psychiatric disability and survive on the street.

**Quintin V.**

22.    Quintin V. is 40 years old, and is currently incarcerated at Clinton Correctional Facility in Dannemora, New York. Quintin V. will be released on or around March 2, 2007, and will be under post-release supervision.

23.    Quintin V. has been diagnosed with undifferentiated schizophrenia. He receives his psychiatric medication, Risperdal, by injection every two weeks. He is currently housed in the Intermediate Care Program at Clinton, a residential housing program for prisoners with serious mental illness. He has taken a variety of different psychotropic medications

7

throughout his life in order to attempt to control the symptoms of his psychiatric disability,

which include auditory hallucinations and paranoia. Quintin V. has been receiving mental

health treatment from an early age and has been hospitalized for mental health reasons on at least

six occasions, beginning when he was a child and most recently in 2004, shortly before he came

into the state prison system.

        24.     Because of his psychiatric disability, Quintin V. has difficulty with

concentration, memory and the completion of basic tasks, including filling out forms. He also

has trouble handling multiple tasks at a time and can get easily overwhelmed and frustrated due

to his disability. According to his mental health records from prison, Quintin V. was found

likely to need assistance with some of his activities of daily living.

        25.     Quintin V. has not received adequate assistance in planning for his release.

He has communicated his need for pre-release services to OMH staff at the prison, but does not

know whether he will receive help. In a January 18, 2007 letter, an OMH Release Planning

Specialist indicated that Quintin V. would be released homeless to the Bellevue Shelter and that

applications for SSI, Medicaid and "other entitlements" would be completed on his behalf, but

that these applications had not yet been submitted as of six weeks before his release date.

Quintin V. has been housed in a homeless shelter before and finds it difficult to manage his life

and mental health while living in a shelter. In the past Quintin V. has found that his disability

makes it too difficult for him to hold down a steady job. He has received SSI in the past because

of his psychiatric disability.

        26.     On information and belief, no benefits applications have been completed

on behalf of Quintin V. As of February 20, 2007, applications on Quintin V.'s behalf for Food

Stamps, Medicaid and Public Assistance had not been processed. Upon information and belief,

as of February 21, 2007, applications on Quintin V.'s behalf for SSI and supportive housing (HRA 2000) had not been submitted.

27.    It is likely that Quintin V. will be released without mental health treatment, benefits or housing, and will struggle to survive in the shelter environment.

**Jessie E.**

28.    Jessie E. is 21 years old, and is currently incarcerated at Great Meadow Correctional Facility in Comstock, New York. This is his first State prison sentence. He will be released on or around February 26, 2007, and will be in the post-release supervision program for five years. He intends to go to live with his father in the Bronx, New York.

29.    Jessie E. has been diagnosed with impulse-control disorder, mood disorder, depressive disorder, and anti-social personality disorder. When he was younger, he was told that he suffered from paranoia and attention deficit disorder.

30.    Jessie E. has received mental health treatment for most of his life. As a young boy, he received inpatient treatment at the Bronx Children's Psychiatric Center for several years. Jessie E. subsequently received treatment at several other psychiatric hospitals. Jessie E. has also received mental health treatment at several prisons during his incarceration. Over the years, Jessie E. has been prescribed numerous psychotropic medications, including lithium, Risperdal, imipramine, Thorazine, and Trilafon. He currently sees a mental health worker about once a week, and sometimes he also speaks to a psychiatrist.

31.    Jessie E.'s psychiatric disability makes it difficult for him to interact with other people. He experiences mood swings, in which he will suddenly go from being happy to being sad, angry, and easily agitated by others. His upset and agitated moods can last days or

weeks. Because Jessie E.'s mood swings happen often and he does not know when they will occur, he tries to avoid being around and talking to people he does not know.

32.     Jessie E. also has difficulty concentrating and difficulties with short-term memory. It is difficult for Jessie E. to read and understand lengthy texts and to perform more than one task at a time. Prior to his incarceration, Jessie E. received Social Security disability benefits for his disabilities.

33.     In a letter dated January 19, 2007, a licensed social worker and OMH Release Planning Specialist acknowledged that Jessie E. had "overwhelming functional impairments". She also cited to Jessie E.'s "lifelong institutionalization, inability to complete any DOCS programs while incarcerated", and "low reading and math scores" as indications of an "inability to seek and maintain substantial and gainful employment within the next year".

34.     Jessie E. has been asking for help with preparing for his release since at least September 2006, but he was not visited by a pre-release coordinator until about two weeks prior to his release date. The coordinator handed Jessie E. an envelope containing several benefits applications and told him to complete those applications. When Jessie E. later told the pre-release coordinator that he had difficulty completing the applications, the coordinator informed Jessie E. that he could not help him but that he would refer him to someone in the community who could help him after his release. Upon information and belief, no further pre-release planning has been performed for Jessie E.

35.     Jessie E. will likely be released with no benefits or mental health treatment arranged for him. Because of his psychiatric disability, it will be difficult for Jessie E. to arrange for mental health treatment, case management, and benefits on his own. He will also have great difficulty finding and maintaining employment.

10

**Greg W.**

36.     Greg W. is 46 years old, and is currently incarcerated at Washington Correctional Facility in Comstock, New York. Greg W. will be released on or around his conditional release date, April 27, 2007, and will be under parole supervision for a period of one year.

37.     Greg W. has been diagnosed with Depressive Disorder, Not Otherwise Specified, for which he currently takes both Prozac and trazodone. Because of Greg W.'s psychiatric condition, he is limited in his ability to concentrate and to remember, as well as in his ability to focus and to complete tasks. Greg W. also has difficulty interacting with others and tends to be sad and withdrawn. He sometimes hears voices at night when he is depressed, and he was hospitalized at Manhattan State Psychiatric Center for approximately six months when he was in his early twenties.

38.     Greg W.'s functioning is further limited by back pain for which he currently takes Flexeril and Naprosyn. These medications relieve his pain a little, but Greg W. still finds it difficult to stand for more than ten or fifteen minutes, or to sit for more than half an hour.

39.     Despite Greg W.'s requests, he has not received the help he needs in planning for his release. He approached staff of defendant agencies OMH and DOP to request help in finding housing and securing other benefits, including SSI. In a letter dated December 14, 2006, the institutional parole officer responded to Greg W.'s request by indicating that he had spoken to "the mental health people about referrals to housing and the like", but was "sorry to report that they do not have the resources to do this . . . [and that] they are quite overpowered by the caseload". In the same letter, Greg W. was told that he would therefore be released to a

11

homeless shelter. Although his psychologist did provide Greg W. with an application for

Medicaid, he provided Greg W. with no assistance in completing the forms. Greg W. got help

from another prisoner, but does not know if he completed the forms correctly. He was not told

that the form could be used to apply for Temporary Assistance or for Food Stamps.

   40. Greg W. will therefore likely be released to a homeless shelter, without

benefits and without the resources to meet his basic needs. His ability to support himself and to

meet his own needs is limited both by his psychiatric condition and by his back pain.

   **Alberto B.**

   41. Alberto B. is 33 years old, and was released on parole from Fishkill

Correctional Facility in Beacon, New York on January 23, 2007. He is currently living at his

mother's apartment in Brooklyn, New York.

   42. Alberto B. has been diagnosed with Bipolar I disorder and depression. He

has been receiving mental health treatment for most of his life, including while he was in prison.

He has been hospitalized for his psychiatric disability on several occasions and has attempted

suicide several times. Over the years, he has take the medications Klonopin, Prozac, Seroquel,

thioridazine and Zoloft for his psychiatric disability.

   43. Alberto B. experiences severe mood swings. During manic episodes he

has difficulty concentrating or performing simple tasks and feels that he loses his connection to

reality. When he is in a depressive mood, Alberto B. will completely isolate himself and

sometimes remains in bed for days and sometime weeks. Alberto B. also suffers from a seizure

disorder for which he requires medication.

   44. Alberto B. was released into the Parole Program once before in 2004. He

received no pre-release planning to prepare him for that release—no one helped him apply for

12

benefits prior to release and he did not receive his medication. He violated parole in 2005 when he was found to have absconded.

45.    About a month before his recent release from Fishkill, Alberto B. met with a pre-release coordinator regarding preparations for his release. He was provided a Medicaid application and an HRA 2000 application, but was given no help in filling them out. He was never given an SSI application, nor was one filled out on his behalf.

46.    Upon his release from Fishkill, Alberto B. was given a Medication Grant Card, but no other benefits or services had been arranged for him. He obtained a prescription for Effexor for his psychiatric disability, but was initially unable to get the prescription filled because he was not able to locate any pharmacies in his area that would accept the Medication Grant Card. He was finally able to get his prescription filled on or around February 20, 2007.

47.    Alberto B. had to apply for Public Assistance, Food Stamps and Medicaid on his own after his release. Other than Emergency Food Stamps, which he received in February, he is still without benefits due to a waiting period of at least 45 days before his applications are approved. He only recently was able to file an SSI application.

48.    Alberto B. has no source of income and almost no money remaining. He has had significant difficulty obtaining his medication for his psychiatric disability and seizure disorder and applying for and obtaining benefits. He has become increasingly frustrated by his current situation and is at serious risk of decompensating.

**Sheldon D.**

49.    Sheldon D. is 50 years old, and was released from Collins Correctional Facility in Collins, New York on November 22, 2006. He will serve under parole supervision for more than a year. He is currently living at the Atlantic House Men's Shelter in Brooklyn.

13

50.    Sheldon D. has both psychiatric and physical disabilities. He has been
diagnosed with depression and post-traumatic stress disorder for which he currently takes
Wellbutrin SR, Lamictal, Geodon, and Lyrica. He also has insulin-dependent diabetes,
artherosclerosis, severe peripheral vascular disease, hyperlipidemia, hypertension, and chronic
leg pain. His right fifth toe was amputated due to gangrene, and he has difficulty walking and
standing and depends upon a cane.

51.    Because of his psychiatric disabilities, Sheldon D. has difficulty with
concentration, memory and the completion of basic tasks, including filling out forms. He
becomes anxious in crowds. At times he experiences auditory hallucinations, and believes
strangers are talking about him. He easily becomes overwhelmed and discouraged when he is
unable to complete tasks.

52.    Sheldon D. has a history of mental health treatment dating back to his
childhood when he was hospitalized at Creedmoor Psychiatric Center, and he has attempted
suicide multiple times. He received mental health treatment during each of his four previous
prison terms.

53.    Sheldon D. was previously released into the Parole Program in 1995,
1990, and 1979. He did not receive any pre-release planning to prepare him to return to the
community. He did not receive any medication when he was released, and no one helped him
apply for benefits prior to release. Each time he stopped reporting to his parole officer soon after
his release. His parole was revoked.

54.    Before Sheldon D. was released from Collins, he asked for help in
applying for SSI and other public benefits. A social worker filled out a Medicaid application for
Sheldon D. but told him that he had to apply for Food Stamps and Public Assistance after he was

14

released. The social worker also completed an SSI application for Sheldon D., but rather than filing it before Sheldon D. was released, he gave Sheldon D. the SSI application and told him to file it with the Social Security Administration himself. With the assistance of counsel, after his release, Sheldon D. scheduled an appointment with SSA and filed an SSI application. He has not yet been approved for such benefits.

55.    At Sheldon D.'s request, the social worker at Collins completed and filed an HRA 2000 application for Sheldon D. However, the social worker did not properly complete the application and failed to provide sufficient documentation of Sheldon D.'s psychiatric disabilities, which resulted in HRA's denial of the application. Since his release, Sheldon D. has been forced to stay in shelters, first Bedford-Atlantic and now Atlantic House Men's Shelter. Sheldon D. has had difficulty managing his affairs in the crowded, chaotic environment of the shelter, where there is rampant drug use.

56.    Sheldon D. did receive a Medication Grant Program card and a two-week supply of medication and prescriptions for a refill of each medication just before he was released. He also received a referral to NYC LINK. When Sheldon D. was released from Collins, the correction officer took the cane Sheldon D. had been using and did not provide him with any means to get a replacement.

57.    Sheldon D. had to apply for Public Assistance and Food Stamps on his own after his release. Other than the Emergency Food Stamps he received at the end of November 2006, Sheldon D. was without benefits until mid-January 2007, due to a 45-day waiting period before his application could be approved.

58.    Because he had not been approved for Medicaid benefits at the time he was released, Sheldon D. had difficulty obtaining medical and psychiatric treatment. NYC

15

LINK referred him to a treatment provider that scheduled appointments for Sheldon D. to see a doctor and psychiatrist. However, when the provider found out that Sheldon D.'s Medicaid had not been approved, they cancelled the appointments. Although Sheldon D. told his parole officer about the problem with his Medicaid benefits, his parole officer did nothing to assist him in resolving the issue.

59.     Sheldon D. is confident he can succeed in the parole program if he is provided the reasonable program modifications, benefits and services he needs.

**Viken M.**

60.     Viken M. is 47 years old, and was released from Woodbourne Correctional Facility in Woodbourne, New York on February 8, 2007. He will serve approximately one year under parole supervision, and is currently living in his mother's apartment in Queens.

61.     Viken M. has both psychiatric and physical disabilities. He has been diagnosed with bipolar disorder, anxiety disorder, panic disorder with agoraphobia, and adult-type attention deficit hyperactivity disorder. He also has insulin-dependent diabetes, high blood pressure, elevated cholesterol, hyperlipidemia, herniated discs in his back and neck, bilateral carpal tunnel syndrome, and instability in his right shoulder and right knee. He has paresthesias (numbness) in both hands, and his right leg is paralyzed below the knee. Viken M. also has severe sleep apnea, and has a deviated septum and allergies that further interfere with his breathing.

62.     Viken M.'s disabilities limit many major life activities, and particularly impair his ability to interact with others and his ability to travel on public transportation. He has been unable to work for many years, and received SSI prior to his incarceration.

16

63.     Before Viken M. was released from Woodbourne, he asked for help in applying for SSI and other public benefits. The pre-release coordinator told Viken M. that he had to wait to apply for SSI until after he was released. She gave him a Medicaid application, but did not help him to complete it beyond showing him where to sign and instructing him to check any boxes that applied to him. Viken M. did the best he could with the form and returned it as instructed via the internal prison mail system. When he inquired about his application about a week before his release, the pre-release coordinator did not say it had been submitted; instead she told him it was probably "around somewhere".

64.     A few days before he was released from Woodbourne, Viken M. wrote to the pre-release coordinator and asked if she had found his completed Medicaid application form, because if she had not, he wanted to fill out another one because this was very important to him. The pre-release coordinator did not respond to this note and so Viken M. was released from Woodbourne without knowing whether his application for Medicaid was ever submitted.

65.     Viken M. did receive a Medication Grant Program card just before he was released. However, when he found a pharmacy that accepted the MGP card, he was told that some of the medication he had been prescribed was not covered by the MGP card. For example, he was not able to obtain Humalog, a fast-acting form of insulin that had been prescribed to control his diabetes, and which is particularly useful in situations in which his blood-sugar levels are very high.

66.     A few days after his release from Woodbourne, Viken M. contacted the Social Security Administration by calling the "800" number and requesting an appointment at his local office to apply for Supplemental Security Income (SSI) disability benefits. The earliest appointment he could get was for March 7, 2007, nearly one month after his release date.

17

67. Viken M. has already begun to struggle with the technical requirements of his parole. On his way home from Woodbourne, he hurt his back lugging his property through the Port Authority bus terminal. He called his parole officer and asked to reschedule his appointment because he was experiencing much pain. His parole officer told him that if he did not make it to the appointment, the officer would come for him with handcuffs. Viken M. was able to make it to the appointment, but the officer's response to his request for an accommodation, combined with his pain and the general anxiety he was feeling about the pressure of having to manage all his medications, caused him to have a panic attack.

68. Viken M. is presently attending a MICA program at Elmhurst hospital as a condition of his parole. Because he does not yet have any medical coverage, he is being billed for his treatment. He is confident he can succeed in the parole program if he is provided the reasonable program modifications, benefits and services he needs.

### As To All Class Representatives

69. Because of the defendants' failure to make reasonable modifications, each class representative is, or upon release will be, subjected to an increased and serious risk of losing or being denied access to the Parole Program and the public benefits programs in which he is otherwise eligible to participate.

### C.    Defendants

70. Defendant George B. Alexander is the Acting Chairman and Chief Executive Officer of the New York State Division of Parole ("DOP"). As such, he is responsible for DOP's activities in planning and arranging for the release of prisoners into the Parole Program, the supervision of released prisoners, the prosecution of parole revocation proceedings within New York State, and ensuring that the Parole Program operates in a manner that complies with the requirements of federal law, including the ADA and the Rehabilitation Act. He is also

18

responsible for overseeing the training and supervision of all staff at DOP, including institutional

parole officers, who are based in state correctional facilities and responsible for pre-release

planning, and community-based field staff, who are responsible for supervising parolees and

helping them to access the various programs offered by DOP. Acting Commissioner Alexander

is sued in his official capacity.

71.     Defendant DOP is the agency created by the State of New York for the

purpose of administering the Parole Program within New York State, including planning and

arranging appropriate conditions for release of prisoners into the Parole Program, the supervision

of released persons, and the prosecution of parole revocation proceedings. DOP is a public

entity under 42 U.S.C. §§ 12131(1) and 12132, and the Parole Program that DOP administers

includes programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a)

and (b).

72.     Defendant New York State Office of Mental Health ("OMH") is the lead

governmental agency responsible for statewide planning, development, funding and monitoring

of public mental health services, including more than 2,500 mental health programs operated by

local governments and nonprofit agencies. OMH is responsible for providing mental health

services in State prison facilities and for providing pre-release planning for those individuals

with mental illness who are released from state prison facilities. OMH is a public entity under 42

U.S.C. §§ 12131(1) and 12132, and the mental health services that OMH administers include

programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

73.     Defendant Michael F. Hogan is the Acting Commissioner of OMH. He is

responsible for administering the agency's operations and services, including mental health

services for individuals under parole supervision and prisoners in the custody of the New York

19

State Department of Correctional Services ("DOCS"), and for ensuring that the program operates in a manner that complies with the requirements of federal law, including the ADA and the Rehabilitation Act. He is sued in his official capacity.

74.    Defendant New York State Department of Health ("DOH") is the New York State agency responsible for administering the state-wide Medicaid program, which subsidizes medical treatment—including prescription medications, mental health and substance abuse treatment—for eligible low-income residents. DOH is a public entity under 42 U.S.C. §§ 12131(1) and 12132, and the Medicaid programs that DOH administers include programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

75.    Defendant Richard F. Daines is the Commissioner of DOH. As Commissioner, he is responsible for overseeing the operation of the State's Medicaid program, and ensuring that the program operates in a manner that complies with the requirements of federal law, including the ADA and the Rehabilitation Act. He is sued in his official capacity.

76.    Defendant New York State Office of Temporary and Disability Assistance ("OTDA") is the New York State agency with responsibility to provide Food Stamps and Temporary Assistance to indigent New York State residents who meet the eligibility criteria. OTDA has regulatory responsibility over the State's local social services districts, including the City of New York, which have responsibility for processing applications for Food Stamps, Medicaid and Temporary Assistance for eligible residents. OTDA is a public entity under 42 U.S.C. §§ 12131(1) and 12132, and the public assistance programs that OTDA administers include programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

77.     Defendant David A. Hansell is the Acting Commissioner of OTDA, and as such is responsible for ensuring that the services and programs operated or provided by OTDA, and by local social services districts over which the agency exercises regulatory authority, comply with the requirements of federal law, including the ADA and the Rehabilitation Act. He is sued in his official capacity.

78.     Defendant New York City Human Resources Administration ("HRA") is the executive agency of the City of New York with responsibility for processing applications from New York City residents for Food Stamps, Medicaid and Temporary Assistance. HRA is a public entity under 42 U.S.C. §§ 12131(1) and 12132, and the programs that HRA administers include programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

79.     Defendant Robert L. Doar is the Commissioner of HRA, and in that capacity is responsible for ensuring that the agency complies with federal and state laws, including the ADA and Rehabilitation Act, and for implementing the Medicaid, Temporary Assistance and Food Stamps programs. He is sued in his official capacity.

80.     Defendant New York City Department of Health and Mental Hygiene ("DOHMH") is the agency responsible for the planning, funding, solicitation, development and monitoring of mental health services for adults with mental illness in New York City, including parolees with mental illness. DOHMH administers the Medication Grant Program for those individuals with mental illness leaving State prisons who are returning to New York City. DOHMH is a public entity under 42 U.S.C. §§ 12131(1) and 12132, and the programs that DOHMH administers include programs or activities that receive federal financial assistance under 29 U.S.C. § 794(a) and (b).

21

81.     Defendant Thomas R. Frieden is the Commissioner of DOHMH, and in
that capacity is responsible for ensuring that the agency complies with federal and state laws,
including the ADA and Rehabilitation Act, and for implementing the Medication Grant Program.
Commissioner Frieden is sued in his official capacity.

## CLASS ACTION ALLEGATIONS

82.     Named plaintiffs bring this action on behalf of themselves and a class
consisting of individuals who (a) have a psychiatric disability that substantially limits one or
more major life activities within the meaning of the Americans with Disabilities Act, (b) are
currently incarcerated in a New York State prison and are eligible to be released into New York
City under parole supervision or who have been released from a New York State prison into New
York City and are currently under parole supervision, and (c) are eligible, or upon release will be
eligible, for one or more of the following public benefits programs: Medicaid, SSI, Food Stamps,
and Temporary Assistance.

83.     This action meets the requirements of Fed. R. Civ. P. 23(a) as follows:

a.     The proposed class is so numerous that joinder of all its members
is impracticable.  Upon information and belief, there are thousands of indigent
individuals with psychiatric disabilities under parole supervision in New York
City and thousands of individuals with psychiatric disabilities who are
incarcerated in a New York State prison and are parole-eligible.  In addition,
joinder of all members of the proposed class is impracticable because membership
of the proposed class constantly changes, as additional persons receive felony
sentences and later become parole-eligible, and other persons complete their
sentences entirely and are no longer subject to incarceration or parole supervision.

22

b.    The questions of law and fact presented by the named plaintiffs are common to other members of the class.

c.    Such questions include, generally, whether, under federal and state law, defendants sufficiently accommodate the disabilities of indigent individuals with psychiatric disabilities who are under parole supervision so that they are able to participate successfully in the Parole Program and the public benefits programs for which they are or will be eligible, and more specifically:

     i.  whether defendants adequately assist Class Members prior to their release in securing appropriate mental health services so that Class Members are able to access the services of the Parole Program and comply with the conditions of parole supervision;

     ii.  whether defendants adequately assist Class Members prior to their release in securing other needed services for which they are eligible, including public benefits and housing, so that Class Members are able to access the services of the Parole Program and comply with the conditions of parole supervision;

     iii.  whether defendants adequately assist Class Members prior to their release in securing other needed services for which they are eligible, including public benefits and housing, so that they have access to those benefits immediately upon their release;

23

iv.     whether defendants have taken sufficient steps to provide
        their employees and agents with the appropriate
        information, training, procedures and supervision necessary
        to comply with the requirements of federal and state law,
        including the ADA and the Rehabilitation Act; and

v.      whether the Parole Program's outwardly neutral
        requirements and conditions are significantly more difficult
        to satisfy for Class Members and without appropriate
        reasonable modifications than for parolees who have no
        psychiatric disabilities.

d.      The violations alleged by the named plaintiffs are typical of those
suffered by the class. The entire class will benefit from the relief sought.

e.      The named plaintiffs will fairly and adequately protect the interests
of the class. The named plaintiffs have no interests adverse to or in conflict with
those of the other class members. The Legal Aid Society and the Urban Justice
Center, co-counsel for plaintiffs, are legal services organizations experienced in
class action civil rights and poverty law litigation that have secured court-ordered
relief in class-action cases involving public benefits, the treatment of homeless
persons, and prison and jail conditions. Cravath, Swaine & Moore LLP, co-
counsel for plaintiffs, is a private law firm experienced in major class-action
litigation.

24

84.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class. Fed. R. Civ. P. 23(b)(1)(A).

85.    The defendants have acted or refused to act on grounds generally applicable to the class, making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole. Fed. R. Civ. P. 23(b)(2).

## FACTS

86.    Under New York State law, prisoners convicted of felonies and sentenced to incarceration are eligible for release into the parole, conditional release or post-release supervision programs at some point during or following their sentences, with very few statutory exceptions.

87.    One of the goals of the Parole Program is to increase the likelihood that parolees will succeed at reintegrating into the community. This is a primary reason for the many pre-release planning agreements into which State defendants have entered over the years, and it is a purpose that is defeated when prisoners with psychiatric disabilities are released without the reasonable modifications needed to enable them to participate successfully in the Parole Program.

88.    Despite both local and national consensus on the importance of pre-release planning, New York has failed to implement needed services systematically and on the scale necessary to accommodate Class Members' disabilities.

89.    Defendants are aware of the need for specialized services for disabled prisoners but do not offer needed accommodations to all Class Members as required by law. Indeed, defendants OMH and DOP have acknowledged in various policies and publications such

25

as the Mental Health Resource Handbook and the New York State Parole Handbook that pre-release planning should be provided to prisoners with psychiatric disabilities. Despite this acknowledgment, however, the actions DOP and OMH have taken are not adequate to meet the needs of Class Members. For example, although OMH and DOP have a small pre-release program with DOCS and some community service providers to provide pre-release planning for prisoners with psychiatric disabilities in order to facilitate their transition back into the community, this program is miniscule. The program, known as CORP, the Community Orientation and Reentry Program, consists of only 31 beds at a single maximum-security facility for men. Prisoners who are not part of CORP (*i.e.*, the vast majority of male prisoners and all female prisoners) receive services either haphazardly or not at all.

90.    When released without needed health care, without appropriate housing, and without means to meet their immediate needs, Class Members stand a greatly reduced chance of successful participation in the Parole Program and face repeated reincarceration for violations of the Parole Program caused by manifestations of their psychiatric disabilities. Defendants' failure to provide needed modifications denies Class Members the services of the Parole Program, and bars them from the Parole Program entirely upon rearrest.

**A.    Overview of Demands Placed on Plaintiff Class Under the Parole Program**

91.    Persons released to parole supervision are subject to general conditions of release that are set out in statutes and regulations, as well as to special conditions determined on an individual basis by DOP. These conditions typically include the expectation that a parolee seek and find a means to support herself, as well as requirements that the parolee report regularly to her parole officer, remain at her approved residence unless granted permission to do otherwise, submit to regular drug tests, and seek and accept other services to which she is referred. For parolees with psychiatric disabilities, parole supervision often includes a

26

requirement that the individual seek and accept mental health treatment. Activities that ordinarily would be voluntary are thereby institutionalized under the Parole Program, and the parolee's continued freedom rests on her ability to perform them.

92.    Given these conditions, successful participation in the Parole Program requires parolees to manage a demanding schedule of mandated appointments, and the Parole Program thus presumes that individuals are capable of following through on any additional recommendations, referrals or mandates.

93.    Violation of any condition of the Parole Program, including failing to attend an appointment, failing to be present during required hours at a registered residence, or failing to take prescribed medication, may result in arrest and prosecution. Such prosecutions can result in the revocation of parole and the parolee's return to state prison, or can lead to the addition of new conditions of release with which the parolee must comply. Persons accused of violating discretionary parole are not entitled to bail. Many spend several months in jail awaiting formal proceedings even if they are ultimately restored to the Parole Program.

**B.    Class Members Enter the Parole Program Without Adequate Pre-Release Planning and Transitional Services and, as a Result, Are Denied an Equal Opportunity to Participate in the Program.**

94.    While incarcerated, Class Members are provided with medication, treatment, and other mental health services. These services may include periodic consultations with a psychiatrist or therapist, administration of psychotropic medication, and use of the Central New York Psychiatric Center for inpatient care. A number of prisons offer additional services and programs, such as the Residential Crisis Treatment Program for prisoners experiencing a psychiatric crisis, and the Intermediate Care Program for prisoners who are unable to function in the general prison population because of their psychiatric disabilities. Class Members are also

27

provided with food and shelter, in a highly structured environment in which they make relatively
few decisions about their care.

95.     In contrast, when Class Members transition from prison into the Parole
Program, many abruptly find themselves without arranged mental health services, without stable
housing, and without the means to pay for necessities like food, toiletries, or even a winter coat.
From their first day outside prison walls, Class Members are expected to manage their treatment
and meet their own needs with minimal external support, but most have little ability to do so.
Many Class Members are unable to manage complex schedules of mandated appointments, and
are unable to make use of paper referrals without additional assistance. As a result, many Class
Members do not receive necessary mental health treatment, do not find appropriate housing, and
cannot find the stable external environment that they need.

96.     A stable external environment—for example, a situation in which a
parolee has access to mental health counseling, is able to pay for prescribed medication as well
as for food and clothing, and has a safe and reliable residence—increases the likelihood that a
Class Member will be able to manage the symptoms of his or her illness and meet the
requirements of the Parole Program. Without a stable external environment, many Class
Members are unable to manage their symptoms, finding their lives dominated by their mental
illness and resulting struggles. Many also decompensate (suffer an acute deterioration of their
mental health), which further diminishes their ability to think and carry on daily activities. As
explained in more detail below, for many Class Members the chaotic environment of a homeless
shelter makes attaining external stability even more difficult.

97.     Class Members' symptoms often severely impair their ability to manage
ordinary life activities and the conditions of the Parole Program. For example, some Class

28

Members have schizophrenia, a chronic and often disabling brain disease whose symptoms include hallucinations, delusions, and unusual or disorganized speech, thinking and behavior. Other Class Members have anxiety or mood disorders, whose symptoms include paralyzing fear, debilitating emotional extremes, and sometimes hallucinations or delusions as well. Most Class Members take psychotropic medication, which can be heavily sedating or cause additional adverse effects. Each illness or medication side-effect can limit a Class Member's ability to carry out daily activities, for example by impairing her ability to think, concentrate, process information, remember, travel on public transportation, or interact with others. Instability in other aspects of an individual's life may further impair her ability to function. To participate successfully in the Parole Program, Class Members require reasonable modifications in the form of pre-release planning and transitional supports.

98.     When defendant agencies fail to provide needed modifications, Class Members' illnesses leave them with a drastically reduced ability to access the services of the Parole Program and to comply with the terms of the Program, increasing their risk of parole violations and a return to prison. When appropriate planning and transitional supports are not provided, the abrupt loss of services and increased demands of parole supervision also create predictable and preventable exacerbations of Class Members' symptoms. Any worsening of Class Members' symptoms further erodes their already limited ability to participate successfully in the Parole Program.

99.     Further, the Parole Program also has a disparate impact on Class Members. The challenges discussed above make it significantly more difficult for Class Members to meet the requirements and access the services of the Parole Program than for

29

parolees without psychiatric disabilities. As a result, a larger percentage of Class Members fail

to meet the requirements of the Parole Program and are reincarcerated as a result.

C.    **Defendants Fail to Afford Class Members Reasonable Modifications for Their Disabilities and an Equal Opportunity to Participate in the Parole Program.**

100.    Despite the difficulties that Class Members face upon reentering the

community due to their psychiatric disabilities, Defendants fail, in several ways, to make

reasonable accommodations so as to provide Class Members an equal opportunity to meet the

requirements and access the services of the Parole Program.

1.    Defendants Fail to Arrange for Timely and Appropriate Mental Health Services as Required to Afford Class Members Reasonable Modifications for Their Disabilities and an Equal Opportunity to Participate in the Parole Program.

101.    Class Members require community-based mental health services in order

to control their symptoms, access the services of the Parole Program and meet the requirements

of that Program. Community-based mental health services include a range of services, such as

medication; individual or group therapy; treatment for co-occurring substance use disorders;

vocational rehabilitation; and residential mental health and substance abuse treatment. Many

Class Members may also need some degree of mental health case management, which includes a

range of services based on the needs of the individual, for example: (1) facilitating service

delivery, including helping individuals make and keep appointments, escorting individuals to

appointments as needed, and arranging mental health, medical and psychiatric rehabilitation

services; (2) advocating for and assisting individuals to gain access to public benefits or health-

related services; and (3) assisting individuals to manage their finances and increase their

independence.

30

102.    Under the existing terms of the Parole Program, defendants OMH and

DOP share primary responsibility for planning for the release of prisoners with psychiatric

disabilities. Defendants OMH and DOP have acknowledged in various policies and in

publications such as the Mental Health Resource Handbook and New York State Parole

Handbook that pre-release planning should include assistance in obtaining appropriate mental

health services. Since as far back as 1986, defendants OMH and DOP have entered into

agreements to provide appropriate pre-release planning. Nevertheless, defendants have failed to

implement needed services systematically and on the scale necessary to accommodate Class

Members' disabilities.

a.    Defendants Fail to Arrange for Timely and Appropriate Mental
Health Treatment.

103.    As a condition of their parole, most Class Members are required to

undergo some form of mental health treatment. All Class Members have received treatment

while in prison or have requested appropriate services, so that defendant agencies OMH and

DOP are aware of their illness and need for continuing care. Despite this, neither agency has a

system in place to ensure that Class Members receive continuous treatment as needed to

accommodate their disability and to allow them to comply with the conditions of the Parole

Program.

104.    Class Members typically enter the Parole Program with very little, if any,

community mental health care arranged prior to their release, and they have little ability to

arrange it themselves. Instead, individuals with psychiatric disabilities are told that their parole

officer or a third-party agency (overseen by OMH) will provide a referral for services. If Class

Members do receive a referral, it is typically for a screening and intake evaluation only, and may

be with a social worker or other staff who are unable to prescribe medication. Many parolees are

31

not assigned to meet a treating physician until a much later date, and may go for weeks without meaningful mental health treatment.

105.    The defendants' system delays the beginning of treatment, sometimes for a considerable period: some public hospitals, for example, have a policy or practice of scheduling intake appointments two or more months in advance of intake. By the time they can be seen, Class Members may have run out of medication, been reincarcerated, or be acutely ill because of the lack of care. Other Class Members are unable to advocate for themselves and to follow through on appointment referrals; without case management or similar services, they may never find a treating physician at all. Every delay therefore adds an additional, unnecessary barrier to Class Members' successful participation in the Parole Program. Such unnecessary delays in obtaining adequate mental health care are particularly pernicious when Class Members are first released into the Parole Program, the most challenging phase of community re-integration.

106.    Many Class Members require medication to manage the symptoms of their psychiatric disabilities. The Medicaid program provides health insurance coverage that covers the cost of such medication and treatment for indigent persons. When an application for Medicaid is submitted, a 45-day waiting period typically applies before the Medicaid application is granted. Defendants fail to submit Medicaid applications on behalf of prisoners far enough in advance of the prisoners' release to ensure that they are covered by Medicaid promptly upon their re-entry into the community.

107.    Upon release from prison, prisoners with psychiatric disabilities who take medication are commonly given two weeks' worth of medication and a prescription for the medications for a two-week supply with no refills. Prisoners are not provided Medicaid

32

coverage immediately upon release from prison. Instead, some prisoners are given a temporary benefit card for the provision of psychiatric medication upon release under the State Medication Grant Program ("MGP"). This temporary benefit card ("MGP card") is intended to cover the cost of filling the prescription Class Members receive upon release once their two-week supply of medication runs out.

108.    Even as a temporary benefit card, the MGP card is not an adequate substitute for Medicaid coverage. The MGP card is only accepted at some pharmacies and covers psychiatric medications only. The MGP card does not cover ongoing mental health treatment such as therapy visits. The card does not cover medication prescribed for other medical conditions, even though many Class Members suffer from various other conditions that directly or indirectly affect their mental health. Although the MGP card is meant to cover visits to a psychiatrist for the purpose of obtaining a prescription, Class Members are not informed that this is the case. The MGP card does not indicate that it covers prescription-related visits, and Defendant OMH does not make adequate efforts to ensure that parolees with psychiatric disabilities are linked with service providers who will accept the MGP and issue new prescriptions.

109.    Because of defendants' failure to submit pre-release Medicaid applications on time or at all, there is usually a gap in coverage between the date when the medications received upon release and obtained with the MGP card run out and the date when Medicaid becomes active and new prescriptions can be obtained and filled. In the best of circumstances, a Class Member who applies for Medicaid in conjunction with Safety Net Assistance on the same day as her release from prison and who is provided with a two-week supply of medications

33

would run out of medications two weeks before her Medicaid could, even in theory, become active.

110.    In practice, Class Members' medications often run out before they can be refilled. This happens because Class Members often do not receive a full 14 days of medication upon release; often receive only a 14-day prescription after release; and/or because an appointment with a physician who accepts Medicaid cannot be scheduled on the first day when Medicaid becomes active. Obtaining the necessary medical appointment after Medicaid becomes active can take several weeks or even months.

111.    State pre-release coordinators are supposed to submit complete Medicaid applications to defendant DOHMH, which is supposed to forward them to HRA in connection with Class Members' applications for MGP before Class Members are released from prison. (*See infra* ¶ 128.) However, in practice, large numbers of those applications are not sufficiently complete and correct to be accepted for Medicaid. When the applications for Medicaid are denied, Class Members must reapply after release, generally entailing a 45-day waiting period that does not even begin until a new application can be submitted.

112.    Because of their psychiatric disabilities and lack of access to required supporting documentation, many Class Members are unable to complete the paperwork and application process to apply for Medicaid without assistance. Such assistance could take the form of helping Class Members determine what information needs to be written on the applications and/or helping them write that information on the applications, as well as assisting Class Members in collecting the required supporting documentation. Defendants do not routinely provide such assistance. Class Members who require such assistance and do not obtain it have their Medicaid applications denied again.

34

113.    The lack of reliable access to medical care and mental health services typically causes a worsening of Class Members' underlying illnesses. With increased hallucinations, delusions, anxiety, depression, or other symptoms, Class Members' ability to function is correspondingly reduced. They are therefore unable to access the services of the Parole Program and to comply with its conditions, which leaves them vulnerable to arrest for violation of the Parole Program.

        b.     Defendants Fail to Arrange for Case Management and Related Services.

114.    Many Class Members require case management services, for example to help them navigate appointments or to help them to manage their medications and referrals that they receive through the Parole Program.

115.    Defendant OMH uses one application form to determine eligibility for supportive housing and case management services (including varying levels of intensive service such as supportive case management, intensive case management and assertive community treatment, which is very intensive case management by an interdisciplinary team available 24 hours a day seven days a week). This application is known as the HRA 2000.

116.    Class Members cannot submit an HRA 2000 to apply for case management services on their own. Rather, the application for case management has several sections that must be completed by a physician or mental health professional, including a detailed psychosocial summary, an evaluation by a psychiatrist, and a report of tuberculosis testing. These forms ask for detailed information regarding a patient's needs, records and medical history. If the forms are prepared prior to Class Members' release from prison, the HRA 2000 can be completed by employees of defendant OMH with reference to records already in their possession and as part of a pre-release plan that they are already obligated to complete.

35

117.    Once Class Members are released, however, if an application for case management is to be submitted on their behalf, they must first locate a new doctor or social worker who will complete the required psychosocial and psychiatric evaluations. For some Class Members, this may entail waiting not only until they are referred to an appropriate physician, but until that physician has received their records and is able to submit detailed recommendations as to the client's needs. For other Class Members, the same psychiatric disabilities that makes case management necessary may also make it impossible to obtain.

118.    Although Class Members' need for these services is known to defendants, and although defendants OMH and DOP have responsibility for planning for Class Members' release, defendants do not have an adequate system for assessing Class Members' needs and submitting these applications when appropriate. Without case management or similar services when those are required, Class Members are typically unable to manage their daily activities. They may be unable to advocate for themselves to get appointments when needed, unable to remember scheduled appointments, unable to travel to unfamiliar locations, or unable to complete required forms. As a result, many of these parolees do not manage to secure ongoing treatment for psychiatric disabilities, are unable to control their symptoms, and are reincarcerated soon after their entry into the Parole Program.

2.    Defendants Fail to Arrange for Timely and Appropriate Public Benefits as Required to Afford Class Members Reasonable Modifications for Their Disabilities and an Equal Opportunity to Participate in the Parole Program.

119.    Individuals who participate in the Parole Program are expected to find some legitimate means of supporting themselves. Those who are too ill to work or are unable to secure employment must typically seek and obtain public benefits if they are to meet their immediate needs and comply with the conditions of the Parole Program. Indigent parolees are eligible for one or more income-support programs, including SSI and state-administered

36

Temporary Assistance, as well as Food Stamps and Medicaid. SSI and Temporary Assistance

provide income and also facilitate access to other services that can increase recipients' ability to

comply with the terms of the Parole Program. Medicaid provides health insurance coverage,

which is needed to receive the mental health treatment typically required as a condition of

release. Receipt of SSI can also serve as proof of the medical need that is required to establish

eligibility for supportive housing and for case management, both of which can reduce or

compensate for the functional impairments caused by psychiatric disabilities. SSI may also

speed access to vocational rehabilitation.

        a.    Defendants Fail to Submit Timely Applications for Federal
              Disability Benefits.

        120.    The Social Security Administration has a statutory obligation to develop

systems to allow individuals to apply for SSI prior to release from State prison. In New York

State, the SSA has sought to fulfill this important obligation through a contract with defendant

DOP. This contract requires DOP to identify prisoners who are potentially eligible for SSI, to

take SSI applications, and to obtain and submit necessary medical evidence with the assistance

of OMH. The applications are to be submitted up to 120 days prior to an individual's expected

release date.

        121.    Despite this, defendants DOP and OMH do not have an adequate system

for assessing Class Members' needs and submitting these applications effectively on behalf of

eligible individuals. Despite the fact that many Class Members would qualify for SSI upon their

release, and despite the fact that SSA has a contract with defendant DOP to prepare pre-release

applications for SSI for prisoners several months before they are released, defendants fail to

assist many of these individuals in applying for these benefits before release. When applications

are submitted, defendants DOP and OMH often fail to obtain and submit needed medical

37

evidence—even when this evidence is from the agencies' own files. As a result, many Class

Members whose medical conditions are severe enough to meet the disability criteria for SSI have

their applications denied. Even when they do submit applications for psychiatrically disabled

prisoners prior to their release, the defendants have usually delayed the submission so long that

there is virtually no chance that benefits will in fact be available to eligible parolees upon their

release.

      122.    Some parolees with psychiatric disabilities received SSI prior to

incarceration. In most cases, it is less difficult for these individuals to be awarded SSI on new

applications because SSA can review their prior disability files to assist them in making a

determination. Despite this, defendant DOP fails to systematically identify prisoners who

received SSI prior to incarceration and to process new applications for them so that they can

receive SSI upon release. As a result, most individuals who qualify for SSI are forced to apply

on their own when they are released from prison.

      123.    Defendants' failure to submit these applications prior to Class Members'

release from prison results in significant delay, and sometimes means that Class Members never

receive benefits or are reincarcerated before their application can be approved. Applications for

SSI take approximately three to five months to process, and appeals following an initial denial

can take more than a year. During this time, the applicant is forced to survive with little or no

financial support while the application is pending. Many Class Members, because of their

psychiatric disabilities, are unable to complete the paperwork and follow through on the

appointments needed to apply; defendants' failure therefore means that some Class Members do

not receive SSI benefits at all.

b.    Defendants Fail to Submit Timely Applications for Medicaid.

124.    As explained earlier, defendants also fail to submit timely applications for

Medicaid on behalf of Class Members. A 45-day waiting period typically applies before

Medicaid applications submitted in conjunction with a Safety Net Assistance application can be

granted. However, Medicaid applications may be submitted up to 45 days prior to release from

prison. Because defendants often fail to submit Medicaid applications even close to 45 days in

advance of Class Members' release from prison, Class Members are often not covered by

Medicaid promptly upon their re-entry into the community. The MGP card is not an adequate

temporary substitute for Medicaid and does not adequately fill the gap between release from

prison and the inception of Medicaid coverage. (*See supra* ¶¶ 108-9.)

c.    Defendants Do Not Allow Timely Applications for Food Stamps
and Public Assistance.

125.    Defendant OTDA is the single State agency responsible for supervising

the administration of the Temporary Assistance and Food Stamp programs by local social

services districts in New York State.

126.    Defendant HRA is the local social services district responsible for

administering the Temporary Assistance and Food Stamp programs in New York City. HRA is

required to comply with all directives and instructions by OTDA regarding those programs.

127.    OTDA has issued instructions directing local social services districts to

accept applications for Temporary Assistance and Food Stamps up to 45 days before a Class

Member's anticipated release date from prison.

128.    State defendants DOH and OTDA have established procedures for the

submission of applications for Temporary Assistance and Food Stamps for Class Members

before they are released from prison. These procedures require City defendant DOHMH to

39

accept applications for Medicaid, Temporary Assistance, and Food Stamps and to forward them with supporting documentation to City defendant HRA. DOHMH and HRA must also decide how the immediate needs of applicants will be identified and addressed once they are released. Finally, DOHMH must submit a plan to State defendant OMH detailing, among other things, the process by which the timely filing of Medicaid applications is to be performed and the coordination with applications for Temporary Assistance and Food Stamps.

129.    In practice, however, these procedures are not properly followed and do not result in the submission of such applications far enough in advance of the prisoners' release to ensure that benefits are available upon their re-entry into the community. Upon information and belief, the breakdown is attributable to several factors: (1) the failure, in practice, of OMH pre-release coordinators routinely to prepare applications on behalf of Class Members for Temporary Assistance and Food Stamps; (2) the failure of DOHMH to ensure that timely applications for Temporary Assistance and Food Stamps are submitted to the correct components within HRA; (3) bureaucratic structures and procedures used by HRA, which disregard such applications even when they are made; and (4) the failure of the responsible State agencies (DOH and OTDA) to supervise and correct these problems.

130.    The standard application form for Temporary Assistance, Food Stamps, and Medicaid is a combined application (the "common application"). Separate boxes on the form may be checked that specify each program for which the applicant is applying.

131.    Class Members do not have direct access to the application form prior to their release from prison. For applications prepared prior to release, this form is supposed to be completed by State pre-release coordinators employed by Defendant OMH, who are responsible

for completing the application and checking all appropriate boxes. For indigent prisoners with psychiatric disabilities, an application should be submitted for all three programs.

132.    Upon information and belief, OMH employees who are preparing pre-release plans for Class Members are trained to check the box for Medicaid, but are trained not to check the boxes for Temporary Assistance and Food Stamps, regardless whether the prisoner they are supposed to be helping appears to be in need of and likely eligible for such programs. Even when Class Members specifically ask for assistance in applying for Food Stamps or Temporary Assistance prior to their release, OMH pre-release coordinators do not check the Food Stamps and Temporary Assistance boxes. Instead, they misinform Class Members and tell them that they must wait until they are released to apply. As a consequence, pre-release applications for Temporary Assistance and Food Stamps are generally not submitted at all.

133.    Even when pre-release coordinators do prepare pre-release applications for all three programs by checking all three boxes, such applications are not in fact processed by HRA. HRA is organized into one division that administers Temporary Assistance and Food Stamps (the Family Independence Administration, or "FIA") and a separate division that administers Medicaid (the Medical Insurance and Community Service Administration, or "MICSA"). Upon information and belief, when DOHMH receives pre-release Medicaid applications on behalf of State prisoners, it forwards them to MICSA. Although MICSA processes those applications for Medicaid, it does not process them for Temporary Assistance or Food Stamps. Neither does MICSA forward an application for all three programs to FIA for processing of the Temporary Assistance and Food Stamp applications. As a consequence, in practice, any pre-release application for Temporary Assistance and Food Stamps that is prepared by OMH pre-release coordinators is routinely ignored by HRA.

41

134. Because of these failings, Class Members are routinely required to apply for Temporary Assistance and Food Stamps after they are released from prison. Because certain waiting periods apply to these applications, Class Members routinely experience gaps during which they have no cash assistance and/or Food Stamps.

135. A Food Stamp application is supposed to be decided within 30 days. Although expedited Food Stamps are available for emergency food needs during the 30-day waiting period, even expedited Food Stamps need not be granted for five days.

136. An application for Safety Net Assistance entails a waiting period of up to 45 days. An application for Family Assistance (the less common situation for Class Members) entails a waiting period of up to 30 days. Although in theory a limited, same-day "immediate needs" cash grant is available when an applicant for Temporary Assistance is in immediate need, an "immediate needs" cash grant is not an adequate substitute for regular Temporary Assistance.

137. Defendants OMH, DOP, and HRA have a policy and practice of telling prospective parolees that they can apply for Food Stamps and Temporary Assistance once they are released from prison, without informing them they have a right to apply for those benefits prior to release. OMH and DOP employees typically do not advise prisoners with psychiatric disabilities that applications for Food Stamps and Temporary Assistance can be submitted prior to their release from prison. If asked, many OMH and DOP staff state incorrectly that such applications are not allowed. HRA has a similar policy and practice of informing prospective applicants that they may apply only after their release.

138. Although they are financially eligible for public benefits, many Class Members will not receive those benefits after their release without reasonable modifications for their disability. Because of the complexity of the application process, it is very difficult for

42

many individuals with psychiatric disabilities released from State prisons to secure Temporary

Assistance and Food Stamps without assistance to facilitate their enrollment and participation in

these programs. Many Class Members are unable to maintain eligibility requirements for

Temporary Assistance and Food Stamps because the symptoms of their psychiatric disabilities

render them unable to comply with the detailed bureaucratic requirements of these programs.

The failure to attend a single required appointment or to submit a single required document may

result in the rejection of an application or termination of benefits. In some cases, failure to

attend an appointment is considered "sanctionable", and may result in the applicant being barred

from receiving benefits for a 90-day period.

139.    Because of gaps during which they have no cash assistance or Food

Stamps, Class Members often enter the Parole Program without income or other means to meet

their basic needs, including transportation to mandatory appointments with their parole officer

and other service providers. This worsens their symptoms, interferes with their rehabilitation

and community integration, reduces their access to the services of the Parole Program and ability

to comply with its conditions, and places them at increased risk of reincarceration for violation of

the Parole Program.

3.    Defendants Fail to Submit Timely Applications for Appropriate Housing
and Mitigate the Deleterious Effects of Shelter Conditions.

140.    A parolee's housing situation can greatly affect the parolee's chances of

succeeding in the Parole Program. As the agency responsible for preparing and approving a

parolee's parole program, Defendant DOP must investigate and approve the housing in which the

parolee expects to live. Defendant OMH shares responsibility for planning for the release of

prisoners with psychiatric disabilities, particularly with regard to mental-health related

supportive services. Both defendants have acknowledged in various policies and in publications

such as the Mental Health Resource Handbook and New York State Parole Handbook that the pre-release planning they provide should include assistance in obtaining appropriate housing.

        a.      Defendants Fail to Submit Timely Applications for Appropriate Housing.

141.    For many Class Members, the most appropriate release plan would involve placement in supportive housing, which includes on-site or linked social services and is targeted at individuals with special needs. Defendants OMH, HRA, and DOH in fact have participated in studies showing that supportive housing is cost-effective and reduces incarceration. Supportive housing programs use the same HRA 2000 application that is used for case management services; as with case management, the application must be completed in part by a treating physician or clinician as it must include a psychosocial report. For supportive housing programs, the application must be submitted to HRA, which determines financial eligibility and the level of supportive housing services appropriate to the applicant.

142.    Although Class Members' need for housing is known to Defendants, Defendants do not have an adequate system for assessing Class Members' needs and submitting these applications when appropriate. Because there are waiting lists for most programs, delay in submitting an application can result in an individual being unable to secure needed housing in time for her release from prison. As a result, Class Members are often relegated to homeless shelters.

        b.      Defendants Fail to Arrange for Supportive Services for Class Members Released to Homeless Shelters.

143.    Many persons with psychiatric disabilities are discharged from prison as "undomiciled" with a homeless shelter as their approved Parole Program address. In addition, many individuals who are not initially discharged to a homeless shelter quickly end up in one because they do not receive the public benefits necessary to support themselves.

144.    Use of a homeless shelter as part of a release plan creates an inherently

unstable situation and poses particular risks for individuals with psychiatric disabilities. Shelters

are typically crowded and chaotic, and cause acute distress for Class Members who suffer from

anxiety, depression, post-traumatic stress disorder, phobias, or any condition that impairs their

ability to interact with others or to be in a crowded environment. Drug use by other shelter

residents presents a hazard for Class Members with a history of addiction. Further, individuals

who display unusual behavior or appear vulnerable, like many with psychiatric disabilities, are at

risk of attack. No matter what the shelter conditions are, however, a parolee who flees such an

inappropriate living situation following a deterioration of her mental health can be found to have

violated the Parole Program.

145.    Many Class Members have difficulty maintaining and managing a

schedule of appointments under the best of circumstances; these tasks are even more difficult

when they are homeless and staying in a shelter. Homeless shelters have no direct telephone

service, limited ability to relay messages, and unreliable mail service. Most shelters also require

residents to leave during the day but do not allow them to reserve beds, so that individuals are

faced with the constant anxiety and distraction of finding a space to sleep and to secure their

belongings.

146.    When Class Members must be released to a homeless shelter, reasonable

modifications are needed in order to allow Class Members an opportunity to succeed in the

Parole Program. Like modifications that are necessary outside the shelter setting, these

modifications may include case management to help Class Members coordinate their

appointments and to ensure they receive needed health care and other services; they may also

include assignment to parole officers with specialized training who are able to recognize signs of

45

increasing impairment. Without services to compensate for instability in their home environment, Class Members commonly experience an exacerbation of their symptoms. This leaves them unable to access the services of the Parole Program and to comply with its conditions, and increases their likelihood of reincarceration.

> 4.    Defendants Have Failed to Provide Their Employees and Agents with the Appropriate Information, Training, Procedures, and Supervision Necessary to Comply with the Requirements of Federal and State Law, including the ADA and the Rehabilitation Act.

147.    Defendant DOP is responsible for training and supervising its staff in New York State prisons who are supposed to provide prisoners with psychiatric disabilities with pre-release planning, as well as its field Parole Officers who are supposed to supervise parolees. DOP has failed to adequately train and supervise its staff in New York State prisons (and/or the staff of DOCS and defendant OMH) in the tasks associated with pre-release planning, including, but not limited to, assisting prisoners with psychiatric disabilities in submitting applications for Social Security benefits, supportive housing and mental health services in a timely manner prior to their release from prison. In addition, DOP has failed to adequately train and supervise its field Parole Officers to make reasonable accommodations for parolees with psychiatric disabilities, including, but not limited to, assisting parolees with obtaining access to the mental health services they require, recognizing and responding appropriately to patterns of behavior that may be manifestations of psychiatric disabilities, such as a failure to keep appointments, abnormal or disruptive actions, or self-medication through misuse of drugs or alcohol.

148.    Defendant OMH is responsible for training and supervising the OMH staff in New York State prisons who are supposed to provide pre-release planning services for prisoners with psychiatric disabilities. OMH has failed to adequately train and supervise its staff in New York State prisons in the tasks associated with proper pre-release planning, including,

46

but not limited to, assisting Class Members with making timely applications for Social Security

benefits, supportive housing, case management and mental health services, Medicaid, Temporary

Assistance and Food Stamps; informing Class Members of their rights under these programs and

services available under the MGP; and ensuring that Class Members receive prescription

medications and mental health services upon release and without interruption.

149.    Defendant OTDA is responsible for training and supervising the staff of

HRA with regard to processing applications for Temporary Assistance and Food Stamps.

Defendant DOH is responsible for training and supervising the staff of HRA with regard to

processing applications for Medicaid. Both agencies are responsible for coordinating with OMH

and DOP with regard to making applications for public benefits in connection with the pre-

release planning process for Class Members prior to their release from prison. OTDA and DOH

have failed to adequately train and supervise HRA staff in the tasks associated with processing

these applications on behalf of prisoners with psychiatric disabilities prior to their release from

prison, and have failed to coordinate adequately with OMH and DOP with regard to making such

applications part of the pre-release planning process.

150.    Defendant HRA is responsible for processing applications for Temporary

Assistance, Food Stamps, Medicaid, case management, and supportive housing programs

submitted by or on behalf of Class Members. HRA has failed to adequately train and supervise

its staff in the tasks associated with processing these applications on behalf of Class Members in

the following respects: (a) failing to accept applications for Temporary Assistance and Food

Stamps submitted by Class Members prior to their release from prison; (b) misinforming Class

Members and personnel in other agencies that Class Members may not submit applications for

Temporary Assistance and Food Stamps prior to their release from prison; and (c) failing to

47

process all applications for Temporary Assistance and Food Stamps submitted by Class Members.

151.    Defendant DOHMH is responsible for planning, in conjunction with OMH, the process by which the timely filing of Medicaid applications is to be performed in connection with the Medication Grant Program, and coordinating those applications with applications for Temporary Assistance and Food Stamps. DOHMH is also responsible for ensuring that Class Members who return to New York City after their release from a State prison receive necessary mental health and case management services without interruption. DOHMH fails to adequately train and supervise its staff in connection with these tasks by failing to ensure (a) that timely applications for Temporary Assistance and Food Stamps are submitted to the proper components of HRA and (b) that Class Members who reside in New York City after their release from a State prison receive necessary mental health and case management services without interruption.

152.    As a result of defendants' failure to adequately train and supervise their employees, individuals with psychiatric disabilities are released from prison without receiving the public benefits and mental health services they need in order to successfully participate in, and complete, the Parole Program.

48

## CLAIMS FOR RELIEF

153.    Based on the foregoing factual allegations, the named plaintiffs assert the following claims for relief:

## FEDERAL CAUSES OF ACTION

### FIRST CAUSE OF ACTION

(For discrimination under the ADA by all defendants.)

154.    Defendants are public entities within the meaning of the ADA, 42 U.S.C. § 12131(1)(A) and (B), and U.S. Department of Justice implementing regulations, 28 C.F.R. § 35.104, or agents of such public entities.

155.    Each Class Member has a psychiatric disability that substantially limits one or more of the major life activities of such individual—such as thinking, concentrating, interacting with others, caring for oneself, working, and remembering and processing information—as defined under the ADA, 42 U.S.C. § 12102(2) and 28 C.F.R. § 35.104.

156.    Each Class Member is a "qualified individual with a disability" as defined under the ADA, 42 U.S.C. § 12131(2) and 28 C.F.R. § 35.104, as an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the defendants.

157.    Defendants discriminate against Class Members by failing to make reasonable modifications for disabled individuals with psychiatric disabilities, which denies or will deny such individuals an equal opportunity to access and participate in various programs and services of the Parole Program, as administered by the defendants, in violation of Title II of the

49

ADA and its implementing regulations, 42 U.S.C. § 12132 and 28 C.F.R. § 35.130(b)(7), as
follows:

      a.      The failure of defendants DOP, Acting Commissioner Alexander,
OMH and Acting Commissioner Hogan to provide pre-release planning to
provide for appropriate mental health services to each Class Member so he or she
may access the services, programs, and activities of the Parole Program places
Class Members at increased risk of violating the terms and conditions of the
Parole Program, and violates Class Members' rights protected under the ADA.

      b.      The failure of defendants DOP, Acting Commissioner Alexander,
OMH, Acting Commissioner Hogan, DOH, Commissioner Daines, OTDA,
Acting Commissioner Hansell, DOHMH, Commissioner Frieden, HRA and
Commissioner Doar to assist each Class Member so they can receive public
benefits to which they are entitled (including Temporary Assistance, Food
Stamps, Medicaid and SSI) immediately upon release and use them to obtain
medication and other basic necessities and have access to the services, programs
and activities of the Parole Program places Class Members at increased risk of
violating the terms and conditions of the Parole Program and violates Class
Members' rights protected under the ADA.

      c.      The policy and practice of defendants DOP, Acting Commissioner
Alexander, OMH and Acting Commissioner Hogan of discharging individuals
with psychiatric disabilities under parole supervision to homeless shelters without
appropriate mental health services places Class Members at an increased risk of

50

violating the Parole Program and violates Class Members' rights protected under
the ADA.

d.     The failure of all defendants to adequately train and supervise their
employees and agents to recognize and accommodate individuals with psychiatric
disabilities who are released to parole supervision violates Class Members' rights
protected under the ADA.

e.     Due to defendants' failure to provide reasonable modifications to
address Class Members' disabilities, Class Members face a significantly increased
risk of being unable, by reason of their psychiatric disabilities, to conform their
conduct to the rules and conditions imposed by the Parole Program for their
release.

158.    Defendants OMH, Acting Commissioner Hogan, DOH, Commissioner
Daines, OTDA, Acting Commissioner Hansell, DOHMH, Commissioner Frieden, HRA and
Commissioner Doar discriminate against Class Members by failing to provide reasonable
modifications necessary for Class Members to apply for, successfully obtain, and maintain
eligibility for the programs and services of Temporary Assistance, Food Stamps, and Medicaid,
in violation of the ADA.

159.    All defendants discriminate against Class Members by:

a.     failing to afford Class Members the benefits and services of the
Parole Program in a manner that is equal to others; and failing to provide Class
Members with these benefits and services in a manner that is as effective in
affording equal opportunity to obtain the same result, gain the same benefit and

51

reach the same level of achievement as that provided to others, in violation of 28

C.F.R. § 35.130(b)(1)(ii)-(iii); and

b.     using methods of administration that subject Class Members to

discrimination in violation of 28 C.F.R. § 35.130(b)(3)(i)-(iii) and (b)(8).

## SECOND CAUSE OF ACTION

(For discrimination under Section 504 of the Rehabilitation Act by all defendants.)

160.    Defendants are recipients, or agents of recipients, of "federal financial

assistance", as defined by Section 504 of the Rehabilitation Act and the implementing

regulations promulgated by the U.S. Department of Justice, the U.S. Department of Health and

Human Services, and the U.S. Department of Agriculture, thereby rendering them subject to

Section 504. 29 U.S.C. § 794(b)(1); 28 C.F.R. § 41.3(d), (e); 45 C.F.R. § 84.3(f), (h); 7 C.F.R.

§ 15b.3(f), (g).

161.    Each Class Member has a psychiatric disability that substantially limits

one or more of the major life activities of such individual—such as thinking, concentrating,

interacting with others, caring for oneself, working, and remembering and processing

information—as defined under Section 504 of the Rehabilitation Act, 29 U.S.C. § 705(9)(B),

(20)(B).

162.    Each Class Member meets the essential eligibility requirements for the

receipt of services and is therefore a "qualified handicapped person", as that term is defined in

regulations implementing Section 504. 28 C.F.R. § 41.32; 45 C.F.R. § 84.3(l); 7 C.F.R.

§ 15b.3(n)(4).

163.    Defendants discriminate against Class Members by failing to make

reasonable modifications for disabled individuals with psychiatric disabilities, which denies or

52

will deny such individuals an equal opportunity to access and participate in various programs and services of the Parole Program, as administered by the defendants, in violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 28 C.F.R. §§ 41.51 and 41.56, as follows:

        a.     The failure of defendants DOP, Acting Commissioner Alexander, OMH and Acting Commissioner Hogan to provide pre-release planning to provide for appropriate mental health services to each Class Member so he or she may access the services, programs, and activities of the Parole Program places Class Members at increased risk of violating the terms and conditions of the Parole Program, and violates Class Members' rights protected under Section 504 of the Rehabilitation Act.

        b.     The failure of defendants DOP, Acting Commissioner Alexander, OMH, Acting Commissioner Hogan, DOH, Commissioner Daines, OTDA, Acting Commissioner Hansell, DOHMH, Commissioner Frieden, HRA and Commissioner Doar to assist each Class Member so they can receive public benefits to which they are entitled (including Temporary Assistance, Food Stamps, Medicaid and SSI) immediately upon release and use them to obtain medication and other basic necessities and have access to the services, programs and activities of the Parole Program places Class Members at increased risk of violating the terms and conditions of the Parole Program and violates Class Members' rights protected under Section 504 of the Rehabilitation Act.

        c.     The policy and practice of defendants DOP, Acting Commissioner Alexander, OMH and Acting Commissioner Hogan of discharging individuals

53

with psychiatric disabilities under parole supervision to homeless shelters without appropriate mental health services places Class Members at an increased risk of violating the Parole Program and violates Class Members' rights protected under Section 504 of the Rehabilitation Act.

d.     The failure of all defendants to adequately train and supervise their employees and agents to recognize and accommodate individuals with psychiatric disabilities who are released to parole supervision violates Class Members' rights protected under Section 504 of the Rehabilitation Act.

e.     Due to defendants' failure to provide reasonable modifications to address Class Members' disabilities, Class Members face a significantly increased risk of being unable, by reason of their psychiatric disabilities, to conform their conduct to the rules and conditions imposed by the Parole Program for their release.

164.     Defendants OMH, Acting Commissioner Hogan, DOH, Commissioner Daines, OTDA, Acting Commissioner Hansell, DOHMH, Commissioner Frieden, HRA and Commissioner Doar discriminate against Class Members by failing to provide reasonable modifications necessary for Class Members to apply for, successfully obtain, and maintain eligibility for the programs and services of Temporary Assistance, Food Stamps, and Medicaid, in violation of Section 504 of the Rehabilitation Act and its implementing regulations, 29 U.S.C. § 794(a) and 28 C.F.R. §§ 41.51 and 41.56.

165.     All defendants discriminate against Class Members by:

a.     failing to afford Class Members the benefits and services of the Parole Program in a manner that is equal to others; and failing to provide Class

54

Members with these benefits and services in a manner that is as effective in

affording equal opportunity to obtain the same result, gain the same benefit and

reach the same level of achievement as that provided to others, in violation of

28 C.F.R. § 41.51(b)(1)(ii)-(iii); 45 C.F.R. § 84.4(b)(2) and (b)(1)(ii)-(iii); 7

C.F.R. § 15b.4(b)(4)(i)-(iii); and

      b.     using methods of administration that subject Class Members to

discrimination in violation of 28 C.F.R. § 41.51(b)(3)(i)-(iii).

### THIRD CAUSE OF ACTION

(For violation of the Medicaid Act, actionable under 42 U.S.C. § 1983,
by defendants DOH, Commissioner Daines, HRA and Commissioner Doar.)

     166.    Defendants DOH and Commissioner Daines, acting under color of state

law, are responsible for the administration of Medicaid in the State of New York, through a State

plan for medical assistance.

     167.    Defendants HRA and Commissioner Doar, acting under color of state law,

are responsible for the administration of Medicaid in the City of New York, through a State plan

for medical assistance.

     168.   42 U.S.C. § 1396a(a)(8) of the Medicaid Act states, "A State plan for

medical assistance must . . . provide that all individuals wishing to make application for medical

assistance under the plan shall have opportunity to do so, and that such assistance shall be

furnished with reasonable promptness to all eligible individuals."

     169.    Defendants DOH, Commissioner Daines, HRA and Commissioner Doar

fail to provide Class Members the ability and opportunity to apply for medical assistance and fail

to provide medical assistance with reasonable promptness, in that the abovementioned

defendants fail to permit Class Members to apply for Medicaid sufficiently in advance of their

release so that benefits are available upon their release, which deprives Class Members of their rights under 42 U.S.C. § 1396a(a)(8) and 42 C.F.R. § 435.906, actionable under 42 U.S.C. § 1983.

## FOURTH CAUSE OF ACTION

(For violation of the Food Stamp Act, actionable under 42 U.S.C. § 1983, by defendants OTDA, Acting Commissioner Hansell, HRA and Commissioner Doar.)

170.    Defendants OTDA and Acting Commissioner Hansell, acting under color of state law, are responsible for the administration of Food Stamps in the State of New York through the food stamp program authorized by the Food Stamp Act.

171.    Defendants HRA and Commissioner Doar, acting under color of state law, are responsible for the administration of Medicaid in the City of New York through the food stamp program authorized by the Food Stamp Act.

172.    7 U.S.C. § 2020(e)(2)(B)(i) of the Food Stamp Act provides that a state agency "shall establish procedures" that "provide timely, accurate, and fair service to applicants for, and participants in, the food stamp program".

173.    7 U.S.C. § 2020(e)(3) of the Food Stamp Act provides that under a proper state plan of operation, a state agency shall "promptly determine the eligibility of each applicant household" in order to "complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application".

174.    Defendants OTDA, Acting Commissioner Hansell, HRA and Commissioner Doar have failed to establish procedures that provide timely, accurate and fair service to applicants for, and participants in, the food stamp program and are not promptly determining the eligibility for Food Stamps of each applicant household, in that abovementioned

56

defendants fail to permit Class Members to apply for Food Stamps sufficiently in advance of their release so that benefits are available upon their release, which deprives Class Members of their rights under the Food Stamp Act, 7 U.S.C. § 2020(e)(2)(B)(i) and (e)(3), actionable under 42 U.S.C. § 1983.

175. Defendants OTDA, Acting Commissioner Hansell, HRA and Commissioner Doar have failed to determine the eligibility of Class Members who have applied for Food Stamps on applications submitted in conjunction with the Medication Grant Program, which deprives Class Members of their rights under the Food Stamp Act, 7 U.S.C. § 2020(e)(2)(B)(i) and (e)(3), actionable under 42 U.S.C. § 1983.

### FIFTH CAUSE OF ACTION

(For Breach of contract by defendants DOP and Acting Commissioner Alexander.)

176. Defendant DOP is a party to an existing contract with SSA.

177. 42 U.S.C. § 1383(m) of the Social Security Act directs that "The Commissioner of Social Security shall develop a system under which an individual can apply for supplemental security income benefits under this subchapter prior to the discharge or release of the individual from a public institution."

178. SSA has issued system instructions that establish SSA's pre-release program, which provides that SSA will "actively pursue pre-release agreements with all appropriate institutions" to facilitate pre-release submission of SSI applications for individuals in public institutions, such as State prisons.

179. Defendant DOP is a party to an existing pre-release agreement with SSA which has been entered into for the benefit of "inmates of State correctional facilities who are to be released to supervision by DOP", such as Class Members. The purpose of this contract is "to

57

provide a guarantee of financial help for those who are released to the community", to "ensure

that Title XIX Medicaid eligibility is established as quickly as possible" and to "ensure

continuity of medical care upon release to the community".

180.    The benefit to Class Members from this contract between SSA and DOP is

immediate rather than incidental.

181.    This claim involves financial obligations and important interests of the

United States, in that the SSI program is administered by SSA, a federal agency, and SSI benefits

are federally funded.

182.    Under the terms of the contract, DOP is required to review the income,

resources and disability of parole-eligible prisoners for potential SSI eligibility and obtain

medical evidence and submit applications for potentially eligible SSI candidates beginning 120

days from a prisoner's expected release onto parole.

183.    Defendants DOP and Acting Commissioner Alexander have breached

DOP's contractual obligations by failing to review the income, resources and disability of parole-

eligible prisoners for potential SSI eligibility and obtain medical evidence and submit

applications for potentially eligible SSI candidates. This breach directly affects Class Members

and entitles them to relief as third-party beneficiaries to the contract.

## SIXTH CAUSE OF ACTION

(For violation of the Due Process Clause of the United States Constitution, actionable under
42 U.S.C. § 1983, by all defendants.)

184.    Defendants DOP, Acting Commissioner Alexander, OMH, Acting

Commissioner Hogan, DOH, Commissioner Daines, OTDA, Acting Commissioner Hansell,

DOHMH, Commissioner Frieden, HRA and Commissioner Doar, acting under the color of state

law, have violated and continue to violate the property rights of all Class Members guaranteed by

58

the Due Process Clause of the Fourteenth Amendment to the United States Constitution by

erroneously informing Class Members that they may not apply for public benefits prior to their

release from New York State prisons, actionable under 42 U.S.C. § 1983.

## STATE LAW CAUSES OF ACTION

### SEVENTH CAUSE OF ACTION

(For violations of N.Y. Soc. Serv. Law § 331 and 18 N.Y.C.R.R. § 303.1(a) and (b) by
defendants HRA and Commissioner Doar.)

185.    Defendants HRA and Commissioner Doar are responsible for the

administration of Medicaid, Temporary Assistance and Food Stamps in the City of New York.

186.    Class Members are "handicapped" within the meaning of N.Y. Soc. Serv.

Law § 331(3) and 18 N.Y.C.R.R. § 303.1(a) and (b).

187.    The failure of defendants HRA and Commissioner Doar to provide

reasonable modifications necessary for Class Members to apply for, successfully obtain, and

maintain eligibility for the programs and services of Medicaid, Temporary Assistance and Food

Stamps, discriminates against Class Members on the basis of their handicap in violation of Class

Members' rights under N.Y. Soc. Serv. Law § 331 and 18 N.Y.C.R.R. § 303.1(a) and (b).

### EIGHTH CAUSE OF ACTION

(For violation of the New York State Human Rights Law by defendants DOHMH,
Commissioner Frieden, HRA and Commissioner Doar.)

188.    Defendants DOHMH, Commissioner Frieden, HRA and Commissioner

Doar are each a "person" subject to N.Y. Exec. Law § 296(2)(a) in that they are providers of a

"place of public accommodation" pursuant to N.Y. Exec. Law § 292(9).

189.    Class Members have a disability within the meaning of N.Y. Exec. Law

§ 292(21).

190.    Defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar, by refusing, withholding from or denying Class Members accommodations, advantages, facilities or privileges because of their disabilities, discriminate against Class Members in violation of Class Members' rights under N.Y. Exec. Law § 296(2)(a), enforceable under N.Y. Exec. Law § 297(9).

### NINTH CAUSE OF ACTION

(For violation of the New York City Human Rights Law by defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar.)

191.    Defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar are each a "person" subject to N.Y.C. Administrative Code § 8-107(4)(a) in that they are "providers of public accommodation" pursuant to N.Y.C. Administrative Code § 8-102(9).

192.    Class Members have a disability within the meaning of N.Y.C. Administrative Code § 8-102(16).

193.    Defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar, by refusing, withholding from or denying Class Members accommodations, advantages, facilities or privileges because of their disabilities, discriminate against Class Members in violation of Class Members' rights under N.Y.C. Administrative Code § 8-107(4)(a), enforceable under N.Y.C. Administrative Code § 8-502(a).

### TENTH CAUSE OF ACTION

(For violation of N.Y. Soc. Serv. Law §§ 366(1) and 366-a(1), Kendra's Law, and implementing regulations of each by defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar.)

194.    Defendants HRA and Commissioner Doar are responsible for the administration of Medicaid in the City of New York, through a State plan for medical assistance.

60

Defendants DOHMH and Commissioner Frieden are responsible for the timely submission of

Medicaid applications for State prisoners who will be released to New York City pursuant to

Kendra's Law, 1999 N.Y. Laws, ch. 408, § 15, OTDA Admin. Dir. 03 ADM 06 (July 3, 2003),

and DOH Local Commissioners Mem. 00 OMM LCM-4 (Sept. 1, 2000).

195.    Defendants DOHMH and Frieden are responsible for accepting

applications for Medicaid submitted on behalf of prisoners and forwarding them with supporting

documentation to HRA; deciding how the immediate needs of Class Members for Medicaid will

be identified and addressed once they are released from prison; and submitting a plan to OMH

detailing, among other things, the process by which the timely filing of Medicaid applications by

Class Members is to be performed and the coordination of applications for Temporary

Assistance and Food Stamps.

196.    The failure of defendants HRA and Commissioner Doar to provide for

submission of Medicaid applications sufficiently in advance of Class Members' release so that

benefits are available upon their release, and to meet the immediate needs of Class Members for

Medicaid while their applications are being processed, violates Class Members rights under N.Y.

Soc. Serv. Law §§ 366(1) and 366-a(1), and 18 N.Y.C.R.R. § 350.3(a) and (b).

197.    The failure of defendants DOHMH and Commissioner Frieden to provide

for submission of Medicaid applications sufficiently in advance of Class Members' release so

that benefits are available upon their release, and to meet the immediate needs of Class Members

for Medicaid while their applications are being processed, violates Class Members' rights under

Kendra's Law, 1999 N.Y. Laws, ch. 408, § 15, OTDA Admin. Dir. 03 ADM 06 (July 3, 2003),

and DOH Local Commissioners Mem. 00 OMM LCM-4 (Sept. 1, 2000).

## ELEVENTH CAUSE OF ACTION

(Violation of N.Y. Soc. Serv. Law § 95(3)(a) and implementing regulations
by HRA and Commissioner Doar.)

198.    Defendants HRA and Commissioner Doar are responsible for the

administration of Food Stamps in the City of New York.

199.    The failure of defendants HRA and Commissioner Doar to permit Class

Members to apply for Food Stamps sufficiently in advance of their release so that benefits are

available upon their release, to determine the eligibility of Class Members who have applied for

Food Stamps on applications submitted in conjunction with the Medication Grant Program, and

to meet the immediate needs of Class Members for emergency Food Stamps while their

applications are being processed violates Class Members' rights under N.Y. Soc. Serv. Law

§ 95(3)(a) and 18 N.Y.C.R.R. § 387.5.

## TWELFTH CAUSE OF ACTION

(For violations of N.Y. Soc. Serv. Law §§ 131, 132 and 133 and implementing regulations by
HRA and Commissioner Doar.)

200.    Defendants HRA and Commissioner Doar are responsible for the

administration of Temporary Assistance and the submission and processing of applications for

benefits in the City of New York.

201.    The failure of defendants HRA and Commissioner Doar to permit Class

Members to apply for Temporary Assistance sufficiently in advance of their release so that

benefits are available upon their release, to determine the eligibility of Class Members who have

applied for Temporary Assistance on applications submitted in conjunction with the Medication

Grant Program, and to meet the immediate needs of Class Members for Temporary Assistance

62

while their applications are being processed violates Class Members' rights under N.Y. Soc. Serv. Law §§ 131(1) and (2), 132 and 133, and 18 N.Y.C.R.R. §§ 350.3(a) and (b) and 387.2(o).

## THIRTEENTH CAUSE OF ACTION

(For breach of contract by defendants DOHMH and Commissioner Frieden.)

202.   The following allegation is likely to have further evidentiary support after a reasonable opportunity for further investigation: Upon information and belief, Defendant DOHMH is a party to an existing contract with HRA.

203.   The contract has been entered into for the benefit of individuals, such as Class Members, who require medication to treat psychiatric disabilities upon being released from State and local correctional facilities.

204.   The benefit to Class Members from this contract between DOHMH and HRA is immediate rather than incidental.

205.   In or around December 2000, DOHMH (then New York City Department of Mental Health, Mental Retardation and Alcoholism Services) entered into an agreement with HRA entitled "Medication Grant Program Plan". Under the terms of the agreement, DOHMH is required to accept applications of prisoners for Medicaid, Temporary Assistance and Food Stamps that it receives from prisons prior to the prisoners' release, and then to forward the applications to HRA.

206.   On or around July 3, 2003, OTDA issued Administrative Directive 03 ADM 6, entitled "Medication Grant Program (MGP) — The Need for Cooperation and Coordination Between Local Departments of Social Services and Mental Hygiene", which instructs local Departments of Social Services and local Departments of Mental Hygiene to develop and follow the procedures set forth in the Model Memorandum of Understanding

(MOU) in Attachment 1 of the directive. The procedures set forth in the MOU require the local

Departments of Mental Hygiene (DOHMH in New York City) to designate staff to interview

applicants to the MGP who reside in prisons and are in need of medications to treat mental

illness; to require that the designated staff provide the MGP applicant with applications for

Medicaid, Temporary Assistance and Food Stamps; to require that the designated staff obtain as

much documentation as possible of all statements on the applications and assist the applicant as

needed with securing missing documentation; to consider the applicant's immediate needs based

on the applicant's expected situation in the community upon release; and to forward the

applications to the local Departments of Social Services (HRA in New York City) in an

expedited manner.

      207.    DOHMH fails to designate staff to interview applicants to the MGP who

reside in prisons and are in need of medications to treat mental illness; fails to require that the

designated staff provide the MGP applicant with applications for Medicaid, Temporary

Assistance and Food Stamps; fails to require that the designated staff obtain as much

documentation as possible of all statements on the applications and assist the applicant as needed

with securing missing documentation; fails to consider the applicant's immediate needs based on

the applicant's expected situation in the community upon release; and fails to forward the

applications to HRA in an expedited manner.

      208.    These failures of defendants DOHMH and Commissioner Frienden

constitute a breach of DOHMH's obligations under its contract with HRA concerning pre-release

benefits applications. This breach directly affects Class Members and entitles them to relief as

third-party beneficiaries to the contract.

## FOURTEENTH CAUSE OF ACTION

(For violation of the Due Process Clause of the New York State Constitution by defendants
DOHMH, Commissioner Frieden, HRA and Commissioner Doar.)

209.    DOHMH, Commissioner Frieden, Defendants HRA and Commissioner

Doar have violated and continue to violate the property rights of all Class Members guaranteed

by the Due Process Clause of Article I, § 6 of the New York State Constitution by erroneously

informing Class Members that they may not apply for public benefits prior to their release from

New York State prisons.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs request that the Court:

210.    Certify a plaintiff class pursuant to Fed. R. Civ. P. 23(b)(1) and (b)(2).

211.    Adjudge and declare that the policies, practices, omissions and conditions

described above are in violation of the rights of Class Members under the Americans with

Disabilities Act, Section 504 of the Rehabilitation Act, the Medicaid Act, the Food Stamp Act,

the Due Process Clause of the United States and New York State Constitutions, the New York

State Social Services Law, Kendra's Law, and the New York State and New York City Human

Rights Laws.

212.    Declare that the continuing failure of all defendants to provide reasonable

modifications for the disabilities of Class Members violates the ADA.

213.    Declare that the continuing failure of all defendants to provide reasonable

modifications for the disabilities of Class Members violates Section 504 of the Rehabilitation

Act.

214. Declare that the continuing failure of all defendants to provide their employees and agents with the appropriate information, training, procedures, and supervision violates the ADA and Section 504 of the Rehabilitation Act.

215. Declare that the continuing failure of defendants DOH, Commissioner Daines, HRA and Commissioner Doar to permit Class Members to apply for Medicaid sufficiently in advance of their release so that benefits are available upon their release violates the Medicaid Act.

216. Declare that the continuing failure of defendants OTDA, Acting Commissioner Hansell, HRA and Commissioner Doar to permit Class Members to apply for Food Stamps sufficiently in advance of their release and/or to process Class Members' applications so that benefits are available upon their release violates the Food Stamp Act.

217. Declare that the continuing failure of defendants DOP and Acting Commissioner Alexander to review the income, resources and disability of parole-eligible prisoners for potential SSI eligibility and obtain medical evidence and submit applications for potentially eligible SSI candidates is a breach of DOP's contract with SSA, to which Class Members are third-party beneficiaries.

218. Declare that the misinforming by defendants DOP, Acting Commissioner Alexander, OMH, Acting Commissioner Hogan, DOH, Commissioner Daines, OTDA, Acting Commissioner Hansell, DOHMH, Commissioner Frieden, HRA and Commissioner Doar of Class Members that they may not apply for public benefits prior to their release from State prisons violates the Due Process Clause of the United States and New York State Constitutions.

219. Declare that the continuing failure of defendants DOHMH, Commissioner Frieden, HRA and Commissioner Doar to provide Class Members with reasonable

66

accommodations for their disabilities discriminates against Class Members in violation of the

New York State and New York City Human Rights Laws and New York Social Services Law

and implementing regulations.

220.    Declare that the continuing failure of defendants DOHMH, Commissioner

Frieden, HRA and Commissioner Doar to accept and/or process pre-release applications for

Medicaid, Temporary Assistance and Food Stamps violates the New York Social Services Law,

implementing regulations and Kendra's Law.

221.    Declare that the continuing failure of defendants DOHMH and

Commissioner Frieden to provide for the pre-release submission of applications for benefits for

Class Members breaches DOHMH's contract with HRA, to which Class Members are third-party

beneficiaries.

222.    Enjoin the defendants, their successors, agents, servants, employees, and

all those in active concert or participation with them from further:

    a.    failure to provide reasonable modifications for the disabilities of

Class Members to enable them to participate in various programs and services of

the Parole Program, and the programs of public assistance, Medicaid and food

stamps;

    b.    failure to provide their employees and agents with the appropriate

information, training, procedures to provide appropriate pre-release planning for

Class Members;

    c.    failure to assist Class Members with pre-release application for

Food Stamps, Medicaid, Public Assistance, and Social Security disability benefits

and to process the applications for these benefits; and

67

       d.      using methods of administration that subject class members to discrimination; and

require defendants to formulate a remedy, subject to the Court's approval and modification, if necessary to end those practices.

      223.    Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein no longer exist and this Court is satisfied that they will not recur.

      224.    Award plaintiffs a reasonable attorney's fee, including litigation expenses, and costs pursuant to 42 U.S.C. § 12205 and 28 C.F.R. § 35.175 (for claims arising under the ADA); 29 U.S.C. § 794a (for claims arising under the Rehabilitation Act of 1973); 42 U.S.C. § 1988 (for all other federal statutory claims); N.Y. C.P.L.R. Art. 86 (for pendent claims arising under state law); and N.Y.C. Admin. Code § 8-502(f) (for pendent claims arising under the New York City Human Rights Law).

225.   Grant and award such other and further relief as this Court deems just and

proper.

Dated: New York, New York
       February 22, 2007

Respectfully submitted,

THE LEGAL AID SOCIETY,
Steven Banks, Attorney-in-Chief (SB 0987)
Adriene L. Holder, Attorney-in-Charge, Civil
   Practice (ALH 1872)
Scott A. Rosenberg, Attorney-in-Charge, Law
   Reform, Civil Practice (SAR 5579)
John Boston, Project Director, Prisoners' Rights
   Project (JB 5511)
Betsy Ginsberg, of Counsel (BG 9890)
Kathleen M. Kelleher, of Counsel (KK 0598)
Kenneth Stephens, of Counsel (KS 7914)
199 Water Street, 3rd Floor
New York, NY 10038
(212) 577-3300

URBAN JUSTICE CENTER,
Jennifer J. Parish (JP 0604)
666 Broadway, 10th Floor
New York, NY 10012
(646) 602-5600

CRAVATH, SWAINE & MOORE LLP,

by

Antony L. Ryan (AR 0394)
Chelsea W. Teachout (CT 8148)
Michael P. Zulandt (Application Pending)
Josef M. Klazen (Application Pending)
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000

69

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY

-------------------------------------------------------------------------X

THE STATE OF NEW YORK, THE NEW YORK     :        Case No.: _____
STATE DEPARTMENT OF CORRECTIONAL
SERVICES, and THE NEW YORK STATE DIVISION :
OF PAROLE,

                                    :

                  Plaintiffs,

                                             **AFFIRMATION OF**
                                             **TERRENCE X. TRACY**

       -against-                             :

MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON
and MALCOLM CARTER,                        :
*individually and on behalf of all others similarly situated*

                                 :

                        Defendants.

-------------------------------------------------------------------------X

THE STATE OF NEW YORK,
COUNTY OF ALBANY:

        TERRENCE X. TRACY, an attorney duly admitted to practice in the courts of the

State of New York, affirms that the following statements are true under the penalties of

perjury:

        1. I currently serve as Counsel to the New York State Division of Parole (the

"Division" or "Parole").

        2. In June 1996, I commenced my employment with the Division as an Associate

Counsel and in December 1996, was appointed to my current position.

        3. Among my duties, I am responsible for the provision of all the legal services that

affect the day-to-day operation of the Division, an agency which supervises approximately

43,000 felony offenders who have been released from State prison (hereinafter

"releasees") through presumptive release, the discretionary grant of parole, conditional

release or release to serve a period of post-release supervision. The Division employs a workforce of approximately 2,200 individuals and has a combined annual operations and capital budget that amounts to approximately $ 225,000,000. The Division's principal office is located at 97 Central Avenue, Albany, New York 12206.

4.   I make this affirmation in the paramount interests of the safety and security for the citizens of the State of New York, and in support of an application, through an Order To Show Cause, for a temporary restraining order and preliminary injunction authorizing the Division and the New York State Department of Correctional Services (hereinafter "DOCS") to address in a systematic and orderly manner the retention in or release from DOCS' custody or the Division's jurisdiction certain classes of individuals either in State custody by incarceration or under supervision in the community solely as a result of the terms and conditions of their post-release supervision ("PRS"), such classes being individuals affected by two recent decisions of the New York State Court of Appeals.

5.   I have reviewed the recent New York State Court of Appeals decision in Matter of Garner v. New York State Dept. Of Correctional Services, 2008 NY Slip Op 03947, 2008 N.Y. LEXIS 1051 (April 29, 2008) which held that DOCS was prohibited from administratively calculating into an inmate's criminal sentence the period of PRS that attaches to their determinate sentence, even though PRS is a statutorily mandated component of a determinate sentence, (see Penal Law § 70.45[1]), and that PRS can only be part of a criminal defendant's sentence when pronounced by the sentencing judge in open court before the defendant.

6.   The decision in Garner bears upon the Division's supervision of releasees who may not have had a period of PRS pronounced as required at their sentencing

2

proceedings, but whose sentences, as calculated by DOCS, did include the mandatory period of PRS prescribed by Penal Law §70.45.

7. The Court of Appeals, moreover, noted in Garner that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." Id. at \*\*8, n. 4. Plainly there are important issues as to whether affected parolees may and should be resentenced.

8. I have also reviewed the decision that the Court of Appeals issued the same day as Garner in a group of cases combined under the lead caption of People v. Sparber, 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053 (April 29, 2008), which addressed issues associated with the manner by which sentences should be remedied where the period of PRS was not pronounced by the sentencing courts. Most noteworthy for the purpose of this action and the attendant request for injunctive relief is the Court of Appeals' ruling that although "the procedure through which PRS was imposed upon these defendants was flawed as it did not comply with the statutory mandate[,] . . . [t]o remedy this error, rather than striking PRS from the sentences... as urged by defendants, these matters must be remitted to Supreme Court for resentencing and the proper judicial pronouncement of the relevant PRS terms." Id. at \*\*2.

9. In order to give effect to sentencing principles established by the Court of Appeals through the aforementioned decisions, the Division has joined in a major initiative, which has included the participation of DOCS, the Office of the Governor of the State of New York, the Office of Court Administration ("OCA"), and the Division of Criminal Justice Services ("DCJS"), dedicated to identifying the scope of the issues created by the Garner

3

and Sparber decisions and implementing a system that will resolve the myriad issues as fairly and expeditiously as practicable.

10.  After the Court of Appeals issued its decisions in the Garner and Sparber cases, the Division immediately formed a task force charged with the task of identifying all releasees who are currently being supervised by the Division although their commitment orders did not specify a period of PRS.

11.  It appears that the Court of Appeals' decisions could affect as many as 18,000 releasees and could have a significant adverse impact on public safety if the issues they present to both DOCS and the Division, as well as the other State, county and municipal agencies, are not resolved through a careful, methodical process that is expeditious and yet deliberate.

## THE DIVISION'S PRACTICES REGARDING PRS

12.  DOCS is the State agency charged with the lawful responsibility for calculating the maximum expiration dates of all felony offenders remanded to its custody who are subsequently released to the Division at some point in the continuum of their sentence. All of the time computations associated with a State inmate's sentence that are calculated by DOCS are stored on its mainframe, an electronic database to which the Division and its employees have access. Apart from simply having access to this database, there is a daily exchange of data between the two agencies so that information generated by DOCS is transferred over to a separate database maintained by the Division. With this information, Division staff is apprised of an inmate's computed release date, maximum expiration date, and for the purpose of this action, the period of PRS.

4

13. When an inmate is scheduled to be released from DOCS' custody to the jurisdiction of the Division, whether through conditional release, PRS or any other kind of release, e.g., parole, that inmate must first meet with the Facility Parole Officer who is employed at the releasing correctional facility to discuss their release plan and conditions of release.

14. All releasees sign a *Certificate of Release to Parole Supervision*, which sets forth the conditions that will govern their supervision while serving PRS, provides reporting instructions, and confirms the approved residence. See Penal Law §§70.40(1)(b); 70.45(3); Executive Law §259-c(2).

15. Once released to PRS, the releasee will be under the Division's jurisdiction, (see Executive Law §259-i[2][b]), and is required to report to their Parole Officer within 24 hours; at each subsequent meeting, the releasee is given instructions as to their next report date. It is virtually impossible for the Division to execute its responsibilities under Article 12-B of the Executive Law and effectively supervise a released felony offender within the community unless appropriate residence and reporting instructions are approved and followed.

16. When a Parole Officer suspects that a parolee has violated the conditions of release in an important respect, parole revocation proceedings are commenced pursuant to Executive Law §259-i(3). Upon the completion of the parole revocation hearing process, where any parole violation charges are sustained, some releasees are returned to DOCS custody for a certain duration of time determined by one of the Division's Administrative Law Judges or a member of the Board of Parole pursuant to 9 N.Y.C.R.R. §8005.20. Other releasees may be released again to continued supervision by the Division. The

5

Administrative Law Judges who preside over parole revocation proceedings draw their jurisdiction from Executive Law §§259-d and 259-i(3); they do not inquire into the legality of the parolee's underlying sentence.

17.    Because DOCS is the State agency charged with the responsibility for calculating the maximum expiration dates of all releasees, the Division continues to supervise each releasee until the maximum expiration date, as determined by DOCS, is reached. See Executive Law §259-i(2)(b).

18.    The Division maintains centralized files at its office located at 97 Central Avenue in Albany, N.Y. that contain the sentence and commitment papers of the releasees under its jurisdiction.    In addition, individual Parole Officers in the field offices throughout the State have copies of the sentence and commitment documents in the files they maintain for releasees under their supervision.    However, in nearly all of the above-described files that the Division maintains for those offenders who are currently serving a period of PRS, the Division lacks any court documentation beyond the sentence and commitment order, and is therefore, in no position to make an informed assessment of what transpired in connection with a releasee's sentencing.    In this regard, for most releasees, the Division cannot discern with any confidence whether the period of PRS was imposed in the manner prescribed by the Court of Appeals in Garner and Sparber.

19.    Given this limitation, coupled with the absence of any statutory authority to terminate a period of PRS, cf. Executive Law §259-j, the Division routinely continues to supervise a releasee who is serving a period of PRS until the maximum expiration date of the sentence, or until the releasee violates a condition of release.    Indeed, it has been the standard understanding and practice of the Division that it is without authority to terminate

6

its jurisdiction over a PRS releasee unless: (a) the maximum expiration date has passed; or (b) a court of competent jurisdiction orders the Division to terminate its jurisdiction over the releasee.

20. The recent decisions of the Court of Appeals, if given the most extreme interpretation - one that the Division submits would be unwarranted - could have the effect of requiring the immediate release of hundreds of returned PRS violators from DOCS' custody and the Division's cessation of PRS supervision for thousands of felony offenders, even though the Legislature mandated that periods of PRS be served as part of their determinate sentences.

22. A vast majority of the offenders who will be affected by Garner and Sparber decisions are violent felony offenders (Penal Law §70.02), and many are repeat violent felony offenders. I respectfully submit that in the interest of public safety it is crucial that this Court direct that the status quo be maintained until DOCS and the Division have had the opportunity to review the subjects' individual circumstances, and further, that the sentencing courts and the parties to the criminal cases had the opportunity to entertain the possible resentencing in the proper forum as envisioned by the Court of Appeals in Garner and Sparber. The impact on public safety could be irreparably severe if such offenders were immediately free of the State's jurisdiction with the State agencies and their local counterparts being effectively deprived of the opportunity to devise a fair, methodic and timely process to remedy PRS sentencing infirmities identified under Garner and Sparber just over one month ago. Recently, a releasee who had success in having his PRS vacated after prevailing on a habeas corpus petition filed in the Supreme Court, Bronx County, was released without further supervision by the Division, only to be arrested and

7

charged on May 9, 2008 with the murder of woman running a dry cleaning store in Brooklyn, New York. (See Manny Fernandez, Tears and Memories as Business Resumes at Dry Cleaners Where Woman was Killed, N.Y.Times, May 25, 2008, at A29; Scott Shifrel, Loophole Let Thug in Brooklyn Slay Go Free, N.Y. Daily News, May 21, 2008 at 24.) (Attached as Exhibits A and B.)

23. Accordingly, in conjunction with the other consulting State agencies, and in response to the Court of Appeals' decisions, the Division's task force has begun a sweeping review of all of its records pertaining to those releasees who are currently subject to a period of PRS. The Division has begun a screening process in an effort to discover the identities of all releasees whose periods of PRS may not have been established in accordance with Garner or Sparber. Once identified, the Division will be contacting the relevant sentencing courts and District Attorneys' offices by letter so that they have notice that the affected releasee may be appropriate for resentence consistent with the decisions of the Court of Appeals.

24. The Division is working diligently to identify all releasees who may belong to the defendant class as defined in the Complaint. As noted above, as many as 18,000 releasees may be affected in some way by the Sparber and Garner decisions, even though each class member has issues based upon unique circumstances that would require individual resolution before a sentencing court.

25. The Division believes that the Garner and Sparber decisions do not signal a call for immediate and precipitous release of inmates in custody or the termination of supervision if already in the community, for the Court of Appeals remands for resentencing in the Sparber cases, and notes the possibility of resentencing in Garner as well. Rather

8

than immediately ceasing to supervise all releasees whose terms of PRS may have Garner or Sparber-type infirmities, the plaintiffs believe that resorting to the sentencing courts within a reasonable time is appropriate to permit the criminal courts, with input from the District Attorney and defendant, the opportunity to correct errors in a sentence or otherwise pronounce what a defendant's sentence must encompass under applicable law while at the same time uphold the public's expectation for safety within its communities. Simply put, to no degree should public safety be jeopardized while the State of New York endeavors to give legal effect to the Court of Appeals' sweeping decisions rendered just over 30 days ago.

26. The Division is not a party to the criminal cases, and it does not have the capability to recalculate the sentence of any of the members of the defendant class. What the Division can do is alert the appropriate sentencing court and office of the District Attorney that there may be an infirmity with regard to the period of PRS and request that the parties to the criminal proceeding proceed with a resentencing if appropriate.

27. Time is required to coordinate this resentencing effort with the county courts, supreme courts and offices of the respective District Attorneys throughout the State.

28. This affirmation is made specifically in support of plaintiffs' application for an emergency order authorizing the Division to continue to supervise each member of the relevant defendant subclasses described until such time as either: (a) a subclass member has been considered by the sentencing court and resentenced, or not, in conformity with the law, in a forum in which the sentencing court has had a full opportunity to hear from the necessary parties to such resentencing, i.e., the District Attorney and the defendant; or (b) it has become clear that no such proceedings will be held before the sentencing court, and

9

it therefore makes sense for the matter to be resolved pursuant to a comprehensive plan to be submitted for this Court's approval.

29. The Division should not be forced to administratively determine which of its releasees are subject to lawfully-imposed terms of PRS, or may lawfully be resentenced to such terms. Those are questions that the courts can and should decide.

30. Given the above described circumstances, the Division requests that this Court grant an order maintaining the status quo which will allow the Division, consistent with public safety, to continue to supervise the members of the defendant class that are under its jurisdiction for a period of time within which the sentencing courts and District Attorneys' Offices can reasonably commence resentencing proceedings where appropriate.

31. Any precipitous order to release defendants who are ultimately determined not to be entitled to such relief could well result in irreparable harm to the people of the State of New York. On the other hand, it is important that releasees who may be entitled to be relieved from their obligation of continued supervision on PRS are granted that relief as soon as practicable. The process for determining these many cases should be expeditious but accurate.

32. Therefore, it is essential that a temporary restraining order be issued and that the preliminary injunction be brought on by an order to show cause in order for plaintiffs to address in a systematic and orderly manner the status of all of the inmates and parolees affected by the Garner and Sparber decisions.

WHEREFORE, it is respectfully requested that the relief requested be granted.

Dated: June 4, 2008

_____
Terrence X. Tracy

11

# EXHIBIT A

**The New York Times**
nytimes.com

PRINTER FRIENDLY FORMAT
SPONSORED BY 

May 25, 2008

# Tears and Memories as Business Resumes at Dry Cleaners Where Woman Was Killed

### By MANNY FERNANDEZ

Eden Dry Cleaners and Tailoring opened about 8:30 a.m. on Saturday. Kenneth Oh and a friend assisted the first customers. His younger brother, Daniel Oh, and some helpers arrived a few hours later.

Bouquets of flowers were pushed up against the window ledges, and there was still the thinnest of threads running through their mother's sewing machine. It was the first day that the shop, to which their mother had devoted her life, had been open for business since May 15. On May 16, she was found dead in the shop, killed in what the police said was a robbery.

The Ohs' mother, Kyung-Sook Woo, 62, came to the United States from Seoul, South Korea, in the early 1980s and doted on her two sons, her three grandchildren and her little shop called Eden. It sat on the quiet corner of 10th Avenue and Windsor Place in the Windsor Terrace neighborhood of Brooklyn.

Customers — some of whom had been bringing their clothes to her for more than a decade — said her favorite saying was "no problem." She was behind the counter six days a week, usually 12 hours a day, stitching, waving, laughing, talking. She was robbed at least twice when the store was at another location on Windsor Place, but still she kept going. When some customers would bring in their children, Mrs. Woo would step from behind the counter to hug them.

All day on Saturday, some of those same customers came into the store with tears in their eyes. Everyone knew the shopkeeper simply as Linda, and they all had a Linda story.

Before New York's presidential primary, Jackie Gavron, 48, asked Mrs. Woo if she could put a sign in the window in support of Senator Hillary Rodham Clinton; Mrs. Woo agreed, saying that she liked strong women. Jeremy Krevat, 37, was on his way to an interview for a sales job one day last year when he stopped in the store and Mrs. Woo noticed that he was missing a stay in his collar. "She just came over and put one in," he said. He got the job.

On Saturday, people entered the store somewhat timidly, awkwardly, many holding their pink and white claim slips. Grief is hard, and grief in the middle of a transaction over dress shirts is not any easier.

One man apologized for not having his ticket. "I never used to bring my ticket because she knew who I was," he said.

Another man spent several minutes with Kenneth Oh, searching the long racks behind the counter for a suit that he had dropped off for cleaning and alterations. The suit was soon discovered, and Mr. Oh, examining the cuffs of the pants, smiled.

"She did the work," he told the man. "All you got to do is iron. This is the last work she did."

Last Sunday, the police arrested Jamal Winter, 22, of nearby Park Slope and charged him with murder and robbery in the case. The police said they believe that Mrs. Woo was strangled the night before her body was found.

The day of the attack, she had asked a neighbor to chase away a man who had frightened her by hanging out in front of her shop all day, the neighbor said.

Kenneth Oh, 40, said the motive appeared to involve not money but a car. He said that he had bought his mother a 2008 Honda Accord for Mother's Day, and that the attacker may have had his eye on the car for days. The car, parked near the shop, was missing after the killing. It was found about a block and a half away from the suspect's residence, the police said.

The two brothers later read an article in The Daily News saying that Mr. Winter had served time for robbery and was out of jail at the time of Mrs. Woo's killing because of a legal technicality. They were outraged.

"I don't know why he was released," said Daniel Oh, 38, who owns a nail salon on Long Island.

There has been an outpouring of sympathy and shock in Windsor Terrace over the killing. On Thursday night, about 140 people filled the intersection outside the shop for a vigil.

John Maloney, a retired truck driver who has lived in the neighborhood for all his 67 years, referred to Mrs. Woo not as Linda but as Mom.

"Mom was part of the community," he said. She had operated the business in the neighborhood for 18 years.

Customers also worried about the fate of the store. Kenneth and Daniel Oh told them on Saturday that they would keep the shop open. "We're going to save this business," said Kenneth, a regional sales manager for an international cargo company. The brothers said they would close the store for the coming week, reopening on May 31.

A truck pulled up and parked on Saturday morning. Workers with shovels started digging, and another truck arrived shortly after. A tree was being planted, in memory of Mrs. Woo.

Copyright 2008 The New York Times Company

Privacy Policy ' Search | Corrections    RSS : | First Look .  Help ┆ Contact Us | Work for Us ┆ Site Map

# EXHIBIT B

# Loophole let thug in Brooklyn slay go free

BY SCOTT SHIFREL
DAILY NEWS STAFF WRITER

Wednesday, May 21st 2008, 4:00 AM

An ex-con charged with killing a beloved Brooklyn dry cleaning store owner was out of jail on the day of the incident because of a legal glitch, sources told the Daily News.

Jamal Winter, 22, was automatically placed on parole by the state Correction Department after completing a five-year sentence for a Poughkeepsie robbery. When he was arrested for a similar robbery in Brooklyn last June, the state Division of Parole ordered him held for a violation.

But a Bronx judge released him from Rikers Island in March on the technicality that the Poughkeepsie judge never specifically ordered parole.

"The court had no discretion," court spokesman David Bookstaver said.

As a result, Winter made $10,000 bail on the Brooklyn robbery and was free when he allegedly robbed and strangled Kyong-Sook Woo in her Windsor Terrace store on Thursday.

Defendants in similar cases were once given "indeterminate" sentences such as three to six years, released after three years, and automatically spent the remainder on parole.

But a change under then-Gov. George Pataki had defendants given "determinate" sentences, such as the five years Dutchess County Judge Thomas Dolan gave Winter in 2002 for robbing a woman and stealing her car.

But Dolan never mentioned parole, according to a court order signed by Bronx Supreme Court Justice Raymond Bruce, who ordered Winter "discharged" on March 6.

sshifrel@nydailynews.com

| | |
|---|---|
| **From:** | Michael Keane |
| **To:** | Biesty, Thomas; Brewster, Richard; Cohen, Leonard; Duffy, June; Meie... |
| **Date:** | 6/5/2008 11:11 AM |
| **Subject:** | Fwd: Gabriel v. Fischer |


>>> "Matthew D. Brinckerhoff" <mbrinckerhoff@ecbalaw.com> 6/4/2008 2:14 PM >>>
Michael,

I'm writing to follow up on the meeting Aaron Mysliwiec and I had with you last week Friday, May 30.

First, I would like to repeat plaintiffs request that defendants consult with us before they send any letters or proposed orders to judges concerning resentencing individuals who are not incarcerated and are past the expiration of their maximum determinate sentence date. Should defendants go through with this plan, as you said they intended to do, we believe that this will expose defendants to additional liability and damages. We thus would like an opportunity to convince defendants that, at minimum, it should be done in a way that protects plaintiffs' rights to the maximum degree possible.

Second, as we said on May 30, defendants should immediately suspend PRS for those who are not currently incarcerated pending the outcome of defendants' attempts to have the courts resentence them. While you made it plain that defendants would not do this voluntarily, we urged you to consider a path of minimal resistance given the legal reality defendants face. You indicate that you would consider this suggestion. Please let us know defendants' position on this matter as soon as possible.

Third, I want to reiterate that we simply do not understand how defendants can continue to issue and pursue arrest warrants for PRS violations when they know with absolute certainty that most, if not all, of those warrants are unjustified. We suggested that you have a duty to advise your clients that they are exposing themselves to additional liability for claims under the Fourth Amendment for false arrest and imprisonment. We have further asked that you consider dealing with this issue in the same manner as with PRS in general by vacating all warrants pending the completion of defendants' resentencing initiative. You said that you would think about this matter further. Please let us know defendants' position on this matter as soon as possible.

Absent some sort of plan or agreement, we intend to pursue aggresively the relief sought by our motion before Judge Stein.

Finally, during our conversation on May 30, you agreed to provide us with a copy of Parole's Post-Release Supervision Resentencing Initiative. We haven't received it yet and would appreciate a copy at your earliest convenience.

Thanks,
Matt


Matthew D. Brinckerhoff
Emery Celli Brinckerhoff & Abady LLP
75 Rockefeller Plaza, 20th Floor
New York, NY 10019
Tel: (212) 763-5000
Fax: (212) 763-5001
mbrinck@ecbalaw.com
www.ecbalaw.com

This electronic message transmission contains information from the law firm of Emery Celli Brinckerhoff & Abady LLP which may be confidential or privileged. The information is intended to be for the use of the individual or entity named above. If you are not the intended recipient, be aware that any disclosure, copying, distribution, or use of the contents of this information is prohibited. If you have received this electronic transmission in error, please notify us by telephone (212-763-5000) or by electronic mail (mbrinck@ecbalaw.com) immediately.