UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
LAWRENCE HARDY, RAMONE CROSS, and
SHAWN SMITH, individually and on behalf of all others          08 Civ. 2460 (SHS)
similarly situated,

Plaintiffs,

– against –

BRIAN FISCHER, in his capacity as Commissioner
of the New York State Department of Correctional
Services (DOCS), and in his individual capacity;
ANTHONY J. ANNUCCI, in his capacity as Deputy
Commissioner and Counsel for DOCS, and in his
individual capacity; LUCIEN J. LECLAIRE, JR., former
Acting Commissioner of DOCS, in his individual capacity;
GLENN S. GOORD, former Commissioner of DOCS,
in his individual capacity; and JOHN/JANE DOES 1-50
(DOCS Supervisory, Training, and Policy Personnel),

Defendants.
-------------------------------------------------------------------x

### REPLY DECLARATION OF MATTHEW D. BRINCKERHOFF IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

MATTHEW D. BRINCKERHOFF, an attorney admitted to practice before this

Court, declares under penalty of perjury as follows:

1.      I am a member of Emery Celli Brinckerhoff & Abady LLP ("ECBA"), co-counsel for

plaintiffs and the putative plaintiff class in this case.  I submit this reply declaration in further

support of plaintiffs' motion for class certification.  This declaration is made upon personal

knowledge, except where otherwise noted.

2.      Attached as Ex. 1 is a true and accurate copy of the Affirmation of Anthony J. Annucci,

dated June 4, 2008.

1

3.      Attached as Ex. 2 is a true and accurate copy of the sentencing transcript for plaintiff

Ramone Cross, dated May 24, 2002.

4.      I swear under penalty of perjury that the foregoing is true and correct.


Dated:  August 15, 2008
        New York, New York


                              _____/s/_____
                              MATTHEW D. BRINCKERHOFF

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ALBANY
-----------------------------------------------------------------------X

THE STATE OF NEW YORK, THE NEW YORK                        Case No.:

STATE DEPARTMENT OF CORRECTIONAL
SERVICES, and THE NEW YORK STATE DIVISION :
OF PAROLE,
                                                          :
                        Plaintiffs,                       **AFFIRMATION OF**
                                                          **ANTHONY J. ANNUCCI**
            -against-                                      :

MICHAEL MYERS, ROGER SMALLS, JESUS NEGRON:
and MALCOLM CARTER, individually and on behalf of all
others similarly situated,
                                                          :
                        Defendants.
-----------------------------------------------------------------------X

      ANTHONY J. ANNUCCI, an attorney duly admitted to practice in the courts of the

State of New York, affirms that the following statements are true under the penalties of

perjury:

      1.     I currently serve as Executive Deputy Commissioner of the New York State

Department of Correctional Services ("DOCS" or the "Department").

      2.     Between September 1, 1989 and October 1, 2007, I served as the

Department's Deputy Commissioner and Counsel.  I joined the Department in October of

1984 as Deputy Counsel.  From 1980 to 1984, I served as the law secretary to two Acting

Supreme Court Justices in Kings County, Criminal Term.

      3.     Among my duties, I am responsible for the provision of all the legal services

for the day-to-day operation of the New York State prison system, which consists of 69

correctional facilities, an inmate population numbering approximately 62,500, and a

1

workforce of about 31,600 employees.  The Department's combined annual operations and capital budget amounts to approximately $3 billion.  The Department's principal office is located at Building 2, 1220 Washington Avenue, Albany, New York 12226.

4.    I make this affirmation in the paramount interests of the safety and security of the citizens of the State of New York, and in support of an application, through an Order to Show Cause, for a temporary restraining order and preliminary injunction, authorizing the Department and the New York State Division of Parole ("Parole" or the "Division") to maintain on a temporary and limited basis, continued custody or supervision of certain classes of individuals, whose status is based solely on the terms and conditions of post-release supervision ("PRS") that was administratively added by the Department, in order to allow an orderly and systematic process whereby each of these cases can be referred to the appropriate sentencing court and district attorney in this state for possible resentencing, consistent with two recent decisions by the New York State Court of Appeals, or for whatever other action is deemed appropriate by the sentencing court.

## THE DEPARTMENT'S PRACTICE OF CALCULATING PRS SENTENCES

5.    On August 6, 1998, the New York State Legislature enacted "Jenna's Law," which ended indeterminate sentences for criminal defendants convicted of violent felonies.  See L. 1998, ch. 1. Jenna's Law also created a schedule of mandatory periods of PRS to be included as a part of the determinate terms of violent felony offenders.  See Penal Law §70.45.  The Legislature subsequently extended determinate sentencing and PRS to all drug offenders with the Drug Law Reform Act of 2004 (L. 2004, ch. 738), and to those sex

offenders who had been subject to indeterminate sentencing, with the Sex Offender Management and Treatment Act of 2007 (L. 2007, ch. 7).

6.    Jenna's Law was named for Jenna Grieshaber, a twenty-two-year-old nursing student who was murdered by a violent felon released from prison after serving two-thirds of his sentence.

7.    Until recently, all New York State prison sentences were "indeterminate" - they ran between a certain minimum and maximum amount of time set by the court at the time of sentencing.  Beginning with the Sentencing Reform Act of 1995 (L. 1995, ch. 3), and thereafter as part of other major legislative enactments, the Legislature has established determinate terms for repeat offenders convicted of violent felonies, first-time violent felony offenders, drug offenders, and sex offenders.  Determinate terms have no minimum periods.  Rather, the inmate is ineligible for release by the parole board and must serve at least six-sevenths of the determinate term before he or she is eligible for release; an inmate serving a determinate term for a drug felony is eligible to earn a merit time reduction and may be released upon serving five-sevenths of said term.[1]

8.    Penal Law §70.45 requires PRS for every determinate term imposed for an offense committed on or after September 1, 1998.  For the past ten years, if the commitment for a determinate term was silent regarding PRS, DOCS assessed such period mandated by §70.45 upon the inmate's transfer to this Department's custody.

---

[1] If the inmate loses sufficient "good time" while incarcerated, he or she may serve the entire determinate term.  However, if there is a portion (2/7th or less) of the determinate term that is undischarged at the time of release, and the inmate is not subject to PRS, then the inmate is subject to supervision by Parole for that undischarged portion of the term.  Such parole supervision is legally distinct from PRS but it similar in the nature of the supervision imposed.

9.      DOCS undertook this course of conduct in the good-faith belief that its actions were fulfilling Penal Law mandates for determinate terms to include periods of PRS.

10.     It appears that such practice was understood and accepted by the courts, district attorneys and the defense bar for over eight years until it was challenged in the last few years, with the first successful challenge occurring in 2006.

11.     Accordingly, when an inmate sentenced to a determinate term for a violent felony (Penal Law §§70.02, 70.04, 70.06(6)), a drug felony (§§70.70, 70.71), or a sex offense (§70.80), was received by DOCS, DOCS would apply the mandates of §70.45 to the information on the inmate's sentence and commitment order.

12.     The documents required to accompany an inmate's transfer to DOCS are listed in Correction Law §601(a); a transcript of the sentencing proceeding is not included therein. Although Criminal Procedure Law §380.70 requires DOCS to be furnished with the sentencing minutes within 30 days of the sentencing date, compliance with this statute has been irregular. As a practical matter, sentencing minutes are not ever received by DOCS for a substantial number of its inmates. Moreover, even when sentencing minutes are received by DOCS, they tend to arrive long after the reception process. DOCS does not, therefore, have for many inmates (at the time of reception or thereafter) a record sufficient to determine whether PRS was actually pronounced if the sentence and commitment order is silent regarding PRS. Indeed, in some cases in which DOCS does have the sentencing minutes, PRS has been correctly pronounced by the sentencing courts even though the commitment sheet is silent. As of May 30, 2008, DOCS identified a total of 45 technical

4

PRS violators in its custody with silent commitments for whom sentencing minutes were available that did confirm the imposition of PRS by the court.

13.     Courts around the state regularly sentenced violent felons and committed them to the custody of DOCS with the apparent understanding that PRS arose automatically by operation of law.  Courts and defense attorneys did not raise any serious challenge to this practice until some time in 2005.

14.     DOCS calculated the release dates of inmates' sentences and assessed the periods of PRS to be served under the jurisdiction of Parole upon their release from DOCS.

15.     Inmates serving determinate terms for violent felonies who were credited with the full amount of good time authorized by Correction Law § 803 were granted conditional release after serving six-sevenths of their terms.  Those inmates who failed to earn any good time were released to PRS upon completion of the entire determinate term.

16.     Upon release from DOCS, such persons were under the jurisdiction of and supervised by Parole while serving their periods of PRS.  See Executive Law § 259-a(4).

17.     During the course of their PRS or Parole supervision, certain individuals were found to have violated the terms of their supervision.  Upon such violations, Parole issued warrants for the detention of the offending supervisees and conducted release revocation hearings pursuant to Executive Law §259-i(3).

18.     Upon the completion of the violation hearing process, where any charges were sustained, supervisees were either restored to PRS, placed in a parole transition facility for up to 180 days or returned to DOCS for a duration of time determined by Parole. See Executive Law §259-i(3)(f)(x).

5

19.    Defendants as a class belong to subclasses of incarcerated inmates and releasees, some of whom have completed their underlying determinate terms, and some of whom have not completed said terms.


## THE HISTORY OF DETERMINATE SENTENCING AND PAROLE

20.    New York's sentencing provisions are complex and address a range of issues, including the effects that incarceration and parole have on offenders, the collateral consequences of criminal convictions, the alternatives to incarceration, the re-entry of incarcerated inmates into society upon release and the impact of sentencing on crime victims. New York's sentencing provisions reflect policies grounded in criminal justice data, and were formulated in consultation with judges, prosecutors, defense attorneys, crime victims and the general public at large.

21.    New York State, like other states, has since the 1950s moved away from policies and legislation promoting sentencing discretion as then advocated by the American Law Institute's Model Penal Code, to policies and legislation limiting sentencing discretion through administrative guidelines and  determinate terms imposed both for purposes of incarceration and supervision thereafter.

22.    With the passage of the Rockefeller Drug Laws in 1973, judges were limited in their discretion to impose lesser terms of imprisonment upon defendants convicted of certain drug offenses. See L. 1973, ch. 276. In 1973, the Legislature also passed second felony offender laws imposing mandatory sentences. See L. 1973, ch. 277, § 9. In 1978,

additional mandatory sentencing laws were passed for juvenile offenders and violent felony offenders. <u>See</u> L. 1978, ch. 481.

23.     At the same time that judicial discretion was being limited by New York's Legislature, the Parole Reform Act of 1977 was enacted in an effort to limit administrative discretion by the Division. Said Act required written guidelines to govern determinations of release on parole.

24.     Another effort to curtail judicial determinations regarding the length of time inmates would be incarcerated resulted in the establishment of the DOCS Shock Incarceration Program, which allowed certain inmates to be released before the completion of their judicially imposed minimum periods of imprisonment. <u>See</u> L. 1987, ch. 261.

25.     In the 1990s, the New York Legislature enacted several pieces of legislation requiring determinate terms for violent felony offenses. The Sentencing Reform Act of 1995 required determinate terms for predicate felons convicted of violent felony offenses, but still left prosecutors and judges wide discretion in plea bargaining. Determinate sentencing was extended to first-time violent felony offenders in 1998 by Jenna's Law.

26.     Jenna's Law also introduced the requirement for determinate terms to include periods of PRS.

27.     Determinate terms, and thus PRS, were extended to drug offenders in 2004 and in 2007, to defendants convicted of non-violent felony sex offenses.

28.     In New York State, 274,000 offenders are presently subject to some kind of state, county or community supervision. DOCS incarcerates approximately 62,500 inmates and Parole supervises over 42,000 releasees from DOCS. In addition, 30,000 offenders

are in local jails, another 125,000 are subject to probation, and 14,000 are in some other sort of community supervision.

29.    The Department's records indicate that approximately 26,000 inmates are released from DOCS into the community each year. Of these, 10,000, i.e., 39%, return to prison within three years of their release.

30.    Nevertheless, research on recidivists shows that the failure to comply with the rules governing parole is highest in the first year following release, and the failure rate decreases with time spent on supervision. The data also shows that within the first year of release, the risk of re-arrest is highest in the first six months following release, and then declines by the twelfth month and continues to decline through the third year following release.

31.    The criminal justice statistics available to the Department indicate that post-release supervision has been an effective tool in facilitating the adjustment of incarcerated inmates back into the community. Studies show that where supervision is not maintained, the released inmate presents a danger to the community and has less of a likelihood of succeeding by gaining employment and avoiding criminal activity.

32.    It was with these laudable goals that the post-release supervision legislation was adopted in New York, and it has always been the policy of DOCS to carry out the intention of the Legislature.

33.    DOCS calculated PRS into the sentences of defendants convicted of the applicable offenses, and the courts upheld such practice for years. However, when DOCS became aware of the challenges to this practice, it expended considerable efforts to be

prepared, for the possibility that such challenges would ultimately be sustained, as recently happened when, the Court of Appeals issued its' decisions in the <u>Garner</u> and <u>Sparber</u> cases.

## POST-RELEASE SUPERVISION AND THE COURT OF APPEALS

34.    I have reviewed the recent New York State Court of Appeals' decision in <u>Matter of Garner v. New York State Dept. Of Correctional Services</u>, 10 NY3d 358 (2008), which held that the Department was prohibited from administratively assessing PRS for determinate terms; even though PRS is mandated by statute, it may only be pronounced by the sentencing judge.  The Court of Appeals in issuing its decision, however, noted that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." <u>Id.</u> at 363, n. 4.

35.    I have also reviewed the decision the Court of Appeals issued the same day as <u>Garner</u> in a group of cases combined under the lead of <u>People v. Sparber</u>, 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053  (April 29, 2008), which addressed issues involved in trying to remedy sentences for which periods of PRS were not actually pronounced by the sentencing judges, but there were some other indicia on the record that PRS was at least contemplated by the court.  The Court of Appeals held that although "the procedure through which PRS was imposed upon these defendants was flawed as it did not comply with the statutory mandate[,] . . .[and] [t]o remedy this error, rather than striking PRS from the sentences... as urged by defendants, these matters must be remitted to Supreme Court for resentencing and the proper judicial pronouncement of the relevant PRS terms." <u>Id.</u> at **2.

36.     After the decisions by the Court of Appeals were issued, DOCS prepared to implement a plan immediately to identify all inmates in its custody whose determinate terms were required to include PRS, and then to identify those whose commitments do not satisfy the Garner and Sparber requirements.  While this initiative is a major undertaking, months of preparation by DOCS dating back to early 2007, placed the Department in a position to launch the "Post-Release Supervision Resentencing Initiative" expeditiously (see "Post-Release Supervision Resentencing Initiative," attached as Exhibit A).  Within days of the Court of Appeals' decisions, the Department secured the cooperation of the New York State Office of Court Administration ("OCA") and in consultation with other state agencies, was able to begin to address the PRS problem by giving notice to the courts and the district attorneys that resentencings of thousands of inmates may be required (see Memorandum to New York State Administrative Judges from Lawrence K. Marks, regarding Post-Release Supervision, dated May 14, 2008, attached as Exhibit B).   The Post-release Resentencing Initiative includes reviewing the Department's records for thousands of inmates, as well as concerted efforts to enlist the cooperation and guidance of other state agencies, including Parole, the Office of the Governor of the State of New York, OCA, and the Division of Criminal Justice Services ("DCJS") in order to identify the scope of the PRS issues and to implement a path toward resolution of the issues as expeditiously as practicable.

37.     The Department has reviewed information that accompanied inmates so as to identify those with potential PRS problems who may be affected by Garner and the Sparber cases.  I have concluded that said decisions may affect as many as 30,000

10

inmates and parolees and could have a significant adverse impact on public safety if the Department, Parole, sentencing courts, district attorneys and other state, county and municipal entities are not afforded an appropriate opportunity to respond deliberately and carefully in resolving sentencing errors. The recent decisions of the Court of Appeals could have the effect of substantially advancing the release dates from DOCS or supervision by Parole of thousands of inmates and releasees, even though the Legislature mandated longer periods of supervision and imprisonment pursuant to statutorily-required PRS. The Court of Appeals' decisions affect the release dates of hundreds of currently-incarcerated felons and thousands more who have since been released to supervision of Parole. In light of the nature of the crimes committed by these individuals, and in the interest of public safety it is necessary that this Court direct that the status quo be maintained until DOCS and Parole have had the opportunity to review the individual circumstances of every sentence, and the sentencing courts and the district attorneys have had the opportunity to evaluate resentencing in the proper forum. Because the overwhelming majority of affected inmates and releasees are violent felony offenders, and many of them repeat violent felony offenders, the impact on public safety could be irreparably severe.

38.    Accordingly, after having consulted with other state agencies, and in response to the Court of Appeals' decisions, the Department launched the Post-release Resentencing Initiative on April 30, 2008 in order to identify all inmates or releasees whose sentences contain PRS errors in light of the Court of Appeals' decisions, and in order to remedy those errors through resentencing or for whatever other determination is made by

the sentencing courts. All of the affected inmates or releasees belong to a class of defendants whose sentences may contain PRS errors and may require resentencing.

39.    DOCS and Parole have been able to identify the defendant class and its subclasses after months of diligent work. In early 2007, the Department organized a work group and outlined a plan to undertake a comprehensive manual review of thousands of inmate files. Initially, the DOCS mainframe computer created a master list of cases where determinate terms had been imposed during the period from September 1, 1998, the day that Penal Law § 70.45 took effect, to March 8, 2007. The purpose of the manual review was to ascertain in each case whether the sentence and commitment order itself, as required by Criminal Procedure Law § 380.60 and Correction Law § 601(a), affirmatively noted that the required PRS period was a part of the sentence.

40.    The manual review required an examination of approximately 40,000 sentence and commitment orders, each of which contained one or more determinate terms of imprisonment. The analysis of these historic records began on March 12, 2007, and concluded on April 20, 2007. A total of 39,883 computer notations were entered into the Department's mainframe computer on a newly-created data field called "PRS." As a result of this project, the PRS data field is now routinely filled in at all of the DOCS reception centers for each new sentence and commitment order that contains a determinate term of imprisonment, and for which the law requires a period of PRS. For each applicable sentence and commitment order, the following entries are made:

Y = PRS is silent, meaning the commitment was silent regarding PRS;

N = PRS is NOT silent, meaning the commitment indicated PRS;

12

H = historic, meaning the inmate had already been released from custody and the file was not available. If the inmate is returned to DOCS thereafter, the field would be updated at that time; and

M = the sentencing minutes indicated that PRS was pronounced at sentence even though the commitment was silent.

41.    As of January 2008, DOCS staff had made approximately 49,300 entries into the PRS data field. This number includes new commitments that were received between the manual cutoff review date and January 4, 2008.

42.    An analysis of this data reveals that there are approximately 41,000 entries where the sentence and commitment orders were NOT SILENT regarding PRS.

43.    Hence, the concern arises with the approximately 8,100 entries where the sentence and commitment order WAS SILENT regarding PRS, which means that DOCS staff assessed the PRS component of the sentence when the inmate was received at a DOCS reception center. Of this number, approximately 6,300 inmates remained in DOCS custody at the time the analysis was run, while 1,800 have been released.

44.    In the wake of the Garner and the Sparber decisions, the Department has worked diligently to identify all inmates who may belong to the defendant class, and is attempting to document the identities of inmates and releasees belonging to several subclasses of the defendant class, including inmates currently incarcerated solely on the basis of PRS violations, inmates who are currently incarcerated pursuant to their underlying determinate terms but will in the future be subject to PRS, and released inmates who are now on PRS and being supervised by Parole. As noted above, as many as 30,000 inmates and releasees may be affected in some way by the decisions, even though each

class member has issues based on unique circumstances that would require individual resolution before a resentencing court.

45.    As a result of the PRS Initiative, the Department has been prioritizing groups of inmates belonging to the pool affected by the <u>Garner</u> and <u>Sparber</u> decisions according to their status.  In order to proceed in an equitable fashion, DOCS determined that the first priority for PRS resentencing must be accorded to those individuals who have been returned to DOCS as PRS violators and their sentence and commitment orders are silent regarding PRS.

46.    A determination on the merits in each case, including the potential outcome of an immediate release, cannot be made, however, unless and until (1) the sentencing minutes are also reviewed, and (2) it is determined whether at the time of the violation, the inmate was subject to an undischarged period of the determinate sentence.  For example, in those cases in which the sentence and commitment orders are silent regarding PRS but the sentencing minutes do reflect that PRS was imposed by the sentencing courts, it would appear that no resentencing procedure is warranted or necessary.  Instead, the defect can be cured by the court issuing a new commitment that correctly reflects the period of PRS that was imposed.

47.    Of the entire pool of inmates with potential PRS sentencing errors, DOCS has determined that approximately 546 inmates are currently being incarcerated by DOCS solely on the basis of PRS violations.  DOCS does not have available all of the necessary documentation for each of these individuals to determine whether release is now appropriate.  In these cases, it is likely that only the sentencing court can make a

determination as to whether PRS was properly pronounced.  Moreover, even if PRS was not properly pronounced, it will be necessary to determine whether the inmate was also subject to an undischarged portion of the determinate sentence at the time of the violation.

48.    At the outset, within days of the Court of Appeals' decisions, and with concern that this first priority subclass of inmates required immediate focus, an outreach effort was made to all district attorneys' offices throughout New York State and a contact was identified for each office to facilitate resentencing where appropriate.

49.    DOCS organized the 546 inmates with silent sentence and commitment orders into separate lists of individual inmates categorized by county of commitment (the "County Lists").  On May 6, 2008, DOCS e-mailed each County List of inmates to the district attorneys of each concerned county, together with the identification data that was pertinent in each case, including an indictment or SCI number and a New York State Identification number (NYSID).

50.    Furthermore, working with the OCA, a procedure was developed whereby the administrative judge of each judicial district would be the contact person to receive formal notifications of the cases that DOCS identified as potentially being appropriate for resentencing. As previously discussed, attached hereto as Exhibit B is the May 14, 2008 OCA e-mail instruction that was sent, with attachments, to each administrative judge by Lawrence Marks.

51.    As the e-mail explains, in each case DOCS is preparing a standardized letter to each sentencing judge of an inmate who appears to have a PRS sentencing error.  One type of standard letter is addressed to the sentencing judges when the sentencing minutes

15

are in the file, and a second standardized letter is used when the sentencing minutes are not in the file.

52.    Of the 546 inmate files reviewed for sentence and commitment orders that are silent regarding PRS, a total of 167 had sentencing minutes in the file with no PRS, while in the remaining 379 inmate files reviewed for silent commitments, the sentencing minutes were not in the file.

53.    In the letters to the sentencing judges, a copy of the sentence and commitment order is included as well as a copy of the sentencing minutes, when available.

54.    A copy of every letter sent to a sentencing judge is sent to the district attorney of the county of commitment and to the inmate with the apparent PRS error.

55.    In addition, as the OCA instruction to the administrative judges also indicated, each letter from DOCS included a proposed order whereby the sentencing court could set the matter down for a hearing and require the production of the inmate for a resentencing nunc pro tunc, or instead direct that DOCS recalculate the inmate's sentence without a period of PRS.  The OCA e-mail further delineated that the sentencing court could take whatever other action was deemed appropriate.

56.    The entire thrust of the resentencing initiative is to place each matter in which there appears to be an error in sentencing before the sentencing court and have the court, not an executive agency like DOCS, make a determination as to whether mandatory PRS should apply.  This is critical for several reasons. First, as the Court of Appeals aptly noted, sentencing is within the sole province of the sentencing court.  Second, in order to make a determination as to what the appropriate course of action should be, whether an actual

16

resentencing or some other disposition, a court might also need to examine other critical records in addition to the sentencing minutes. These other records would include such documents as the plea minutes, and as noted in the <u>Sparber</u> decision, the court worksheet or the file jacket, none of which can be accessed in the normal course by the Department.

57.     For the approximately 167 inmates identified as those whose sentencing minutes do not contain a reference to PRS, and for the remaining 379 whose sentence and commitment are silent (for the total of 546) but for whom the sentencing minutes are not in the file, DOCS has been mailing letters to sentencing courts, district attorneys and inmates seeking the intervention of the sentencing courts.

58.     As of the close of business on May 27, 2008, DOCS mailed out a total of 433 letters to sentencing courts.  Of these apparently erroneous commitments, 138 were in New York County, 110 in Kings County, 55 in Erie County, 55 in Queens County, 21 in Suffolk County, 28 in Bronx County, 12 in Monroe County, 4 in Westchester County, 8 in Rockland County and 2 in Albany County..

59.     The Department believes that <u>Garner</u> and the <u>Sparber</u> cases do not signal a call for immediate and precipitous release of inmates in custody; rather, the Court of Appeals remanded for resentencing in the <u>Sparber</u> cases, and noted in <u>Garner</u> that resentencing may be available.  Rather than immediately release inmates and supervisees from custody, plaintiffs believe referral of these cases to the sentencing courts within a reasonable time is appropriate to permit the courts, with input from the district attorneys and defendants, the opportunity to correct errors in sentences or otherwise pronounce what such defendants' sentences must encompass under applicable law.

17

60.    The Department has worked historically with the courts and county and municipal authorities to correct errors in sentencing. The PRS Initiative has required the Department and Parole to undertake the burdensome and time-consuming process of notifying the relevant district attorney of any inmate or releasee whose criminal sentence may not have had PRS properly pronounced at sentencing, in violation of the law.

61.    Time is required to coordinate this resentencing effort with district attorneys across the state as well as with the resentencing courts and the attorneys for the criminal defendants requiring resentencing.

62.    This affirmation is made specifically in support of plaintiffs' application for an emergency order authorizing the Department to retain in its custody each member of the defendant subclasses described until such time as a subclass member has been calendared for resentencing, or the courts have otherwise taken appropriate steps toward resolving the issues presented; and authorizing the Department to release from its custody any member of the defendant subclass who is incarcerated solely on the basis of a PRS violation and for whom it appears that no resentencing will timely resolve such issues.

63.    Immediate release of such inmates would subject the citizens of New York to imminent and irreparable harm. The threat is real and not imagined. Indeed, a habeas corpus petitioner challenging custody pursuant to a PRS violation, after prevailing in Bronx County Supreme Court in April 2008, was released rather than reincarcerated, only to have been charged in the May 15, 2008 murder of a 63-year-old grandmother at her dry cleaning business in Brooklyn.

18

64.     The Department submits that it should defer to the sentencing courts before releasing hundreds of inmates immediately and thousands more in the next year, and many more thousands in the years to come.  As <u>Garner</u> instructs, the Department may not presume to determine what an inmate's sentence should be.  The Department respects the fundamental premise that sentencing is the sole premise of the judiciary and recognizes that it must calculate terms of imprisonment as ordered by the sentencing court.  It is the practice of the Department to notify the sentencing court of any apparent errors in sentencing, so that the court may have the opportunity to take any appropriate action.

65.     Given the circumstances, the Department requests that this Court grant an order maintaining the status quo until the parties have had an opportunity to obtain necessary documents and assess the circumstances of individual cases, and the sentencing courts have had an opportunity to calendar the cases for possible resentencing.

66.     Time is of the essence, and there would be foreseeable irreparable harm to the people of the State of New York if DOCS must immediately release hundreds, and then thousands of violent felons.  Equally compelling is the need for swift resolution of the matters so that individuals who are entitled to be released are released as soon as practicable.  Any such individuals obviously should not be exposed to unnecessary incarceration; conversely, the citizens of the State of New York should not be exposed to the public safety risks that are consequences of PRS errors made or uncorrected by the sentencing courts, the district attorneys, the defense bar as well as DOCS, Parole and other state agencies.

## CLASS ACTION RELIEF IS REQUIRED

19

67.     In <u>Garner</u>, the Court of Appeals ruled that DOCS can be prohibited from administratively assessing a period of PRS on a determinate term of imprisonment, even though PRS is mandated by statute.  Nevertheless, the Court noted that its holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate re-sentencing of a defendant in the proper forum." <u>Id.</u>, 10 NY3d at 363, n. 4. Indeed, the Court of Appeals' decision in the <u>Sparber</u> group of cases signals that the remedy for the error of unpronounced terms of PRS is not to strike PRS from the sentences, but rather to remit to the sentencing courts "for resentencing and the proper judicial pronouncement of the relevant PRS terms." <u>Id.</u>, 2008 NY Slip Op 3946, 2008 N.Y. LEXIS 1053, at **2.

68.     Because of the Court of Appeals' decisions in <u>Garner</u> and <u>Sparber</u>, plaintiffs are faced with a vast number of individuals who are currently subject to periods of PRS that were not lawfully imposed and may appropriately be subject to correction through the resentencing process.

69.     The class includes thousands of inmates and supervisees who are subject to periods of PRS that, under <u>Garner</u> and <u>Sparber</u>, were not lawfully imposed.  The specific circumstances of each case may differ, and, as the <u>Sparber</u> and <u>Garner</u> cases demonstrate, there are a variety of flaws that can lead to a period of PRS being declared unlawful.  However, the only method that has consistently been identified as correcting a period of unlawful PRS is a resentencing proceeding before the original sentencing court. See, <u>e.g.</u>, <u>Garner</u>; <u>Sparber</u>; and <u>Earley v. Murray</u>, 451 F.3d 71, at 76 (2nd Cir. 2006), rearg. denied 462 F.3d 147, ("when DOCS discovered the oversight made by Earley's sentencing

judge, the proper course would have been to inform the state of the problem . . . [t]he state then could have moved to correct the sentence through a judicial proceeding, in the defendant's presence, before a court of competent jurisdiction").

70.    Therefore, if DOCS is to avoid (a) releasing thousands of violent felons to the street without any further supervision and (b) allowing thousands of illegal sentences to stand uncorrected, it must endeavor to return each member of the class to his or her sentencing court.  The sentencing courts are the forums that are best suited to making the individualized determinations that must be made if the legal deficiencies in the sentences of all the class members are to be corrected.

71.    The first step in implementing the necessary resentencings is for plaintiffs to identify every individual who may be subject to an improperly imposed term of PRS (the members of the class).

72.    DOCS and Parole have already commenced this massive task, which is complicated by the fact that the sentence and commitment order and the sentencing minutes of each class member must be inspected, and each case must also be examined to determine any undischarged portion of the determinate sentence.

73.    Plaintiffs  must enlist the sentencing court of each class member, as well as the relevant district attorney's office, and believe that the interests of justice are best served when defendants have been given the opportunity to retain counsel.

74.    As set forth above, plaintiffs are currently seeking that cooperation by sending individual letters and proposed orders to the sentencing courts and district attorneys for each class member.  To the date of this Complaint, more than 433 letters

21

have been sent to sentencing courts across the state impacted by the decisions in <u>Garner</u> and <u>Sparber</u>.

75.     Therefore, it is essential that a temporary restraining order brought on by an order to show cause be granted, and that the status quo be maintained for the specified timeframe from the entry of this Order or pending the hearing on the preliminary injunction.

76.     No prior application for similar relief has been made to this Court.

WHEREFORE, it is respectfully requested that the relief requested be granted.


Dated: Albany, New York
      June 4th, 2008


                                    _____
                                    Anthony J. Annucci

22

# Exhibit A

## POST-RELEASE SUPERVISION
## RESENTENCING INITIATIVE

### PURPOSE

The purpose of this document is to detail the cooperative effort that is being undertaken jointly by the Department of Correctional Services (DOCS) and the Office of Court Administration (OCA), in conjunction with the Governor's Office of Counsel, to arrange for the resentencing of numerous individuals presently incarcerated with DOCS. Specifically, this applies to individuals with determinate sentences of imprisonment that require the imposition of post-release supervision (PRS) pursuant to Penal Law Section 70.45, and for whom the sentencing court did not pronounce such period of PRS at the time of sentence.

### HISTORICAL BACKGROUND

Penal Law Section 70.45 was enacted as a part of Chapter 1 of the Laws of 1998 and in pertinent part provides that "[e]ach determinate sentence also includes as a part thereof, an additional period of post-release supervision." It applies to all violent felony offenders who committed their crimes on or after September 1, 1998, and who were subject to a determinate sentence of imprisonment. It has since been expanded to also cover drug offenders and those sex offenders who were previously subject to indeterminate sentencing.

When an individual is committed to state prison and delivered to a DOCS reception center, in accordance with Correction Law Section 601(a), the documents that accompany the individual include "a certified copy of the sentence and a certificate of conviction pursuant to Section 380.70 of the Criminal Procedure Law", a copy of the pre5sentence report, and a copy of the criminal history record.

The sentencing minutes are not delivered with the inmate to a reception center. Instead, in accordance with Section 380.70 of the Criminal Procedure Law (CPL), the sentencing minutes are required to be transcribed and then mailed to DOCS within thirty days of the date of sentence. Though this provision of law is mandatory, DOCS does not always receive a copy of the sentencing minutes. Moreover, at the time of reception, DOCS must perform all reception related responsibilities, which include the calculation of an inmate's sentence whereby all of the potential release dates are determined, e.g., the parole eligibility date where applicable, the conditional release date, and the maximum expiration date, etc.

Each month DOCS receives approximately 1,400 new commitments into its custody, each of whom will require a sentence calculation. This is a separate and distinct category from the hundreds of parole violators, conditional release violators, and post-release supervision violators who are also routinely returned to the custody of DOCS.

Once all of the various reception responsibilities are completed, which generally requires a period of about one week, the inmate is transferred to a general confinement

facility to continue serving the underlying sentence of imprisonment. It is crucial for DOCS not to cause any delays in the reception process since all such beds are needed to enable DOCS to accept all state-ready inmates in a timely manner from the localities. (see CPL section 430.20(1)). Hence, the sentence calculation responsibility must be performed at the time of the reception.

In a recent Court of Appeals case captioned <u>Matter of Garner v. DOCS,</u>__NY3d__, (April 29, 2008), the Court ruled that DOCS was without authority to administratively add PRS to the sentence and that only the sentencing judge is authorized to pronounce the PRS component of a defendant's sentence. The Court also noted that their holding was "without prejudice to any ability that either the People or DOCS may have to seek the appropriate resentencing of a defendant in the proper forum."

Prior to the <u>Garner</u> decision, and based upon DOCS' earlier understanding of the requirements of Penal Law Section 70.45, DOCS would calculate the mandatory period of PRS as part of the inmate's sentence at reception, even if the commitment document was silent on the issue of PRS.

## PLANNED COURSE OF ACTION

Now that the <u>Garner</u> decision has finally resolved the issue, DOCS, in accordance with the general principles set forth in Correction Law Section 601-a, is working in tandem with OCA to identify every potential case that would appear to qualify for resentencing, and to provide official notification to the sentencing courts and the district attorneys. It would appear that such resentencing should be pronounced nunc pro tunc to the date the original sentence was imposed.

In order to proceed in an orderly fashion, it has been determined that the first priority must be accorded to those individuals who are in the custody of DOCS based upon a technical violation of PRS, and for whom the commitment document was silent. Several months ago DOCS undertook a huge research project to identify every case that involved both a silent commitment and a period of PRS. In order to do this, DOCS had to manually examine each commitment document for every inmate who was subject to a determinate sentence of imprisonment that required PRS, in order to determine whether it was silent as to PRS.

In the wake of the <u>Garner</u> decision, however, another step is required in order to determine whether or not the court actually failed to pronounce a period of PRS at the time of sentencing. The experience of DOCS has been that in a number of cases where the commitment was silent, a separate review of the sentencing minutes did indicate that the period of PRS was pronounced by the court at sentencing. In all such cases it would appear that a clerical error had been made in the preparation of the commitment document and that the issuance of a new commitment document that would conform to what transpired during sentencing, would correct the defect without the necessity of an actual resentencing procedure. Hence, a review of the sentencing minutes is a prerequisite in every case in order to accurately determine whether resentencing is warranted.

Since DOCS is not always provided with a copy of the sentencing minutes, it is not possible to definitively identify every case where resentencing is warranted. Instead, in those cases where the sentencing minutes are available and the commitment is silent, DOCS can identify definitively each case that would be subject to resentencing. As of May 7, 2008, DOCS identified a total of 166 cases in this category.

In those cases where the commitment is silent but there are no sentencing minutes, DOCS can only bring these cases to the attention of the sentencing courts and the district attorneys as cases that potentially may warrant resentencing. The sentencing courts and district attorneys in turn will have to retrieve and review the sentencing minutes in order to make definitive determinations. As of May 7, 2008, a total of 380 cases have been identified within this category.

In an overall effort to move expeditiously, DOCS has generated lists of both categories of cases by county of commitment, and is providing such lists by e-mail to the concerned district attorney offices, so that the appropriate investigations can be immediately initiated. Formal notifications will separately be mailed both to the sentencing courts and the district attorney offices, which will also include copies of the commitment documents, and where available, the sentencing minutes as well.

# Exhibit B

NEW YORK STATE
Unified Court System

OFFICE OF COURT ADMINISTRATION

ANN PFAU
CHIEF ADMINISTRATIVE JUDGE

LAWRENCE K. MARKS, ESQ.
ADMINISTRATIVE DIRECTOR

## MEMORANDUM

May 14, 2008

TO:        Administrative Judges

FROM:    Lawrence K. Marks ⟨jM⟩

SUBJECT:    Post-Release Supervision

As you may know, the Court of Appeals in two recent decisions (People v. Sparber and People v. Garner, both decided on April 29, 2008) addressed the issue of a trial court's failure to pronounce at sentencing the period of post-release supervision (PRS) that the Penal Law requires be imposed for sentences in certain cases (see Penal Law § 70.45).

These decisions may well require, ultimately, that thousands of currently incarcerated defendants be resentenced . The immediate focus of concern, however, is a group of several hundred defendants who have served their prison terms but have been returned to State prison for committing a technical violation of a condition of their PRS. In the next few days, the State Department of Correctional Services (DOCS) will be sending directly to each of you letters and a proposed order that DOCS has individually addressed to the judges in your court or district who sentenced these defendants (drafts of these materials are attached). These are cases in which DOCS has a copy of the sentencing minutes and the minutes reveal that the PRS period was never pronounced at sentencing or cases in which DOCS does not have a copy of the sentencing minutes and thus is unable to determine if the PRS period was pronounced at sentencing. The numbers of these cases range from as many as 142 in New York County and 107 in Kings County to just a few or even none in the smaller counties.

As you can see in the attached drafts, among other things DOCS will be asking the sentencing judge (1) if DOCS has a copy of the sentencing minutes, to calendar the case and impose the PRS period nunc pro tunc, or, if the judge is not prepared to do that, to order DOCS to calculate the term of imprisonment without PSR and (assuming there are no holds) release the inmate without any further supervision; or (2) if DOCS does not have a copy of the sentencing minutes, to acquire the sentencing minutes, and if the minutes reveal that the PRS period was not pronounced at the sentencing then calendar the case and impose the PRS

Sentence

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:   CRIMINAL TERM PART 61

- - - - - - - - - - - - - - - - - - - - -X

THE PEOPLE OF THE STATE OF NEW YORK           : Indictment
                                                No. 7543/99
              - against -                     :

RAMONE CROSS,                                 :
                                                SENTENCE
                    Defendant.     :

- - - - - - - - - - - - - - - - - - - - -X

                    May 24th, 2002
                    100 Centre Street
                    New York, New York

B E F O R E :

                    HONORABLE HON. BONNIE WITTNER,
                                        Justice.

A P P E A R A N C E S :

                    FOR THE PEOPLE:

                    HON. ROBERT MORGENTHAU
                    District Attorney
                    New York County
                    One Hogan Place
                    New York, New York
              BY:   KERRY O'CONNELL, ESQ., A.D.A.

                    FOR THE DEFENDANT:

                    MICHAEL WASHOR, ESQ.


                              JOSEPH V. CONNOLLY
                              Official Court Reporter

```
 1              (Whereupon, the Court, Mr. Gross, Mr.

 2      Washor and the defendant being present in the

 3      courtroom, the following proceedings commenced:)

 4              COURT CLERK:  Calendar number 25; In-

 5      dictment Number 7543 of 1999; People versus

 6      Ramone Cross.

 7              Appearances?

 8              MR. GROSS:  Jonathan Gross, Assistant

 9      District Attorney, for the People.

10              MR. WASHOR:  Michael Washor, W-A-S-H-O-

11      R, for the defendant.

12              THE COURT:  Does Ms. O'Connell want to

13      be here for this?

14              MR. GROSS:  No, your Honor.

15              She just asked for me to state for the

16      record that the defendant is to get four years.

17              I've handed the predicate statement to

18      the Court.

19              COURT CLERK:  He has to be arraigned on

20      the statement, Judge.

21              THE COURT:  All right.

22              (Off-the-record discussion between Mr.

23      Washor and the defendant.)

24              COURT CLERK:  Ramone Cross, the Dis-

25      trict Attorney of the County of New York has
```

Sentence                                                     3

1    filed a statement of predicate violent felony

2    conviction.

3              It states on May 25th, 1990, in the

4    Supreme Court, Queens County, in the State of New

5    York, the defendant was convicted of the violent

6    felony of criminal possession of a weapon, in the

7    third degree.

8              It further states that on May 25th,

9    1990, in the Supreme Court of Queens County, in

10   the State of New York, the defendant was convict-

11   ed of the felony of criminal possession of a con-

12   trolled substance, in the third degree.

13             It further states that the defendant

14   was incarcerated from May 25th, 1990, to December

15   14th, 1993, at Elmira Correctional Facility.

16             You have a right to challenge these

17   prior felony convictions on the grounds that they

18   were obtained in violation of your constitutional

19   rights.

20             If you don't make a challenge at this

21   time, it will be deemed to be a waiver by you of

22   any allegation of unconstitutionality.

23             You may admit or deny that you are the

24   same person mentioned in the statement.

25             Before answering the following ques-

Sentence                                              4

1     tion, please speak to your attorney.

2                    (Off-the-record discussion between Mr.

3     Washor and the defendant.)

4                    MR. WASHOR:  Your Honor, there's no

5     challenge to the prior convictions.

6                    THE COURT:  The defendant is found to

7     be a predicate violent felon.

8                    I have read the I and S.

9                    This was a negotiated plea.

10                    Do the People want to be heard?

11                    MR. GROSS:  No.

12                    THE COURT:  Do you want to say anything

13     or do you want to say anything, Mr. Washor?

14                    MR. WASHOR:  Your Honor, I've read the

15     Probation Report.  I don't think there's anything

16     in the report that's particularly remarkable,

17     that would impair the Court from keeping the

18     representation made at the time of plea.

19                    To that extent, I would urge the Court

20     to impose a sentence that has been agreed upon.

21                    THE COURT:  All right.

22                    There is a waiver of appeal, as well, I

23     believe.

24                    Is that correct?

25                    MR. WASHOR:  Yes, that's correct.

1            THE COURT:  The sentence of the Court

2     is as promised, four years, plus one and a-half

3     years post-release supervision.

4            If he's a predicate felony, I don't

5     know if I can do that.  I think I have to do five

6     years post-release.

7            MR. WASHOR:  No, we checked it, Judge.

8            MS. O'CONNELL:  Kerry O'Connell,

9     Assistant District Attorney, for the People.

10            THE COURT:  I'm almost positive by law

11     I have to do that.

12            MR. WASHOR:  I do believe it's still

13     within the discretion of the Court and that was

14     part of the negotiated plea.

15            MS. O'CONNELL:  Re-write the statement.

16            THE COURT:  Do I have to give five

17     years for a predicate?

18            MR. WASHOR:  Can we approach, your

19     Honor?

20            THE COURT:  Yes.

21            (Whereupon, Ms. O'Connell and Mr.

22     Washor approached the bench, where there was an

23     off-the-record discussion with the Court.)

24            THE COURT:  The surcharge and the

25     Victim Service fee is imposed.

1              I'm just trying to look up the parole

2        supervision.

3                    (Pause.)

4              THE COURT:   The sentence of the Court

5        is as I said, four years, plus one and a-half

6        years post-release supervision.

7              Surcharge and Victim Service fee is

8        imposed.

9              There is no waiver of appeal on this.

10             COURT CLERK:   No waiver of appeal.

11             THE COURT:   He was arraigned.

12             He has been found a predicate violent

13       felony.

14             MR. WASHOR:   Judge, there is no record

15       of appeal on this, the record should reflect

16       that.

17             THE COURT:   No, there is no waiver.

18             Everyone has turned in the transcript

19       and we can return all transcripts to the Appeals

20       Bureau.

21             COURT CLERK:   Yes, Judge.

22             THE COURT:   This will conclude this

23       series of cases.

24             All those transcripts back there could

25       go to Appeals.

Sentence                                                     7

1                    MR. WASHOR:  Judge, one last thing, if

2          we can approach, with what do you call it?

3                    MS. O'CONNELL:  What do you call it?

4                    MR. WASHOR:  I meant the assistant.

5                    (Whereupon, Ms. O'Connell and Mr.

6          Washor approached the bench, where there was an

7          off-the-record discussion with the Court.)

8                    (Open court.)

9                    *                *                *

10   Certified to be a true

11   and accurate transcript.

12                                        _____

13                                        JOSEPH V. CONNOLLY

14

15

16

17

18

19

20

21

22

23

24

25